RICHARD M. CALLAHAN, JR.
225 South Lake Avenue, Suite 300
Pasadena, CA  91101
Telephone:  (626) 202-4060
Telecopier:  (626) 794-4676
State Bar No. 100446
Email: *rmcallahanjr@gmail.com*

Attorney for Defendant
GREGORY PUSATERI

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  CR 14-282-R-4 |
| Plaintiff, | **DEFENDANT PUSATERI'S (#4) NOTICE OF MOTION AND MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29(c) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE** |
| vs. | |
| DAVID PRITCHARD, *et al.,* | |
| Defendants. | |
| | Date:   January 26, 2015 |
| | Time:   1:30 p.m. |
| | Place:  Courtroom of the Honorable Manuel L. Real |

TO ACTING UNITED STATES ATTORNEY STEPHANIE YONEKURA AND ASSISTANT UNITED STATES ATTORNEYS ELLYN LINDSAY AND BYRON McCLAIN:

PLEASE TAKE NOTICE that on January 26, 2015 at 1:30 p.m., or on another date and time convenient to the Court, defendant Gregory Pusateri will move this Court for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.  This motion is based upon the attached points and authorities, the files and records of this case, and any argument that may be heard on this motion.

/

1    Dated:  December 5, 2014.

2

Respectfully submitted,
THE LAW OFFICES OF
RICHARD M. CALLAHAN, JR.

By: _____
RICHARD M. CALLAHAN, JR.
Attorney for Defendant
GREGORY PUSATERI

## POINTS AND AUTHORITIES

### I

### INTRODUCTION

On November 21, 2014, Defendant Greg Pusateri was convicted on 27 counts of mail fraud, wire fraud, and selling unregistered securities, arising out of selling investments in Gigapix Studios and OZ3D LLC. Defendant Pusateri moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure at the conclusion of the prosecution's case-in-chief, and again at the conclusion of the presentation of all evidence. Both motions were denied, and sentencing is set for February 9, 2015. Defendant Gregory Pusateri now renews his motion for judgment of acquittal due to the fact that there was insufficient evidence to convict him on the fraud charges, as well as for selling unregistered securities.

Rule 29(c) of the Federal Rules of Criminal Procedure states in pertinent part:

(c) After Jury Verdict or Discharge.

(1) *Time for a Motion.* A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

(2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

The test for reviewing sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 727 (9th Cir. 2011); United *States v. Hollis,* 490 F.3d 1149, 1154 (9th Cir. 2008).

/

# I

# ARGUMENT

**A.    THE GOVERNMENT FAILED TO PROVE AN INTENT TO DEFRAUD**

### 1.  It is Critical to Separate Management from Salespeople

In a company with over 700 investors, Greg Pusateri was involved with approximately 260 of them.  Four of them appeared for the government at trial.  It is of import to recognize that of all the litigation resulting from the demise of Gigapix, Greg Pusateri was never sued by one of his clients for fraud or misrepresentation.

As was argued by Mr. Pusateri at trial, the wrong people were on trial.  Greg Pusateri didn't build Gigapix; he didn't control Gigapix funds; he didn't know how investor funds were spent.  Greg wasn't the one who misappropriated millions of investor dollars by indulging on boats, fancy hotels and $1200 massages.  The true responsibility for the demise of Gigapix rests with Blauvelt and Pritchard.

### 2.  To His Investors, Greg Pusateri Was the Face of Gigapix

The defense argued that Greg was the face of the company to his investors; he was the person these investors dealt with for the most part, the person they got to know and trust.  Greg actually became good friends with a number of his investors.

But then, when the business fails through no fault of Greg's, these investors who lost money because of mismanagement and misuse of investor funds pointed the finger at the only real person they know—Greg—who was merely telling the investors precisely the information he was provided by management.

### 3.  Greg Pusateri Got His Information From PPM, Newsletters and Sales Meetings

The evidence at trial demonstrated that Greg believed what Pritchard and Blauvelt told the salespeople and placed in newsletters, and only repeated to investors what he was told.  Tiffany Ryan and Shawn Walker confirmed that Blauvelt and Pritchard instructed the sales staff about current developments at Gigapix, and the salespeople

-3-

1  were then to convey those representations to investors.  Clearly, Greg had a right to
2  believe what Pritchard and Blauvelt represented to them.  Both had an established track
3  record, particularly Pritchard, who was an Emmy winner and producer of the Simpsons,
4  the remarkably successful television series.  It is hard to imagine a better source of
5  information to express to investors than representations from the creative head of the
6  company.

### 4.  **Greg Pusateri Was Not Aware of Financial Problems at Gigapix**

7
8      The government argued that Gigapix was in dire financial straits as of September
9  of 2009, and that salespeople like Greg must have known.  Yet government witness
10 Tiffany Ryan testified Pritchard never let on to salespeople that the company was in dire
11 straits during sales meetings—instead, they were always upbeat and motivational.  Greg
12 was not the CFO of the company, and had no access to the books of the company.
13 Clearly, management did not desire its salespeople to be aware of the true financial
14 situation since such negative information could taint their enthusiasm in presenting the
15 investment opportunity to the investors.  Government witness Shawn Walker testified
16 Pritchard deceived the investors, the creditors, and even deceived employees with his
17 words.  Even the CFO, Colin Mutton, a highly educated man and former accountant with
18 a major accounting firm, testified that Pritchard was a remarkable salesman, and that he
19 believed in Pritchard—until it was too late.

### 5.  **The Solicitation Was the Words of the Salesperson Combined with the PPM and Accompanying Documents**

20
21
22      The purpose of the salespeople contacting the potential investors was simply to
23 present the program, encourage the investor to review the materials and hopefully invest.
24 Some investors testified they weren't advised of risk, returns, or commissions, but that
25 is *precisely* why they were sent the offering materials—to learn the details of the
26 investment.  The offering materials mailed to the investors were an instrumental part of
27 the solicitation.  Investors had to sign the subscription agreement affirming they were
28 familiar with the PPM and risks before they invested.

-4-

### 6. **It Was Not the Salesperson's Job to "Walk" the Investor Through the PPM**

Contrary to the government's argument at trial, there is no evidence that it was the salesperson's job to read and review the entire PPM with the investor. The salesperson's job was to learn of the potential investor's interest, whether they wanted to inquire further, and answer questions. If so, the company would send the offering materials, particularly the PPM. The investor promised—in writing—they had reviewed the PPM.

### 7. **Unaccredited Investors Wanted to Invest**

Contrary to the prosecution's intimation at trial, Gigapix did not single out unaccredited investors. In fact, most of their investors were accredited. But in the case of Greg Pusateri, he was hardly out stalking inexperienced investors—they came to *him*. The testimony at trial showed that each of the four government investors *asked to be contacted* through friends and family who had invested previously.

The evidence showed these investors in many cases were talked into investing by their family or friends. They talked about Gigapix together, got motivated together, and got excited about investing together. These investors were already sold on the investment before they ever spoke to Greg Pusateri. For example, Sandra Wilson testified that Danny Anderson and his wife talked her into investing in Gigapix. There was no need for Greg or any salesperson to exaggerate the offering. These investors were ready, willing and able to invest based upon what family and friends had already told them.

Danny Anderson and Sandra Wilson testified that Greg told them to indicate in the subscription agreement they were accredited, even if they were not. Mr. Pusateri strongly denied this when he testified. What is curious about Danny Anderson's testimony is that in his FBI questionnaire, Anderson wrote that he *was* an accredited investor. Also highly significant is that both Anderson and Wilson had invested together before in another failed investment, Cousin Investments LLC. With that investment, as with their Gigapix investment, Anderson and Wilson used Millennium Trust Company

-5-

("MTC") to facilitate the use of their IRA funds in the investment.   On cross-examination, both admitted to falsehoods on their MTC documents where they affirmed they were accredited, had reviewed the PPM, and were aware of the risks in investing, particularly investing in a private offering.  [Exhibits 35, 601].  Since both of them had used MTC for a private offering before they ever heard of Gigapix or Greg Pusateri, they would have filled out the same form for their Cousins investment—and would have had to be deceitful on that document as well.

The investors who testified for the government, for the most part, seemed like good people with values.  If so, why would they possibly get involved with a company that told them to lie on a legal document?  This defies logic and common sense.

## 8.  <u>Greg</u> <u>Pusateri</u> <u>was</u> <u>a</u> <u>Substantial</u> <u>Shareholder</u> <u>in</u> <u>Gigapix</u>

In determining whether Greg had an intent to defraud, it is critical to remember that the testimony demonstrated Greg had a great deal of stock in the company.  Most of this stock was provided as a ten percent year-end bonus based on sales:  $1 million in sales to investors resulted in $100,000 in Gigapix stock.  In addition, Greg would ask for his holiday bonus to be in stock, rather than cash, because—like the investors—he believed in the future of the company.  As was argued at trial, Greg Pusateri is a victim of this nightmare as well as the other shareholders.

## B.   GREG PUSATERI DID NOT MAKE MISREPRESENTATIONS TO INVESTORS

The government presented evidence at trial relating to alleged misrepresentations and omissions by Greg Pusateri to the government investor-witnesses, to wit:

## 1.  <u>Risk</u> <u>of</u> <u>Investment</u>

The government investors testified that they were unaware of the risk involved in the investment.  Yet the word "risk" appears in OZ3D PPM 52 times—sometimes in bold print, other times in capital letters, and sometimes both.  As was argued at trial, how can someone possibly promise there is no risk in moviemaking?  Government witness Linda Hampshire admitted she knew there was risk; even Sandra Wilson, who also

-6-

testified for the government, grudgingly admitted that "any movie can fail." Clearly, the investors knew there was risk.

### 2. Investment Returns

Several witnesses testified that they were told they would receive exorbitant returns on their investment, and these returns would begin shortly after they invested. Yet as discussed above regarding "risk," it would be ridiculous for anyone to guarantee a large return on 1) any movie, and 2) by a fledgling production company. Even investor-witness Linda Hampshire admitted there were no guaranteed returns. As was argued by Mr. Pusateri at trial, if an investor truly believed there was no risk and a guaranteed huge return—wouldn't they invest every dollar they had? But these investors did not. They tested the waters first: they invested some, waited, then invested more. These investors did not put everything they owned into Gigapix because deep down they *knew* there was risk—although it is obviously difficult for some of them to admit.

### 3. Commissions

The government focused a great deal in this case on sales commissions, and the fact that the salespeople did not volunteer how much they were making in commissions. But as was made clear by Sandi Fox, the government's own witness with telemarketing experience, she didn't volunteer how much she made in commissions, and frankly, none of her investors brought it up. Further, it is specifically set forth in the PPM. As Mr. Pusateri argued at trial, this issue was a red herring.

### 4. OZ3D would be finished 12-18 months after the investment

The government also argued that Greg misrepresented that the OZ3D film would be finished 12-18 months after the investor pledged funds to Gigapix. Greg testified he never said such a thing, but it is important to note that the May 2008 OZ3D PPM states it could take 18 months or longer to finish OZ3D—which would put the completion date at the end of 2009. [Exhibit 257]. Since many of Greg's client's invested in 2009, even if Greg had made such a representation to investors during that time, it would have been a more conservative estimate than the company itself was espousing in the PPM.

-7-

### 5.  The Purported "Urgent" Need to Invest Quickly

Several government investor witnesses—including Linda Hampshire—testified they felt an urgency to invest quickly.  Yet the trial testimony showed that the deadlines for investing in these offerings were real.  Ms. Hampshire invested at the very end of May, 2008, and on cross-examination she remembered that the Gigapix offering was to expire May 31st.  This was absolutely true, as the OZ3D offering was to begin the following day, June 1st.

### 6.  Gigapix Planned to Go Public, Which Would Cause the Stock Price to Rise

The prosecution intimated that Greg and other salespeople told investors that Gigapix planned to go "public," and when it did, the stock price would rise dramatically. Yet Shawn Walker testified that Gigapix had every intention to go public; CFO Mutton said Gigapix was actively preparing to do so.  This was hardly a misrepresentation.

### 7.  The Testimony of Greg's Boss, Ken Gross, Proves Greg Was Not Making Misrepresentations to Investors

The government wanted the jury to believe that Greg was fired from Gigapix due to making misrepresentations to investors.  Not only was this not demonstrated, but the opposition was shown to be true.

One of the keys to this case was Ken Gross.  He was in charge of supervising the salespeople at Gigapix, and was Greg's boss.  By all accounts, Ken Gross was a "by the book" boss, and had himself been fired by Blauvelt for disagreeing with Blauvelt's questionable methods.   Gross testified that if he became aware of anyone misrepresenting Gigapix or OZ3D to investors, they would have been fired immediately.

Ken Gross testified that he never heard Greg Pusateri misrepresent facts to an investor, and that Greg was never reprimanded for making misrepresentations.  In the government's case-in-chief, the prosecution introduced testimony that Greg and co-defendant Brown had their own offices downstairs in the Lankershim office, and that Ken Gross wanted Greg and Cherie Brown up on the second floor with the other

-8-

DEFENDANT PUSATERI'S (#4) NOTICE OF MOTION AND MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29(c) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

salespeople, implying that Gross suspected them of making misrepresentations to investors.

As we learned when Ken Gross testified, such insinuation could not be further from the truth. Gross testified that the primary reason he wanted Greg to be in the same room with the other salespeople was so that the others could hear how he spoke to investors, and learn from him. Greg was that good a salesman, and Ken Gross wanted to use him as a teaching tool for the others.

## 8. The Recollection of the Government Investor-witnesses Must Be Viewed with Great Caution

It is clear that the government investor-witnesses spoke to other investors about Gigapix, including when making the decision whether to invest. But as was argued at trial, when one investor tells another investor something about Gigapix, and then that investor tells another, it can become like the children's game of telephone. These investors spoke to a myriad of people about Gigapix, including their friends, family, and other Gigapix employees. The question is whether, after a period of six, eight, or even ten years, these investors can be sure precisely who told them what about Gigapix, and whether, after the information has passed from one person to another over that period, that information is even remotely accurate anymore. The prosecution-investors were trying to reconstruct events that happened years ago, a process that simply cannot be trusted—particularly when the stakes are as high as they are here.

Compounding the problem is that simple semantics are crucial to this inquiry. As noted in closing argument, were the investors told that they *would* receive a large return on their investment, or that they *should* receive a large return, or something completely different? Were they told that Gigapix *would* be the next Pixar, or were they told Gigapix *could* be the next Pixar? Such subtle differences make a profound difference in what was actually said six, eight or even ten years ago, and whether the prosecution proved it beyond a reasonable doubt.

/

C. **GREG PUSATERI WAS NOT GUILTY OF SELLING UNREGISTERED SECURITIES**

1. **Cease and Desist Orders**

The prosecution spent a great deal of time on the fact Gigapix and Blauvelt had incurred seven cease & desist orders beginning in 2005, and that Pusateri was included as a party to a desist & refrain order from California in May of 2009. Yet these orders are civil in nature, not criminal. There was no trial. As government securities expert William Hicks testified, the key difference between civil and criminal selling unregistered securities is that in the civil arena, there is no need to prove "willfulness."

Greg's desist & refrain stipulation only admits to 1) selling unregistered securities, which, until that time, he had no idea he was doing, and 2) failing to tell investors about the Wisconsin Order of Prohibition, since, like everyone else at Gigapix, he had been left in the dark about this order by management.

2. **Greg Pusateri Stopped Selling Gigapix After the Desist & Refrain Order**

What is key to the California desist & refrain order is that changes were made once the order was issued in May of 2009. Blauvelt told Greg the stock was now OK to sell, but regardless, Greg was never a closer after the California desist & refrain order out of an abundance of caution. After California issued the Desist & Refrain, Greg's responsibilities were simply to maintain contact with his clients, update them on recent developments, and then make appointments for Blauvelt to finalize any possible further investment. In other words, once Greg learned of the problems selling Gigapix and OZ3D, he simply stopped selling. No rational jury could have found Greg guilty beyond a reasonable doubt of selling unregistered securities after May of 2009. Each of the counts alleging selling unregistered securities (Counts 23 through 27 of the redacted indictment) occurred *after* Greg Pusateri stopped closing the investments, and Count 27 is alleged to have occurred almost a year after Greg left Gigapix. Greg Pusateri was not a "willful" seller of securities as is required by law.

-10-

1

**CONCLUSION**

2

For the reasons stated, Greg Pusateri's Rule 29 motion should be granted.

3   Dated:  December 5, 2014.                    Respectfully submitted,

4                                                                      THE LAW OFFICES OF
                                                                        RICHARD M. CALLAHAN, JR.

5

6   By: _____
                                                                        RICHARD M. CALLAHAN, JR.

7                                                                      Attorney for Defendant

8                                                                      GREGORY PUSATERI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28