1   STEPHANIE AMES, California State Bar Number 195608
    THE LAW OFFICE OF STEPHANIE AMES
2   12100 Wilshire Boulevard, Suite 800
    Los Angeles, CA 90025
3   Tel: (310) 739-5952
    Fax: (310) 881-1289
4
    Attorney for Defendant
5   CHRISTOPHER BLAUVELT

6
                    UNITED STATES DISTRICT COURT
7
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
8
9                                    )
                                     )
    UNITED STATES OF AMERICA,        )
10                                   )  Case No.:  CR14-00282-R-2
    Plaintiff,                       )
11                                   )  **DEFENDANT'S POSITION WITH RESPECT**
    v.                               )  **TO PRE-SENTENCE REPORT**
12                                   )
    DAVID PRITCHARD et al.,          )
13                                   )
    CHRISTOPHER BLAUVELT -1          )  HONORABLE MANUEL L. REAL
14                                   )
    Defendant.                       )
15
16          Defendant Christopher Blauvelt, by and through his attorney of record, Stephanie Ames, hereby

17   files Defendant's Position with Respect to the Pre-Sentence Report for the sentencing hearing set for

18   January 12, 2015, at 10:00 a.m.  This position is based upon this memorandum, the points and

19   authorities in support thereof, the pleadings and other papers filed in this case and on such other oral and

20   documentary evidence that may be presented at hearing.

21          Executed this 9th day of January 2015.

22                                          Respectfully submitted,

23

24                                          By_____/s/_____
                                            STEPHANIE AMES, Esq.
25                                          Attorney for Defendant

                                    -1-

MEMORANDUM OF POINTS AND AUTHORITIES

I.

INTRODUCTION

Defendant Christopher Blauvelt (hereinafter "Defendant" or "Blauvelt") made his initial appearance on June 6, 2014.  Jury trial for Blauvelt and co-defendant David Pritchard commenced October 14, 2014.  On October 23, 2014 the jury convicted Defendant of counts one through seven for the offense of mail fraud, aiding and abetting in violation of 18 U.S.C. §§1341, 2(a); counts nine through eleven for the offense of wire fraud, attempted wire fraud, aiding and abetting in violation of 18 U.S.C. §§1343, 1349, 2(a); and counts fourteen and fifteen for the offense of offer and sale of unregistered securities, aiding and abetting in violation of 15 U.S.C. §§77e(a)(1), 77x and 18 U.S.C. §2.  The mail fraud and wire fraud counts carry a statutory maximum sentence of 20 years.  Trial for co-defendants Cheri Brown and Greg Pusateri was held subsequently and both of those defendants were similarly convicted.  Defendant has remained in custody since his initial appearance.

II.

DEFENDANT'S POSITION REGARDING GUIDELINES CALCULATION AND OBJECTIONS TO THE PRE-SENTENCE REPORT

Pursuant to §2B1.1(a) of the Federal Sentencing Guidelines (the "Guidelines") the base offense level is seven (7). The base offense level is then increased according to the amount of loss attributable to the fraud.  The Pre-Sentence Report (hereinafter "PSR") recommends a twenty-two level increase based upon the assertion that the actual loss is $20,882,654.65.  Defendant hereby objects to this calculation.

A.    Specific Offense Characteristics – Loss Amount

The government bears the burden of proof on facts underlying a sentence enhancement.  See *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (en banc).  As a potentially

1   disproportionate enhancement is involved, the burden is on the government to prove by clear and

2   convincing evidence the amount of "harm that resulted from the acts or omissions" of the defendants.

3   See *United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006); *United States v. Munoz*, 233 F.3d 1117

4   (9th Cir. 2000);  see also *United States v. Hicks*, 217 F.3d 1038, 1049 (9th Cir. 2000).   The Ninth Circuit

5   specifically instructs district courts "to take a realistic, economic approach to determine what losses the

6   defendant truly caused or intended to cause."  E.g., *United States v. W. Coast Aluminum Heat Treating

7   Co.*, 265 F.3d 986, 991 (9th Cir. 2001).

8          The Guidelines provide that the general rule for determining loss under §2B1.1 is the greater of

9   actual loss or intended loss.  Intended loss is defined as "the pecuniary harm that was intended to result

10  from the offense."  §2B1.1 Application Note 3.  In this case there is no intended loss.  Gigapix was a

11  legitimate company engaged in the real business of television and film production.  All employee

12  witnesses testified at trial to one extent or another as to the legitimate efforts that the company was

13  making toward the production of film and television projects.   As government witness Shawn Walker

14  testified at trial, Gigapix produced the movies *Captain Abu Raed*, and *Baker Boys: Behind the Surge*, as

15  well as the television series *Workaholics*.  Further, Gigapix was actively working on the production of a

16  number of kids film; with *Field Trip, Blackbeard,* and *OZ3D* being three of them; and had developed

17  four additional kids films for production.  Gigapix was producing reality shows in-house that they were

18  trying to sell to networks.  They had a project called "Movie Books" wherein the company had

19  purchased the rights to a couple of novels that they intended to turn into a limited series for television.

20  They had purchased the rights to a comic book that they were trying to develop as a feature film.   (See

21  Exhibit 1, Transcript of Trial Testimony for Shawn Walker, pages 41-45).  If any of these projects had

22  been financially successful then investors as well as officers and employees of the company would have

23  made money.  That was the intended purpose of the actions of all of those connected to Gigagpix,

24  including Defendant.  Unfortunately, these efforts were unsuccessful and the company became defunct.

25  As was testified to by Collin Mutton when asked why Gigapix failed its investors financially he said

they started making a film called *Blackbeard* and the company spent millions of dollars trying to keep it on track until basically the company had no money left.  (Exhibit 2,  Transcript of Trial Testimony for Collin Mutton, page 32).  The important point is that this was not a sham company created for the purpose of stealing money from the investors.  The purpose of Gigagpix was to create entertainment and make money for everyone as a result.  Accordingly, there was no intended loss.

We therefore next look to actual loss which is defined by the Guidelines as the "reasonably foreseeable pecuniary harm that resulted from the offense."   §2B1.1 Application note 3(A)(i).  The PSR used actual loss in its calculation and in support thereof attaches a chart of all of the investors and a total of all of the money invested.  (PSR at pages 36-50).  This results in 663 investors for a grand total of $20,882,654.65.  The PSR notes that some of the money was returned to four of the investors and so reduces the number of victims to 559[1].  However, as previously noted, Gigapix was a legitimate company with legitimate purposes.  The mere fact that an individual invested money and did not see a return on that investment or lost the money invested does not automatically make the investment a "harm that resulted from the offense." The offense causing the harm in this case is the material misrepresentations and/or omissions that caused an investor to invest their money when they otherwise would not have.  The government at trial established that some sales people lied to some investors in order to get them to invest.  Specifically it established the actual loss for J.G. D.A.  J.H. and  L.H.  However, it does not necessarily follow that because some sales people lied to some investors that all sales people lied to all investors[2].  Ken Gross testified that part of his job was to make sure that salespeople were honest and up-front with the investors and potential investors and that Defendant

---

[1] At paragraph 32 of the PSR probation represents that the chart shows that $21,087,273.61 was obtained from at least 663 victim investors and that some of the money was returned to certain victims leaving a total loss of $20,882.654.65.  However, the chart attached to the PSR shows the total loss of $20,882.654.65 from 663 investors and does not reflect any money returned.  Given the fact that both amounts are above 20 million it does not affect the offense level calculation and so is not a serious issue.

[2] The government provides victim impact statements from 31 additional investors.  The loss amount provided by these individuals totals approximately $1,199,530.

directed him to make sure that they did not make misrepresentations.  Mr. Gross testified that he took this responsibility seriously[3].  (Exhibit 3, Transcript of Trial Testimony for Ken Gross, page 18).

Further, there is evidence that supports the contention that these two sales people did not misrepresent material information to all of the investors in order to obtain their investment.  Mr. Pusateri sought to admit the testimony of several investors at his trial who would have testified that they were not lied to by Mr. Pusateri and they did not feel they were deceived into making their investment in Gigapix. In Mr. Pusateri's Motion for New Trial he proffers the anticipated testimony of these individuals as follows:

> Troy Judd would have testified that he had a number of conversations with Greg Pusateri over the years, and that Greg made absolutely no promises about the possible success of the Gigapix or OZ3D investments.  Greg advised Judd of the risks involved in the investment, and never stated that the investment was "guaranteed" "a sure thing" or words to that effect.  Greg never promised a return on the investment, a date when the returns would commence, nor the amount of any possible return.  Judd would have testified that whenever he spoke to Mr. Pusateri, Greg always said the same thing; "Never invest more than you can afford to lose.

Likewise Larry and Margaret Suggett.

> The Suggetts both would have testified to several conversations they had with Greg through the years, and that Greg told them the investment in Gigapix was speculative. He never told them there was no risk, or that the investment was "guarantee."  Mr. and Mrs. Suggett also would have testified that Greg did not want them to invest too much in Gigapix, since he did not want to strap the Suggett family financially.  They would have testified that Greg never promised a return, or a particular rate or date of return.  Greg told them that Gigapix was "trying to be" another Pixar.  Just like Troy Judd, they both distinctly remember Greg Pusateri telling them, "Never invest more than you can afford to lose."

---

[3] Defendant recognizes that the government presented evidence at trial and that is contained in the PSR that letters signed by Defendant contained material misrepresentations.  However, these letters typically were sent out to investors after they had already invested and therefore did not cause the individual to invest.  Further, the government has not established that these letters were sent out or received by all of the listed investors.  Accordingly, Defendant would argue that they do not constitute the offense for purposes of establishing loss.

(Defendant Gregory Pusateri's Motion for New Trial docket entry 244, page 5 of 10, page ID#3534)
Defendant acknowledges that the government is not required to put on at trial every individual that could
be classified as a victim for loss purposes.  However, the Court also cannot presume that every investor
was a victim as is shown by the investors proffered by co-defendant Pusateri as defense witnesses for
trial.

Additionally, application note 3 to §2B1.1 allows for credits against loss.  "Loss shall be reduced
by the following: The money returned, and the . . . services rendered, by the defendant or other persons
acting jointly with the defendant, to the victim before the offense was detected. "  USSG §2B1.1
application note 3(E)(i).  See  *United States v. Hausmann,* 345 F.3d 952, 960 (7th Cir. 2003) (economic
crime guideline adopts "credit against loss" approach).  Gigapix, its officers and employees rendered
services on behalf of the company and its investors before any offense was detected. As Shawn Walker
testified at trial in relation to OZ3D, writers had gone through multiple drafts for the script.  They had
development artwork and had contracted out to different artists in the animation industry to provide
them visual images.  They engaged a producer and director.  (Exhibit 1, Transcript of Trial Testimony
for Shawn Walker at page 48).  All of these efforts were in furtherance of their intended purpose to
make *OZ3D* and were services rendered on behalf of the investors.   As was noted by the government's
accountant Tonya Pinkerton in her trial testimony, 40.5% of the money was used for employee payroll
and benefits, office rent, taxes etc. (See Exhibit 4, Government's Trial Exhibit 56).  These administrative
expenses were legitimate business expenses that would be expected in the running of a production
company.  As was noted by at least one investor when answering the investor questionnaire as to how
specifically his money would be used by Gigapix Studios he answered "to pay expenses while they
ramped up their earning."  (See Exhibit 5, Questionnaire of John G, produced by government in
discovery).  Further,  21.0% was spent on costs that the government directly attributes to production and
1.9% was used for travel. (Exhibit 4, Government's Trial Exhibit 56).  Ms. Pinkerton testified that she
separated travel because she did not know whether it was business related.  Since she only reviewed

bank records and not company invoices and receipts she often made an educated guess on where to allocate the use of funds.  (Exhibit 6, Transcript of Trial Testimony for Tonya Pinkerton, page 32) Given that there was no evidence that these travel expenditures were personal this amount should also be considered as a business expense.[4]  All of these expenditures were in furtherance of Gigapix's intent to make quality film and television and was a service for its investors toward that goal.  Accordingly, these sums should not be included in the loss calculation.

These expenditures also support the fact that it was not Defendant's intent to steal money from investors.  If that were his intent then the personal expenditures would have been far more significant and money would not have been spent on artists, writers, location scouting etc.  Gigapix would not have spent so much money on office rent and super computers.  Accordingly, this Court should consider Defendant's gain as the alternative measure of loss.

Application note 3(C) of §2B1.1 provides that"[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  USSG §2B1.1.   As is evidenced in government's trial exhibit 546 (Exhibit 4) the total personal expenditures by executives at Gigapix was $1,944,940.88 resulting in an increase for loss of 16.  §2B1.1(b)(1)(I).  This loss amount coincides with the loss amount based upon the government's substantiated loss to identified victims included in its under seal filing of victim impact statements.  The amount of loss documented in the government's filing amounts to approximately $1,199,530 for the 31 victim investors identified.

B.      Specific Offense Characteristics – Number of Victims

The PSR asserts that a six level enhancement is appropriate under USSG §2B1.1(b)(2). Defendant objects to application of this enhancement.  In support of this enhancement the PSR points to the chart of investors identified beginning at page 36.  For the reasons previously stated in Defendant's

---

[4] Collin Mutton testified that David Pritchard traveled personally but that expense was placed on the credit card.  Counsel does not believe that it was included in Ms. Pinkerton's analysis of travel expenses.

1   position regarding loss, the total number of investors also should not be used for calculating the number

2   of victims.

3           The government bears the burden of proving by a preponderance of the evidence the facts

4   necessary to enhance defendant's offense level.  See *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir.

5   994).   The Guidelines do not allow a district court to estimate the number of victims to enhance a

6   sentence under §2B1.1(b)(2). Id.   See also *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir.

7   2009).   A list of investors is not sufficient to support the allegation that they all are victims.   The

8   government's filing of victim impact statements supports the contention of thirty-one investor victims in

9   addition to those that testified[5].   Accordingly, the appropriate enhancement is 2 pursuant to 2B1.1(b)(2).

10  This enhancement is also supported by the included provision for mass-marketing.  Specifically, (2)(A)

11  provides that if the offense involved 10 or more victims; or (ii) was committed through mass-marketing,

12  increase by two levels.  Id.  Mass-marketing is defined under application note 4(A) as a plan, program,

13  promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other

14  means to induce a large number of persons to . . . (iii) invest for financial profit."  USSG §2B1.1.  This

15  two level enhancement is warranted under the Guidelines.

16          C.      Victim Related Adjustment – Vulnerable Victims

17          At paragraph sixty-one the PSR alleges that "the co-defendants reloaded at least five victims, one

18  of whom was 85 years old.  Based on the foregoing, a two-level increase is applied pursuant to USSG

19  §3A1.1(b)(1).  Defendant objects to the application of this enhancement in this case.  U.S.S.G. §

20  3A1.1(b)(1) provides that "[i]f the defendant knew or should have known that a victim of the offense

21  was a vulnerable victim, increase by 2 levels.  The application notes to that section define vulnerable

22  victim as a person . . who is **unusually** vulnerable due to age, physical or mental condition, or who is

23  otherwise particularly susceptible to the criminal conduct.  §3A1.1 Application note 2 (emphasis added).

24

25
_____

[5] Danny Anderson who is included in the victim impact statement is the only witness who is included in both.

-8-

The note goes on to provide an example of when and when not to apply such an increase. The example for when not to apply the increase is "in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." Id. This case is nearly identical to the example provided in the Guideline notes except that it is even stronger for the argument against application because the identified individual was elderly, not senile. Further, the Ninth Circuit has directed that "a trial judge considering an enhancement on this basis must make essentially two determinations. First, the judge must determine whether one or more of the victims belong to a class that is particularly vulnerable to the criminal activity in question, and second, is there one or more specific individual victims whom the defendant knew or should have known were unusually vulnerable by virtue of membership in the class identified." *United States v. Luca*, 183 F.3d 1018, 1025 (9th Cir. 199). "Age, standing alone, does not establish someone as a special victim". *Id*. In this case the second determination cannot be met. The identified individual is J.G. who appeared in court and testified at trial. As evidenced by his testimony this individual was not in fact unusually vulnerable because of his advanced age.

The PSR points to the cases of *United States v. Ciccone,* 219 F.3d 1078 (9th Cir. 2000) and *United States v. Randall*, 162 F.3d 557 (9th Cir. 1998) in support of this enhancement. However, these two cases are readily distinguishable from the matter at hand. In *Randall* the court found that the defendant was intentionally seeking out people who had a track record of falling for fraudulent schemes. Likewise in *Ciccone*, the sales people specifically targeted people who had previously fallen for other telemarketing schemes. In this case, there is no such evidence that sales people intentionally solicited someone who had previously given money to a fraudulent telemarketing scheme. Accordingly, this enhancement does not apply.

    D.      Adjustment for Role in the Offense – Aggravating Role

The PSR includes a four level enhancement for organizer or leader of criminal activity that involved five or more participants. USSG §3B1.1(a) specifically provides that "[i]f the defendant was

an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." Id.  The government has the burden of proof on role enhancements[6] and the district court must make reasonably specific findings or the record must be sufficiently clear.[7]

The PSR points to the fact that Defendant was the Chief Executive Officer of Giaipix and was a managing member of OZ3D and that he and defendant Pritchard received the greatest share of the profits.  The fact that a defendant plays an important or even essential role in the criminal enterprise does not necessarily require an aggravating role adjustment.  *See e.g. United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994) (reversing for lack of evidence that pilot controlled or coordinated any of his codefendants);  *United States v. Woods,* 335 F.3d 993, (9th Cir. 2003) (reversed where government failed to show that defendant managed or supervised any other participant in the fraud);  *United States v. Litchfield*, 959 F.2d 1514 (10th Cir. 1992) (noting that the enhancement is for "organizers or leaders," not for "important or essential figures").  There must be evidence that the defendant occupied one of the four specified roles, not merely that the defendant was more culpable than others who participated in the crime.  *United States v. Harper*, 33 F.3d 1143, 1150 (9th Cir. 1994) (holding defendant must occupy one of the four roles).  Courts of appeals have rejected role increases where they find that no adjustment was supported by the record.  *United States v. Stevens*, 985 F.2d 1175 (2nd, Cir. 1993).

The PSR considers Defendant a leader because he held a position of authority and supervised the conduct of the sales people.  Defendant cannot dispute this.  However, Defendant would argue that the government has not established that the criminal activity involved five or more participants.  Defendant has already argued extensively that Gigapix was not a sham, but was a legitimate production company with legitimate business efforts.  The criminal activity engaged in was the material misrepresentations or omissions in sales of company shares.  The trial established the participation in

---

[6] *United States v. Milton*, 153 F.3d 891 (8th Cir. 1998) (government bears the burden of proof on aggravating role enhancements).

[7] *United States v. Skys*, 637 F.3d 146 (2nd Cir. 2011) (rejecting findings as insufficient to support leadership enhancement)

fraudulent sales of shares by two individuals; Greg Pusateri and Cheri Brown. Including Defendant and Mr. Pritchard in this calculation results in four participants in criminal activity. Accordingly, the proper enhancement for aggravating role is two levels pursuant to §3B1.1(c).

E.    Obstruction and Related Adjustments

The PSR addresses the potential for a two level upward adjustment for willful obstruction of justice but does not include the enhancement in its calculations. Instead it leaves the determination for the Court. Defendant objects to inclusion of this enhancement. Section 3C1.1 of the Guidelines provides that "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (b) a closely related offense, increase the offense level by 2 levels." USSG §3C1.1. The government bears the burden of proving by a preponderance of evidence that the defendant obstructed the administration of justice. See *United States v. Brennan*, 326 F.3d 176 (3rd Cir. 2003); *United States v. Kozohorsky*, 708 F.3d 1028 (8th Cir. 2013). Application note 2 to this provision of the Guidelines states that it is "not intended to punish a defendant for the exercise of a constitutional right. . . In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." USSG § 3C1.1 Application Note 2. Merely because Defendant testified at trial to some events differently from government witnesses does not mean that he was intentionally lying. Further, Defendant was completely cooperative with agents and met with them when requested. As the government points out in its sentencing position, Defendant made a number of admissions to them. In addition to the two recorded interviews that were presented in part at trial Blauvelt had additional contacts with FBI agents as evidenced in Exhibit 7. On November 18, 2013 Defendant spoke to agent Storer and advised that Colin Mutton had moved company records to a storage

facility in Santa Monica and the only information that Blauvelt had was from his personal recollection and a few documents he had in his briefcase.  (Exhibit 7 page 1, 302 of contact on November 18, 2013). Additionally, when an indictment was returned on this case FBI agent Potocek was able to call Defendant to advise him that a warrant had issued for his arrest.  Instead of trying to flee, Blauvelt advised agent Potocek that he was homeless and did not have means of transportation but directed the agent as to where he could be located and picked up for self surrender.  (Exhibit 7 page 2, 302 of contact on June 5, 2014).  As is evidence by page three of Exhibit 7, Blauvelt was where he said he would be and was arrested by Santa Barbara County Sheriff for transport without incident.  (Exhibit 7 page 3, 302 of contact on June 6, 2014).  These actions show a person who is willing to cooperate with authorities, not obstruct or impede their investigation.  Accordingly, the Court should not impose an enhancement under this provision.

Defendant submits that the proper Guideline calculation is as follows:

| Base offense level | 7 | 2B1.1(a)(1) |
| | 16 | 2B1.1(b)(1)(I) |
| | 2 | 2B1.1(b)(2)(A) |
| | 2 | 3B1.1(c) |
| | 27 | resulting in a guideline range of 70-87 months |

III.

DEFENDANT'S POSITION REGARDING SENTENCING FACTORS PURSUANT TO
18 U.S.C. 3553(a)

Although the Sentencing Guidelines are the starting point for the Court to determine an appropriate sentence they are not mandatory and in fact in this case are far beyond a sentence that is fair and just, especially if the Court considers the Guidelines recommended by the PSR.  Accordingly, this Court should vary from the advisory guidelines because such guidelines produce a sentence that is

-12-

greater than necessary to comply with the sentencing factors under 18 U.S.C. §3553.  It is now well established that sentencing judges "may vary [from Guidelines ranges] based solely on policy consideration, including disagreements with the Guidelines," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted).  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of sentencing enumerated in 18 U.S.C. 3553(a).  *Id*. at 109-10.

Section 18 U.S.C. 3553(a) directs that the court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."   Allan Ellis, John R. Steer, Mark Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011).   In fact, the guidelines themselves provide in the application notes that the offense level determined under this guideline may substantially overstate the seriousness of the offense in some cases.  Federal Sentencing Guidelines Manual § 2B1.1 App. note. 20(C).

Currently, the guidelines sentences for large-dollar fraud offenses are nearly equal to the guidelines for violent crimes.  In fact, the offense level attributed to Mr. Blauvelt by probation in the PSR is 41, the offense level for first degree murder is only two levels higher at 43[8].  The degree of culpability and harm caused by these two offenses is in no way comparable even though the offense levels are the same.  Over the last twenty-five years the sentencing guidelines range has nearly tripled for economic offenses even though the harm caused to society has not changed. *Id.* [9]  Accordingly, the factors of section 3553 are particularly important for the Court to consider in imposing an appropriate sentence and a below guidelines sentence meets those factors.

Mr. Blauvelt is a fifty-nine year old man who has had significant medical problems as is evidence by the under seal filing of medical records submitted by Defendant.  In 2012 he suffered two strokes.  He has congestive heart disease and as noted in the PSR was recently diagnosed with stage III congestive heart failure.  He currently has a hernia which is extremely painful and has not been treated while at the MDC.  He has been diagnosed with bipolar disorder and was placed on an involuntary psychiatric hold on March 16, 2013.  Mr. Blauvelt believes that his psychiatric issues have been the result of possible strokes rather than a psychological disorder.   In support, his erratic behavior does appear to coincide in time with his significant medical episodes.

In determining the appropriate punishment, one meaningful factor that the Court looks to is the degree of culpability and criminal intent of the defendant in committing the crime.  Although there are some aggravating factors applied by probation in this case relating to culpability there are also mitigating factors regarding that culpability as it relates to Defendant's intent in committing this crime.  At trial, and in his discussions with FBI agents, Blauvelt told agents and this Court about his desire and

---

[8] Federal Sentencing Guidelines §2A1.1.

[9] The Criminal Justice publication cites the sentencing guidelines amendments in 1989, 2001 and 2003 as responses to the saving and loan crisis, the economic crimes package, and Sarbanes-Oxley Act respectively as the causes for these increases.

efforts to make successful movies and television.  Objective evidence further supports the fact that this was his intent and goal.  His intent was not to steal from people.  If this had been his intent then the government's financial exhibits would should most of the money going into Blauvelt's pockets.  This was not the case.  He sought out and rented appropriate office space for film production, as well as, the tools of the trade needed in the industry.  He paid money to artists and writers and many outside contractors to make production possible.  Mr. Blauvelt's efforts were a failure and the jury found that he and others hid the problems from investors and presented the company as more successful than it was.  This cannot be disputed.  However, Blauvelt's intentions are significant and his intentions were not criminal.

Regarding disparity in sentencing, the *Criminal Justice* article previously cited compared a number of large-dollar economic crimes defendants and their sentences.[10] Each of those cases shows significantly greater losses generally lesser sentences than is recommended by probation and the government in this case.  Accordingly, the factors delineated in 18 U.S.C. §3553 warrant a variance below the Guidelines applicable in this case.

IV.

CONCLUSION

Defendant respectfully requests that this Court imposed a sentence well below the sentencing guidelines in this case to reflect his personal history and characteristics, his lack of intent to harm

///

---

[10] Several offenders noted in table include: US v. Ferguson, $500,000,000 in loss, sentenced to 24 months; US v. Nacchio, $28,000,000 in loss, sentenced to 72 months; US v. Jackson, $20,000,000 in loss 51 months; US v. Nichols, $21,123,830 in loss, sentenced to 292 months; US v. Miller, $21,000,000 in loss, sentenced to159 months

anyone in the commission of this offense and to put the offense and loss in proper relation to other economic offenses of far higher dollar values.

Respectfully submitted,

DATED January 9, 2015

By_____/s/_____
STEPHANIE AMES, Esq.
Attorney for Defendant

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California.  I am over the age of eighteen and not a party to this litigation.  My business address is 12100 Wilshire Boulevard, Suite 800 Los Angeles CA 90025.

On January 10, I served the foregoing document described below as **DEFENDANT'S SENTENCING POSITION REGARDING PRE-SENTENCE REPORT** on the interested parties to this action:

[]     (BY PERSONAL SERVICE). I delivered such envelope by hand to counsel for the parties as set forth below:

[XX]   (BY MAIL)  I placed a true and correct copy of the above document in an envelope, postage prepaid, first-class to the address below:

Christina Torres
United States Probation Officer
312 North Spring Street, 6th Floor
Los Angeles CA 90012-4701

[]     (BY EXPRESS MAIL COURIER)  I placed a true and correct copy of the above document in an envelope, postage prepaid, and deposited the envelope in a box regularly maintained by the courier for overnight delivery:

[]     (BY TELECOPIER TRANSMISSION)  I transmitted said document via telecopier transmission (FAX) to counsel for the party set forth above.

[XX]   (State)  I declare under penalty of perjury pursuant to the laws of the State of California that the above is true and correct.


_____Stephanie Ames_____          ____/s/_____
           (Type or print name)                                      Signature