# EXHIBIT 1

1

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,              )
                                          )
6                      Plaintiff,         )
                                          )
7        vs.                              )  Case No. CR 14-282 R
                                          )
8  DAVID PRITCHARD and                    )
   CHRISTOPHER JAMES BLAUVELT,            )
9                                         )
                       Defendants.        )
10  _____)

11

12            REPORTER'S PARTIAL TRANSCRIPT OF
                   TRIAL PROCEEDINGS
13            TESTIMONY OF SHAWN WALKER
              THURSDAY, OCTOBER 16, 2014
14                   9:35 A.M.
              LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22  _____

23     MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
            FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 430
            LOS ANGELES, CALIFORNIA 90012
25                 (213) 894-2305


            UNITED STATES DISTRICT COURT

41

```
 1              THE LAW CLERK:   Judge, should I bring in the jury?

 2              (In the presence of the jury.)

 3              THE COURT:   The record should reflect the jurors are

 4    present and in their proper places.   The defendants are present

 5    with their counsel.

 6         Cross-examination, Defendant Blauvelt.

 7                        CROSS-EXAMINATION

 8    BY MS. AMES:

 9    Q    Good morning, sir.

10    A    Hello.

11    Q    Sir, I'd first like to ask you a few questions about a few

12    of the productions that you've discussed.   *Captain Abu Raed*,

13    are you familiar with that production?

14    A    Yes.

15    Q    And that was produced by GigaPix; is that correct?

16    A    GigaPix was a co-producer of the production, yes.

17    Q    So there were -- were there multiple producers on that?

18    A    Yes.

19    Q    And GigaPix was one of them?

20    A    Correct.

21    Q    And when was that movie in production?

22    A    To my knowledge, probably 2008, roughly, '7, '8.

23    Q    Okay.   And that movie was completed; is that correct?

24    A    Correct.

25    Q    And was that movie considered successful, in your opinion?
```

**UNITED STATES DISTRICT COURT**

1    A      Well, you'd have to define what "successful" would be.   So

2    critically, it was very successful.   It was well received in

3    terms of critically liking the movie.   Financially successful,

4    I have no idea.   I don't think it was.

5    Q      Critically successful, did it win a number of awards,

6    things of that nature?

7    A      Yes.

8    Q      And what did it win, to your knowledge?

9    A      Well, we won the World Cinema Audience Award at the

10   Sundance, which is quite a big film production.   There were --

11   to my knowledge, there was probably upwards of 20 different

12   awards at different festivals it won.

13   Q      So it was critically successful?

14   A      Correct.

15   Q      In your experience in the industry, is it often the case

16   that a critically successful film may not necessarily become a

17   financially successful film?

18   A      Yes.

19   Q      But oftentimes, it may become a financially successful

20   film; is that correct?

21   A      Correct.

22   Q      Is that part of the speculative aspect of this business?

23   A      Yes.

24   Q      *Baker Boys: Behind the Surge* was another production of

25   GigaPix; is that right?

**UNITED STATES DISTRICT COURT**

1  A      Correct.

2  Q      And tell us about that.

3  A      That was a -- it was a co-production we did with a company

4  out of Switzerland called Point Prod'.  It was a four-part

5  series of a journalist vetted with an army group in Iraq, and

6  we -- GigaPix basically provided production funds for it.  We

7  did a lot of the post-production work and were able to sell

8  that to television.

9  Q      And when was that in production with GigaPix?

10  A      Probably sometime in '09 or '10, to my recollection.

11  Q      And was that production considered, in your opinion, a

12  critical success?

13  A      I would say to some degree.  There wasn't as -- as many

14  accolades towards it, you know, obviously because it was a TV

15  production or a documentary series.  But in terms of sort of

16  how it was received, I think it was well received.  I would say

17  yes.

18  Q      Did you know whether it was a financial success?

19  A      No.

20  Q      Is that that it wasn't or did you not know?

21  A      I didn't know.  I would say from my knowledge of what the

22  sales amounts were from the television rights, that they were

23  very small.

24  Q      *Workaholics* was another production of GigaPix?

25  A      Correct.

**UNITED STATES DISTRICT COURT**

44

1    Q    And what was *Workaholics*?

2    A    *Workaholics* is a half-hour sitcom on Comedy Central now

3    that was developed at GigaPix.  And we -- GigaPix provided

4    funding to produce some Web series based on the property.

5    That, in turn, was seen by Comedy Central.  They decided to do

6    a pilot and paid for it, and then it turned into a series for

7    the network.

8    Q    And you say that's still ongoing now, so it's still

9    being --

10   A    Correct.

11   Q    -- shown by Comedy Central?

12   A    Yes.

13   Q    And when did GigaPix begin production of *Workaholics*?

14   A    That probably was in -- we did development work probably

15   in either 2008, 2009.  I think it really got into the pilot

16   network in 2010.

17   Q    You mentioned just in general on direct that there were

18   other projects that, when you started with GigaPix, you were

19   working on.  Can you tell us about a few of those projects?

20   A    There was always a -- a group of items.  I mean, in a

21   production company, you have -- you try to put together a

22   development slate.  So you always have projects in different

23   stages, from simple ideas that we toss around internally to big

24   formal scripts that people are bringing in from the outside

25   that they want to produce with you.

UNITED STATES DISTRICT COURT

45

1    There were -- in general, we had a slate of kids films we

2    were trying to produce, *Field Trip* and *Blackbeard* being one of

3    them.  There were four others that we had scripts developed

4    for.  On the TV side there were reality shows that we were

5    producing in-house to try to sell to networks.  There were --

6    going a ways back, there was a project called "Movie Books"

7    that we had where we had the rights to a couple of novels that

8    we were going to turn into sort of a limited series for

9    television.  We had a comic book that we were trying to develop

10   as a feature film.  We produced comics based on that property.

11   Q    And do you do a number of these different slates again

12   because of the speculative nature and you can't really put all

13   of your eggs in one basket or just one production?  Is that an

14   accurate statement?

15   A    That would be accurate, yes.

16   Q    And so during the entire time that you were at GigaPix,

17   you continually observed these slate -- various slates of

18   projects; is that correct?

19   A    Yes.

20   Q    Now, there's also kind of -- I guess I consider it a term

21   of art, "slated for production."  What, in your opinion, would

22   you take that to mean?

23   A    Typically if you said it was "slated for production,"

24   you've done enough work to have them ready for production in

25   terms of you have the script in a pretty decent state to where

**UNITED STATES DISTRICT COURT**

48

```
1        At one point in time we had a producer engaged that was
2   going to help us do the film.  We also had a director engaged
3   at one point in time.  And we were also in the process of
4   negotiating and working on a deal with an animation studio in
5   Toronto to actually do the production of the film.
6   Q     And you, as part of GigaPix -- the company had determined
7   it would take 20 million to produce that film; is that correct?
8   A     Correct.
9   Q     But you were only able to get 8 million; correct?
10  A     I'm not sure what the exact number would be that they
11  actually --
12  Q     But to your knowledge, you were never able to get
13  20 million to be able to produce that film?
14  A     Correct.
15  Q     Now, regarding Blackbeard, that again was another one of
16  your slated projects at GigaPix?
17  A     Correct.
18  Q     And was that in the production stages?
19  A     That was in the pre-production stages, in my opinion.
20  Q     And some actual work had been done in Iowa; is that
21  correct? -- like --
22  A     Correct.
23  Q     -- creating a scene?
24  A     Right.
25  Q     What can -- please tell us about that.
```

**UNITED STATES DISTRICT COURT**

**EXHIBIT 2**

1

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3       HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                 Plaintiff,               )
                                           )
7        vs.                               )   Case No. CR 14-282 R
                                           )
8   DAVID PRITCHARD and                    )
    CHRISTOPHER JAMES BLAUVELT,            )
9                                          )
                  Defendants.              )
10  _____)

11

12              REPORTER'S PARTIAL TRANSCRIPT OF
                      TRIAL PROCEEDINGS
13                TESTIMONY OF COLIN MUTTON
                WEDNESDAY, OCTOBER 15, 2014
14                       2:34 P.M.
                  LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24           312 NORTH SPRING STREET, ROOM 430
              LOS ANGELES, CALIFORNIA 90012
25                    (213) 894-2305


              UNITED STATES DISTRICT COURT

1    Many industries continued to erode worldwide banking and

2    investor confidence.  And these conditions had a profound

3    effect on the future of GigaPix as well."

4    Q     So now, does that accurately describe the reasons that

5    GigaPix failed financially?

6    A     No.

7    Q     Why did GigaPix fail its investors financially?

8    A     Because in 2009, before we had funding in place, it was

9    decided by those in charge to start making a film called

10   *Blackbeard* in March 2009.  And there was no letter of credit

11   saying that we had the money.  There was no official agreement

12   that we had the funds to make the movie.  So the movie was

13   started to make -- was started to be whatever it's called when

14   they start building all the stuff and before they start

15   shooting.

16        So the company spent millions of dollars trying to keep

17   *Blackbeard* on track out of GigaPix money while trying to find

18   various sources of finance to finance the movie so that we

19   could continue making it.  And we continued pouring money into

20   it for months afterwards until basically the company had no

21   money.

22   Q     According to the financials that we looked at during this

23   entire period, GigaPix was actually losing money; right?

24   A     Well, yeah.  GigaPix never made any money.

25   Q     Now, did you ever invest your personal money in GigaPix or

# EXHIBIT 3

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,      )

6                Plaintiff,    )

7     vs.                )     Case No. CR 14-282 R

8  DAVID PRITCHARD and
     CHRISTOPHER JAMES BLAUVELT,    )

9                Defendants.   )

10

11

12              REPORTER'S TRANSCRIPT OF
                TRIAL PROCEEDINGS

13       TESTIMONY OF KENNETH STEPHEN GROSS
           FRIDAY, OCTOBER 17, 2014

14               10:17 A.M.
           LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22

23     MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
          FEDERAL OFFICIAL COURT REPORTER

24       312 NORTH SPRING STREET, ROOM 430
        LOS ANGELES, CALIFORNIA 90012

25           (213) 894-2305

```
 1   them stock, if they didn't read that disclaimer prior to
 2   collecting the final package, the sale could be refused.
 3   Q     Um, and so I understand the process, though, the executive
 4   didn't talk to any of the potential investors or investors
 5   until it had made that second-step process?
 6   A     Not necessarily.  At some point -- at some -- there were
 7   occasions where an officer of the company might get involved
 8   because a potential investor had questions that could only be
 9   answered by somebody who had that knowledge, in which case he
10   would talk to the investor prior to the completion of the
11   transaction.
12   Q     And part of your job was to make sure that these
13   salespeople were honest and up-front with the investors and
14   potential investors; correct?
15   A     That was my main function.
16   Q     And that's what Mr. Blauvelt had hired you to do?
17   A     That's correct.
18   Q     And that's what he directed you to do to make sure that
19   they did not make any misrepresentations and that they were
20   honest; correct?
21   A     He insisted on it and was very adamant about the fact that
22   it was my responsibility to make sure that misrepresentations
23   of material facts were not made on my watch.
24   Q     And you took that responsibility seriously?
25   A     Very seriously.
```

# EXHIBIT 4

United States of America v. David Pritchard et al
Use of Funds Table - Gigapix and Oz3D Separated

Timeframe: 07/31/06 - 12/31/12

## Use of Funds

| Category | Oz3D and Survey Says | | Gigapix | | COMBINED | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| *Transfer to Gigapix from Oz3D* | (4,013,608.96) | 48.8% | | | | |
| **Administrative** | (983,197.21) | 12.0% | (9,441,946.70) | 43.9% | (10,425,143.91) | 40.5% |
| Advertising | (47,893.85) | | (162,433.32) | | (210,327.17) | |
| Employee Payroll/Commissions | (392,660.72) | | (3,786,574.77) | | (4,179,234.77) | |
| Employee Benefits | 0.00 | | (715,539.91) | | (715,539.91) | |
| Legal | (22,500.00) | | (1,182,753.65) | | (1,205,253.65) | |
| Rent - Oso | 0.00 | | (543,569.62) | | (543,569.62) | |
| Taxes | (23,751.73) | | (1,670,020.16) | | (1,693,771.89) | |
| Misc. | (496,390.91) | | (1,381,055.99) | | (1,877,446.90) | |
| **Sales** | (2,548,056.97) | 31.0% | (3,465,425.16) | 16.1% | (6,013,482.13) | 23.4% |
| Commissions/Payroll | (1,921,418.10) | | (2,810,428.44) | | (4,731,846.54) | |
| Filings | (14,225.00) | | (59,646.33) | | (73,871.93) | |
| Leads | (226,783.59) | | (192,838.17) | | (419,621.76) | |
| Mailing | (77,735.92) | | (190,030.49) | | (267,766.41) | |
| Rent | (251,353.02) | | 0.00 | | (251,353.02) | |
| Telephone | (56,541.34) | | (212,481.13) | | (269,022.47) | |
| **Production** | (391,029.87) | 4.8% | (5,007,185.10) | 23.3% | (5,398,214.97) | 21.0% |
| **Personal** | (151,413.64) | 1.8% | (1,793,527.24) | 8.3% | (1,944,940.88) | 7.6% |
| Blauvelt | (140,497.51) | | (578,586.44) | | (719,083.95) | |
| Pritchard | (10,000.00) | | (349,373.95) | | (359,373.95) | |
| Pritchard or Blauvelt | (916.13) | | (621,657.24) | | (622,573.37) | |
| Taylor | 0.00 | | (243,909.61) | | (243,909.61) | |
| **Unknown** | (31,799.10) | 0.4% | (1,006,934.54) | 4.7% | (1,038,733.64) | 4.0% |
| **Travel** | (10,542.94) | 0.1% | (486,108.11) | 2.3% | (496,651.05) | 1.9% |
| **Investors** | (88,944.00) | 1.1% | (329,614.96) | 1.5% | (418,558.96) | 1.6% |
| **Total** | (8,218,592.69) | 100% | (21,530,741.81) | 100% | (25,735,725.54) | 100% |

Page 1 of 1

# EXHIBIT 5

# INVESTOR QUESTIONNAIRE – GIGAPIX STUDIOS

**1. Biographical Data:**

Name: _JOHN G███████_

Any other name used for the investment (i.e., trusts, dba, etc.):
_____

Address:    Street: ██████████████████████

City: ████████████████

State: ████████        Zip: ██████████

Age: _73_____

Home Telephone Number: ████████████████

Cellular Telephone Number: ██████████████

Email Address: ████████████████████████

**Background Questions:**

2. What is your current occupation?

_RETIRED_

3. Were you an accredited investor at the time of your investment?

_I BELIEVE SO._

4. Rate your level of investment experience.



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | ⑧ | 9 | 10 |
|---|---|---|---|---|---|---|---|---|----|
| Limited | | | | | | | | | Extensive |

5. Have you previously invested with a Private Placement Memorandum?
   If yes, please describe the type (oil and gas, movies, etc.) and company?



_OIL+GAS ~ E.F. HUTTON_

**Introduction to Gigapix Studios Inc./Oz3D, LLC:**

6. When were you first contacted by a representative of Gigapix Studios Inc./Oz3D, LLC?

5/24/2005

What was his or her name(s)?

CHRIS BLAUVELT

7. What did the tell you about the investment opportunity being presented?

GREAT POTENTIAL FOR PROFIT. EMPHASIS ON TALENTS THOSE CREATING MOVIES. FOR EACH UNIT PURCHASED CAME 4 WARRANTS, ALLOWING FOR BUYING 4 ADD'L SHARES AT A FUTURE TIME AT ONE DOLLAR EACH,

8. Did you receive anything via mail after speaking with the representatives?  If yes, what was it?

A LETTER WITH ENCLOSED DOCUMENTS, INCLUDING A THICK "CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM."

9. In which investment did you invest with Gigapix Studios Inc./Oz3D, LLC?

GIGAPIX STUDIOS
~~A THICK "CONFIDENTI~~

10. At what stage of development was the project when you made your initial investment?

THEY HAD SIGNED A CONTRACT WITH HOPE CANYON ENTERTAINMENT. IF SUCCESSFUL THEY ANTICIPATED A FULL-LENGTH FEATURE CONTRACT, THEY HOPED FOR AN IPO AFTER THAT, THEY HAD RECENTLY LEASED SUBSTANTIAL FACILITIES.

**Representations Made to You:**

11. What, if anything, were you told about the following?

a. Any risk(s) associated with the investment?

OF COURSE THERE IS RISK INVOLVED, BUT WE HAVE GREAT PEOPLE AND IF SUCCESSFUL REWARDS WOULD BE GREAT.

b. Any anticipated returns you would make on your investment.  Were you guaranteed certain returns?

NO GUARANTEES, BUT POTENTIAL OF A HUGE RETURN. IF THE STOCK APPRECIATED GREATLY THE WARRANTS WOULD PROVIDE THAT POTENTIAL.

c. When you would start to receive returns on your investment?

*NO DATE MENTIONED, BUT THEY WERE TALKING ABOUT AN IPO IN THE NEAR FUTURE,*

d. How many units were left to purchase in the investment when you made your initial investment?

*I DON'T BELIEVE I WAS TOLD THAT,*

e. Would the salespeople would earn a commission on your investment, and if so, how much?

*HE WAS VERY PERSISTENT, SO I ASSUMED HE WAS ON COMMISSION,*

f. How specifically your money would be used by Gigapix Studios Inc./Oz3D, LLC?

*TO PAY EXPENSE WHILE THEY RAMPED UP THEIR EARNINGS*

  f(1): Did you ever authorize Gigapix Studios Inc./Oz3D, LLC to use your investment money for anything other than what was told to you by the salesperson?

  *NO*

g. How Gigapix Studios Inc./Oz3D, LLC and its employees would make money from your investment and/or the movie.

*THEY WERE IN THE BUSINESS OF PRODUCING ANIMATED MOVIES AND ADVERTISEMENTS*

h. Did you read the Private Placement Memorandum prior to your investing?

*PRETTY MUCH,*

12. What were the most important factors in your decision to invest?

*THE TALENT OF THE EMPLOYEES FOR MOVIES AND THE POTENTIAL FOR PROFIT, I WAS LUCKY IN THAT THEY LET ME INVEST LESS THAN THEIR STATED MINIMUM,*

**Your Investment**

13. How much money did you invest?  Please specify the source of the funds (i.e. personal checking account, IRA, etc) and on what date(s) you invested.

$5,000  7/22/2005

14. How did you send your payments (check, wire, etc.)?

      a. If by check, to whom were you instructed to make out the check? [Please provide receipts of these transactions]

      b. If by wire, to what account did you wire the funds? [Please provide receipts of these transactions]

THE FUNDS WERE WIRED FROM MY IRA AT TRADESTATION SECURITIES TO IRA RESOURCES IN ~~EASBEA GA~~ THEN IN SAN DIEGO, ENCLOSED IS 2005 STATEMENT,

      c. If you mailed your investment, to what address was it mailed?

15. Did you receive a <u>stock certificate</u> or other paperwork indicating you invested money and owned a percentage of the movie? If yes, How did you receive this paperwork (via mail, email, Fax, etc.)?  YES. VIA MAIL, IT DID NOT INICATE ANY PERCENTAGE OF A MOVIE,

**If you have any receipts and/or envelopes of your payment, stock certificate, or other literature specific to you (including UPS, FedEx, USPS, etc.), please provide a photocopy and keep the originals.** ENCLOSED ARE DOCUMENTS APPLICABLE, I ALSO HAVE COPIES OF ALL THEIR LETTERS OF ALL THEIR GREAT BUSINESS SUCCESSES AND PROMOTIONAL MATERIALS IF YOU DESIRE THEM,

**Return on Investment:**

16. Have you received any form of return on your investment?  If yes, please state the amount and date received.  NONE.

**Miscellaneous:**

17. Have you contacted any other law enforcement or regulatory agency about Gigapix Studios Inc./Oz3D, LLC?  If so, who and when?

NO

18. Did you ever contact Gigapix Studios Inc./Oz3D, LLC with any complaints regarding your investment?  If yes, what were the complaints, who did you speak with, and what was his or her response?  I CALLED PERIODICALLY ABOUT THE PROSPECTS OF AN IPO-ALWAYS EXCUSES. I COMPLAINED WHEN THEY CUT MY ~~STOCK~~ BY REVERSE STOCK SPLIT, WHICH INCLUDED THE WARRANTS. THEY SAID IT WAS NECESSARY PREPARATION TO ARRANGEMENTS TO BECOME PUBLICLY TRADED.

19. Were you made aware that Gigapix Studios and Chris Blauvelt received multiple state cease and desist orders since August 2008?  If no, would you have liked to have known?  If yes, what did they tell you about them?

NO, AND I WOULD HAVE LIKED TO KNOW,

20. Please provide any other information you feel would be helpful to the Federal Bureau of Investigation that is not covered in the questions listed above.

IT SEEMS CLEAR THAT INVESTORS HAVE BEEN LEFT WITH WORTHLESS STOCK.

Thank you very much for taking the time to respond to this questionnaire.

# EXHIBIT 6

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,          )
                                        )
6                    Plaintiff,         )
                                        )
7        vs.                            )   Case No. CR 14-282 R
                                        )
8    DAVID PRITCHARD and                )
     CHRISTOPHER JAMES BLAUVELT,        )
9                                       )
                     Defendants.        )
10   _____)

11

12          REPORTER'S PARTIAL TRANSCRIPT OF
                 TRIAL PROCEEDINGS
13          TESTIMONY OF TONYA PINKERTON
             THURSDAY, OCTOBER 16, 2014
14                  1:14 P.M.
             LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23   MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
          FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 430
           LOS ANGELES, CALIFORNIA 90012
25                (213) 894-2305

1    that we looked at that you separated travel as a category in

2    and of itself; correct?

3    A    Yes.

4    Q    And you said that you did that because you had no way of

5    knowing whether it was personal or business?

6    A    Yes.

7    Q    And why is it that you had no way of knowing?

8    A    Because the memo line of the check or wire transaction did

9    not indicate which individual it was for or the purpose wasn't

10   clear.

11   Q    And that's also because you only inspected the bank

12   documents; is that correct?

13   A    Yes.

14   Q    You did not look at any sorts of source documents?

15   A    Correct.

16   Q    So you didn't look at invoices?

17   A    Correct.

18   Q    Receipts?

19   A    Correct.

20   Q    Bills, any actual document that supports what the bill or

21   the expense is for?

22   A    That's correct.

23   Q    So on occasions, you were making a bit of an educated

24   guess; is that correct?

25   A    Yes.  Based on knowledge, experience, interviews, and memo

# EXHIBIT 7

FD-302 (Rev. 5-8-10)

- 1 of 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     11/18/2013

    CHRIS BLAUVELT, cellular telephone number ███████████████, was telephonically contacted by the interviewing agent. BLAUVELT had previously spoken with the interviewing agent regarding BLAUVELT's former company, GIGAPIX STUDIOS, INC. (GIGAPIX). BLAUVELT left voicemail messages for the interviewing agent on November 12, November 13, and November 15, 2013, asking for the interviewing agent to return his call. BLAUVELT was familiar with the identity of the interviewing agent and the purpose of the interview. BLAUVELT provided the following information:

    BLAUVELT advised that he was trying to get a job, but was unsuccessful in part because of the negative information about him on the internet. He said that he had no money or family, and was homeless and at times sleeping in his vehicle. BLAUVELT said that he spent twelve years trying to make GIGAPIX go, and therefore needed to include it on his resume. However, the internet searches and the FBI investigation of GIGAPIX has made getting a job difficult.

    Per BLAUVELT, DAVID PRITCHARD was President of GIGAPIX at one time, and PRITCHARD had information about the company. Also, COLIN MUTTON, the Chief Financial Officer (CFO), moved the company records to a storage facility in Santa Monica, California. BLAUVELT opined that the only information he had would be from his personal recollection and the few documents he had in his briefcase.

    BLAUVELT stated that he was trying to get his life back on track, and that he had gone through a divorce and could not see his children. BLAUVELT said that he would be happy to cooperate with the interviewing agent, and he (BLAUVELT) really wanted to get some resemblance of his life back. BLAUVELT advised he was sleeping on his brother's couch in Redding, California at the time of the interview, but this was a temporary arrangement.

---

Investigation on  11/18/2013  at  Los Angeles, California, United States (Phone)

File #  ███████████████                                     Date drafted  11/18/2013

by  STORER ADAM W

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry   08/04/2014

CHRISTOPHER JAMES BLAUVELT (BLAUVELT), date of birth ~~██████████~~, cellular telephone number (~~██████~~ was contacted telephonically from the ROYBAL FEDERAL COURTHOUSE located at 255 East Temple Street, Los Angeles, California. After advising BLAUVELT of his identity, the interviewing agent said an arrest warrant had been issued for BLAUVELT. The warrant was for BLAUVELT's role in GIGAPIX STUDIOS. The interviewing agent told BLAUVELT to come to the lobby of the Roybal Federal Building immediately, or else BLAUVELT risked becoming a fugitive. Additionally, the interviewing agent told BLAUVELT there were no promises or guarantees, but some of the past individuals who turn ed themselves in were released on bail the same day. BLAUVELT provided the following information:

BLAUVELT could not get to the courthouse that day because he did not have a car. At the time of the call, BLAUVELT was on the side of the road with a back pack in Goleta, California. A few days earlier, he started hitchhiking to Salinas, California for a court case. BLAUVELT only made it as far as Goleta and was going to miss his court date. BLAUVELT advised he could be found by law enforcement across the street from a SHELL gas station at the intersection of Calle Real and Turnpike Road. BLAUVELT told the interviewing agent he did not have a weapon.

During a subsequent call, BLAUVELT was advised that an officer from SANTA BARBARA COUNTY SHERIFF's would be coming to BLAUVELT's location to pick him up.

UNCLASSIFIED//FOUO

| | | | |
|---|---|---|---|
| Investigation on | 06/05/2014 | at | Los Angeles, California, United States (Phone) |
| File # | 318B-LA-259005 | Date drafted | 07/29/2014 |
| by | Eric R. Potocek | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

11362

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

### FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/10/2014

On June 6, 2014 at approximately 10:25AM, pursuant to an authorized arrest warrant signed by Honorable Victor B. Kenton, United States District Court, Central District of California, CHRISTOPHER JAMES BLAUVELT was arrested into federal custody, from the Santa Barbara County Sheriff's Department (SBSD), located at 4434 Calle Real, Santa Barbara, California by Federal Bureau of Investigation Special Agents John D. Verrastro, and Amie Stemen.

BLAUVELT was shown a copy of the warrant; transported to the Roybal Federal Building; and transferred to the custody of the United States Marshal Service without incident beginning time, and mileage 10:36AM, 19708, ending time, and mileage 12:24PM, 19810.

On June 5, 2014, SBSD arrested and detained BLAUVELT pursuant to the warrant.

UNCLASSIFIED//FOUO

Investigation on   06/06/2014   at   Santa Barbara, California, United States (In Person)

File #  318B-LA-259005                                    Date drafted   06/09/2014

by   VERRASTRO JOHN D, Amie A. Choate

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.