1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   ELLYN MARCUS LINDSAY (Cal. Bar No. 116847)
4  BYRON J. MCLAIN (Cal. Bar. No. 257191)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-2041
        Facsimile: (213) 894-6269
8       E-mail:    ellynlindsay@usdoj.gov
                   Byron.mclain@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12             FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,          No. CR 14-282-R

14            Plaintiff,              GOVERNMENT'S OPPOSITION TO
                                      DEFENDANT GREGORY PUSATERI'S
15            v.                      MOTION FOR JUDGMENT OF ACQUITTAL
                                      PURSUANT TO RULE 29(C) OF THE
16 GREGORY PUSATERI,                  FEDERAL RULES OF CRIMINAL
                                      PROCEDURE AND MOTION FOR A NEW
17            Defendant.              TRIAL PURSUANT TO RULE 33 OF THE
                                      FEDERAL RULES OF CRIMINAL
18                                    PROCEDURE

19                                    HEARING DATE: 1/26/15
                                      HEARING TIME: 1:30pm
20                                    HEARING LOCATION: Courtroom of the
                                      Honorable Manuel Real
21

22
23       Plaintiff United States of America, by and through its counsel

24 of record, the United States Attorney for the Central District of

25 California and Assistant United States Attorneys Ellyn Marcus Lindsay

26 and Byron J. McLain, hereby opposes Defendant Gregory Pusateri's

27 Motion for Judgment of Acquittal Pursuant to Rule 29(c) of the

28 Federal Rules of Criminal Procedure, and Motion for a New Trial

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  This Opposition is based on the attached memorandum of points and authorities, the files and records in this case, and such other evidence and argument as may be provided to the Court at the hearing on this matter.

Dated: January 16, 2015          Respectfully submitted,

                                 STEPHANIE YONEKURA
                                 Acting United States Attorney

                                 ROBERT E. DUGDALE
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 ELLYN MARCUS LINDSAY
                                 BYRON J. MCLAIN
                                 Assistant United States Attorneys
                                 Major Frauds Section

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  FACTS..........................................................1

III. ARGUMENT.......................................................8

    A.   THERE WAS OVERWHELMING EVIDENCE OF DEFENDANT'S GUILT,
        AND THUS DEFENDANT'S MOTION FOR A JUDGMENT OF
        ACQUITTAL SHOULD BE DENIED.................................8

    B.   DEFENDANT'S MOTION FOR A NEW TRIAL MUST BE DENIED.......14

        1.   Legal Standard....................................14

        2.   Defendant Has Not Met any of the Requirements For
            a New Trial.......................................15

            a.   Not Offered for the Truth....................17

            b.   State of Mind................................19

            c.   Prior Consistent Statement..................19

IV.  CONCLUSION....................................................21

i

**TABLE OF AUTHORITIES**

**CASES:**                                                                    **PAGE(S)**

Jackson v. Virginia,
       443 U.S. 307 (1979)................................................9

Tome v. United States,
       513 U.S. 150 (1995)...............................................20

United States v. Abascal,
       564 F.2d 821 (9th Cir. 1977)......................................18

United States v. Anfield,
       539 F.2d 674 (9th Cir. 1976)......................................17

United States v. Bao,
       189 F.3d 860 (9th Cir. 1999)..................................19, 20

United States v. Chang Da Liu,
       538 F.3d 1078 (9th Cir. 2008).....................................20

United States v. Collicott,
       92 F.3d 973 (9th Cir. 1996).......................................20

United States v. Gomez-Norena,
       908 F.2d 497 (9th Cir. 1990)......................................17

United States v. Hatcher,
       496 F.2d 529 (9th Cir. 1974)......................................18

United States v. Kellington,
       217 F.3d 1084 (9th Cir. 2000).................................14, 15

United States v. Lincoln,
       630 F.2d 1313 (8th Cir. 1980).....................................14

United States v. Mosley,
       465 F.3d 412 (9th Cir.2006)........................................9

United States v. Payne,
       944 F.2d 1458 (9th Cir. 1991).....................................20

United States v. Pimentel,
       654 F.2d 538 (9th Cir. 1981)..................................14, 15

United States v. Sanchez,
       969 F.2d 1409 (2d Cir. 1992)......................................15

United States v. Sandoval-Gonzalez,
       642 F.3d 717 (9th Cir. 2011).......................................9

United States v. Sherpa,
       97 F.3d 1239 (9th Cir. 1996)......................................14

ii

**TABLE OF AUTHORITIES (CONTINUED)**

**RULES:**                                                                 **PAGE(S)**

Fed. R. Crim. P. 29(c)...............................................8, 14

Fed. R. Crim. P. 33......................................................14

Fed. R. Crim. P. 33(a)...................................................14

Fed. R. Evid. 403........................................................18

Fed. R. Evid. 801(d)(1)(B)...............................................19

Fed. R. Evid. 801(d)(2)(A)...............................................18

MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

Defendant Gregory Pusateri ("defendant") moves this Court for a judgment of acquittal based on insufficient evidence, and for a new trial based on this Court's alleged erroneous evidentiary rulings.

Defendant's motions should be denied.  The evidence against defendant was overwhelming, and this Court did not err in its rulings.

**II.     FACTS**

In 2002, co-defendant Christopher Blauvelt founded Gigapix, which was supposed to be an animation studio that would produce and distribute television shows and movies.  Defendant Blauvelt served as Chief Executive Officer, Chairman of the Board of Directors, and Chief Financial Officer of the Company.  In June 2006, co-defendant David Pritchard joined Gigapix as its President and Director.  While in charge as the two main operators of Gigapix, defendants Blauvelt and Pritchard hired salespeople to solicit investors in Gigapix and in the movie OZ3D through cold-call telemarketing.  Defendant and co-defendant Cherie Brown were the two top-selling telemarketers.

The evidence against defendant at trial consisted of testimony from victim investors he had solicited, insiders who testified about what happened at the company and what everyone knew was going on there, and financial analysis.  Defendant testified and made many admissions.

Victim Danny Anderson testified that he learned of Gigapix through a friend, and that shortly thereafter, defendant called him. Defendant told him that Gigapix was a $50 million company, the earlier films of which had been successful.  The telephone call

occurred in approximately May 2009, but defendant told Mr. Anderson
that OZ3D would be released in 12-18 months and that Mr. Anderson
would receive returns in 12-18 months.  Defendant told him that OZ3D
action figures had already been made.  Defendant told him that he and
his wife would be millionaires.  He also said that Gigapix was next
in line to be purchased by the Disney company.  He said there was
virtually no risk to the investment, and also that he personally had
invested and that if the Andersons did not get paid, defendant would
not get paid.  The Andersons told defendant that they were by-the-
hour wage earners and that this was their retirement money.  When
they went over the paperwork with defendant, he told them to
disregard the risk language in the Private Placement Memorandum
("PPM").  In filling out the subscription agreement, defendant simply
instructed the Andersons as to what they should check on each page --
when they got to the part asking if they were accredited, defendant
told them to check that they were even though they were not.
Defendant never mentioned to the Andersons that he, Gigapix, OZ3D,
and Blauvelt were the subject of cease and desist orders.  Because of
defendant, the Andersons invested a total of $25,000 and lost all of
it.

Victim Sandra Wilson testified that defendant told her that
Gigapix's movies would do as well as Disney movies, that action
figures had already been manufactured, and that the Wilsons would be
millionaires.  He told her to think of her children and
grandchildren.  While the call took place in May 2009, defendant told
Ms. Wilson that she would see returns within one year.  He told her
the investment was very safe.  He never mentioned the PPM.  She was

2

present with the Andersons when defendant instructed them how to fill out the subscription agreement, and he "just zoomed through it." Defendant knew the money they were investing was their retirement money, and he knew they were not accredited.  He instructed them to check that they were regardless.  Again, he never mentioned the cease and desist orders that he and others had received.  The Wilsons invested $17,000 and lost it all.

Victim Linda Hampshire testified that defendant told her, in May 2008, that OZ3D would be coming out in one year, and that Michael J. Fox would be one of the voice actors.  He told her she could not lose, and that he had invested his own money.  Defendant knew that the Hampshires were not accredited, and they never filled out a subscription agreement.  At a later date, he pressured her to invest her 401K money, telling her that he was her financial advisor.  He never mentioned the cease and desist orders.  The Hampshires invested a total of $25,000 and lost it all.

Victim Jerome Goodman testified that defendant told him that the investment was a sure thing, and that there was no risk because things were going so well.  He asked Mr. Goodman, "what are you going to do with all that money?" He told Mr. Goodman that Gigapix's prior movies had made big profits.

Shawn Walker testified that he worked at Gigapix as Pritchard's right-hand man from the fall of 2006 through the end of 2011.  He testified that the projects Pritchard undertook were highly risky and there was no guarantee they would be successful.  Walker testified that from 2006 through 2009, the projects he and Pritchard were working on were in development mode and were not on the verge of

being made.  OZ3D was never in production during the time Walker was present.  Moreover, no voice actors had been hired, let alone Michael J. Fox.  In 2009, they began to work on a live-action children's movie called "Blackbeard."  The financial structure for Blackbeard was not fully in place, in that Pritchard had not obtained bank financing and thus no production bond.  Part of the financing had been a tax credit from the state of Iowa that was withdrawn at the last minute.  This sent the production into disaster, and bills could not be paid.  This was in mid-2009.  After that, Gigapix was a financial disaster, and bills could not be paid.  Money was being raised through OZ3D but was being used to cover Gigapix's debts.  Everyone at Gigapix was aware that the only money coming in was from the OZ3D raise and that the money was being used to pay off the debts from Iowa.  The salespeople were all aware of this.  Bills were not being paid, such as payroll and health insurance.

Walker was asked about some of the statements in letters that Pritchard and Blauvelt sent to investors.  For example, Government's Exhibit 40 stated that Ernst and Young was doing an audit of Gigapix. Walker stated everyone knew this was not true because if it had been true, it would have been a big deal and a selling point.  In Government's Exhibit 68, Pritchard stated that Gigapix was about to become a public company, which never happened.  Even if it did, it was only to be traded on the pink sheets and not on a major exchange.

Tiffany Ryan testified that she worked as an opener and then assistant sales manager at Gigapix.  The closers made 20% commissions, and if an opener helped them, they would give 5% to the opener and keep 15%.  She and everyone else at Gigapix understood

1    that the investments were highly risky, and it would have been a lie

2    had a salesperson told the investors that the investment was not

3    risky.  It would also have been a lie for a salesperson to tell

4    investors that they would receive returns within a year of their

5    investment, or to say that OZ3D was in production or would soon come

6    out.  Also, no action figures related to OZ3D had been made.  When

7    Ryan started, the offices were on Oso Avenue, and the closers sold

8    behind closed doors.  When the office moved to Lankershim Boulevard,

9    there was an open area for salespeople.  The manager, Ken Gross,

10   wanted the salespeople out in the open where they could be heard, to

11   make sure they were not making misrepresentations.  The only two who

12   he was unable to get out in the open were defendant and Cherie Brown.

13   A salesperson named Hines refused to sell out in the open, so instead

14   went to Cherie Brown and gave her his clients.  When she sold them

15   behind her closed door, they split the commissions.  Ryan tried to be

16   a closer, but she told potential investors about the risks and she

17   never guaranteed returns, and she only made one sale in two months.

18        Gigapix's regulatory issues were well known, and Ryan prepared

19   do not call lists which were circulated to the salespeople.

20        After the issues in Iowa, everyone was aware of the financial

21   problems of the company.  People's salaries were not getting paid and

22   the activity level of the studio had dropped to almost nothing.  Ryan

23   left in June 2011 because Gigapix could no longer afford her salary

24   of $900 per month.

25        Tonya Pinkerton, a financial analyst with the FBI, testified

26   that she analyzed the bank accounts for Gigapix and OZ3D from July

27   31, 2006, through December 31, 2012.  Over $8 million came into OZ3D

28

from investors, and about $13 million came into Gigapix from investors.  In all, there were 731 investors.  Forty percent of the money that came in went to administration, 23.4% went to selling the investment, a total of about 21% was spent on anything having to do with producing movies, and $1.9 million went to Pritchard and Blauvelt.  Cherie Brown made $650,964.81 from April 14, 2008, through August 19, 2011, and defendant made $578,284.15 from September 11, 2006, through January 10, 2011.

Professor William Hicks testified that the OZ3D and Gigapix offerings should have been registered with the SEC as none of the exemptions from registration applied.

Defendant called Ken Gross as a witness.  He testified that he was the sales manager at Gigapix on and off from 2002 through 2010. He stated that he was defendant's boss, and that he ran a tight ship, by the book.  He said that he never heard defendant make misrepresentations and he was never reprimanded for making misrepresentations.  He testified that he wanted the salespeople to be in one room, out in the open for three reasons: so that everyone could learn from each other, so that there would be no hard feelings about certain people having private offices, and as a prophylactic measure against misrepresentations.  He testified that he wanted defendant and Cherie Brown out in the open with everyone else, but that Blauvelt refused, and defendant and Brown sold behind closed doors.  On cross-examination, Gross admitted that salespeople earning high commissions, such as the 20% at Gigapix, generally could not be trusted to sell honestly.  He also admitted that in the trial of Pritchard and Blauvelt, he testified under oath that the reason he

1    wanted the salespeople in the open was so that he could do his job --
2    that is, preventing misrepresentations.  He testified that if
3    defendant and Brown were being fully open and honest, there would be
4    no reason not to let him hear what they were saying, but they
5    refused.  Gross had no idea what defendant said to the investors.  In
6    fact, he was unable to do his job as to defendant and Brown.

7         Defendant called one of his investors, Troy Judd.  The
8    government's objections to questions eliciting what defendant told
9    Mr. Judd were sustained.

10        Defendant testified.  He stated that he had a background in
11   production, and wanted to be on the creative side at Gigapix.
12   However, he got into sales.  He had about 260 clients.  He stated
13   that he never told anyone that there was no risk to the investment,
14   or that it was a sure thing.  He said he told everyone not to invest
15   more than they could afford to lose.  He never guaranteed a return on
16   the investment by a particular date.  He knew that with any movie,
17   returns would not come in for 2-3 years.  He might have said that
18   names were being tossed around as voice actors, such as Michael J.
19   Fox.  He might have said that Gigapix hoped to be like Pixar.  He
20   never told any investor that he was their financial broker.  He never
21   told investors that toys were already manufactured.  He did not walk
22   investors through the PPM, but he made sure they all received it,
23   read through it, and understood it.  He never told any investor that
24   the PPM should be ignored, and he never told anyone how to fill out
25   the subscription documents.  He never told any investor to mark that
26   they were accredited if they were not.

27        On cross examination, defendant agreed that several of the
28

7

statements the investors claimed he made to them were false, but maintained that he never said these things to investors.  These would include: that the investment carried little or no risk, that OZ3D would be released within a year, that investors would see returns within one year to 18 months after investing, that action figures had been produced, that Gigapix would be purchased by Disney, and that he would only receive money when the investors did.

Regarding the offer and sale of unregistered securities, defendant admitted that he knew the securities were not registered, and that he knew they should have been registered, but claimed that he relied on Blauvelt, who told him that he was getting the securities registered.

Colin Mutton, Gigapix's accountant, testified.  He confirmed that after 2009, everyone at Gigapix knew that the company was falling apart financially.  It was clear that the money raised was going to the debts created by Blackbeard and just to keep the lights on.

**III. ARGUMENT**

    **A.    THERE WAS OVERWHELMING EVIDENCE OF DEFENDANT'S GUILT, AND THUS DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD BE DENIED**

Defendant moves this Court for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, based on his claim that the evidence against him was insufficient to support the jury's verdict.  As he notes, his burden is quite heavy: this Court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

1  reasonable doubt.'"  <u>United States v. Sandoval-Gonzalez</u>, 642 F.3d

2  717, 727 (9th Cir. 2011), quoting <u>United States v. Mosley</u>, 465 F.3d

3  412, 415 (9th Cir.2006), and <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

4  (1979).

5      As demonstrated with the factual recitation above, the evidence

6  against defendant was overwhelming.  He blatantly lied to the

7  investors about the risk involved in the investment, his own

8  financial investment in the company, the timing of action and

9  returns, and other material facts.  He omitted to inform investors of

10  his own large financial gain from their investments, of his cease and

11  desist order from California, and of the grave financial condition of

12  Gigapix.  Without any hesitation, he victimized people who were

13  unsophisticated and unwealthy, having no problem whatsoever in taking

14  their retirement money that they had worked long years at low-wage

15  jobs to earn.

16      In order to convince this Court that the evidence was

17  insufficient, defendant merely repeats the arguments he made to the

18  jury.  Each of these arguments is just that -- an argument -- and the

19  jury clearly rejected them all.  This Court really need go no further

20  in order to deny defendant's motion, as the only way defendant's

21  motion can be granted is to take the evidence in the light most

22  favorable to defendant, rather than the other way around.  However,

23  should this Court wish to go further, the government discusses below

24  defendant's specific arguments.

25      First, defendant claims that since he was not management, it was

26  wrong for him to be convicted.  However, he admitted to defrauding

27  260 victims, and he profited by over $575,000.  His argument here is

28

9

1  really one of relative culpability which will be, the government

2  assumes, addressed at sentencing.

3      Defendant then argues that because he was the person who spoke

4  to the investors, they pointed the finger at him when things failed.

5  This is not true, however.  The investor victims testified as to what

6  defendant told them, but also testified regarding the letters they

7  received from Blauvelt and Pritchard and their personal contact with

8  those two individuals.  The investors did not "point the finger" at

9  defendant, but rather answered questions about who told them what.

10      Defendant claims that he believed what Pritchard and Blauvelt

11  told the salespeople and placed in the newsletters and only repeated

12  what he was told.  However, the victim investors all testified that

13  defendant told them many things that defendant admitted knowing were

14  lies: for example, that the investment involved no risk, that OZ3D

15  would be released shortly, that investors would receive returns

16  within one year to 18 months of their investment, and that defendant

17  received no money from the investment, but only earned stock and thus

18  would make no money unless and until the investors made money.

19      Defendant claims that he was not aware of the financial problems

20  at Gigapix.  He represents that witnesses Shawn Walker and Tiffany

21  Ryan testified that Pritchard misled everyone into thinking things

22  were going well.  But in fact, both witnesses testified that everyone

23  was well aware that the company was in dire financial straits as of

24  mid-2009.

25      Defendant then claims that the offering materials covered the

26  risks and other pitfalls of investing in Gigapix and OZ3D, and it was

27  not the salesperson's job to walk the investors through the PPMs.

28

However, the victims testified quite clearly that defendant sold the investment as one involving no risk.  When investors questioned defendant regarding the contradictory information in the materials, he told them to ignore it.  Given that the investors were clearly unsophisticated and knew nothing about movies, defendant cannot hide behind boilerplate PPM's he told the investors to ignore.

Defendant next asserts that unaccredited investors wanted to invest.  He claims the unaccredited investors were talked into the investment by friends.  However, that was not the testimony.  The testimony was that friends referred the victims to the investment, and defendant talked them into investing.  Defendant's attempts to rewrite the victims' testimony must be ignored.

Defendant next claims that he believed in the company because he received stock.  However, he did not put his own money into the company -- he received an enormous amount of money from the company -- and actually, directly from the investors.  Over his tenure at Gigapix, he earned over $575,000.  Defendant was hardly a victim.

Defendant next claims that he did not make misrepresentations to investors.  For example, he asserts that he did not tell his investors that there was no risk in the investment.  However, all four investors with whom he spoke testified that he told them exactly that.  Moreover, they were unsophisticated and did not understand the PPM on which defendant now relies.  Beyond that, to the extent they did see that the written boilerplate mentioned risk, defendant told them to ignore the clearly legalese document.  He asks how anyone could fail to understand how risky movies were as an investment. However, the victims in question lived far from Hollywood and had no

11

1    clue how the movie business worked.  They relied on defendant to tell

2    them.  And he lied about it.

3      Defendant then argues that it would make no sense for the

4    victims to have been told to expect exorbitant returns.  Yet that is

5    exactly what defendant told each of them.   He told Danny Anderson he

6    would be a millionaire.  He told Sandra Wilson to think of her

7    children and grandchildren.  He asked Jerome Goodman -- "what are you

8    going to do with all that money??"

9      Defendant maintains that if he told investors, as they

10    testified, that OZ3D would be released in 12-18 months, this would be

11    more conservative than even the PPM.  This argument is beside the

12    point: defendant testified that he was well aware that such a

13    statement would have been false.  Therefore, if he made the

14    statement, as his victims testified that he did, he knowingly lied.

15      Defendant then relies on the direct testimony of Ken Gross, the

16    sales manager at Gigapix.  He repeats certain claims from Mr. Gross's

17    direct testimony, such as that he never heard defendant make a

18    misrepresentation, and that the reason he wanted defendant in the

19    open was so that other salespeople could learn from him.  However, it

20    became quite clear that Mr. Gross actually was quite aware that

21    salespeople earning high commissions, such as defendant, often make

22    misrepresentations, and that his job at Gigapix was to make sure that

23    salespeople did not do this.  However, as he testified in the trial

24    of Pritchard and Blauvelt, he was completely unable to do this with

25    defendant and Brown because they refused to sell in the open, and in

26    fact, he had no idea what they said to the investor victims.  Mr.

27

28

1    Gross's testimony demonstrated that defendant was allowed to hide

2    behind closed doors and to lie at will.

3         The testimony of the investor victims was devastating to

4    defendant, as even he admitted that the things they testified he told

5    them were false.   Thus, it is no surprise that defendant tries now as

6    he did in his closing argument, to undermine this testimony.

7    Defendant does this by trying to import uncertainty to what was clear

8    and certain testimony about who told each investor what.   In fact,

9    there was no doubt: the investors each testified that defendant told

10   them the investment involved little or no risk, that it would make

11   them rich, that returns would come within 12-18 months, and that he

12   only made money if they did.

13        Finally, defendant complains about the sufficiency of the

14   evidence supporting his convictions for the offer and sale of

15   unregistered securities.   In doing so, he belittles the evidence of

16   the cease and desist orders.   However, this evidence is almost beside

17   the point given defendant's clear admission during trial: that he

18   knew the investments were securities and he knew they had to be

19   registered with the SEC.   His only lame denial was that he thought

20   Blauvelt would take care of getting the securities registered with

21   the SEC.   However, he continued selling all the way through until he

22   left, even though the PPMs continued to note that the securities were

23   not registered with the SEC.

24        Defendant next claims that he did not "sell" the securities

25   after May 2009 because Blauvelt was the final closer.   Even if the

26   jury believed this assertion, defendant still "offered" the

27

28

                                        13

securities, and he still "aided and abetted" in the offer and sale of the securities.  Thus, he is guilty as a principal.

As demonstrated by this lengthy discussion of defendant's issues, all he does to support his motion is to re-argue the case and interpret the facts in the light most favorable to himself.  If the evidence is viewed in the light most favorable to the government, as must be done in a Rule 29(c) motion, defendant's motion must be denied, as the jury's verdicts of guilt are well founded and supported by overwhelming evidence.

**B.   DEFENDANT'S MOTION FOR A NEW TRIAL MUST BE DENIED**

**1.   Legal Standard**

Rule 33 provides that "upon the defendant's motion, a court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  A new trial motion under Rule 33 "should be granted only in <u>exceptional cases</u> in which the evidence preponderates highly against the verdict." <u>United States v. Pimentel</u>, 654 F.2d 538, 545 (9th Cir. 1981)(citation omitted, emphasis added); see also <u>United States v. Kellington</u>, 217 F.3d 1084, 1097 (9th Cir. 2000) (new trial motion should only be granted where "the evidence preponderates sufficiently heavily against the verdict" such that "a serious miscarriage of justice may have occurred") (citation omitted).

In ruling upon a Rule 33 motion, a court's "authority should be exercised sparingly and with caution." <u>United States v. Lincoln</u>, 630 F.2d 1313, 1319 (8th Cir. 1980); <u>cf.</u> <u>United States v. Sherpa</u>, 97 F.3d 1239, 1244 (9th Cir. 1996) (a court "cannot simply set aside a verdict just because he or she personally disagrees with a jury's

14

finding"). A defendant must establish a genuine concern that he was wrongly convicted to overturn the presumptively valid guilty verdict: "There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'" United States v. Sanchez, 969 F.2d 1409, 1414-15 (2d Cir. 1992) (even though district court believed some trial testimony was perjurious, new trial was not warranted because sufficient other trial evidence supported the conviction).

        2.   Defendant Has Not Met any of the Requirements For a New Trial

Defendant's motion falls far short of showing, as defendant must to obtain a new trial, that this is the "exceptional case" in which the "evidence preponderates sufficiently heavily against the verdict" to give rise to "a real concern that an innocent person may have been convicted" and that a serious miscarriage of justice may have occurred. Pimentel, 654 F.2d at 545; Kellington, 217 F.3d at 1097; Sanchez, 969 F.2d 1414.

As discussed above, the evidence against defendant was overwhelming. Nevertheless, he presents the case as if there were only four investors who would testify that he lied to him, while a vast number of investors would testify otherwise. He offered, however, only three witnesses, two of whom were married and thus were told the same things by defendant.

Defendant claims Troy Judd would have testified that he had a number of conversations with defendant, and that defendant made no promises about the possible success of the investments. He told Mr.

Judd about the risks involved in the investment, and never promised a return.  Defendant also told him not to invest any more than he could afford to lose.

The case agent interviewed Mr. Judd.  He told the case agent that he really heard about the investment through his father, Greg Judd.  Troy Judd invested sometime between 2005 and 2007.  While defendant told him to only put in what he could afford to lose (which was $3,000), defendant said he was heavily invested in the company. Defendant told Mr. Judd that there were no guarantees, but that it was a great opportunity.  Defendant told him that the company was on the cusp of going public, and that there was an urgency to invest as it was getting down to the wire.

Defendant proffered the testimony of Larry and Margaret Suggett. He states that they would have testified that defendant told them the investment in Gigapix was speculative, and never said there was no risk or that the investment was guaranteed.  Defendant also did not want them to invest more than they could afford.  He never promised a return, or a particular rate or date of return.  Again, defendant told them never to invest more than they could afford to lose.

The case agent interviewed the Suggetts.  They are in their 70s and are not accredited: Mrs. Suggett being a retired teacher and Mr. Sugget being a retired fireman.  They invested with defendant in 2002, at the very beginning.  He told them it was speculative and if they could not afford to lose the money, they should not invest. Defendant told them the investment would be very lucrative when it went public, but there was a lot of risk.  Defendant went over the PPM with them.  Defendant told them he was not paid a salary --

16

rather, he was paid in stock.  The Suggetts also invested $5,000 in OZ3D.

The government objected to any testimony by the victims of what defendant said, as such evidence was hearsay.  Defendant maintained that the evidence was not offered for the truth of what was said, but rather to demonstrate the state of mind of the investors.[1]  Defendant now proffers three reasons why the evidence should have been admitted.

### a.   *Not Offered for the Truth*

Defendant's first claim is that the evidence he proffered was not hearsay because it was not offered for the truth of the matter asserted, but rather to show that he made the statements.  Defendant cites three cases for this proposition, none of which is on point here, because: 1) in none of these cases was a defendant allowed to introduce his own statements through third party witnesses; and 2) the statements offered were directly relevant to an issue in the case.  In United States v. Anfield, 539 F.2d 674, 678 (9th Cir. 1976), a prosecutor testified in defendant's perjury trial that the defendant had made a particular statement in sworn testimony in the grand jury, which conflicted with his sworn testimony at a later trial.  The Ninth Circuit held that in such a circumstance, the prosecutor's recitation of what the defendant said was not hearsay.

---

[1] It is the government's memory that defendant objected only on this specific ground -- that is, that the testimony was offered for the state of mind of the investors.  If this is true, then a strict standard of review will apply.  "[A] party fails to preserve an evidentiary issue . . . not only by failing to make a specific objection, but also by making the wrong specific objection."  United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir. 1990) (citations omitted) (applying plain error review because defendant made the wrong specific objection)

The relevant fact was that the defendant made inconsistent statements under oath.   The Court held that his testimony was "independently relevant."   Here, the statements are the defendant's, but are offered by the defendant as opposed to the government, the adversary party. See Federal Rule of Evidence 801(d)(2)(A).   Moreover, the proposed testimony was irrelevant: simply because defendant told two investors one thing does not make it more probable that he did not tell other investors the opposite.   Further, the additional information obtained by the government points to the main issue that makes the proffered testimony irrelevant: the investments made by these witnesses were very early in defendant's selling career, prior to the charged conduct in the case -- 2002 for the Suggetts, and 2005 for Mr. Judd. The testimony was not only irrelevant, it was further inadmissible pursuant to Federal Rule of Evidence 403: it would lead to unfair prejudice, would confuse the issues, would mislead the jury, would cause undue delay, and would waste time.

Defendant's other cited cases offer no further support for his position.   See United States v. Hatcher, 496 F.2d 529 (9th Cir. 1974)(statement made to defendant offered by prosecution to show effect on defendant); United States v. Abascal, 564 F.2d 821 (9th Cir. 1977) (wiretap of co-defendant offered by defendant to show co-defendant using real estate terms for real estate, not as code words for drugs).   None of defendant's cases authorizes a defendant to put his own words into evidence through the testimony of other witnesses, and thus this Court properly excluded the statements on this ground.

### b.   State of Mind

Defendant next asserts that the evidence was admissible as it was not offered for the truth, but rather for the investors' states of mind.  He notes that one of the elements of mail and wire fraud is that the misrepresentations must be material, and the statements were offered for that purpose.  However, the state of mind of people who invested very early in the company's history and who are not count victims is hardly relevant.  Moreover, defendant's argument fails in that defendant could have elicited testimony as to the investors' state of mind -- the government objected to the investors' testimony as to what defendant told them.  Defendant could have asked these investors if certain things were important to them in their decision to invest.  What defendant told them was, for the most part, beside the point as to what they felt was important in their decision to invest.  Thus, there was no error in excluding the evidence on this ground.

### c.   Prior Consistent Statement

Defendant claims that the testimony of his investor witnesses was admissible as a prior consistent statement, pursuant to Federal Rule of Evidence 801(d)(1)(B).  However, this rule does not apply.

Rule 801(d)(1)(B) states that out-of-court statements are not hearsay if the declarant testifies at trial, is subject to cross-examination about the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."  United States v. Bao, 189 F.3d 860, 864 (9th Cir. 1999), quoting Rule 801(d)(1)(B).  Prior consistent

statements may not be admitted simply "to counter all forms of impeachment or to bolster the witness . . . .  The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told."  <u>Tome v. United States</u>, 513 U.S. 150, 157-58 (1995), quoted in <u>Bao</u>.   The party offering the statements must establish the following for the statements to be admissible:

> (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

<u>Bao</u>, 189 F.3d at 864.

Here, the first and fourth elements are met.  The second and third are not, however.  Regarding the second, as in <u>Bao</u>, the government did not allege that the defendant had a motive to fabricate his testimony.  Thus, the statements were properly excluded for this reason.

The third element is not met here, either.  In virtually all cases in which a proponent puts forth a prior consistent statement, including those cited by defendant, the statement is itself virtually indistinguishable from the testimony of the declarant.  <u>United States v. Chang Da Liu</u>, 538 F.3d 1078, 1086 (9th Cir. 2008) (statements witnesses made to the FBI prior to the time the FBI started to pay them); <u>United States v. Collicott</u>, 92 F.3d 973, 981-82 (9th Cir. 1996) (witness claimed she could not remember making a particular statement; testimony was that she made the statement); <u>United States v. Payne</u>, 944 F.2d 1458, 1470 (9th Cir. 1991) (victim's prior statement to the FBI).  Here, however, it is not.  Defendant

testified that he would never tell a potential investor that the investment was guaranteed or had low risk, or that the movies would be coming out soon.  The prior consistent statement would be that he told someone that he would never tell a potential investor that the investment was guaranteed or had low risk, or that the movies would be coming out soon.  Instead, the offered statements are directly from investors as to what he told only them.  Thus, for purposes of the rule, they are not "consistent."  What defendant wanted to introduce was more akin to prior acts of honesty in order to bolster a general character for honesty, which is different from having consistently made the same statement in the past.

Because defendant could not meet the criteria for admission of the testimony as his own prior consistent statements, this Court properly excluded them.

**IV.   CONCLUSION**

For the foregoing reasons, defendant's motions for a judgment of acquittal and for a new trial should be denied.

21