**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (State Bar No. 65672)
Email: rdrooyan@scheperkim.com
JEAN M. NELSON (State Bar No. 150856)
Email: jnelson@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Attorneys for Defendant**
**DAVID PRITCHARD**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:14cr00282-R |
| Plaintiff, | **DEFENDANT DAVID PRITCHARD'S POSITION RE: SENTENCING; DECLARATION OF JEAN M. NELSON** |
| v. | |
| DAVID PRITCHARD, et al. | Date:      February 9, 2015 |
| Defendant. | Time:      10:00 a.m. |
| | Ctrm.:      8 |
| | Assigned to Hon. Manuel L. Real in Courtroom 8 |
| | Action Filed:     05/15/2014 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

SENTENCING MEMORANDUM ................................................................................. 1

I. INTRODUCTION ........................................................................................... 1

II. FACTUAL BACKGROUND .......................................................................... 3

    A. Mr. Pritchard's Personal Background and Work Experience ................... 3

    B. Gigapix ....................................................................................................... 4

        1. Mr. Pritchard's Numerous Efforts to Make Gigapix a Successful Production Studio ......................................................................... 4

        2. Mr. Pritchard's Efforts to Revamp Gigapix ................................. 6

    C. OZ3D ........................................................................................................... 8

III. MR. PRITCHARD'S OBJECTIONS TO THE PSR AND POSITION REGARDING SENTENCING GUIDELINES CALCULATIONS ..................... 9

    A. The Government Has Failed to Prove that the Loss Amount Is $20,882,654 ......... 10

        1. There Is No Reliable Evidence that the Loss is $20,882,654.66 ............... 10

        2. The Government Has Failed to Prove that $20,882,654 in Losses Was Reasonably Foreseeable to Mr. Pritchard ........................... 15

    B. The Government Has Not Proven That More Than 250 Victims Were Involved ............ 16

    C. The Government Has Not Proven That Mr. Pritchard Knew or Should Have Known Any Victims Were Vulnerable ................................................. 17

    D. There Is No Basis for a Role Adjustment ................................................. 18

IV. MR. PRITCHARD'S POSITION REGARDING SENTENCING FACTORS PURSUANT TO 18 U.S.C. §3553(a) .................................................. 20

1        Defendant David Pritchard, by and through his counsel, respectfully submits

2   the following memorandum and accompanying materials to set forth his position

3   regarding the sentencing factors in his case, and to provide the Court with additional

4   information for the Court's consideration  in determining an appropriate sentence in

5   this case.

6

7   DATED:  January 29, 2015        Respectfully submitted,

8                                SCHEPER KIM & HARRIS LLP

9                                RICHARD E. DROOYAN

                             JEAN M. NELSON

10

11

12                           By:  /s/ Richard E. Drooyan

13                              Richard E. Drooyan

                            Attorneys for Defendant

14                              DAVID PRITCHARD

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SENTENCING MEMORANDUM**

I.    **INTRODUCTION**

Mr. Pritchard is a 67-year old man who, prior to this case, had never been arrested, charged or convicted of any offenses.  His background and life experiences reveal that he is someone who strives to work hard, adventure far, and help people and communities in need.  Although Mr. Pritchard is, by no means, perfect, we submit that the conviction in this case is an aberration in a very productive life, replete with many charitable activities and community services.

Long before Mr. Pritchard joined Gigapix, he was a creative and successful producer who had won awards for the movies and programs he produced.  His drive to take on difficult challenges has led him to climb eight of the tallest mountains in the world and to help others by creating an orphanage in Peru, a shelter for abused women in Jordan, and a rehabilitation center in Boston to helps adults with spinal cord injuries.  And he has used his business skills to help numerous charities and to assist city committees plan major renovations of public buildings.

To determine the sentence in this case, Mr. Pritchard asks this Court to also consider his efforts to make Gigapix a success for the benefit of the investors who ultimately lost money in the company.  Although Mr. Pritchard was perhaps overly optimistic in his own abilities based upon his history, he worked hard to make Gigapix and OZ3D successful.  Mr. Pritchard recognizes that the jury found that investors were fraudulently induced to invest in these companies by cold calls and letters from Christopher Blauvelt and the sales team.  The jury also presumably found that Mr. Pritchard misled two investors in telephone conversations he had with them before they invested and that letters he sent out to other investors after they had invested were misleading.  There is no evidence, however, that he directed the sales force (or anyone else) to make misrepresentations in cold calls or any other calls to investors.

///

1    With respect to the specifics of the Presentence Report and the guideline

2  range of 324 to 405 months, which even the government recognizes is overly harsh,

3  Mr. Pritchard objects to the enhancements based on loss, number and vulnerability

4  of victims, and aggravating role.  The PSR and government contend the loss is all

5  $20,882,654 invested by over 650 investors.  Yet at trial, the government called only

6  three victims to testify about the money they lost in Gigapix and OZ3D; only two of

7  these investors had any direct contact with Mr. Pritchard, and they invested a total of

8  $15,000 around the time they spoke with Mr. Pritchard.  Based on this very limited

9  testimony and loss, the government urges a loss amount 1,000 higher than the

10  amount it has actually proven and a number of victims that is hundreds of times

11  higher than actually proven.

12    The government has made no effort to prove up the loss or the number of

13  victims, relying instead on its claim that Gigapix and OZ3D were sham companies

14  and that two of the cold callers lied to some of the investors.  Yet Gigapix and

15  OZ3D were engaged in real work, and there is no evidence that all of the members

16  of the sales team made misleading statements or that all investors were misled and

17  thereby harmed.  As to Mr. Pritchard in particular, there is no evidence that he

18  provided the sales team with false information about Gigapix and OZ3D, told them

19  to lie to investors, or directed them to target vulnerable victims.

20    The government has also failed to prove Mr. Pritchard played an aggravating

21  role in this case.  It appears that the government has backed away from its "cold

22  calling" theory since there was no evidence to connect Mr. Pritchard to any of the

23  fraudulent cold calls or show that he organized or supervised the sales force, which

24  is the basis of the role enhancement in this case, or anyone else involved in any

25  fraudulent conduct.  But based upon conversations with two investors and post-

26  investment updates to investors, the government  recommends that Mr. Pritchard be

27  sentenced to 240 months in custody -- virtually a life sentence for someone without

28  a criminal record, who has a lifetime of achievement and who worked tirelessly to

1  save the companies that at the core of the fraud in this case.

2      If the Court does accept the government's victim statements as evidence of

3  $1,199,530 in losses, the Court should find that Mr. Pritchard's total offense level is,

4  at most, 25 with a sentencing range of 57 to 71 months.  For the reasons set forth

5  herein, we request the Court to depart downward from the guidelines or, at a

6  minimum, impose a sentence at the low-end of the guidelines.

7  II.    **FACTUAL BACKGROUND**

8      A.    **Mr. Pritchard's Personal Background and Work Experience**

9      In his letter to the Court, Mr. Pritchard has described his many charitable and

10 civic activities and his interest in the outdoors.  And the letters submitted by his

11 friends and family confirm his life-long commitment to help others.  This

12 commitment pre-dates by years (indeed decades) his involvement in Gigapix, and he

13 has succeeded in a variety of ways, from establishing an orphanage and a women's

14 shelter in foreign countries to raising funds for charities to helping inner city kids.

15 Mr. Pritchard is someone who has vigorously and actively helped others, not simply

16 by donating money, but by donating his time and skill.

17     As set forth in the PSR, Mr. Pritchard had a long and successful career in the

18 entertainment industry for years before he joined Gigapix in 2006.  He was Vice

19 President of Corporate Affairs for HBO and served as President and CEO of several

20 publicly traded companies in the entertainment sector, including film, television,

21 and commercial production and distribution companies.  Mr. Pritchard started and

22 sold his own production company, which created hit comedy and reality TV shows,

23 produced films, and created the first interactive internet channel for Time Warner.

24 He produced well-known TV shows such as "The Simpsons," "King of the Hill,"

25 "Family Guy," "Dr. Katz," and "Mission Hill."  He received Emmy awards for his

26 work on these shows and produced "Captain Abu Raed," a Jordanian feature film

27 that won the 2008 Sundance Film Festival Audience Award.  He also was Executive

28 Producer for "Workaholics," a popular show airing on Comedy Central.

1  At the time that Mr. Pritchard was deciding whether to join Gigapix, he was

2  working on several projects, including a new a production studio, which ultimately

3  attracted a $50 million investment by a venture capital fund, a real estate project in

4  China, and an animation studio and kids animated project in Jordan.

5  **B.**   **Gigapix**

6  **1.**   **Mr. Pritchard's Numerous Efforts to Make Gigapix a**

7  **Successful Production Studio**

8  Mr. Pritchard decided to join Gigapix with the goal of creating a successful

9  independent production studio.  Although he agreed to join Gigapix in 2006, he

10  continued to work in Jordan to complete his animation project and to finish

11  "Captain Abu Raed," and he did not start working at Gigapix until late 2007.

12  Once Mr. Pritchard joined Gigapix, he secured post-production work on his

13  projects in Jordan, which yielded both fees and studio production credits for

14  Gigapix.  These credits helped Gigapix secure distribution agreements for its future

15  projects.

16  Specifically, Mr. Pritchard obtained post-production work for Gigapix on

17  "Captain Abu Raed"  and "Ben and Izzy."  The latter was an animated TV program

18  for children, which aimed to help American and Jordanian children learn about each

19  other's cultures.  (Exhibit 425 attached hereto).

20  Mr. Pritchard also secured for Gigapix the final production and editing work

21  on "Baker Boys," a four-part documentary directed by Kern Kornwiser, about the

22  U.S. military surge in Iraq in 2007.  Mr. Pritchard and Kip Konwiser were executive

23  producers on the documentary, which generated nearly $400,000 in revenues for

24  Gigapix, won numerous awards and acclaim from critics, and was distributed in the

25  United States on the Military Channel, in 20 countries worldwide, and on DVD in

26  North America.

27  Starting in 2008, Mr. Pritchard sought to turn Gigapix into a successful

28  independent production studio.  He believed that Gigapix should focus on producing

1  movies and TV programs for children.  Based on extensive research and his

2  experience in the industry, Mr. Pritchard believed that Gigapix could earn

3  significant revenues from the large, underserved market for children's content.  He

4  prepared a thorough and detailed business plan for producing and distributing the

5  films and TV programs.  (Exhibit A attached hereto).  Per this plan, Gigapix would

6  initially develop and produce a total of five children's movies and related film and

7  TV-spin-offs.

8      Mr. Pritchard spent a great deal of effort in 2008 and 2009 to implement his

9  business plan.  He set up three LLC entities, wholly owned by Gigapix, to handle

10  different aspects of the development and production, and he developed a financing

11  plan involving tax credits from the state of Iowa and a loan from Banker's Trust

12  Company of Iowa.  Pursuant to this plan, GPX Development, LLC, and later Recess

13  Film Productions LLC, entered into a contract with the Iowa Department of

14  Economic Development ("IDED") for $10 million dollars in tax credits to fund

15  production and distribution of "Blackbeard."  (Exhibits 404 and 409 attached

16  hereto).  Mr. Pritchard enlisted the investment bank Capitoline Global Finance to

17  help set up the loan with Bankers Trust for Recess Film Productions LLC for

18  production costs.  (Exhibit 411 attached hereto).

19      Mr. Pritchard also lined up distribution deals with Anchor Bay and Essential

20  Media.  (Exhibits 417 and 419 attached hereto).  Mr. Pritchard set these deals up

21  before production  started to ensure the movies and programs would enter the

22  marketplace and be sold quickly.  Mr. Pritchard recruited Kip Konwiser, an

23  experienced and well-known film producer of independent films, to help  with these

24  distribution deals, the contract with IDED, and the bank loan and to supervise the

25  productions.  In addition, Mr. Pritchard brought in Kern Konwiser, an experienced

26  director, to develop the films creatively and to direct the first film; Jim Cardwell, an

27  experienced studio executive, to oversee the financings and begin the funding for

28  OZ3D, and other experts in the production field.  He also hired attorneys to draft

1  contracts and film financiers to prepare financial data and projections.

2  Mr. Pritchard was on his way to making Gigapix a successful independent

3  studio making high-quality marketable children's movies and TV programs until the

4  IDED abruptly and inexplicably pulled the tax credits in September 2010.  (*See*

5  Exhibit 419 attached hereto; Trial Transcript 10/16/14 at 397:13-14 (Ryan).)  This

6  caused Bankers Trust and Capitaline to pull out of the deal, leaving Gigapix with

7  little more than a legal claim against IDED and a long list of expenses to be paid.

8  Nonetheless, Mr. Pritchard continued to work to save Gigapix.  Mr. Pritchard

9  stopped drawing a salary in 2010, and thereafter only received payments for some

10  personal expenses (some of which were incurred to help two friends with urgent

11  personal needs) in lieu of his salary.  In the creditor's claim that he filed in the

12  Gigapix bankruptcy, the approximately $167,000 in personal expenses was offset

13  against the approximately $700,000 in salary that he was owed.  (Trial Transcript

14  10/17/14 at 625:20-25 – 626:1-3 and 627:23-25 – 628:1-13.)[1]

15  In a final attempt to save Gigapix, Mr. Pritchard sought a reverse merger with

16  a public company.  (Exhibit 454 attached hereto).  Unfortunately, after months of

17  trying, the merger fell through.

18  **2.**     **Mr. Pritchard's Efforts to Revamp Gigapix**

19  In early 2008, Mr. Pritchard learned that John Savage, former President of

20  Gigapix, was suing the company.  Mr. Pritchard reviewed Mr. Savage's resignation

21  letter and realized that Blauvelt may have been mismanaging Gigapix.  Mr.

22  _____

23  [1] In the government's sentencing position, it contends that trial exhibit 160 indicated
that Mr. Pritchard received a total of $359,373.95 "from the company bank accounts

24  on personal expenses."  Exhibit 160, however, did not identify the expenses or
differentiate between Mr. Pritchard's personal expenses, which were treated as part

25  of his salary, and his business expenses, such as travel, accommodations, and dining

26  incurred while travelling or meeting for business purposes.  Moreover Ms. Pinkerton
admitted at trial that she had to guess what some of these expenses concerned and

27  who incurred them.  (Trial Transcript 10/16/14 at 426:25 – 427:1-4; 430:12-4).

28

1   Pritchard concluded that Blauvelt's influence and control of Gigapix needed to be

2   reduced in order to attract institutional investors.  Accordingly, Mr. Pritchard

3   retained the services of Bill Uchimoto of Buchanan Ingersoll & Rooney, who

4   advised the company to do a capital restructure to reduce the percentage of shares

5   held by Blauvelt and significantly increase the percentage of shares held by the

6   shareholders.  (Trial Transcript 10/20/14 at 65:19 – 67:5).  Mr. Pritchard ultimately

7   convinced Blauvelt to relinquish many of his shares, and Gigapix successfully

8   completed the capitalization restructure in late 2009, which increased shareholders'

9   ownership from 9% to 49%.[2]  At the time of the restructure, Mr. Pritchard remained

10  optimistic that Gigapix would be a success.

11        Mr. Pritchard also determined that the pending state regulatory actions against

12  Blauvelt and Gigapix had to be resolved.  These actions concerned the sale of

13  company securities not registered for sale with each state in which they were sold,

14  and were directed against Mr. Blauvelt, not Mr. Pritchard.[3]  Mr. Pritchard pushed

15  Blauvelt to retain Myers & Heim, a New York law firm that specializes in resolving

16  regulatory actions to handle the pending actions and the subsequent actions that

17  arose.  Mr. Pritchard also obtained Mr. Uchimoto's guidance about registering the

18  securities for sale in each state, and tasked him with preparing a PPM with robust

19  disclosures for the later fund raises.

20  ///

21

_____

22  [2] Two of the mail fraud counts (Counts One and Two) were based upon the letter

23  Mr. Pritchard sent to investors in connection with the exchange of their Warrants

24  (representing ownership of 9% of Gigapix) for stock (representing 49% of the
    company) as part of the capital restructuring.  None of the investors invested

25  additional monies or took on additional risk as a result of this exchange.

26  [3] Mr. Pritchard was named in one of these regulatory actions but, as he explained at

27  trial, the law firm handling the state registration made a filing error that was
    subsequently resolved.

28

1    Mr. Pritchard had little to do with the sales team and ultimately cut their

2    commissions down to 10%, knowing that many on the sales staff would (and did)

3    then leave.  Mr. Pritchard focused his efforts on finding institutional financing, such

4    as the tax credits from Iowa and the distribution deals which included advancement

5    of production costs.  He also took various steps to prepare Gigapix to become a

6    public company.

7        C.    OZ3D

8    Prior to joining Gigapix, Mr. Pritchard had developed a script for a children's

9    animated film about the Wizard of Oz.  After it was  decided to develop and produce

10   the Wizard of Oz using a stand-alone entity OZ3D, Mr. Pritchard focused on the

11   creative development of the film, including the screenplay, character designs,

12   artwork, and distribution.  Mr. Pritchard worked to finalize the script, obtain artwork

13   for the animation, and land distribution agreements with Anchor Bay and Essential

14   Entertainment.  (Exhibit 430 and Exhibit 432, p. 4 ¶ 14 attached hereto).  Mr.

15   Pritchard and his team also obtained agreements with a ARC, a Canadian production

16   studio, and Multiple Media, a Canadian distribution company.  (Exhibit 447

17   attached hereto).  Multiple Media agreed to help arrange financing for nearly 60% of

18   the production through a tax credit program offered by the Canadian government.

19   *Id.*

20   OZ3D intended to raise a total of $20 million in financing for the film.  It

21   raised $8 million from individual investors and planned to raise the remaining $12

22   million from co-production financiers, distribution advances, and tax credit

23   financing agreements described above.  The Private Placement Memorandum for

24   investors disclosed that nearly 60% of OZ3D's funds would be used to pay direct

25   production costs, and roughly 30% to 40% of its funds would be used to pay

26   Gigapix for creative development services, marketing, publicity, overhead,

27   executive supervisory services, and administration.  (*See* Government Trial Exhibit

28   9).

1       Once the agreements with ARC and Multiple Media were finalized, the

2 parties announced in April 2011, that they were beginning production.  (Exhibit B

3 attached hereto).  Several weeks later Mr. Pritchard advised shareholders of this in a

4 letter.  As production efforts began, however, relations between ARC and OZ3D

5 began to fray, with ARC attempting to take over the rights to the film.  Although

6 OZ3D ultimately prevailed in the dispute, the break in the relationship destroyed the

7 agreements to finance production.  Mr. Pritchard sought to find replacement

8 financing and other co-production partners, but he could not obtain a new agreement

9 before Gigapix had to file for bankruptcy protection.

10 **III.**    **MR. PRITCHARD'S OBJECTIONS TO THE PSR AND POSITION**

11       **REGARDING SENTENCING GUIDELINES CALCULATIONS**

12       The parties agree that the base offense level is seven, and that Mr. Pritchard's

13 criminal history is category one.[4]  The PSR proposes an enhancement of 22 levels

14 for loss, a six-level enhancement based on the number of victims, another two-level

15 enhancement for vulnerable victims, and a four-level aggravating role enhancement.

16 The evidence before the Court does not, however, support any of these

17 enhancements.

18 ///

19 ///

20 ///

21 ———————————————

22 [4] Mr. Pritchard has no objections to the statements in the PSR concerning his

23 personal information, with one limited exception.  The PSR indicates that Mr.
Pritchard played professional football for a season with the Atlanta Falcons.  (PSR ¶

24 89).  This statement is not accurate and may have resulted from a misunderstanding

25 of a brief comment Mr. Pritchard made during his interview about the employment
he sought immediately after college.  In 1969, Mr. Pritchard tried out with the

26 Atlanta Falcons to play receiver and safety.  He was invited to practice with the

27 team and was paid $99 a week.  After about a month of practicing with the team,
Mr. Pritchard left to pursue employment with Johnson & Johnson.

28

A.    <u>**The Government Has Failed to Prove that the Loss Amount Is**</u>
      <u>**$20,882,654**</u>

The PSR calculates the actual loss amount as $20,882,654.66 based solely on a list of 663 purported investors provided by the government.  Neither the PSR nor the government explains how this list was compiled and why it is accurate. Moreover, neither the PSR nor the government indicates whether all of the actual loss was reasonably foreseeable to Mr. Pritchard.

It is the government's burden to prove the loss enhancement and, given the hugely disproportionate effect that the loss has on the sentence in this case, it must do so with clear and convincing evidence.  *United States v. Treadwell*, 592 F.3d 990, 1000-01 (9th Cir. 2010) (listing considerations that determine whether standard is preponderance or clear and convincing, including, inter alia, whether enhancement would have disproportionate effect).

Here, the proposed 22-level enhancement  increases the sentence  *ten-fold*, from 30 to 37 months (level 19) to 324 to 405 months (level 41), which amounts to a virtual life sentence for Mr. Pritchard, who is 67 years old.  Such a massive increase requires clear and convincing proof that the loss is in fact $20,882,654.66.  However the government has not provided any information showing that 1) there were 663 investors who lost  $20,882,654 as a result of the fraud  and 2) all this alleged actual loss was reasonably foreseeable to Mr. Pritchard.

1.    **There Is No Reliable Evidence that the Loss is $20,882,654.66**

The government has identified 31 investors in its under seal filing who it contends had been misled and lost approximately $1,199,530.  As to the 632 other "victims" on the list attached to the PSR, the government failed to offer evidence that these investors were misled by any alleged misrepresentations and suffered their losses as a result of those misrepresentations.

The government has not explained who created the list of "victims," how the losses were determined, and why the figures listed are reliable.  On its face, the list

1    appears to include creditors owed money by Gigapix or OZ3D.  For instance,

2    Buchanan Ingersoll & Rooney PC is listed as "Victim No. 76" with a loss of

3    $696,081.  But Buchanan Ingersoll & Rooney is the law firm that provided

4    numerous services to Gigapix, not an investor.[5]  Similarly, the government has not

5    provided any information about the two trust companies listed as victims 572 and

6    596 (listing a total of $130,000 in "losses").  There is no evidence to indicate

7    whether these trust companies owned any stock or were merely creditors of the

8    company.

9         The Ninth Circuit has made clear that the government may not simply rely on

10   unsubstantiated lists to support sentencing enhancements.  Rather, "the government

11   [is required] to produce at least *some* evidence to support" its sentencing

12   calculations, *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009)

13   (emphasis in original), and provide "specific evidence" that the defendant's conduct

14   proximately caused the calculated victims losses, *see United States v. Brown*, 771

15   F.3d 1149, 1160 (9th Cir. 2014).  And the Court must make an independent

16   sentencing determination that is likewise based on evidence, not conjecture.  *See*

17   *United States v. Najjor*, 255 F.3d 979, 984 (9th Cir. 2001) ("The sentencing court is

18   responsible for making an independent determination as to the amount of loss the

19   victim suffered as a result of the defendant's conduct."); *see also United States v.*

20   *Barany*, 884 F.2d 1255, 1261 (9th Cir. 1989) ("It would be an abdication of judicial

21   responsibility simply to adopt a suggested figure without making an independent

22   determination that the amount actually reflects the damages suffered by the

23   victim.").  The evidence presented here is patently inadequate to support the loss

24   calculation urged by the government.

25   _____

26   [5] Although some investors sent their funds to the law firm, there is no showing how

27   much of this represents investor money and whether any of these investors are
     already on the list.

28

1    The government also has offered no evidence to show that all of the investors

2  on the list invested based on misrepresentations.  At trial the government offered

3  evidence to show that three investors were misled by two sales people and that Mr.

4  Pritchard made misleading statements in calls with two of those investors, Danny

5  Anderson and Jerome Goodman, and in three letters he signed that were sent to

6  investors after they had made their investments.  As for calls by the sales staff,

7  however, the government only offered evidence that Pusateri and Brown made

8  misleading statements to some investors;[6] it offered no evidence that any of the

9  other cold callers made misleading statements.

10    Indeed, Tiffany Ryan, who was the only witness the government called from

11  the sales staff, testified that she was not aware of what the "closers were saying to

12  potential investors."  (Trial Transcript 10/16/14 at 382:10-12).  She also explained

13  that the Sales Manager Ken Gross tried to ensure that misrepresentations were not

14  made by the closers.  (Trial Transcript 10/16/14 at 389:12-19).  Ms. Ryan never

15  testified  that she made misleading statements to investors, heard others making

16  misleading statements, or received directions to make misleading statements.

17  Moreover, she explained that Mr. Pritchard never directed the sales people to lie.

18  Rather, he only provided the sales team "information and maybe it would be kind of

19  forward-thinking information, [for example] this is what we're trying to do, this is

20  what we're trying to do to make it happen."  (Trial Transcript 10/16/14 at 399:9-12).

21  ///

22

23  [6] Some investors have specifically indicated that the sales staff did not make

24  misleading statements to induce them to invest.  (Blauvelt Sentencing Position, at 5:
3-20).  Three investors have proffered that co-defendant Greg Pusateri cautioned

25  them about the risks of investing in the company and did not promise a return on

26  their investment.  *Id*.  One of the 31 investors who submitted a Victim Impact

27  Statement did not believe he had been misled and a second investor did not claim
that she had been misled.

28

1    The government notes that Mr. Pritchard "personally met with investors" and
2 "authored letters that were sent to investors." (Sentencing Position at 5-6) But the
3 government offered only limited evidence about calls Mr. Pritchard had with two
4 investors who invested at most at total of $15,000 after they spoke to him. As for
5 the letters, the government has not proven that all investors actually received the
6 letters and, more importantly, that they in fact read and relied on any of them *before*
7 they invested in Gigapix or OZ3D. This is not surprising as the letters Mr. Pritchard
8 sent out to investors about developments at the companies did not solicit any
9 additional investments in either venture.

10    The government apparently believes that because most of the 31 investors,
11 were misled, all of the other 633 investors were misled as well. But Gigapix and
12 OZ3D were not sham companies; they were legitimate businesses that were working
13 to develop and produce films. As the government notes, Mr. Pritchard was
14 responsible for "production" (Sentencing Position at 5), and he worked throughout
15 the time he was with Gigapix to set the company on a course to become a successful
16 independent production studio for children's entertainment. The government's own
17 witness Shawn Walker testified about the efforts he and Mr. Pritchard made in this
18 regard: "By 2009, we were really trying to get the live-action kids films going and
19 we were also working on developing the *Wizard of Oz* animated film." (Trial
20 Transcript 10/16/14 at 316:22-24). Mr. Walker also acknowledged that he
21 "certainly saw Mr. Pritchard work towards the advancement of Gigapix" and that
22 Mr. Pritchard should have been paid for his work. (Trial Transcript 10/16/14 at
23 368:13-14; 370: 4-6).

24    Because Gigapix and OZ3d were not sham companies, the government cannot
25 just assume that all investors were defrauded.[7] To the contrary, the government

26 _____

27 [7] In its response to Blauvelt's Sentencing Position, the government contends that
28 (footnote continued)

1  must prove that the relevant conduct upon which its loss calculation is based was
2  actually criminal conduct.  *See, e.g., United States v. Catchings*, 708 F.3d 710, 712,
3  720 (6th Cir. 2013) (relevant conduct must be criminal conduct).[8]  Without proof
4  that a given investment transaction to be included in the loss calculation was a
5  fraudulent transaction, then it is just a transaction and is not relevant.

6      The government also bears the burden of proving that the defendant's relevant
7  conduct proximately caused the victims' loss.  *United States v. Hicks*, 217 F.3d
8  1038, 1048-49 (9th Cir. 2000)  (adopting proximate causation requirement for
9  relevant conduct); *see also United States v. Berger*, 587 F.3d 1038, 1043 (in
10  securities fraud case, district court abused its discretion in calculating defendant's
11  loss because it did not "properly establish that [defendant's] sentence was based
12  only on all harm that resulted from acts or omissions of the defendant").  Thus, the
13  government must demonstrate, not simply that investors lost money, but that the

14  _____

15  loss may simply be determined by the total number of investors and cites to *United*
16  *States v. Amlani*, 111 F.3d 705, 709 (9th Cir. 1997).  Yet this case involved a sham
   company that promised prizes that either did not exist or were worthless in exchange
17  for customers' money.  Moreover, that case involved no analysis of "reasonable
18  foreseeability," as it considered only the intended loss.

19  [8] While the Ninth Circuit has not opined whether relevant conduct must be criminal,
   *see United States v. Christensen*, 732 F.3d 1094, 1110 (9th Cir. 2013) (Tashima, J.,
20  dissenting) (noting lack of Ninth Circuit authority and listing cases from other
21  circuits), every other circuit to have considered the issue has held that, while the
   government may use relevant conduct to increase a defendant's loss amount and
22  overall sentence, that relevant conduct must be criminal.  *See Catchings*, 708 F.3d at
23  712, 720; *United States v. Griffith*, 584 F.3d 1004, 1013 (10th Cir. 2009); *United*
   *States v. Schaefer*, 291 F.3d 932, 940-41 (7th Cir. 2002); *United States v. Dove*, 247
24  F.3d 152, 155 (4th Cir. 2001); *United States v. Jain*, 93 F.3d 436, 443 (8th Cir.
25  1996); *United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996); *United States v.*
   *Dickier*, 64 F.3d 818, 830-31 (3d Cir. 1995); *see also United States v. Norris*, 452
26  F.3d 1275, 1281 fn. 1 (11th Cir. 2006) (expressing no opinion on whether relevant
27  conduct must be criminal but noting that several circuits have held that relevant
   conduct must be criminal).

28

1    criminal conduct at issue proximately caused the losses of each victim.

2         The government has failed to prove either that the investors on theirs lists

3    were actually defrauded or that any misrepresentations proximately caused their

4    losses.  The government accordingly has failed to prove that the loss amount is

5    anything more than what the testifying investors lost or what the 31 investors

6    identified by the government lost - $1,199,530.

7              **2.      The Government Has Failed to Prove that $20,882,654 in**

8                        **Losses Was Reasonably Foreseeable to Mr. Pritchard**

9         The PSR and the government apparently agree that the guideline range should

10   be determined based on the actual loss, which  is defined as "the reasonably

11   foreseeable pecuniary harm that resulted from the offense." Application Notes

12   3(A)(i) and 3(A)(ii).  Yet neither make any effort  to determine the amount of actual

13   loss that was "reasonably foreseeable" to Mr. Pritchard.  Without any analysis, the

14   PSR and the government simply conclude that Mr. Pritchard is liable for all losses

15   on the investor list attached to the PSR.  Given the large enhancement

16   recommended, the government must offer clear and convincing evidence, not just a

17   conclusion, that all of the loss was foreseeable to him.

18        Here, the losses attributable to the "cold-calling" by sales personnel were not

19   foreseeable to Mr. Pritchard because Mr. Pritchard did not supervise, oversee or

20   direct the sales team.  As both government and defense witnesses testified,  Blauvelt

21   was responsible for the sales team, and Mr. Pritchard handled the development and

22   production of movies and TV projects.  (Trial Transcript 10/16/14 at 379:11-15

23   (Ryan) and 307:2-6 (Walker)).  Notably, the only thing that the government accuses

24   Mr. Pritchard of doing is meeting with the sales staff "to brief them on

25   developments from the studio."  (Sentencing Position at 1:27-28 ("Defendant

26   regularly held meetings with the sales staff to brief them on developments from the

27   studio.")).  Obviously, if the government had any evidence that Mr. Pritchard

28   directed or was involved with the fraudulent cold calls, it would have trumpeted it

1  loud and clear; instead, it has backed away from its cold calling theory as to Mr.

2  Pritchard.

3         Mr. Pritchard could not reasonably foresee that all of the investors would be

4  fraudulently induced to invest and lose their money as a result of their

5  misrepresentations.  The loss should be limited to what the government proved was

6  foreseeable to Mr. Pritchard – the losses suffered by Mr. Anderson and Mr.

7  Goodman.

8      **B.**   **The Government Has Not Proven That More Than 250 Victims**

9            **Were Involved**

10        The PSR indicates that six levels should be added to Mr. Pritchard's offense

11  level on the basis that more than 250 victims were involved in the offense.  Pursuant

12  to §2B1.1(b)(2), the offense level can be increased by two levels if the offense

13  involved 10 or more victims, by four levels if the offense involved 50 or more

14  victims, or by six levels if the offense involved 250 or more victims.  For the

15  reasons discussed above, neither the PSR nor the government has proven that more

16  than 31 victims were involved.  This evidence supports only a two-level

17  enhancement and not the six-level enhancement stated in the PSR.  With this 2-level

18  enhancement, Mr. Pritchard's total offense level is 25.

19        U.S.S.G. § 2B1.1, comment. (n.1) defines "victim" as "any person who

20  sustained any part of the actual loss determined under subsection (b)(1)").  As the

21  Ninth Circuit has explained, "[e]ach of the victims must have sustained a loss that is

22  monetary or that otherwise is readily measurable in money *and* that loss must be

23  included in the loss calculation made pursuant to U.S.S.G. § 2B1.1(b)(1)."  *Brown*,

24  771 F.3d at 1162 (quoting *United States v. Armstead,* 552 F.3d 769, 780–81 (9th

25  Cir.2008) (internal quotation marks omitted).  Thus, in *Brown,* the Ninth Circuit

26  reversed a victim adjustment that included an additional 148 victims beyond those

27  that were included in the loss calculation.  *Id.*; *see also Showalter,* 596 F.3d at 1160-

28  61 (reversing victim adjustment that was based on list provided by bankruptcy

1  trustee without evidence to establish that each victim had sustained losses as result

2  of defendant's conduct); *Armstead,* 552 F.3d at 780 (reversing victim adjustment

3  where district court simply found "that there were a substantial number of people

4  involved").

5        Here, the government has presented a list of over 650 investors but has not

6  provided any information about the circumstances of each investor to establish that

7  each of them could be considered a "victim."  As discussed above, the government

8  has failed to establish that all, or even any substantial number, of these investors

9  invested based on misrepresentations that could be charged to Mr. Pritchard.

10  Without evidence that the investors suffered losses that can properly be counted in

11  the loss calculation, they cannot be included in the victim calculation.  Thus, the

12  government's evidence supports only a two-level enhancement and not the six-level

13  enhancement stated in the PSR.  With this 2-level enhancement, Mr. Pritchard's

14  total offense level is 25.

15      **C.**    **The Government Has Not Proven That Mr. Pritchard Knew or**

16           **Should Have Known Any Victims Were Vulnerable**

17        The PSR calculates a two-level enhancement pursuant to §3A1.1, finding that

18  "co-defendants reloaded at least five victims, one of whom was 85 years old."

19  Section 3A1.1, however, requires more than the mere identification of the

20  vulnerable victim for the enhancement to apply.  The government must prove that a

21  defendant "knew or should have known that a victim of the offense was a vulnerable

22  victim."  *Id.*  Neither the PSR nor the government in its sentencing position offer

23  any evidence that Mr. Pritchard knew or should have known any of the victims he

24  spoke to were vulnerable.  While the government presented evidence indicating that

25  Mr. Pritchard was on calls with one or two investors who he knew had invested

26  before, the government did not present evidence that Mr. Pritchard knew that those

27

28

DEFENDANT DAVID PRITCHARD'S POSITION RE:  SENTENCING

1  investors had been "reloaded," i.e., that they had previously invested based on

2  misrepresentations.[9]

3      **D.**    <u>**There Is No Basis for a Role Adjustment**</u>

4         The PSR finds that a four-level adjustment should be added for Mr.

5  Pritchard's role as an organizer or leader of criminal activity that involved five or

6  more participants.  Section 3B1.1(a) provides that "[i]f the defendant was an

7  organizer or leader of a criminal activity that involved five or more participants or

8  was otherwise extensive, increase by 4 levels."  The PSR indicates that the

9  enhancement applies to Mr. Pritchard because he held a position of authority in the

10  criminal scheme and "supervised the conduct of more than five criminally culpable

11  participants."  (PSR ¶ 67).  The PSR identifies Gross, Pusateri, Brown, Roth, Hines,

12  Mutton and Walker as employees and implies they are among the "five or more

13  participants" in the scheme.  (PSR ¶ 66-67).  The PSR also generically describes Mr.

14  Pritchard as deciding how money received by the companies "should be applied,"

15  directing Mutton and Walker, holding meetings with sales staff, and speaking to

16  investors.

17         The PSR's reasoning for applying this adjustment is flawed for many reasons.

18  The PSR does not establish that five participants were criminally involved.  At most,

19  only four were involved:  Mr. Pritchard, Blauvelt, Pusateri and Brown.  The PSR

20

21  _____

22  [9] In its response to Blauvelt's Sentencing Position, the government cites two cases to

23  support its claim that the defendants, including Pritchard, "reloaded" vulnerable victims.  These cases, however, involved completely fraudulent investment scams

24  and efforts by defendants to specifically identify people who had fallen for similar scams.  *United States v. Randall*, 162 F.3d 557 (9th Cir. 1998) (where defendants

25  induced customers to send money in exchange for worthless gifts and awards);

26  *United States v. Ciccone*, 219 F.3d 1078 (where defendants induced customers to send money in exchange for worthless gifts and false promises of a charitable

27  donation).

28

1    offers no evidence that the other identified employees were criminally involved.[10]

2    Nor does the PSR show that the criminal activity was "otherwise extensive," which

3    it could not do since Gigapix and OZ3D were not sham entities.

4          Nor does the PSR offer any evidence that Mr. Pritchard organized or

5    supervised any criminal conduct other than his own.  The government never claimed

6    or established that Mr. Pritchard directed the sales staff to mislead investors.

7    Indeed, it merely states that Mr. Pritchard met with the sales teams to update them

8    on company business.  Further, it acknowledges that Blauvelt and not Mr. Pritchard

9    was responsible for the sales force.  Thus, there is no evidence that Mr. Pritchard

10   had any role in any misrepresentations made by the sales staff.  *See United States v.*

11   *Woods,* 335 F.3d 993, 1002 (9th Cir. 2003) (reversing role enhancement where

12   defendant did not supervise closers in telemarketing scheme or any other

13   participants in the fraud).  *See also Brown,* 771 F.3d at 1159 (reversing role

14   enhancement where "it was not 'really made clear'" whether defendant controlled

15   other criminally responsible participants).

16         Finally, the PSR wrongly assumes that all of Mr. Pritchard's managerial

17   activities at Gigapix and OZ3D were in furtherance the criminal activity.  These

18   companies were not shams, and Mr. Pritchard's various managerial activities at the

19   company, such as holding meetings and directing Mutton and Walker, were part of

20   the everyday legitimate business of the companies.

21   ///

22   ///

23   _____

24   [10] The PSR states that the government has advised the Probation Office that Shawn
     Walker, Colin Mutton and several other employees were criminally involved in the
25   scheme.  PSR, n.1.  Yet the government advised defense counsel on January 28,
     2015, that it does not believe Walker was criminally involved and, at trial, the
26   government never claimed that Mutton or any of the other employees listed in the
27   footnote were accomplices.

28

## IV.   **MR. PRITCHARD'S POSITION REGARDING SENTENCING FACTORS PURSUANT TO 18 U.S.C. §3553(a)**

Title 18 U.S.C. § 3553(a) directs that the court "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a).  As to the sentencing guidelines, "they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence."  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  Regardless of the sentencing guideline range, the district court must nonetheless "make an individualized determination based on the facts."  *Id*.

Here, the appropriate Offense Level based upon the evidence actually introduced by the government is, at most, 25.  With a Criminal History I, the applicable guideline range is 57 to 71 months.

We respectfully ask the Court to impose a sentence below the applicable range.  Mr. Pritchard is 67 years old, has no prior criminal history, has had noted success in the entertainment industry, and has a lengthy history of charitable activities and community service that pre-date by decades his involvement with Gigapix.  We accept the jury's findings in this case, but note that Mr. Pritchard's involvement in the fraudulent aspects of Gigapix and OZ3D was limited to speaking to two investors who thereafter invested $15,000, and sending out post-investment letters to investors.  Further, he made every effort to makes these companies successful and save them for the benefit of the investors.  Even a sentence at the low end of the guidelines – four years and 9 months – will take Mr. Pritchard into his 70's before he is released from custody and will severely impact his ability to resume a productive life.

///

1    Mr. Pritchard is not perfect, and he regrets the mistakes he made in

2 connection with Gigapix and OZ3D.  But Mr. Pritchard's demonstrated history and

3 experience shows that he is someone who can truly provide extensive service to the

4 community upon his release from custody in the years he has left.

5

6 DATED:  January 29, 2015          Respectfully submitted,

7                                    SCHEPER KIM & HARRIS LLP

8                                    RICHARD E. DROOYAN
                                    JEAN M. NELSON
9

10                                   By:   /s/ Richard E. Drooyan

11                                         Richard E. Drooyan
                                          Attorneys for Defendant
12                                         DAVID PRITCHARD

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF JEAN M. NELSON</u>

I, Jean M. Nelson, declare and state as follows:

1.      I am an attorney admitted to practice in the State of California and am a member of the bar of this Court.  I am a partner at Scheper Kim & Harris, LLP, and, along with Richard E. Drooyan, I am counsel for defendant David Pritchard in this action.  I submit this declaration in support of defendant's Position Re:  Sentencing. I have personal knowledge of the facts stated herein, and could and would testify competently thereto if called as a witness in this matter.

2.      Attached hereto are Exhibits 404, 409, 411, 417, 419, 425, 430, 432, 447 and 454.  These Exhibits had been previously filed with the Court in support of Mr. Pritchard's Motion for New Trial.

3.      Attached hereto as Exhibit A is a true and correct copy of a business plan Mr. Pritchard had completed for Gigapix in or about June 2009.

4.      Attached hereto as Exhibit B is a true and correct copy of an announcement issued by Gigapix, Starz Animation Toronto, and Multiple Media Entertainment.  This announcement is part of Government's Trial Exhibit 67.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of January 2015, at Los Angeles, California.

    /s/ Jean M. Nelson
    Jean M. Nelson