1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 404

*IOWA DEPARTMENT OF ECONOMIC DEVELOPMENT*
**IOWA FILM, TELEVISION AND VIDEO PROJECT PROMOTION PROGRAM**
**CONTRACT**

| | |
|---|---|
| RECIPIENT: | GPX Development, LLC |
| CONTRACT NUMBER: | 08-FILM-022 |
| AWARD DATE: | November 19, 2008 |

This CONTRACT (the "**Contract**") is made as of the CONTRACT EFFECTIVE DATE by and between the **Iowa Department of Economic Development** ("**IDED**"), 200 East Grand Avenue, Des Moines, IA 50309 and **GPX Development, LLC** an California Limited Liability Company(the "**Recipient**"), **9333 Oso Avenue, Chatsworth, CA 91311.**

WHEREAS, the purpose of the Iowa Film, Television, and Video Project Promotion Program (the "**Program**") is to assist and encourage the production of legitimate film, television, and video projects within the state of Iowa; and

WHEREAS, the Recipient submitted an application to IDED requesting registration of its Project as more fully described in Exhibit A, Recipient's Iowa Film, Television and Video Project Promotion Program Application (the "**Application**"); and

WHEREAS, the IDED found the Project to meet the requirements established to receive Program tax credit benefits and IDED approved Recipient's Project, subject to the terms and conditions set forth herein, (the "**Registered Project**"); and

NOW THEREFORE, in consideration of the mutual promises contained herein and intending to be legally bound, the Recipient and IDED agree to the following terms:

## ARTICLE 1
## CONTRACT DURATION

This Contract shall be in effect until the authorized tax credits have been claimed and Recipient's obligations under this Contract have been satisfied

## ARTICLE 2
## PROGRAM AUTHORIZATION

2.1   Tax Credit Benefits. Tax credit benefits for this Registered Project are authorized by 2007 Iowa Acts, House File 892.

2.2   Reduction, Discontinuance or Alteration of Program. Any termination, reduction, or delay of tax credit benefits available due, in whole or in part, to (i) legislative changes, or (ii) any other reason beyond the IDED's control may, in the IDED's discretion, result in the termination, reduction or delay of tax credit benefits under the Program to the Recipient and Investors.

# ARTICLE 3
## DEFINITIONS;
## DOCUMENTS INCORPORATED BY REFERENCE; AND ORDER OF PRIORITY

3.1   Definitions.

(a) The following terms apply to this Contract:

*"Award Date"* means the date first stated in this Contract and is the date the IDED approved the Recipient's Application and authorized Program tax credit benefits.

*"Investor"* means a person or entity who that participates financially in a Registered Project but takes no action in producing the Registered Project.

*"Recipient"* means the legally designated entity identified in this Contract that undertakes and pays for the approved Project activities in Iowa but makes no financial contribution to the Registered Project.

*"Registered Project"* means the film, television, or video production operation to be completed by the Recipient as outlined in Exhibit A, Recipient's Iowa Film, Television and Video Project Promotion Program Application (the **"Application"**), as approved by IDED, and Article 4.

*"Project Completion Date"* means the date stated in Article 4 and is the date by which all Registered Project activities shall be satisfactorily completed.

3.2   Document Incorporated by Reference. The following document is incorporated by reference and considered an integral part of this Contract:
Exhibit A - Recipient's Iowa Film, Television and Video Project Promotion Program Application.
Exhibit B – Investor List.

3.3   Order of Priority.  In the case of any inconsistency or conflict between the specific provisions of this document and the exhibits, the following order of priority shall control:
(a) Contract, Articles 1-10.
(b) Exhibit A - Recipient's Financial Assistance Application.
(c) Exhibit B – Investor List.

# ARTICLE 4
## REGISTERED PROJECT

4.1   Description of Registered Project.  Program tax credit benefits have been authorized by IDED for the following Registered Project:

*Project title:*       Field Trip

*Project Type:*   ☒ Feature-length Film   ☐ Short Film   ☐ Commercial   ☐ Documentary

☐ Music Video   ☐ TV Series   ☐ TV Segment

☐Other:_____

*Project Format:*   ☐ 35mm   ☐ 16mm   ☒ HD   ☐ DV

*Project Synopsis:*   Two trouble making kids and their adventurous grandfather set out on the seemingly

simple task of getting to a school field trip but along the way, a freak accident sends their car sinking to the bottom of the bay where they are taken prisoner by the ghost of the famed pirate Blackbeard. In order to escape, they must steal a precious amulet from the town's museum and return it to Blackbeard, which they succeed in doing only to find they've now unleashed the ghost pirate into the world of the living.

4.2   Recipient Information. The tax benefits authorized for the Registered Project are available to the Recipient identified below:

Production company:

| | |
|---|---|
| Name: | GPX Development, LLC |
| Address: | 9333 Oso Avenue, Chatsworth, CA 91311 |
| Phone: | 818.592.0755 |
| E-mail: | kip@konwiserbros.com |
| FEIN / Tax ID: | 26-3174867 |

4.3   Lead Production Names and Contacts

Line Producer:

| | |
|---|---|
| Name: | Steven Brown |
| Phone: | 310-614-6422 |
| E-mail: | steven.starfire@earthlink.net |

Unit Production Manager:

| | |
|---|---|
| Name: | Name |
| Phone: | Phone |
| E-mail: | E-mail |

Production Accountant:

| | |
|---|---|
| Name: | Name |
| Phone: | Phone |
| E-mail: | E-mail |

4.4 Production Dates:  Dates of principal photography in Iowa.

Start of Pre-production or Principal Photography:

On or about    February 15, 2009

End of Principal Photography or Post-production:

On or about    April 1, 2009

4.5 Distribution:  Intended distribution.

Traditional domestic and international theatrical, Broadcast, DVD rental and sales, Cable, Festivals, Internet

4.6 Budget and In-state expenditures:

Total production budget:

$6,000,000.00

*Total expected to be spent in Iowa:*
$5,000,000.00

## ARTICLE 5
## INVESTORS

5.1     <u>Investors.</u>  Only the Investors listed on Exhibit B, Investor List, are eligible to claim tax credit benefits for investment in the Registered Project.

5.2     <u>Tax Credit Certificate.</u> Upon completion of the Registered Project, submittal and approval by IDED of Recipient's qualified project expenditures (as submitted in Form Z, Schedule of Qualified Expenses), IDED will issue to each Investor a tax credit certificate. A copy of the tax credit certificate for the Registered Project shall be attached to the taxpayer's tax return. Recipient shall notify Investors that the Iowa Department of Revenue requires each taxpayer to use the assigned tax credit certificate number.

## ARTICLE 6
## CONDITIONS TO RECEIPT OF PROGRAM TAX CREDIT BENEFITS

Program tax credit benefits shall not be claimed by Recipient and Investors until the following conditions have been satisfied:

6.1     <u>Documents Submitted.</u> IDED shall have received each of the following documents, properly executed and completed, and approved by IDED as to form and substance:

(a)  *Contract.*  A fully executed Contract between IDED and the Recipient.

(b)  *Form Z - Schedule of Qualified Expenses:*  Once the project is completed, all qualified project expenditures for a Registered Project must be submitted to the IDED Iowa Film Office using Form Z, Schedule of Qualified Expenses. No other form will be accepted. No additional claims will be accepted once the Schedule of Qualified Expenses has been approved by the Iowa Film Office.

(c)  *Solid/Hazardous Waste Audit.*  Under Iowa law, a state agency shall not provide a grant, loan, or other financial assistance unless the business meets the following requirement:  To comply with Iowa Code section 15A.1(3)"b," if the Recipient generates solid or hazardous waste, it must either: a) submit a copy of the Recipient's existing in-house plan to reduce the amount of waste and safely dispose of the waste based on an in-house audit conducted within the past 3 years; or b) submit an outline of a plan to be developed in-house, or 3) submit documentation that the Recipient has authorized the Iowa Department of Natural Resources or Iowa Waste Reduction Center to conduct the audit.

(d)  *Tax Credit Certificate Issued by IDED.* No Program tax credit benefits can be claimed until IDED issues a tax credit certificate to Recipient and Investors.

6.2     <u>Prior Costs.</u>  No expenditures made prior to July 1, 2008 shall be included as Registered Project costs.

6.3     <u>Suspension of Tax Credit Benefits.</u> Upon the occurrence of an Event of Default (as defined in this Contract), the IDED shall notify the Iowa Department of Revenue who shall suspend tax credit Program benefits to the Recipient and Investors until such time as the default has been cured.

6.4  <u>Limitation.</u> A taxpayer cannot claim an expenditure tax credit and an investment tax credit on the

same Registered Project.

6.5 <u>Maximum Amount.</u> The total of investment tax credits per Registered Project cannot exceed 25 percent of qualified expenditures for the Registered Project. This amount will be awarded proportionally to each individual Investor in the Registered Project.

## ARTICLE 7
## BENEFITS AVAILABLE

7.1 <u>Authorized Tax Credits.</u> The Recipient and Investors are eligible to claim the following tax credit benefits for the Registered Project:
1. Qualified expenditure tax credit.
2. Qualified investment tax credit.

7.2 <u>Qualified Expenditure Tax Credit.</u>

a. For tax years beginning on or after January 1, 2007, a qualified expenditure tax credit shall be allowed against the taxes required in Iowa Code chapters 422 and 423 and against the moneys and credits tax required in Iowa Code section 533.24 for a portion of a taxpayer's qualified expenditures in the Registered Project.

b. The maximum tax credit shall not exceed 25% of the qualified expenditures on the Registered Project.



c. Under Iowa Code section 261.36(7), an individual may claim a tax credit of a partnership, limited liability company, S corporation, estate, or trust electing to have income taxed directly to the individual. The amount claimed by the individual shall be based upon the pro rata share of the individual's earnings from the partnership, limited liability company, S corporation, estate, or trust.

d. Any tax credit in excess of the taxpayer's liability for the tax year may be credited to the tax liability for the following five years or until depleted, whichever comes first.

e. A tax credit shall not be carried back to a tax year prior to the tax year in which the taxpayer claims the tax credit.

7.2 <u>Qualified Investment Tax Credit.</u>

a. For tax years beginning on or after January 1, 2007, an investment tax credit shall be allowed against the taxes imposed in Iowa Code chapters 422, 423 and against the moneys and credits tax imposed in Iowa Code section 533.24, for a portion of a taxpayer's investment in the Registered Project.

b. The maximum tax credit shall not exceed 25 percent of the investment in the Registered Project. Under Iowa Code section 261.36.8, an individual may claim a tax credit of a partnership, limited liability company, S corporation, estate, or trust electing to have income taxed directly to the individual. The amount claimed by the individual shall be based upon the pro rata share of the individual's earnings from the partnership, limited liability company, S corporation, estate, or trust.

c. Any tax credit in excess of the taxpayer's liability for the tax year may be credited to the tax liability for the following five years or until depleted, whichever comes first.

d. A tax credit shall not be carried back to a tax year prior to the tax year in which the taxpayer claims the tax credit.

7.3 <u>Qualified Expenditures.</u> A qualified expenditure by a taxpayer is a payment to an Iowa resident or an Iowa-based business for the sale, rental, or furnishing of tangible personal property or for services directly related to the registered project, including, but not limited to:

| | |
|---|---|
| 1. Aircraft; | 2. Vehicles; |
| 3. Equipment; | 4. Materials; |
| 5. Supplies; | 6. Accounting; |
| 7. Animals and animal care; | 8. Artistic and design services; |
| 9. Graphics; | 10. Construction; |
| 11. Data and information services; | 12. Delivery and pickup services; |
| 13. Labor and personnel; "labor and personnel" does not include the director, producers, or principal cast members other than day players, stunts, extras and stand-ins; | 14. Lighting; |
| 15. Makeup and hairdressing; | 16. Film; |
| 17. Music; | 18. Photography; |
| 19. Sound; | 20. Video and related services; |
| 21. Printing; | 22. Research; |
| 23. Site fees and rental; | 24. Travel related to Iowa distant locations; |
| 25. Trash removal and cleanup; | 26. Wardrobe. |

# ARTICLE 8
## REPRESENTATIONS AND WARRANTIES



The Recipient represents and warrants to IDED as follows:

8.1 Recipient is duly organized, validly existing and in good standing as a corporation, limited liability company or limited partnership, as applicable, under the state of its organization. Recipient has full and adequate power to own its property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the property owned or leased by it requires such licensing or qualification.

8.2 Recipient has full right and authority to enter into this Contract and the person signing this Contract has full authority to act for the Recipient.

8.3 Recipient hereby agrees to claim the tax credit benefit only for the Registered Project.

8.4 The Application furnished to the IDED by Recipient does not contain any untrue or misleading statements of a material fact nor does it omit a material fact.

8.5 Recipient has received all licenses, permits, and approvals of all Federal, state, local, and foreign governmental authorities, if any, necessary to conduct its businesses; no investigation or proceeding which, if adversely determined, could reasonably be expected to result in revocation or denial of any material license, permit, or approval is pending or, to the knowledge of the Recipient threatened.

8.6 Recipient shall complete the Registered Project by the Project Completion Date.

8.7 The Recipient owns, possesses, or has the right to use all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how and confidential commercial and proprietary information to conduct its business as now conducted, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person. As used in this Contract, "*Person*" means an individual, partnership, corporation, association, trust,

unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

8.8   There is no litigation or governmental proceeding pending, nor to the knowledge of the Recipient threatened, against the Recipient which if adversely determined would result in any material adverse change in the financial condition or operations of the Recipient, nor is the Recipient aware of any existing basis for any such litigation or governmental proceeding.

8.9   The Recipient is not in default under the terms or any covenant, indenture or contract of or affecting either the Recipient or any of its properties, which default, if uncured, would have a material adverse effect on its financial condition or the Registered Project.

8.10   No Default or Event of Default has occurred or is continuing.

8.11   The Recipient is in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to the operations of the Recipient and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes or substances, non-compliance with which could have a material adverse effect on the financial condition, properties, business or operations of the Recipient. The Recipient has not received notice to the effect that its operations are not in compliance with any of the requirements of applicable federal, state or local environmental or health and safety statutes and regulations or are the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which non-compliance or remedial action could have a material adverse effect on the financial condition, properties, business or operations of the Recipient.

8.12   The warranties and representations of this Article are made as of the Contract Effective Date.



## ARTICLE 9
## COVENANTS

9.1   <u>Performance Obligations</u>. By the Project Completion Date, Recipient shall complete the Registered Project and comply with all other performance requirements described in this Contract. The Recipient shall promptly provide IDED with written notice of any major changes that would impact the success of the Registered Project.

9.2   <u>Taxes and Assessments.</u> The Recipient shall duly pay and discharge all taxes, rates, assessments, fees and governmental charges upon or against its properties, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings and adequate reserves are provided therefore.

9.3   <u>Required Reports</u>.  The Recipient shall prepare, sign and submit Form Z, Schedule of Qualified Expenses. The Recipient shall submit any other reports that may be reasonably required by IDED to allow IDED to report on the results of the Program.

9.4   <u>Inspection and Audit</u>. The Recipient will permit the IDED and its duly authorized representatives to visit and inspect any of the Recipient's properties, corporate books and financial records of the Recipient related to the Registered Project, to examine and make copies of the books of accounts and other financial records, and to discuss the affairs, finances and accounts of the Recipient with, and to be advised as to the same by, its officers, and independent public accountants (and by this provision the Recipient authorizes such accountants to discuss with the IDED and the IDED's duly authorized representatives the finances and affairs of the Recipient) at such reasonable time and reasonable intervals as the IDED may request.



9.5   Compliance with Laws.
(a) The Recipient will comply in all material respects with the requirements of all federal, state and local laws, rules, regulations and orders applicable to or pertaining to its properties or business operations including, but not limited to, all applicable environmental, hazardous waste or substance, toxic substance and underground storage laws and regulations, and the Recipient will obtain any permits, licenses, buildings, improvements, fixtures, equipment or its property required by reason of any applicable environmental, hazardous waste or substance, toxic substance or underground storage laws or regulations.

(b) The Recipient shall comply in all material respects with all applicable federal, state, and local laws, rules, ordinances, regulations and orders applicable to the prevention of discrimination in employment, including the administrative rules of the Iowa Department of Management and the Iowa Civil Rights Commission which pertain to equal employment opportunity and affirmative action.

(c) The Recipient shall comply in all material respects with all applicable federal, state and local laws, rules, ordinances, regulations and orders applicable to worker rights and worker safety.

(d) The Recipient shall comply with IDED's administrative rules for the Program..

9.6   Notice of Proceedings. The Recipient shall promptly notify IDED of the initiation of any claims, lawsuits, bankruptcy proceedings or other proceedings brought against the Recipient which would adversely impact the Registered Project.

9.7   Accounting Records. The Recipient is required to maintain its books, records and all other evidence pertaining to this Contract in accordance with generally accepted accounting principles and such other procedures specified by IDED.  These records shall be available to IDED, its internal or external auditors, the Auditor of the State of Iowa, the Attorney General of the State of Iowa and the Iowa Division of Criminal Investigations at all times during the Contract's duration and any extensions thereof, and for three (3) full years from the Agreement Expiration Date.

9.8   No Changes in Registered Project. The Recipient shall not materially change the Registered Project as described in the Recipient's approved application for funding, Exhibit A of this Contract and Article 4, unless approved in writing by IDED prior to the change.

9.9   Indemnification. The Recipient shall indemnify, defend and hold harmless the IDED, the State of Iowa, its departments, divisions, agencies, sections, commissions, officers, employees and agents from and against all losses, liabilities, penalties, fines, damages and claims (including taxes), and all related costs and expenses (including reasonable attorneys' fees and disbursements and costs of investigation, litigation, settlement, judgments, interest and penalties), arising from or in connection with any of the following:
   a) Any claim, demand, action, citation or legal proceeding arising out of or resulting from the Registered Project;
   b) Any claim, demand, action, citation or legal proceeding arising out of or resulting from a breach by the Recipient of any representation or warranty made by the Recipient in this Contract;
   c) Any claim, demand, action, citation or legal proceeding arising out of or related to occurrences that the Recipient is required to insure against as provided for in this Contract; and
   d) Any claim, demand, action, citation or legal proceeding which results from an act or omission of the Recipient or any of their agents in its or their capacity as an employer of a person.

## ARTICLE 10
## EVENTS OF DEFAULT AND REMEDIES

10.1  Events of Default.  Any one or more of the following shall constitute an *"Event of Default"* hereunder:

(a) *Noncompliance with Covenants*. Default in the observance or performance of any covenant set forth in Article 9, for more than five (5) business days; or

(b) *Noncompliance with Contract*. Default in the observance or performance of any other provision of this Contract; or

(c) *Material Misrepresentation*. Any representation or warranty made by the Recipient in this Contract or in any statement or certificate furnished by it pursuant to this Contract, or made in its Application, or in connection with any of the above, proves untrue in any material respect as of the date of the issuance or making thereof; or

(d) *Bankruptcy or Similar Proceedings Initiated*. Either the Recipient shall (1) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (2) not pay, or admit in writing its inability to pay, its debts generally as they become due, (3) make an assignment for the benefit of creditors, (4) apply for, seek, consent to, or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (5) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, or (6) fail to contest in good faith any appointments or proceeding described in Article 10.1(e) below; or

(e) *Appointment of Officials*. A custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for either the Recipient or any substantial part of any of its respective property, or a proceeding described in Article 10.1(d) shall be instituted against either the Recipient and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of sixty (60) days; or

(f) *Failure to Submit Required Reports.*  The Recipient fails to submit complete reports by the required due dates as outlined in Article 9.3.

10.2  Notice of Default and Opportunity to Cure.  If IDED has reason to believe the Recipient is in default of the terms of this Contract, the IDED will issue a written Notice of Default to the Recipient, setting forth the nature of the default in reasonable specificity, and providing therein a reasonable period of time, which shall not be less than 30 days from the date of the Notice of Default, in which the Recipient shall have an opportunity to cure, provided that cure is possible and feasible. A copy of any Notice of Default will also be provided to the Iowa Department of Revenue.

10.3  Remedies and Repayment.  If the Default remains uncured, the Recipient is required to repay all or a portion of the tax credit benefits received. The Iowa Department of Revenue will be notified of any uncured default. IDED or the Department of Revenue may take action to collect the amount owed. The amount to be repaid may include the value of the tax credit benefits claimed  under the Program and applicable interest and penalties as may be established by the Iowa Department of Revenue.

10.4  Expenses. The Recipient agrees to pay to IDED all expenses reasonably incurred or paid by IDED including reasonable attorneys' fees and court costs, in connection with any Default or Event of Default by the Recipient or in connection with the enforcement of any of the terms of this.

# ARTICLE 11
## TRANSFERRING TAX CREDIT CERTIFICATES

11.1 <u>Transfers Permitted.</u> A tax credit certificate issued may be transferred to any person or entity.

11.2 <u>Iowa Department of Revenue.</u> Within 90 days of transfer, the transferee shall submit the transferred tax credit certificate to the Iowa Department of Revenue along with a statement containing the transferee's name, tax identification number, and address, and the denomination that each replacement tax credit certificate is to carry and any other information required by the Department of Revenue. Within 30 days of receiving the transferred tax credit certificate and the transferee's statement, the Department of Revenue shall issue one or more replacement tax credit certificates to the transferee.

11.3 <u>Replacement Certificate.</u> Each replacement tax credit certificate must contain the information required for the original tax credit certificate and must have the same expiration date that appeared in the transferred tax credit certificate.

11.4 <u>Limitation on Amount and Number of Transfers.</u> Tax credit certificate amounts of less than $1000 shall not be transferable. A maximum of two transfers shall be allowed.

11.5. <u>No Tax Credit May be Claimed Until Replacement Issued.</u> An investment tax credit shall not be claimed by a transferee until a replacement tax credit certificate identifying the transferee as the proper holder has been issued.

11.6 . <u>How Claimed.</u> The transferee may use the amount of the tax credit transferred against the taxes imposed in Iowa Code chapter 422, divisions II, III, and V, and in Iowa Code chapter 432, and against the moneys and credits tax imposed in Iowa Code section 533.24, for any tax year the original transferor could have claimed the tax credit. Any consideration received for the transfer of the tax credit shall not be included as income under Iowa Code chapter 422, divisions II, III, and V, under Iowa Code chapter 432, or against the moneys and credits tax imposed in Iowa Code section 533.24. Any consideration paid for the transfer of the tax credit shall not be deducted from income under Iowa Code chapter 422, divisions II, III, and V, under Iowa Code chapter 432, or against the moneys and credits tax imposed in Iowa Code section 533.24.

# ARTICLE 12
## MISCELLANEOUS.

12.1 <u>Choice of Law and Forum.</u>
(a) In the event any proceeding of a quasi-judicial or judicial nature is commenced in connection with this Contract or the Funding Agreements, the proceeding shall be brought in Des Moines, Iowa, in Polk County District Court for the State of Iowa, if such court has jurisdiction. If however, such court lacks jurisdiction and jurisdiction lies only in a United States District Court, the matter shall be commenced in the United States District Court for the Southern District of Iowa, Central Division.

(b) This provision shall not be construed as waiving any immunity to suit or liability, in state or federal court, which may be available to the IDED, the State of Iowa or its members, officers, employees or agents.

12.2 <u>Governing Law.</u> This Contract and the rights and duties of the parties hereto shall be governed by, and construed in accordance with the internal laws of the State of Iowa without regard to principles of conflicts of laws.

12.3 <u>Contract Amendments.</u> Neither this Contract nor any documents incorporated by reference in connection with this Contract may be changed, waived, discharged or terminated orally. The Contract may only



be amended if done so in writing and signed by the Recipient and IDED.

12.4  Notices. Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation by fax) and shall be given to the relevant party at its address, e-mail address, or fax number set forth below, or such other address, e-mail address, or fax number as such party may hereafter specify by notice to the other given by United States mail, by fax or by other telecommunication device capable of creating a written record of such notice and its receipt.  Notices hereunder shall be addressed:

> To the **Recipient**:
>
> | | |
> |---|---|
> | Recipient name: | GPX Development, LLC |
> | Contact name: | Kip Konwiser |
> | Street address: | 9333 Oso Avenue |
> | City, State, ZIP | Chatsworth, CA 91311 |
> | E-mail address: | kip@konwiserbros.com |
> | Phone: | 818.592.0755 |

> To the **IDED** at:
>
> Iowa Department of Economic Development
> Iowa Film Office
> 200 East Grand Avenue
> Des Moines, Iowa 50309
> Attention: Tom Wheeler, Iowa Film Office Manager
> E-mail: Tom.Wheeler@iowalifechanging.com
> Telephone:      515/ 242-4726
> Facsimile:      515/ 242-4718

Each such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Article and a confirmation of such facsimile has been received by the sender, (ii) if given by e-mail, when such e-mail is transmitted to the e-mail address specified in this Article and a confirmation of such e-mail has been received by the sender, (iii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iv) if given by any other means, when delivered at the addresses specified in this Article.

12.5  Headings. Article headings used in this Contract are for convenience of reference only and are not a part of this Contract for any other purpose.

12.6  Final Authority.  The IDED shall have the authority to reasonably assess whether the Recipient has complied with the terms of this Contract. Any IDED determinations with respect to compliance with the provisions of this Contract and the Funding Agreements shall be deemed to be final determinations pursuant to Section 17A of the Code of Iowa (2005).

12.7  Waivers. No waiver by IDED of any default hereunder shall operate as a waiver of any other default or of the same default on any future occasion.  No delay on the part of the IDED in exercising any right or remedy hereunder shall operate as a waiver thereof.  No single or partial exercise of any right or remedy by IDED shall preclude future exercise thereof or the exercise of any other right or remedy.

12.8  Counterparts. This Contract may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument.

12.9  Survival of Representations. All representations and warranties made herein or in any other Contract shall survive the execution and delivery of this Contract and shall continue in full force and effect with respect to the date as of which they were made until this Contract has been terminated.

12.11 <u>Successors and Assigns.</u> This Contract shall be binding upon the Recipient and its respective successors and assigns, and shall inure to the benefit of the IDED and the benefit of their respective successors and assigns. The Recipient may not assign its rights hereunder without the written consent of the IDED, which consent will not be unreasonably withheld.

12.12 <u>Termination.</u> This Contract can be terminated upon mutual, written agreement of the Recipient and IDED.

12.13 <u>Integration.</u> This Contract contains the entire understanding between the Recipient and IDED relating to the Registered Project and any representations that may have been made before or after the signing of this Contract, which are not contained herein, are nonbinding, void and of no effect. Neither of the Parties have relied on any such prior representation in entering into this Contract Agreement.

IN WITNESS WHEREOF in consideration of the mutual covenants set forth above and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties have entered into this Contract and have caused their duly authorized representatives to execute this Contract, effective as of the latest date stated below (the **"Contract Effective Date"**).

**FOR THE IOWA DEPARTMENT OF ECONOMIC DEVELOPMENT:**

BY: _____ for

Michael L. Tramontina, Director

_12/16/08_

Date

**FOR THE RECIPIENT:**

BY: _____ as GPX Development LLC

Signature

_Kip Konwiser - Producer/Head of Production_

Typed Name and Title

_12/15/8_

Date

# EXHIBIT A

Recipient's Financial Assistance Application

# Application for Registration in the Iowa Film, Television and Video Project Promotion Program (IFTVPPP)

Iowa Film Office, Iowa Department of Economic Development
200 E. Grand Avenue.  Des Moines, IA 50309
P: 515.242.4726  F: 515.242.4718
film@iowalifechanging.com  www.traveliowa.com/film

Requests for registration of projects must be received by the Iowa Film Office at least one week prior to the commencement of production activities in the state.

Input data in fields highlighted yellow.  Use the TAB or ARROW keys to move between fields.

**Project Title:**        Field Trip

**Synopsis:**        Two trouble making kids and their adventurous grandfather set out on the seemingly simple task of getting to a school field trip but along the way, a freak accident sends their car sinking to the bottom of the bay where they are taken prisoner by the ghost of the famed pirate Blackbeard.  In order to escape, they must steal a precious amulet from the town's museum and return it to Blackbeard, which they succeed in doing only to find they've now unleashed the ghost pirate into the world of the living.

## Production Company to Receive Incentive:

Company Name:        GPX Development LLC
Business Address:        9333 Oso Avenue
City:        Chatsworth
State:        CA
ZIP:        91311
Phone:        818-592-0755
Fax:        818-449-1900
FEIN / Tax ID:        26-3174867
Web:        www.gigapixstudios.com

Contact Name:  Kip Konwiser
Phone:        818-592-0755
E-mail:        kip@konwiserbros.com

## Lead Production Names and Contacts:

Line Producer
Name:        Steven Brown
Phone:        310-614-6422
E-mail:        steve.starfire@earthlink.net

Unit Production Manager
Name:        TBD
Phone:
E-mail:

Production Accountant

Name:       TBD
Phone:
E-mail:

## Production Dates:

Start of Pre-production or Principal Photography:       February 15, 2009
End of Principal Photography or Post-production:        April 1, 2009

## Production Type: Select one of the following:       Feature-length Film

If other, then please describe:

## Format: Select one of the following:       HD

If other, then please describe:

## Distribution: Please check all that apply and specify which broadcaster, festival, etc.

☒ Theatrical:
☒ Broadcast:
☒ DVD:
☒ Cable:
☒ Festivals:
☒ Internet:
☐ Other. If other, then please describe:

## Budget: A copy of the current production budget is required.

☐ Copy of the current production budget attached.

Total production budget:            $$6,000,000.00
Total expected to be spent in Iowa:     $$5,000,000.00

## In-state expenditures: A copy of project expenditures to date is required.

☐ Expenditure report that itemizes qualified spending to date attached.

## Schedule of Project Investors: A list of project investors which includes the following information per person or entity is required.

Entity name, First name, Last name, Address, City, State, Zip, Phone, E-mail, FEIN / Tax ID and % ownership.

☒ List of project investors attached.

## Public Records and Confidentiality Requests: Check one of the following:

☐ No request. I have reviewed the Notice to Applicants – Open Records included with the application. I understand that upon filing this application it becomes an open record available for public inspection.

☒ Yes, there is information in this application for which the business is requesting confidential treatment. To complete your request, please refer to the following Notice, Instructions and

Example and Request for Confidential Treatment Form.

## NOTICE TO APPLICANTS – OPEN RECORDS

PLEASE NOTE: UPON SUBMISSION OF A SIGNED APPLICATION, THE CONTENTS AND ATTACHMENTS TO THIS APPLICATION FOR REGISTRATION IN THE IOWA FILM , TELEVISION AND VIDEO PROJECT PROMOTION PROGRAM ARE PUBLIC RECORDS WHICH ARE AVAILABLE FOR PUBLIC INSPECTION AND COPYING.

INFORMATION SUBMITTED WITH THIS APPLICATION MAY BE TREATED CONFIDENTIAL IF:

1.   IT MEETS THE LEGAL REQUIREMENTS FOR CONFIDENTIAL STATUS, AND

2.   THE APPLICANT FILES A WRITTEN REQUEST FOR CONFIDENTIALITY, AND

3.   THE DEPARTMENT ISSUES WRITTEN CONFIRMATION THAT THE INFORMATION MEETS THESE   REQUIREMENTS AND WILL BE TREATED AS CONFIDENTIAL.

IF NO REQUEST FOR CONFIDENTIAL TREATMENT OF RECORDS IS MADE, THE DEPARTMENT WILL PROCEED AS IF THE APPLICANT HAS NO OBJECTION TO DISCLOSURE TO MEMBERS OF THE PUBLIC.



Iowa's Open Records Law. The Iowa Department of Economic Development (IDED) is a state agency and it is subject to Iowa's Open Records law (Iowa Code, Chapter 22). Treatment of information submitted to IDED in this application is governed by the provisions of the Open Records law. All public records are available for public inspection. Some public records are considered confidential and will not be disclosed to the public unless ordered by a court, the lawful custodian of the record, or by another person duly authorized to release the information.

Legal requirements for confidential treatment of public records.

The information submitted as part of this application information will be available for public inspection, unless a request for confidentiality has been submitted by the applicant in the required form and approved in writing by IDED. Following are the classifications of records which are recognized as confidential under Iowa law and which are most frequently applicable to business information submitted to IDED:

- Trade secrets [Iowa Code §22.7(3)]

- Reports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose.  [Iowa Code §22.7(6)]

- Information on an industrial prospect with which the IDED is currently negotiating. [Iowa Code §22.7(8)] [Please note: This section allows confidentiality during the pre-application, negotiation phase. Once negotiations are over and an application is submitted, the application information is available to the public.]

- Communications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination.  [Iowa Code §22.7(18)]

Helpful Resources:

- Link to Iowa's Open Records law, Chapter 22, through the Iowa General Assembly's Web site:
  http://coolice.legis.state.ia.us/CoolICE/default.asp?category=billinfo&service=IowaCode&ga=82.

- Link to IDED's administrative rules (see 261 IAC Chapter 195) relating to public and confidential records Iowa's through the Iowa General Assembly's Web site:
  http://www.legis.state.ia.us/ACO/IAChtml/261.htm
- Link to the Iowa Attorney General's Web site and their "Sunshine Advisories" (a series of bulletins that address topics related to Iowa's Open Records and Open Meetings laws).
  http://www.state.ia.us/government/ag/sunshine_advisories/

## Instructions for completing the Request for Confidential Treatment Form:

1. Review the completed application and identify the specific portions of the application that contain information that you are requesting be treated as confidential.

2. Determine if the requested information can be treated confidential under Iowa law. Review the following list and identify the legal basis for your confidentiality request.



- Trade secrets [Iowa Code §22.7(3)]

- Reports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose. [Iowa Code §22.7(6)]

- Communications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination. [Iowa Code §22.7(18)]

- Other (provide legal citation e.g. reference to a state or federal law not listed above)

3. Provide an explanation for your request to treat the information as confidential. For example, if the basis for your request is §22.7(6) above (releasing information would give an advantage to competitors & serve no public purpose), describe how competitors would be able to use the information to their advantage. Or, if information is a trade secret, describe what precautions you have already taken to protect that information from public disclosure and why such actions are necessary.

4. Complete the Request for Confidential Treatment Form and include it with your application materials.

5. Along with the completed Request for Confidential Treatment Form you will need to submit both (a) an original document that includes the confidential information and (b) a redacted version of the same document with the confidential sections blacked out.

- Please conspicuously note on the original record that all or portions of it are confidential. The original document with the confidential information included will be maintained in the section of IDED's files marked "Confidential Information." If your request is approved, the original with the confidential information is not available for public inspection.

- The redacted version (confidential information blacked out) along with the Request for Confidential Treatment Form will become part of the file that is open and available to the public.

6. IDED will review the request and provide written confirmation to you of its approval or denial.

## Example of Completed Request for Confidentiality Form

1. Contact Information. Provide the contact information of the person authorized to respond to any inquiry or action of IDED concerning this confidentiality request:

| | |
|---|---|
| Name: | Major Production Film Company |
| Address: | 1234 Major Avenue, Main Street, IA 50311 |
| Telephone number: | 515-515-5151 |
| Email address: | majorproductions@aol.com |

2. Request

- Application Section:  state which section(s) of the application you want kept confidential.

  Budget and in-state expenditures sections and all investor contact names and numbers.

- Legal basis for request:  check one.

  ___ Trade secrets [Iowa Code §22.7(3)]

  _X_ Reports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose.  [Iowa Code §22.7(6)]

  ___ Communications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination.  [Iowa Code §22.7(18)]

  ___ Other (provide legal citation e.g. reference to a state or federal law not listed above):

  _____

- Explanation for Request:  state your explanation for keeping certain information confidential.

  Releasing the exact amounts budgeted for "talent", "producer" "director" or other above-the-line costs would give an advantage to competitors and serve no public purpose. If our competitors knew how much of the total project budget was allocated to these categories they would be able to undercut negotiating strength otherwise present in private agreements.

3. Required Attachments Included:

  X   Original and
  X   Copy of the application with the confidential information blacked out.

## Request for Confidential Treatment Form

1. Contact Information. Provide the contact information of the person authorized to respond to any inquiry or action of IDED concerning this confidentiality request:

Name:                Kip Konwiser
Address:             9333 Oso Avenue, Chatsworth, CA  91311
Telephone number:    (818) 592-0755
Email address:       kip@konwiserbros.com

2. Request

- Application Section:  state which section(s) of the application you want kept confidential.

    Project Investors list, Budget and estimated Budget to be spent in Iowa

- Legal basis for request:  Check one of the following.

    ☐ Trade secrets [Iowa Code §22.7(3)]

    ☐ Reports to governmental agencies which, if released, would give advantage to competitors and serve no public purpose.  [Iowa Code §22.7(6)

    ☒ Communications not required by law, rule or regulation made to IDED by persons outside the government to the extent that IDED could reasonably believe that those persons would be discouraged from making them to the Department if they were made available for general public examination.  [Iowa Code §22.7(18)]

    ☐ Other (provide legal citation e.g. reference to a state or federal law not listed above):

- Explanation for Request:  state your explanation for keeping certain information confidential.

    Releasing the exact amounts budgeted for "talent", "director" or "producers" or other above the line costs would give an unfair advantage to competitors and serves no public purpose.  If our competitors knew how much of the total project budget was allocated to these categories they would be able to undercut negotiating strength otherwise present in private agreements.

## Legal Entity and Tax Certification

The applicant certifies that it is  a corporation, limited liability company or other legal entity in good standing, authorized to do business in Iowa and has no delinquent tax liabilities due and owing to the State of Iowa. The applicant further authorizes the Department, if it so chooses, to seek a tax clearance letter from the Iowa Department of Revenue and authorizes the Department of Revenue to provide such a letter stating whether the records of the Department show that applicant is in compliance with all tax acts administered by the Iowa Department of Revenue to which applicant is subject.  The applicant also certifies that no tax liens, including but not limited to municipal, county, state or federal liens, have been filed against the entity.

## Obscenity Exclusion

A project that depicts or describes any obscene material, as defined in Iowa Code section 728.1, shall not be eligible to receive assistance under this section.

## Retention of and Access to Records

The applicant acknowledges that, with respect to the accredited production and the labor expenditures related thereto, it shall keep its books and records in accordance with generally accepted accounting principles, for a minimum of three (3) years from the date on which the Iowa Film Tax Credit is issued. The applicant acknowledges and agrees that all books, records and supporting documents related thereto shall be available for inspection, monitoring or audit by the Iowa Department of Economic Development, Iowa Department of Revenue or Iowa Attorney General including any of their duly authorized representatives. The applicant further agrees that it will fully cooperate with any of the auditing entities named above. Failure to maintain books, records and supporting documents shall establish a presumption in favor of the Department or the State of Iowa to refuse to redeem the Iowa Film Tax Credit, or a portion thereof, awarded under the Film Tax Credit Program for which adequate books, records and supporting documentation are not available to support the Film Tax Credit.

## Contract Required

Successful applicants will be notified in writing of approval of a request for registration, including any conditions and terms of the approval. The Department will prepare a contract, which includes, but is not limited to, a description of the Project to be completed by the business; terms and conditions for receipt of tax credit benefits; and the repayment requirements or other penalties imposed in the event the recipient does not fulfill its obligations described in the contract. Projects approved under this program are limited to the descriptions and criteria stated on the application. Changes to a registered Project must be reported in writing immediately to the Iowa Film Office along with a request for contract amendment. Upon review, the Department will approve or deny the request for amendment. If the request is approved, a written contract amendment will be executed by the recipient and the Department.

## Certification & Release of Information

I hereby give permission to the Iowa Department of Economic Development (IDED) to research the Business' history, make credit checks, contact the Business' financial institutions, insurance carriers, and perform other related activities necessary for reasonable evaluation of this application. I also hereby authorize the Iowa Department of Revenue to provide to IDED state tax information pertinent to the Business' state income tax, sales and use tax, and state tax credits claimed.

I understand that certain information submitted to IDED related to this application may be subject to Iowa's Open Record Law (Iowa Code, Chapter 22). "

"I understand this application is subject to final approval by IDED and the Project may not be initiated until final approval is secured.

I hereby certify that all representations, warranties, or statements made or furnished to IDED in connection with this application are true and correct in all material respect. I understand that it is a criminal violation under Iowa law to engage in deception and knowingly make, or cause to be made, directly or indirectly, a false statement in writing for the purpose of procuring economic development assistance from a state agency or subdivision."

## Production Company Signature

IFTVPPP

Sep 19 08 01:53p    Gigapix Studios                          818 449 1900              p.8

Officer of Production Company Signature: _____    9/19/8
Printed Name:  Kip Konwiser
Title:         Producer, Executive
Date Signed:   09/19/08

Required Attachments included:

☒ Original and
☒ Copy of the application with the confidential information blacked out.

## For IDED use only:

☒ Application approved
☐ Application denied
Reason for denial:
Signature:        _Thomas D Wheel_____
Name:             Thomas D. Wheeler
Title:            Manager, Iowa Film Office
Date:             9/19/08

# **EXHIBIT B**

Recipient's Project Investor List

LIST PROJECT INVESTORS – PER IOWA STATE FILM COMMISSION APPLICATION

CONFIDENTIAL  -  CONFIDENTIAL  -  CONFIDENTIAL  -  CONFIDENTIAL

Field Trip, 08-FILM-022

12/16/08

Financier information:

GigaPix Studios
9333 Oso Avenue
Chatsworth, CA  91311
(818) 592-0755

contact:  Kip Konwiser, David Pritchard

Tax ID: 43-1991078

Percentage ownership in project:  100% (privately held company with stock, not traded publically)


Production Company Information:

GPX Development, LLC
9333 Oso Avenue
Chatsworth, CA  91311
(818) 592-0755

contact:  Kip Konwiser, David Pritchard

Tax ID: 26-3174867

# EXHIBIT C

## Recipient's Current Project Budget



South Dakota, Rev. #1 v.2                                                                 Page 1

                                    "Field Trip"

Start Date : April, 2009                    Producers : K. Konwiser, D. Pritchard, G. Taylor
Finish Date : May, 2009                     Exec. Prods:
Total Days : 25                             Director : Kern Konwiser
Post Weeks : 10                             Writer: Sidney Bartholomew
Holidays :                                  Location : IA 25 days
Travel Days :                               Unions: low budget agrmnts: SAG, IA
Prepared by: GigaPix Studios                in IA & NY, Teamster, DGA & WGA
                                            Budget dated: 10.15.08

| Acct No | Category Description | Page | Total |
|---|---|---|---|
| | | 1 | 108,167 |
| 1100 | STORY, RIGHTS & CONTINUITY | 1 | 186,025 |
| 1200 | PRODUCERS UNIT | 2 | 269,400 |
| 1300 | DIRECTION | 3 | 256,757 |
| 1400 | CAST | 4 | 124,072 |
| 1500 | TRAVEL & LIVING COSTS | | 106,051 |
| 1999 | Total Fringes | | |
| | Total Above-The-Line | | 1,050,472 |
| 2000 | PRODUCTION STAFF | 9 | 404,539 |
| 2100 | EXTRA TALENT | 13 | 85,877 |
| 2200 | SET DESIGN | 15 | 95,901 |
| 2300 | SET CONSTRUCTION | 16 | 173,425 |
| 2400 | SET STRIKING | 18 | 4,000 |
| 2500 | SET OPERATIONS | 18 | 138,379 |
| 2600 | SPECIAL EFFECTS | 21 | 42,902 |
| 2700 | SET DRESSING | 22 | 222,658 |
| 2800 | PROPERTY | 24 | 98,982 |
| 2900 | WARDROBE | 26 | 119,418 |
| 3100 | MAKEUP & HAIR | 28 | 60,776 |
| 3200 | LIGHTING | 29 | 148,354 |
| 3300 | CAMERA | 32 | 284,600 |
| 3400 | PRODUCTION SOUND | 34 | 58,416 |
| 3500 | TRANSPORTATION | 35 | 579,594 |
| 3600 | LOCATION/TRAVEL & LIVING | 41 | 561,450 |
| 3700 | PROD. FILM & LAB / HI DEF | 47 | 60,000 |
| 3900 | PROCESS | 48 | 0 |
| 4000 | SECOND UNIT /MINIATURES | 48 | 0 |
| 4100 | TESTS | 48 | 1,500 |
| 4200 | STAGE RENTAL | 49 | 46,500 |
| 4400 | VISUAL EFFECTS | 49 | 70,000 |
| 4399 | Total Fringes | | 384,866 |
| | Total Below-The-Line Production | | 3,642,137 |
| 4500 | FILM EDITING | 51 | 74,719 |
| 4600 | MUSIC | 51 | 44,698 |
| 4700 | POST PRODUCTION SOUND | 52 | 100,000 |
| 4800 | POST PRODUCTION FILM & LABORATORY | 52 | 53,278 |
| 4900 | MAIN & END TITLES | 53 | 15,000 |
| 5299 | ++ | | 14,210 |
| | Total Below-The-Line Post | | 301,905 |
| 6500 | PUBLICITY | 54 | 18,997 |
| 6600 | PUBLICITY-RESEARCH SCREENINGS | 54 | 0 |
| 6700 | INSURANCE | 54 | 60,200 |
| 6800 | GENERAL EXPENSE & OFFICE | 55 | 259,500 |
| 6900 | FOREIGN EXCHANGE GAIN & LOSS | 57 | 0 |
| | Total Fringes | | 0 |

Budget #1  v.1 - October 15, 2008

South Dakota, Rev. #1 v.2

| Acct No | Category Description | Page | Total |
|---------|---------------------|------|-------|
|  | Total Below-The-Line Other | . | 338,697 |
| 7200 | DEPOSITS | 58 | 0 |
| 7499 | Total Fringes |  | 0 |
|  |  |  | 0 |
|  | Total Below-The-Line Contingencies |  |  |
| 8000 | CONTRACT | 60 | 0 |
| 9100 | BANK FEES | 60 | 0 |
|  | Completion bond : 2.5% |  | 133,330 |
|  | Contingency : 10.0% |  | 533,321 |
|  | Total Above-The-Line . |  | 1,050,472 |
|  | Total Below-The-Line . |  | 4,282,739 |
|  | Total Above and Below-The-Line |  | 5,333,211 |
|  | Grand Total |  | 5,999,863 |

Printed: Oct 15, 2008 10:04:04 PM

# EXHIBIT D

Recipient's Current Project Expenditures

## None to date.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 409



IOWA
| changing

September 10, 2009

Kip Konwiser
Recess Film Productions, LLC
9333 Oso Ave.
Chatsworth, CA 91311

Re: Contract for 10-FILM-001, "Blackbeard"

Dear Kip;

This letter confirms the eligibility of Blackbeard to contract with the state of Iowa in the Iowa Film, Television and Video Project Promotion Program under project number 10-FILM-001.

Due to unforeseen delays following recent changes to the program law, we have not been able to complete updating our contract template yet. We are making progress and intend to have your draft of the Blackbeard contract available to you soon. Until then, please accept this letter as assurance that the contract will be forthcoming.

The contract will provide a tax credit of $10,340,309.00. Adherence to the rules and regulations of the qualified Iowa expenditures is required to maintain the tax credit amount.

The production will have to provide a final cost report showing the qualified dollar amount actually spent. In addition, the final cost report must include supporting documentation including receipts, invoices and all other spending verification. Your actual benefit amount will be calculated by the actual qualified spending amount and is subject to a reduction if spending proves to be less than estimated. No benefit shall be given for qualified spending above the benefit maximum set in the contract without a negotiated and amended contract.

Thank you for your patience.

Regards,

Amy E. Johnson
Division Coordinator, Business Development Division
Iowa Department of Economic Development

Chester J. Culver, Governor          **IOWA DEPARTMENT OF ECONOMIC DEVELOPMENT**          Patty Judge, Lieutenant Governor

Mike Tramontina, Director ● 200 East Grand Avenue, Des Moines, Iowa USA 50309 ● Phone: 515.725.3000 ● Fax: 515.725.3010 ● www.iowalifechanging.com 

EXHIBIT 411



JOE M. DEJONG
VICE PRESIDENT
COMMERCIAL BANKING SERVICES
PHONE - 515-245-5251
FAX - 515-245-5216
MOBILE - 515-537-4253
EMAIL - jdejong@bankerstrust.com

April 9, 2010

Capitoline Global Finance, Inc.

Recess Film Productions, LLC.

### RE:   LOAN COMMITMENT

Dear Mr. Brian Gilmore and Mr. David Pritchard:

I am pleased to advise you that Bankers Trust Company, N.A. ("Bank") hereby commits to lend Capitoline Global Finance, Inc. ("Borrower") up to $15,000,000.00 ("Maximum Credit") subject to the terms and conditions described below.

**BORROWER:**
Capitoline Global Finance, Inc.

**MAXIMUM CREDIT:**
$15,000,000.00

**LOAN, INTEREST RATE AND MATURITY DATE:**

$15,000,000.00 Non-Revolving Operating Line of Credit.  Line will be priced at Prime + 3.00%, floating (floor = 8.00%).  Line will be provided for a 12-month period with interest only payments required monthly and principal due on maturity.

If the Index Rate is redefined or becomes unavailable, then Bank may select another index which is substantially similar.

**GUARANTOR:**
Recess Film Productions, LLC. ("Recess")

## COLLATERAL:

The Loan would be secured by the following:

1.) A first security interest in all of Borrower's assets and Recess' assets including but not limited to accounts receivable, Iowa Department of Economic Development State of Iowa ("IDED") tax credits, inventory, equipment, machinery, general intangibles and vehicles. Proceeds from the sale of IDED tax credits issued to Recess will be required to be wired to Bank from purchasing parties. Wire instructions will be provided from Bank to facilitate this transfer.

2.) A $15,000,000.00 Irrevocable Standby Letter of Credit in form and substance satisfactory to Bank issued by CIBC naming Bank as the beneficiary. Letter of credit must have an expiry date 30 days after the maturity date of the Line of Credit.

3.) Assignment of Recess' interest in IDED Iowa Film, Television and Video Project Promotion Program Contract.

4.) Completion Bond from Film Finance to Recess, Borrower and Bank for an amount not less than $15,000,000.00 on the picture "Blackbeard". Completion Bond shall name the Bank as beneficiary of the policies.

## COMMITMENT FEE:

If this commitment is accepted by Borrower and Recess, Bank shall receive from Borrower the sum of $390,000.00 as a commitment fee payable at such time as the loan is funded.

## USE OF PROCEEDS:

Borrower shall use the proceeds for the following purpose: To provide short-term financing to Recess for operating expenses associated with the production of the feature film, Blackbeard. Advances on the line of credit shall be drawn on a predetermined schedule which is subject to approval by Bank. First drawdown is anticipated on or about April 2010. Draws requests shall be funded into an account established for the Borrower prior to funding. Funds advanced into this account are then to be transferred to Recess solely for production-related expenses pertaining to the film Blackbeard, as confirmed to Bank's satisfaction.

## DEPOSIT ACCOUNTS:

Borrower and Recess shall maintain their primary business accounts at Bank for the duration of the loan facility. Collection accounts will also be established by Borrower and Recess at Bank for the collection of receipts from the sale of the film Blackbeard. Such accounts shall be collateralized to Bank.

## OTHER TERMS AND CONDITIONS:

Representations and Warranties: The terms of this Loan Commitment will be more extensively documented in a Loan Agreement to be executed by Borrower and Recess and certain representations and warranties and other terms not specifically included herein would be required from Borrower and Recess.

Pledge of Assets: Borrower and Recess will not be allowed to suffer or permit the pledge or encumbrance of any of its assets except as disclosed and consented to by Bank.

Sale of Company: The Loan shall be due and payable in full in the event Borrower or Recess suffers or permits majority control of Borrower or Recess to be sold, assigned or otherwise transferred, or if Borrower or Recess makes or permits a change in its present management, or if Borrower or Recess merges or consolidates with any company or enterprise, or otherwise disposes of a substantial portion (as determined by Bank) of its assets or properties.

<u>Financial Reporting Requirements:</u> Borrower and Recess shall be required to submit to Bank (i) quarterly un-audited financial statements within 30 days of the end of each calendar quarter; and (ii) annual audited financial statements within ninety days of the end of each calendar year; (iii) Updated financial information and budget information may be required at any time from the Bank.

<u>Collateral Requirements:</u> CIBC, issuer of The Irrevocable Standby Letter of Credit pledged as collateral for the Loan, shall maintain an acceptable rating for the duration of the Loan. Borrower and Recess will be subject to default in the event CIBC's short-term rating as determined by Moody's rating service declines from the rating established as of the date of this signed commitment, and Bank may then upon immediately draw on such Letter of Credit.

<u>Interest Reserve Account:</u> Borrower shall be required to pre-fund an interest reserve account equal to 12 months of anticipated interest ($1,200,000.00). This account will be established and maintained at Bank.

<u>Hazard Insurance:</u> Borrower and Recess shall have in force hazard, fire and extended coverage insurance on all property collateralized to Bank with Bank named as loss payee and in amounts acceptable to Bank.

<u>Legal Opinion:</u> Borrower and Recess' attorneys shall supply Bank with legal opinions opining on such matters, as relative to the Loan and Guaranty as required by Bank's attorney.

<u>Loan Expenses:</u> Borrower shall pay all costs and expenses incurred by Bank in connection with Bank's review, evaluation and due diligence concerning the loan, including, but not limited to, attorneys' fees and expenses incurred by Bank in the negotiation and preparation of the loan documents, the costs of any filing fees and other expenses incidental to making the loan, whether or not the loan is actually made.

<u>Occupational Safety Laws:</u> Borrower and Recess shall not be in violation in any material manner of any federal, state, county or city statutes, orders, rules or regulations pertaining to occupational safety.

<u>No Other Liens:</u> Borrower and Recess shall not give other parties a lien on the property collateralized to Bank other than as approved by Bank.

<u>ERISA Compliance:</u> Borrower and Recess shall meet its minimum funding requirements under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, with respect to any employee benefit plan or other class of benefit plan, which the Pension Benefit Guaranty Corporation, established under ERISA (PBGC) has elected to insure, in either case, whether now in existence or hereafter instituted by the Borrower or Recess.

<u>Collateral Funds:</u> Borrower and Recess shall at all times maintain in their accounts at the Bank collected funds sufficient to pay all items presented for payment from such accounts and sufficient to pay service charges imposed by the Bank. Borrower and Recess agree to pay the Bank interest on any overdraft or deficit balance in any such accounts at the rate set forth in the promissory note executed in connection with the Loan.

<u>New Entities:</u> Borrower and Recess, if applicable, would agree that if it/they cause new entities to be created to conduct business activities similar to, or related to, Borrower's and Recess' current business activities, such new entities shall immediately execute unlimited and unconditional guaranties of all liabilities owing by Borrower and Recess to the Bank.

**Misrepresentation:** Any representation or warranty made by Borrower or Recess which proves to be incorrect or untrue, or any financial information, schedule, statement, report or writing furnished by Borrower or Recess to Bank is untrue in any material aspect shall render this Commitment invalid in the Bank's sole discretion.

**Loan Documents:** This Commitment is subject to receipt by the Bank of such Promissory Notes, Loan Agreements, Guaranties and other loan documents which Bank may require, and no loan or advance shall be made to Borrower unless all of the loan documentation is executed and delivered in form and content acceptable to the Bank.

**Expiration:** This Commitment shall remain in effect until, and shall expire as of, the close of the Bank's business on April 30, 2010.

**Closing:** This Commitment shall be deemed expired and void if, Loan Closing does not occur by the close of Bank's business on May 15, 2010. If the loan closing does not occur by May 15, 2010, Borrower shall immediately pay all legal fees and costs incurred by the Bank since May 1, 2009.

**Assignment Prohibited:** This Commitment is tendered only to Borrower and Recess and is not available to any other party. The filing of any bankruptcy petition by or against Borrower or Recess would render this Commitment null and void.

**Termination of Loan Commitment:** This commitment may be terminated, in the sole discretion of Bank (a) if Bank determines that any financial information, or any representations or warranties, or any other information given by Borrower, or Recess, or any party on their behalf, is materially misleading or inaccurate, or (b) upon the occurrence of a material adverse change in the financial condition of Borrower or Recess.

**Confidentiality:** The terms and provisions of this Commitment shall be confidential between the owners and officers of Borrower, Recess and Bank. The contents and terms of this Commitment shall not be disclosed orally or in writing to any parties other than the owners and officers of the parties, their attorneys or accountants.

**Documents to be delivered prior to Closing:** If Borrower and Recess are agreeable to the proposed terms and conditions, the following documents, in addition to the other documents described above, in form and substance acceptable to Bank, are required for review and approval by the Bank and its attorney prior to closing:

A. Copy of Executed Completion Bond and Completion Guarantee documents from Film Finances.

B. Standby Irrevocable Letter of Credit issued by CIBC.

IMPORTANT. READ BEFORE SIGNING, THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN AGREEMENT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

Sincerely,

Joe M. DeJong

**ACCEPTANCE**

The above Loan Commitment is accepted by Borrower and Recess on this _____ day of _____, 20__.

<u>Capitoline Global Finance, Inc.</u> (BORROWER)

By:_____

Its:_____

<u>Recess Film Productions, LLC</u> (GUARANTOR)

By:_____

Its:_____



**It's our name . . . and our promise.**

JOE M. DeJONG
VICE PRESIDENT
COMMERCIAL BANKING SERVICES
PHONE – 515-245-5251
FAX – 515-245-5216
MOBILE – 515-537-4253
EMAIL – jdejong@bankerstrust.com

September 10, 2009

Mr. Brian A. Gilmore
Capitoline Global Finance
2901 W. Coast Highway
Newport Beach, CA 92663

Mr. Brian A. Gilmore,

This letter is to confirm that pursuant to your request and per instructions provided by Capitoline Global Finance we have been authorized by our borrower Capitoline Global Finance to remit Golden Crest Holdings fee upon initial funding of the loan. Please admit wiring instructions for Golden Crest Holdings in order to facilitate this request.

Please advise when we can expect the Letter from Citibank so we may conclude this transaction.

Sincerely,

Joe M. DeJong
Vice President
Commercial Lending



**Bankers Trust**

*It's our name . . . and our promise.*

JOE M. DeJONG
VICE PRESIDENT
COMMERCIAL BANKING SERVICES
PHONE – 515-245-5251
FAX – 515-245-5216
MOBILE – 515-537-4253
EMAIL – jdejong@bankerstrust.com

August 21, 2009

Capitoline Global Finance, Inc.

## RE: *LOAN COMMITMENT*

Dear Mr. Brian Gilmore:

I am pleased to advise you that Bankers Trust Company, N.A. ("Bank") hereby commits to lend Capitoline Global Finance, Inc. ("Borrower") up to $12,800,000.00 ("Maximum Credit") subject to the terms and conditions described below.

**BORROWER:**
Capitoline Global Finance, Inc.

**MAXIMUM CREDIT:**
$12,800,000.00

**LOAN, INTEREST RATE AND MATURITY DATE:**

$12,800,000.00 Non-Revolving Operating Line of Credit. Line will be priced at Prime ‒ 3.00%, floating (floor = 8.00%). Line will be provided for a 12-month period with interest only payments required monthly and principal due on maturity.

If the Index Rate is redefined or becomes unavailable, then Bank may select another index which is substantially similar.

**GUARANTOR:**
None

**COLLATERAL:**

The Loan would be secured by the following:

1.) A first security interest in all of Production Entity (Recess Films Productions, L.L.C.) assets including but not limited to accounts receivable, Iowa Department of Economic Development ("IDED") tax credits, inventory, equipment, machinery, general intangibles and vehicles. Proceeds from the sale of State of Iowa tax credits issued to Recess Film Productions, LLC will be required to be wired to Bankers Trust Company, N.A. from purchasing party. Wire instructions will be provided from Bank to facilitate this transfer.

2.) A $11,750,000.00 Irrevocable Standby Letter of Credit issued by Citibank New York naming Bankers Trust Company, N.A. as the beneficiary.

3.) Assignment of IDED Iowa Film, Television and Video Project Promotion Program Contract.

4.) Completion Bond from Film Finance for an amount of Iowa spend not less than $12,800,000.00 on the picture "Blackbeard". Completion Bond shall name the Bank as beneficiary of the policies.

**COMMITMENT FEE:**

If this commitment is accepted by Borrower, Bank shall receive from Borrower the sum 1.50% of total commitment as a commitment fee payable at such time as the commitment is accepted.

**USE OF PROCEEDS:**

Borrower shall use the proceeds for the following purpose(s): Short-term financing of IDED Tax Credits and operating expenses associated with the production of the feature film by Recess Film Productions, LLC. Advances on the line of credit shall be drawn on a predetermined schedule which is subject to approval by Bankers Trust Company. First drawdown is anticipated on or about August 2009. Draws requests shall be funded into an account established for the Borrower prior to funding. Funds advanced into this account are then to be transferred to Recess Film Productions, LLC for operating expenses.

**DEPOSIT ACCOUNTS:**

Borrower shall maintain its primary business account at Bank. Accounts are to be established for Recess Film Productions, LLC and Capitoline Global Finance, Inc and will be required to be held at Bankers Trust for the duration of the loan facility. Collection accounts will also be established by Capitoline Global Finance, Inc. at Bankers Trust Company for the collection of receipts from the sale of the finished project.

**OTHER TERMS AND CONDITIONS:**

Representations and Warranties: If the Bank so elects, the terms of this Loan Commitment will be more extensively documented in a Loan Agreement to be executed by Borrower and Guarantor and in such event, certain representations and warranties and other terms not specifically included herein would be required from Borrower and Guarantor.

Pledge of Assets: Borrower will not be allowed to suffer or permit the pledge or encumbrance of any of its assets except as disclosed and consented to by Bank.

Sale of Company: The Loans shall be due and payable in full in the event Borrower suffers or permits majority control of Borrower to be sold, assigned or otherwise transferred, or if Borrower makes or permits a change in its present management, or if Borrower merges or consolidates with any Company or enterprise, or otherwise disposes of a substantial portion (as determined by Bank) of its assets or properties.

Financial Reporting Requirements: Borrower and Production Entity ("Recess Film Productions, LLC) shall be required to submit to Bank (i) quarterly un-audited financial statements within 30 days of each calendar quarter; and (ii) annual audited financial statements within ninety day of end of each calendar year; (iii) Updated financial information and budget information may be required at any time from the Bank.

<u>Interest Reserve Account</u>:   Borrower shall be required to pre-fund an interest reserve account equal to 12 months of anticipated interest.  This account will be established and maintained at Bankers Trust Company.  Reserve account will be required to be funded prior to any disbursements under the approved non-revolving line of credit.

<u>Hazard Insurance</u>:  Borrower shall have in force hazard, fire and extended coverage insurance on all property collateralized to Bank with Bank named as loss payee and in amounts acceptable to Bank.

<u>Legal Opinion</u>:  Borrower's attorney shall supply Bank with a legal opinion opining on such matters, as relative to this loan as required by Bank's attorney.

<u>Loan Expenses</u>:  Borrower shall pay all costs and expenses incurred by Bank in connection with Bank's review, evaluation and due diligence concerning the loan, including, but not limited to, attorneys' fees and expenses incurred by Bank in the negotiation and preparation of the loan documents, the costs of any environmental investigation and/or audit, appraisal fees, title insurance premiums, survey and inspection fees, filing fees and other expenses incidental to making the loan, whether or not the loan is actually made.

<u>Occupational Safety Laws</u>:  Borrower shall not be in violation in any material manner of any federal, state, county or city statutes, orders, rules or regulations pertaining to occupational safety.

<u>No Other Liens</u>:  Borrower shall not give other parties a lien on the property collateralized to Bank.

<u>ERISA Compliance</u>:   Borrower shall meet its minimum funding requirements under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, with respect to any employee benefit plan or other class of benefit plan, which the Pension Benefit Guaranty Corporation, established under ERISA (PBGC) has elected to insure, in either case, whether now in existence or hereafter instituted by the Borrower.

<u>Collateral Funds</u>:  Borrower would at all times maintain in its accounts at the Bank collected funds sufficient to pay all items presented for payment from such accounts and sufficient to pay service charges imposed by the Bank.  Borrower agrees to pay the Bank interest on any overdraft or deficit balance in any such account at the rate set forth in the promissory note executed in connection with the Loan.

<u>New Entities</u>:  Borrower and Guarantor, if applicable, would agree that if it/they cause new entities to be created to conduct business activities similar to, or related to, Borrower's current business activities, such new entities shall immediately execute unlimited and unconditional guaranties of all liabilities owing by Borrower to the Bank.

<u>Misrepresentation</u>:  Any representation or warranty made by Borrower or any Guarantor which proves to be incorrect or untrue, or any financial information, schedule, statement, report or writing furnished by Borrower or any Guarantor to Bank is untrue in any material aspect shall render this Commitment invalid in the Bank's sole discretion.

<u>Loan Documents</u>:  This Commitment is subject to receipt by the Bank of such Promissory Notes, Loan Agreements, Guaranties and other loan documents which Bank may require, and no loan or advance shall be made to Borrower unless all of the loan documentation is executed and delivered in form and content acceptable to the Bank.

<u>Expiration</u>:  This Commitment shall remain in effect until, and shall expire as of, the close of the Bank's business on September 30, 2009.

<u>Closing</u>:  This Commitment shall be deemed expired and void if, Loan Closing does not occur by the close of Bank's business on September 30, 2009.

**Assignment Prohibited:**  This Commitment is tendered only to Borrower and is not available to any other party.  The filing of any bankruptcy petition by or against Borrower would render this Commitment null and void.

**Termination of Loan Commitment:**  This commitment may be terminated, in the sole discretion of Bank (a) if Bank determines that any financial information, or any representations or warranties, or any other information given by Borrower, or any Guarantor, or any party on their behalf, is materially misleading or inaccurate, or (b) upon the occurrence of a material adverse change in the financial condition of Borrower or any Guarantor.

**Confidentiality:**  The terms and provisions of this Commitment shall be confidential between the stockholders of Borrower and the Bank.  The contents and terms of this Commitment shall not be disclosed orally or in writing to any parties other than the stockholders or the attorney or accountant for Borrower.

**Documents to be delivered prior to Closing:**  If Borrower is agreeable to the proposed terms and conditions, the following documents are required for review by the Bank prior to closing:

A.   Final Cost Budget for "Blackbeard" provided by Recess Film Productions, LLC.

B.   Certified Copies of Articles of Incorporation, Operating Agreements and Bylaws (Recess Film Productions, LLC; Golden Crest Holdings, LLC; Recess Film Financing, LLC; Capitoline Global Finance, Inc.; Capitoline Global Finance of Iowa, LLC; Gigapix Studios, Inc).; Certificate of Good Standing of Borrower; Borrowing Resolution; Opinion of Counsel, and Operating Agreements.

C.   Documentation granting Bankers Trust Company permission to discuss expenditures of Recess Film Productions, LLC. with the Iowa Department of Economic Development Film Office.

D.   Copy of Executed Completion Bond and Completion Guarantee documents from Film Finances will be required to be reviewed by Bank counsel prior to any requested release of funds to Capitoline Global Finance, Inc.. A formal opinion of this document will be required by the Bank prior to the releasing of proceeds.

E.   Copies of Standby Irrevocable Letters of Credit issued by Citibank New York.  These documents will be reviewed by Bank counsel with a satisfactory formal opinion prior to any requested released of funds to Capitoline Global Finance, Inc.

F.   Copies of executed agreement between Capitoline Global Finance, Inc and Recess Film Productions, LLC identifying financing agreement between the two parties and any other parties associated with the production of "Blackbeard".

IMPORTANT.  READ BEFORE SIGNING, THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN AGREEMENT MAY BE LEGALLY ENFORCED.  YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

Sincerely,

Joe M. DeJong

**ACCEPTANCE**

The above Loan Commitment is accepted by Borrower and Recess on this
_____, 20__.

**Capitoline Global Finance, Inc. (BORROWER)**

By:_____

Its:_____

**Recess Film Productions, LLC (GUARANTOR)**

By:_____

Its:_____MANAGING MEMBER._____



9333 OSO AVENUE    CHATSWORTH, CALIFORNIA 91311

Mr. David Williams

Film Crest Entertainment

9909 Topanga Canyon Rd. Suite 211

Chatsworth CA. 91311                                             August 25, 2009

Dear Mr. Williams

This is to confirm that subject to the approval by Bankers Trust Iowa the lending bank to Capitoline Global Finance Iowa of the collateral, in the form of an Unconditional Stand by Letter of Credit. This collateral will be drawn on Citibank New York in an amount 11.7mm in US dollars. The issuer Golden Crest Holdings will be paid a fee of 6% for the issuance of such Letter of Credit from the proceeds of a loan to Recess Films LLC from Capitoline Global Finance.

Yours sincerely,

Colin F. Mutton
Chief Financial Officer
Gigapix Studios, Inc.
Phone:   (818) 592-0755
Fax:      (310) 496-2969
Mobile: (310) 600-4564
cmutton@gigapixstudios.com
http://www.gigapixstudios.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 417

# FIRST LOOK AGREEMENT

THIS AGREEMENT ("Agreement") is made as of November 5, 2009, by and between ANCHOR BAY ENTERTAINMENT, LLC c/o, 2950 North Hollywood Way, Third Floor, Burbank, CA 91505 ("Licensee") and GIGAPIX STUDIOS, INC., c/o 9333 Oso Ave., Chatsworth, CA 91311 ("Licensor").

<u>CONDITION PRECEDENT TO EACH PRODUCTION</u>: Licensee's agreement to distribute each Production (as defined below) shall be subject to (i) Licensee's receipt and written approval (to be given in its sole discretion) of the screenplay, Chain of Title, and other information for such Production sufficient for Licensee to exercise its First Look Rights, (ii) Licensor's complete delivery of such Production, and (iii) Licensor's delivery to Licensee of signed copies of a distribution agreement with respect to such Production (which shall be in the form of an agreement incorporating the terms hereof) and any other document Licensee may need signed by Licensor in order to fully and legally exploit all of the rights granted hereunder.

## BASIC PROVISIONS

## PART I - FIRST LOOK PROVISIONS

A.      <u>FIRST LOOK TERM</u>:  The "First Look Term" shall commence as of the date of signature of this Agreement and continue until December 31, 2012.  The First Look Term may be extended for an additional two (2) years (the "Extended First Look Term") upon mutual agreement of the parties.

B.      <u>FIRST LOOK</u>:  During the First Look Term, Licensor shall submit to Licensee any and all projects that Licensor wishes to produce; provided that the foregoing obligation to submit projects shall apply only to projects that the Licensor reasonably believes will be capable of receiving a "G" or "PG" rating; and provided further that each such project shall generally conform to the categories set forth below in B(1), B(2) and B(3).  Licensee must accept or reject projects within 20 business days of submission.  Failure to give notice within such 20 business day period shall be deemed a rejection.  If a project is accepted for distribution, such project shall be deemed a "Production" and shall be governed by the terms of this agreement.  If a project is rejected, Licensor may submit such project to a third party, subject to resubmitting to Licensee in the event of any changed material element.

(1)     <u>Recess Films</u>:  Live action comedy films produced as entertainment for children with a final going-in-budget ranging from Eight to Ten Million Dollars ($8,000,000 - $10,000,000) and a final negative cost of no less than Five Million Dollars ($5,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(2)     <u>GPX Animation</u>:  Stereoscopic, computer generated, animated films produced as entertainment for children with a final going-in-budget of no less than Twenty Million Dollars ($20,000,000) and a final negative cost of no less than Fifteen Million Dollars ($15,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(3)     <u>Low Budget Production</u>:  A film produced as entertainment for children with a final going-in-budget of under Eight Million Dollars ($8,000,000).

C.    SUBMISSION:  At such time as Licensor wishes to proceed to production with a particular project, Licensor shall furnish Licensee with all relevant information regarding such project, including the following package of materials, documentation and information:  script, budget, proposed director, proposed principal cast, chain of title documents, and schedule for principal photography.  Following receipt of a submission package, Licensee shall make a determination, which determination may include request for corporate "greenlight" approval, whether to distribute such project, disapprove the project or request certain alterations be made in the components of the submission package, which shall be considered in good faith by Licensor, provided, however, that the Licensor's decision shall be final and controlling.

D.    LIMITS:  Licensee shall not be required to accept more than six (6) Productions during the First Look Term nor more than four (4) Productions during the Extended First Look Term, and no more than two (2) Productions in any one (1) calendar year of the Term.  Each Production shall be no less than ninety (90) minutes in length and must be rated no more restrictive than "PG."

E.    ACCEPTED PROJECTS:  If Licensee accepts a project as a Production hereunder, then the following provisions shall govern

       (1)    Distribution Rights:  All of Licensee's and Licensor's respective rights and obligations in connection with the delivery and distribution of each such picture shall be governed in accordance with the terms and conditions of Part II - Distribution Provisions below which form a part of this agreement.

       (2)    Production Responsibilities:  Licensor shall serve as the corporate entity responsible for the production of each picture.  Licensor shall be solely responsible for any and all matters in connection with the production, completion and delivery of each Production.  The foregoing shall not prohibit Licensor from creating and appointing as its designee for the purpose of producing an individual Production a single purpose production company, provided that such production company is created and exists solely and exclusively for the purpose of producing the relevant Production.  For each Production, Licensor shall secure a completion bond from Film Finance or another completion bond guarantee company ("Guarantor") that is reasonably acceptable to Licensee.

       (3)    Presentation to Overture:  Licensee shall present each Production to its affiliate, Overture Films, LLC ("Overture"), not later than 15 days after such Production is accepted by Licensee hereunder.  If Overture elects, in its sole discretion, to negotiate for any distribution rights, then Licensee shall permit Licensor to negotiate with Overture for a period of up to thirty (30) days ("Negotiation Period").  Any agreement reached between Licensor and Overture shall be solely between them and shall relieve both parties hereto from any obligations and responsibilities set forth herein.  If Overture elects not to negotiate to distribute a Production or, if Overture and Licensor fail to conclude an agreement during the Negotiation Period, then such Production shall again be governed in accordance with the terms and conditions of Part II - Distribution Provisions.  Licensor warrants that it shall not disclose any involvement with Overture in connection with this Agreement for press purposes without the prior written approval of Licensee.  No inadvertent disclosure by Licensor shall be deemed a breach of this Agreement.

F.    REJECTED PROJECTS:  If Licensee does not accept a project for which Licensor has presented a submission package, then such project shall constitute a "Rejected Project".  Any such Rejected Project may be offered to a third party for distribution, subject to the resubmission in the event of any changed material element.  For the avoidance of doubt, Licensor shall not submit any project to any third party unless and until such time as Licensor shall have submitted such project

to Licensee and Licensee shall have rejected such project. Licensee shall have the right to reject any Production submitted by Licensor for any reason.

PART II – DISTRIBUTION PROVISIONS

1. <u>PRODUCTION</u>: Each project accepted by Licensee pursuant to the First Look Provisions shall be deemed a "Production" hereunder. The Distribution Provisions hereunder shall apply to each Production.

2. <u>RIGHTS</u>:

(a) <u>Licensed Rights</u>: With respect to each Production, Licensor shall have the sole, exclusive and irrevocable right and license to advertise, market and otherwise exploit in any and all formats and in any and all media whether now known or hereafter devised, and all allied, ancillary and subsidiary rights with respect to such Production (the "Licensed Rights") including without limitation those rights enumerated herein and as may be defined in more detail in the attached "General Terms and Conditions" during the Term and the Sell-off Period (as defined below), in the Territory (defined below) and in accordance with the Distribution Provisions of these "Basic Provisions," the "General Terms and Conditions" attached hereto as Exhibit "A," the "Delivery Schedule" attached hereto as Schedule "DM." A "Short Form License" in the form attached hereto as Exhibit "B" shall be completed and delivered for each Production submitted by Licensor and accepted by Licensee hereunder. For any Low Budget Production accepted hereunder, the Licensed Rights shall include all rights other than Theatrical Rights.

(b) <u>Reserved Rights</u>: Unless otherwise agreed to by the parties, Licensor hereby reserves the following rights in and to the Productions: Stage rights, traditional publishing rights, all forms of video games whether now known or hereafter devised and all licensing rights, Merchandising, Subsequent Production (subject to paragraph 10 below), Airline, Ship, Music Publishing, Soundtrack, and Commercial Tie-In Rights (the "Reserved Rights"). Prior to exercising any of the Reserved Rights or any portion thereof, Licensor shall consult Licensee with respect to Licensee's involvement in the exploitation of the Reserved Rights, if any, and to ensure that exploitation of the Reserved Rights does not conflict or interfere with Licensee's exploitation of any of the Licensed Rights.

(c) <u>Pay Television</u>: Any Production that is a 'live-action' Production (as opposed to an animated film or documentary, etc.) and is theatrically released by Licensee shall be licensed to Starz Entertainment, LLC ("STE") under an output agreement between STE and Licensee for as long as Licensee's agreement with STE is in effect. Licensee represents and warrants that, with respect to such output agreement, each Production shall be treated substantially similar to any motion picture licensed from a party other than Licensor.

(d) <u>Certain Exploitation by Licensor</u>: Notwithstanding any of the foregoing, Licensor shall have the non-exclusive right to exploit the Digital/Electronic Rights in and to the Production(s) on either its own website or on websites branded solely for each such Production being exploited; it being understood that Licensor shall not begin exploiting such rights until 90 days following the Street Date for said Production.

(e) <u>International Holdback</u>: Licensor shall not itself nor authorize others to exhibit and/or distribute the Production in any territory not licensed hereunder until the date on which Licensee releases the Production in the United States, on a medium by medium basis (e.g.,

theatrical held back by Licensor until Licensee's theatrical release in the US, home video held back by Licensor until Licensee's home video release in the US).

3.    <u>DISTRIBUTION TERM/EXCLUSIVITY:</u>

(a)    The distribution term ("Term") of Licensee's exclusive Licensed Rights in and to each Production shall commence on the date such Production is accepted by Licensee hereunder in accordance with the First Look provisions and shall continue for a period of ten (10) years after the later of (i) the initial commercial release of the Production by Licensee of such Production or (ii) the date at which all of the materials set out to be delivered to Licensee hereunder in Schedule "DM" (attached hereto and hereby incorporated by this reference) for such Production are actually received and accepted by Licensee and Licensee has issued its Notice of Acceptance of Delivery, plus an additional non-exclusive six month sell off period for Video/DVD Rights. If Licensee desires to extend the Term hereof and/or renew the license of the Licensed Rights licensed herein, or any portion thereof, then at or prior to the expiration of the Term, Licensee shall notify Licensor of the same and upon such notice, Licensor and Licensee will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for any such extension and/or renewal. If the parties fail to reach an agreement within such thirty (30) day period, then Licensor shall be free to offer the Production to a third party. During the Term, Licensor will not itself, nor will it authorize anyone else to, exploit the Licensed Rights except as may be expressly permitted hereunder; provided that during any sell off period, Video Rights shall not be exclusive.

(b)    The date upon which Licensor shall deliver the Delivery Materials specified in paragraph 8(a) below shall be mutually determined on a Production by Production basis.

4.    <u>TERRITORY:</u>  The territory ("Territory") shall mean the United States of America and its territories and possessions, and Bermuda and the Bahamas, provided that the Licensed Rights in Bermuda and Bahamas shall be limited to Television only.

5.    <u>ROYALTIES FOR THE LICENSED RIGHTS:</u>

(a)    In connection with the exploitation of the Licensed Rights, and provided that Licensor is not in default of any of its obligations hereunder, Licensee shall pay to Licensor an amount equal to one hundred percent (100%) of Adjusted Gross Receipts actually received by it from exercise of the Licensed Rights.

(b)    "Gross Receipts" shall mean all non-refundable monies actually received, used, or credited to, available to, and earned by Licensee or on its behalf from (i) the lease, sale, rental, distribution or other exploitation of any such rights granted hereunder including all monies received from subdistributors that Licensee, in its discretion, may elect to use, it being understood: (i) that in the case of the Video/DVD Rights, Gross Receipts shall be calculated without deductions for products that are returned and (ii) that (A) sales taxes, turnover taxes and the like, and any monies received by Licensee in the nature of refundable advances or security deposits, or deposits or periodic payments until such monies are earned or forfeited shall not be considered as included in Gross Receipts, and (B) in the case of sales directly to customers by means of direct response radio, internet, telephonic, mail, email or television solicitations Gross Receipts shall be fifty percent (50%) the gross monies received by Licensee from such sales, net of fulfillment costs, credit card fees and the like.



(c)    Gross Receipts does not mean any revenue received by third parties unless and until it is actually received, used, or credited to, available to, and earned by Licensee or on its behalf as set forth in Section 5(b).

(d)    Adjusted Gross Receipts "Adjusted Gross Receipts" shall mean Gross Receipts (as defined above) after deduction in the following priority of: (i) distribution and sales agency fees equal to the percentages listed in paragraph 5(e) below, (ii) credits, discounts, rebates, incentives, co-op, settlements, allowances and deductions for products returned, unless any such item has been otherwise deducted in computing Gross Receipts; (iii) costs of collection; (iv) foreign currency exchange costs; (v) actual out-of-pocket costs for digital linear tape ("DLT"), authoring, mastering, artwork design, and of "bonus" or added material, and of the like; (vi) all manufacturing and production costs, including but not limited to out-of-pocket costs of physical materials (including, for example, prints, tapes, disks, pre-production materials and the like) including any costs of preparation or distribution of product distributed digitally; (vii) payments and costs incurred by Licensee to third parties for distribution and related charges; (viii) subject to prior written approval of Licensor out-of-pocket direct advertising and marketing costs override, time and material charges for any in-house graphic design costs, with the understanding that if these costs are incurred in connection with various products including the Production hereunder, such costs shall be allocated on a reasonable basis by Licensee among such product and shall in any event include an appropriate charge for costs of conventions, trade shows, festivals and trade association dues; (ix) any costs incurred in connection with Licensee's institution of and/or maintenance or defense of any claim by or naming Licensee affecting rights granted by Licensor hereunder; (x) any third party participations and/or music payments and/or payments under any collective bargaining agreement (whether paid or accrued) and any costs incurred in the administering the same that Licensee agrees to or becomes obligated to assume hereunder; (xi) in the case of non-traditional channels (non-traditional channels include, but are not limited to, scan based trading, CBA markets, and third party marketing and/or sales services for one time and/or limited time promotions and programs) all costs of such sales including but not limited to costs of goods, co-op, discounts, and of marketing, selling and distributing the same, and (xii) any other direct out-of-pocket costs paid to third parties of a similar or dissimilar nature actually incurred in connection with exploitation of rights hereunder.

(e)    Licensee shall be entitled to deduct the following distribution and sales agency fees from Gross Receipts:

(i)    Twelve and a half Percent (12.5%) of Gross Receipts for the exploitation of the Theatrical Rights;

(ii)    Fifteen Percent (15%) of Gross Receipts for exploitation of the Video/DVD Rights; and

(iii)    Seventeen and a half Percent (17.5%) of Gross Receipts for exploitation of the Television Rights and all other Licensed Rights other than those enumerated in (i) and (ii) above.

6.    RESERVES; FREE GOODS; RESIDUALS:

(a)    In the case of Video Rights, Licensee may retain a reasonable reserve for returns of any products sold pursuant to exploitation of the Licensed Rights in each quarterly period, to be liquidated within a reasonable time period taking into account current business and market conditions and based upon Licensee's business judgment.

(b)    Licensee shall be permitted to distribute up to five percent (5%) of any products sold pursuant to exploitation of the Licensed Rights hereunder for promotional and review purposes without the payment of royalties.

(c)     Licensor shall be and remain liable for payment of all contingent payments including, but not limited to "residuals" which may be or become due under any applicable collective bargaining agreement as shown on the Union Residual List (see Schedule DM) to be delivered hereunder with respect to each Production; provided, however, that Licensee shall calculate and pay such residuals (inclusive of payroll taxes and fringes) directly to the guilds. Licensee shall deduct such costs, plus third party processing costs of same, from Licensor's share of Adjusted Gross Receipts with respect to each Production. Licensor warrants that it shall deliver a complete residual list pursuant to Schedule DM and shall indemnify, save and hold Licensee harmless from all damages, losses, penalties, and fees resulting from Licensor's failure to deliver a complete residual list.

7.    ACCOUNTINGS:

(a)     Licensee agrees to account and pay Licensor its royalties hereunder on a calendar quarterly basis within sixty (60) days after the end of the Licensee's fiscal quarter following the initial release of the Production and sixty (60) days following each calendar quarter thereafter for three (3 years following the rendition of the first statement that is rendered; thereafter such accountings and payments, if any, shall be on a semi-annual basis if any monies are payable to Licensor or, if none are due, then Licensee shall have no obligation to render a statement unless Licensor specifically requests in writing that a statement be rendered, which requests shall be made not more often than once per calendar year.  Each such accounting shall set forth in reasonable detail the amounts and sources of revenue and, where applicable, the permitted deductions therefrom.  Licensor or its designee shall have the right, upon reasonable written notice, not more than once in each calendar year, to engage a firm of licensed, independent, certified public accountants to examine and take excerpts from Licensee's books and records as they pertain to this Agreement, which examination shall be conducted for no more than thirty (30) days at Licensee's principal offices (as designated by Licensee) during normal business hours and shall not unreasonably interfere with Licensee's normal business operations.  If a discrepancy of 10% or more is found then Licensee shall pay for the reasonable cost of such audit. Any such independent certified public accountants shall, upon Licensee's request, sign an appropriate confidentiality agreement. If any such examination results in a conclusion that monies earned for the period were under-reported and/or costs deducted (if applicable) during the period were overstated and if as a result thereof any payment is due, Licensee shall forthwith pay the balance due. Any statement that is rendered hereunder that is not contested within twenty four (24) months shall be final and incontestable as to matters shown thereon.

(b)     If any foreign receipts are frozen or unremittable, Licensee will notify Licensor to such effect and upon Licensor's written request and upon condition that the same shall be permitted by authorities of such foreign country, transfer to Licensor, at Licensor's cost and expense, in such foreign country and in the currency thereof such part thereof to which Licensor would be entitled hereunder if the funds were transmitted and paid in the United States in accordance with the terms hereof.  Licensee shall not be liable in any way for any losses caused by fluctuation in the rate of exchange or because of any failure to convert or remit any particular funds to the United States at any particular time or at a more favorable cost or rate of exchange than the cost or rate of exchange at which such conversion and remittance was accomplished, it being agreed that Licensor shall be bound by whatever arrangements Licensee may make for the conversion and remittance of foregoing funds and by whatever cost or rate of exchange is incurred for such conversion and remittance.

8.  <u>MATERIALS TO BE DELIVERED:</u>

(a)    "Delivery" shall mean delivery to and acceptance by Licensee, in its sole discretion, of all delivery items (each a "Delivery Item" and collectively the "Delivery Materials") referenced in the attached Schedule "DM" (the "Delivery Schedule"). At or prior to the date as referred to in Paragraph 3(b) above, Licensor, at its sole cost and expense, shall deliver to Licensee at its address as set forth in the Basic Provisions, or such other place as Licensee may reasonably designate, the materials described in the Schedule DM (the "Delivery Materials"), in technically acceptable condition meeting Licensee's quality control (QC) requirements so that the Licensed Rights may be appropriately and professionally exploited. Licensor shall notify Licensee in writing including the completed Delivery Binder Cover Sheet (Exhibit B) when it has completed delivery of all Delivery Materials and Licensee will review the Delivery Materials and will notify Licensor of any defects within thirty (30) days after delivery of all of the Delivery Materials. Delivery of the Delivery Materials shall be deemed complete when Licensee has approved the Materials by sending to Licensor a written notice of acceptance. If at the end of thirty (30) days no notice is given, Licensee is deemed to have accepted the Materials.

(b)    If Licensee shall notify Licensor of any undelivered Delivery Materials or defects in the delivered Materials, Licensor shall within twenty (20) days after receipt of notice cause all such deficiencies or defects to be corrected and new Materials to be made and delivered to Licensee. Each time Licensor delivers any new Material, the thirty (30) day review period recommences for the new Materials. Licensor shall pay the cost of manufacturing all such new materials. In the event that Licensor fails to correct any defect or to cause such new Materials to be delivered to Licensee within said twenty (20) day period, Licensee may proceed to exploit the Licensed Rights for the relevant Picture by use of the uncorrected delivered materials or may, after determination by Licensee in its reasonable discretion that any defect is incurable, upon written notice to Licensor, terminate this Agreement with respect to such Picture only, with no further liability or obligation to Licensor with respect to such Picture. Notwithstanding the foregoing, Licensee may without any obligation, create any undelivered Delivery Materials or cure any uncorrected Delivery Materials per Paragraphs 1 and 2 of Schedule DM whereupon Licensee will offset the cost thereof against any payments otherwise payable to Licensor hereunder.

(c)    Licensor shall make available to Licensee for copying and use, at Licensor's expense, such reasonable and customary promotional materials not required pursuant to Schedule DM but nevertheless deemed appropriate by Licensee and as Licensor may have in its possession or to which it has access and which Licensee desires to use in exploiting the Licensed Rights hereunder. Licensor shall have access to any material created by Licensee upon payment to Licensee of Licensee's cost to create such materials, plus all access all shipping and duplication costs, any laboratory access fees, if applicable.

(d)    Licensor acknowledges that Licensee plans its release schedules based upon the delivery date(s) specified in this agreement or if none is/are specified then upon delivery dates which are mutually agreed upon between Licensor and Licensee; Licensor's failure to deliver a Production and to complete delivery as provided above, as agreed, shall cause Licensee to not only postpone its release date but to incur additional expenses because of such delay. Licensee shall be entitled to recoup any direct, out-of-pocket costs incurred by Licensee as a result of such delay from any amounts payable hereunder to Licensor.

9.    <u>SUBSEQUENT PRODUCTIONS:</u>    If Licensor or any company controlled by, controlling, or under common control with Licensor seeks to produce, distribute or authorize others to produce or distribute productions related to the characters and/or content of Production,

including but not limited to sequels, prequels or spin-offs ("Subsequent Productions"), then Licensor shall give Licensee written notice of same prior to offering distribution rights or any portion thereof to a third-party or exercising such rights itself, and upon Licensee's request Licensor will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for Licensee's acquisition of the distribution right(s) to same. If the parties fail to conclude an agreement for such right(s) within thirty (30) days after such negotiations commence, then Licensor shall be free to offer such right(s) to others on such terms as it may determine.

10.     THEATRICAL RELEASE:  Each Production shall be tested by a film research/testing service, with OTX and NRG being preapproved, in one or more focus groups, with the costs of such testing being paid by Licensor.  Based on the results of such testing, the parties shall mutually determine the theatrical release date, the scope of such theatrical release (e.g., number of markets and number of screens), and the level of the initial print and advertising commitment (the "P&A Commitment") per subparagraph (i) below.

        (i)     For any Production that receives a sixty percent (60%) approval rating (i.e., sixty percent (60%) of the focus group liked the Production) or which is a Recess Film (regardless of test score), the P&A Commitment shall be no less than Six Million Dollars ($6,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Six Hundred (600) screens.

        (ii)     For any Production that receives a seventy five to eighty five percent (75%-85%) approval rating (i.e., seventy five to eighty five percent (75%-85%) of the focus group liked the Production) or which is a GPX Animation film, the P&A Commitment shall be no less than Ten Million Dollars ($10,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least One Thousand (1000) screens.

        (iii)     For any Production that receives an eighty five to ninety percent (85%-90%) approval rating (i.e., eighty five to ninety percent (85%-90%) of the focus group liked the Production), the P&A Commitment shall be no less than Fifteen Million Dollars ($15,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Fifteen Hundred (1500) screens.

        (iv)     For any Production that receives a ninety percent (90%) approval rating or higher (i.e., ninety percent (90%) or greater of the focus group liked the Production), the P&A Commitment shall be no less than Twenty Million Dollars ($20,000,000) and Licensee shall use reasonable efforts to cause Overture to secure a minimum release of more than Fifteen Hundred (1500) screens.

        (v)     Failure by Licensee to secure the minimum screen releases mentioned in this paragraph 10 shall not be deemed a breach hereof.  If Licensee cannot secure the minimum screen releases for any Production or does not approve the increase in the minimum screens (i.e., an increase in the minimum screens due to the focus group approval rating(s) (the "additional screens")), then Licensor shall have the right to give notice to Licensee that Licensor desires to engage a third party to release the Production on the additional screens and Licensee shall have thirty (30) days to either secure or release in the additional screens or give Licensor notice that it will not elect to do so, at which time Licensor shall be free, at its election, to engage such third party (provided that Licensee shall retain all other Licensed Rights hereunder).

        (vi)     Strategy:  Licensee and Licensor agree to elect Eclipse Advertising (www.eclipseadvertising.com) ("Eclipse") as a non-exclusive consultant to work on the theatrical and video/DVD release of each such Production.  Eclipse services shall include but not be limited

to creating and designing strategy for marketing and advertising campaigns and developing art and promotional materials for the release of each such Production as well as for building the Recess Films brand. The parties agree to consult with Eclipse regarding release strategy for each such Production, including but not limited to the media plan all possible media and sponsorship partners, if any. Licensor shall directly pay for all such costs associated with Eclipse. Licensor shall specifically pay for all the media buying strategic consultation provided by Eclipse and any other consultants elected by the parties and for all of the media purchases (inclusive of any mark-ups that shall be negotiated and mutually approved by both Licensee and Licensor), if any. If Licensor and Licensee jointly decide and approve to engage the services of additional consultants regarding the theatrical and/or the video/DVD release of any such Production then Licensor shall also directly pay for all such third party costs, if any. In the event of a dispute regarding this paragraph, Licensor's decision shall be final.

(vii)  **Strategy Advisory and Consulting Fee:** Licensor shall pay Licensee the non-recoupable sum of Two Hundred Thousand Dollars ($200,000) (not to be combined and/or associated with any other costs incurred by and/or monies otherwise payable to either party hereunder) per each Production for Licensee's consulting and advisory services in connection with the theatrical release of such Production per subparagraph (vi) above. Licensor shall pay such fee to Licensee as follows: (1) Fifty percent (50%) payable when Licensor delivers the Director's Cut of such Production to Licensee, and (2) Fifty percent (50%) payable when Licensor delivers the Final Cut of said Production to Licensee.

(viii)  **Costs:** Licensor shall approve and be responsible for any and all costs associated with the theatrical release of any accepted Production hereunder including but not limited to the P&A Commitment as specified above and any other costs associated with this paragraph 10.

11.  **CREDIT:** Licensee shall be credited as the distributor in all prints and advertising material, including but not limited to DVD packaging and the like, billing blocks and the paid ads. In addition, Licensee shall be entitled to (i) an on screen presentation credit (e.g., "Presented by Licensee") at the beginning of the Production, (ii) the right to run an animated logo at the beginning of the Production, and (iii) a static logo at the end of the Production. All of the foregoing shall be subject to the Territory for such Production and no casual failure by Licensor to comply with these obligations shall be deemed a breach hereof, provided however that Licensor shall use reasonable efforts to cure any such failure.

12.  **OTHER BASIC TERMS:** A courtesy copy of any notice given hereunder shall also be given to Licensee; Attention: Business and Legal Affairs Department, 2950 N. Hollywood Way, Burbank, CA 91505 and to Licensor; Attention: Nadia Davari, 9333 Oso Ave., Chatsworth, CA 91311, Tel: 818-592-0755; Email: ndavari@gigapixstudios.com.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Licensee:                                          Licensor:
ANCHOR BAY ENTERTAINMENT, LLC                      GIGAPIX STUDIOS, INC.

By: _____                        By: _____

Its: _President_____                        Its: _Pres-d-t_____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 419



September 28, 2010

Kip Konwiser
GPX Development, LLC/Recess Film Productions, LLC
9333 Oso Avenue
Chatsworth, CA 91311

**Re: Notice of Revocation of Film Registration of Registered Project 10-FILM-001
Blackbeard**

Dear Mr. Konwiser:

On November 23, 2009, the Iowa Department of Economic Development (Department) sent a
draft contract for your consideration and signature regarding the above-referenced Registered
Project. To date, the Department has not received an executed contract, nor has it received the
specific additional information requested in the transmittal letter. Further, after a review of
agency files, additional questions have been raised regarding the initial approval of the
Registered Project, including specifically, the amount for which Recess was eligible to contract.

Accordingly, due to the reasons provided above and the approximate 10-month delay in
executing the contract, the Department is withdrawing the draft contract sent November 23,
2009.

Please notify the Department within ten (10) business days whether you would like to continue
the contracting process. If we do not hear from you within that time period, additional action
will be taken to revoke the registration for this project.

Sincerely,

Jessica Montana
Interim Film Office Director

CC Scott Brennan, The Davis Brown Tower, 215 10th Street, Ste. 1300, Des Moines, IA 50309

Chester J. Culver, Governor          **IOWA DEPARTMENT OF ECONOMIC DEVELOPMENT**          Patty Judge, Lieutenant Governor

Bret L. Mills, Director  ◆  200 East Grand Avenue, Des Moines, Iowa USA 50309  ◆  Phone: 515.725.3000  ◆  Fax: 515.725.3010  ◆  www.iowalifechanging.com



September 28, 2010

Kip Konwiser
GPX Development, LLC/Recess Film Productions, LLC
9333 Oso Avenue
Chatsworth, CA 91311

**Re: Notice of Revocation of Film Registration of Registered Project 08-FILM-022 Field Trip**

Dear Mr. Konwiser,

This letter serves to inform you that the registration for 08-FILM-022 Field Trip has been revoked.

The Department received correspondence from you dated June 23, 2009 terminating the existing agreement between the Department and the Recess Film Productions, LLC regarding the above-referenced Registered Project.

As such, the Department hereby revokes the registration for 08-FILM-022 Field Trip. Revocation of registration terminates any contractual agreement between you and the Department effective immediately.

Please feel free to contact me if you have additional questions or comments via telephone, 515-725-3124, or email, Jessica.montana@iowa.gov.

Sincerely,

Jessica Montana

CC Scott Brennan, The Davis Brown Tower, 215 10th Street, Ste. 1300, Des Moines, IA 50309

Enclosure (1)

---

Chester J. Culver, Governor | **IOWA DEPARTMENT OF ECONOMIC DEVELOPMENT** | Patty Judge, Lieutenant Governor

Bret L. Mills, Director • 200 East Grand Avenue, Des Moines, Iowa USA 50309 • Phone: 515.725.3000 • Fax: 515.725.3010 • www.iowalifechanging.com

# RECESS FILM PRODUCTIONS LLC

October 11, 2010

**BY EMAIL, FAX & FED. EX.**

Jessica Montana
Iowa Department of Economic Development
200 East Grand Ave.
Des Moines, Iowa 50309
Jessica.Montana@Iowa.gov

    RE: Blackbeard a/k/a Field Trip"- Termination of Status

Dear Ms. Montana,

   On behalf of Recess Film Productions, LLC and GPX Development, LLC regarding the "Blackbeard a/k/a Field Trip" project, which was scheduled for production last year in Iowa, we reject your September 28, 2010, offer to accept a completely different and dramatically reduced tax incentive than the one you used to bring us to Iowa. .

   While it is not our intention to recite other myriad offenses and potential legal claims in this letter, suffice to say, we believe we have a valid and enforceable contract with Iowa Department of Economic Development ("IDED") and it is our intention to hold you to the terms of that contract. As you are aware, per our fully executed agreement dated December 16, 2008, and the letter of confirmation of award dated July 2, 2009, after Iowa's "new legislation" passed, our graduated budget amount provides 50% of nearly the full budget as tax credits.

   One of many examples of your administration's disregard for any consideration, courtesy, due process or sense of fair play toward private enterprise during the past thirteen months of our involvement with your agency, is expressed by the misleading date of IDED's most recent letter of September 28, 2010, whereby you have proclaimed IDED's "final offer". In that letter, you provide a 10 day period in which to respond, however, the effective mail date of the letter is October 3, 2010. Furthermore, we didn't even receive the letter until October 7, 2010.

   In every way and in every step that the administration has handled this affair, they have been one sided and ignorant to any consideration for the injured company, its investors, creditors and employees. Your behavior is reprehensible.

   Acting in good faith and full reliance and in consideration of the terms of the contract of December 16, 2008, which was fully negotiated with your then IDED officers over a lengthy period of time, and the "new legislation agreement", we have expended

considerable resources and capital. Your governor and elected officials then suddenly halted, recalled, and provided false starts to the entire film program. Since the beginning of our contractual relationship for extended periods of time you, have routinely left us with no operating or administrative guidance or financial consideration. The only thing you did remarkably well was consistently act with calloused disregard toward us, and all the vendors that relied on the new industry.

The damages we have incurred and the cost overruns to our project and our companies, rest entirely on the shoulders of the state of Iowa.

This letter is not intended to constitute a full statement of all facts, rights or claims relating to this matter, nor is it intended, nor should it be construed as a waiver, release or relinquishment of any rights or remedies available to Recess Film Productions, LLC, GPX Development, LLC and Gigapix Studios, Inc. whether legal or equitable, all of which are hereby expressly reserved.

Sincerely,

David Pritchard

cc: Kip Konwiser

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 425

| HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS |

Log In    Register Now    SUBSCRIBE NOW

Capital One

The New York Times

# Television

Arts   All NYT   Search

WORLD  U.S.  N.Y. / REGION  BUSINESS  TECHNOLOGY  SCIENCE  HEALTH  SPORTS  OPINION  ARTS  STYLE  TRAVEL  JOBS  REAL ESTATE  AUTOS

ART & DESIGN  BOOKS  DANCE  MOVIES  MUSIC  TELEVISION  THEATER

## A Children's Cartoon From the Middle East Has a New Mideast Peace Plan

By JACQUES STEINBERG
Published: April 30, 2006

More Articles in Arts »

SIGN IN TO E-MAIL
THIS

PRINT

REPRINTS

SAVE

BIRDMAN
THE UNEXPECTED VIRTUE OF IGNORANCE
OCTOBER 17 TRAILER



Eric Feferberg/AFP -- Getty Images
Randa Ayoubi of Rubicon and Queen Rania of Jordan.

**Correction Appended**

ON May 8, Queen Rania of Jordan will be the hostess of a black-tie dinner at the Metropolitan Museum of Art, where as many as 500 guests will be offered Middle Eastern appetizers like chicken tahini salad on mini pita rounds and, later, addressed by a roster of speakers introduced by Barbara Walters.

Though several diplomats from the Middle East are expected, as are dignitaries from the worlds of news and entertainment like Katie Couric and Harvey Weinstein, this is no state dinner. The chief purpose of the gala is to introduce a Jordanian-produced animated television series for young children, one that has cost a relatively steep $6 million to make and is being shopped to networks in the United States and abroad.

The show, "Ben and Izzy," is about the sometimes-rocky friendship between two 11-year-old boys — one American, one Arab. Though the show is meant, first and foremost, to be entertaining, each character serves at least partly as a proxy for the anxieties of the Middle East. As the queen's involvement and its lavish promotion suggest, the series' pedigree is unique.

**Multimedia**



Video: Clip from 'Ben and Izzy'

**Readers' Opinions**

Forum: Television



An animated Mark Twain.

"Typically, when you hear a pitch, you're lucky if you get a Diet Coke," said Bob Higgins, senior vice president of programming and development for Cartoon Network, who considered his royal invitation to the gala perhaps the most memorable "pitch stunt" among the nearly 300 proposals for series he sifts through each year.

But the show's geopolitical ambitions are even grander. "Ben and Izzy," which features three-dimensional, computer-generated graphics evocative of "Toy Story" and "Finding Nemo," is being produced by a fledgling Jordanian animation company named Rubicon, which regards Pixar, the American animation studio that made those movies, as a role model. Led by Randa Ayoubi, 43, a Jordanian woman who was first exposed to American cartoons through imported episodes of "Tom and Jerry" and "The Flintstones," Rubicon aspires to demolish the boundaries separating the world's children by exporting animated shows and movies produced in the Mideast. The venture also hopes to turn a profit, and "Ben and Izzy" is its calling card.

Whether or not "Ben and Izzy" ever gets the opportunity to

**MOST POPULAR**

EMAILED   SEARCHED   VIEWED

1. What Happens When Second Graders Are Treated to a Seven-Course, $220 Tasting Meal
2. As Apprentices in Classroom, Teachers Learn What Works
3. At Florida State, Football Clouds Justice
4. Op-Ed Contributor: What I Saw as an N.F.L. Ball Boy
5. Small Plates
6. New Zealand for Beginners
7. To Become a Doctor
8. The Getaway: The Art of Slowing Down in a Museum
9. Gray Matter: Are We Really Conscious?
10. 'Putin's Tiger,' in a Territory Grab All His Own, Swims to China

Go to Complete List »





find an audience — in America, the creators have made preliminary presentations not only to Cartoon Network but also Discovery Kids and PBS, among others —the story of the show's creation is compelling in its own right, as if a <u>United Nations</u> meeting had played out in the back room of a television studio.

The international crew behind "Ben and Izzy" is led by an American, David Pritchard, a onetime "Simpsons" producer whom Rubicon hired as the series' executive producer. Among the others on his creative team are three Iraqis — one is the lead animator; two others are artists — as well as a Jordanian (the art director) and a Palestinian (technical director). Rounding out the roster is King <u>Abdullah II</u> of Jordan — who, when not running his country, relaxes with the queen by watching "The Simpsons" via satellite. (Their four young children, Queen Rania said in a recent telephone interview from Amman, are devotees of American fare like reruns of "Lizzie McGuire" on the Disney Channel, "SpongeBob SquarePants" on Nickelodeon and "Dexter's Laboratory" on the Cartoon Network.)

Mr. Pritchard, who was also a producer of "Family Guy" and before that an international banker with business in Jordan, said he has met with the king throughout the early development of "Ben and Izzy," to show him drafts of scripts and even some rough animation. Among the investors in Rubicon is the King Abdullah II Fund for Development, which was established by royal decree in 2001 to invest in technology and other ventures.

The main advice the king has given him, Mr. Pritchard said the other day by telephone from Amman, "is to make sure it's funny." The creators say they have taken that dictum to heart, providing Benjamin Martin (the American, whose grandfather, like Izzy's, is an archeologist) and Izzy Aziz (born in Jordan, his full given name is Issam) all manner of raucous adventures. Traveling back through moments in history, they are to be accompanied by a genie named Yasmine and one step ahead of an evil, obese antiquities dealer named Clutchford Wells.

But the real goal of "Ben and Izzy" is more serious: to help young Americans and Arabs steer clear of the prejudices of their parents and grandparents, which may have been reinforced by the Sept. 11 attacks and the war in Iraq. In promotional materials, Ben the American is described as "a symbol for his country" who is "big" and "energetic," but "on the negative side, he is a bit xenophobic, self-centered, needs-to-win competitive."

"Like his native land," the creators write, "he sometimes blunders into situations without thinking."

Izzy the Jordanian, by contrast, is "slight of build, sinewy and studious," but "on the downside, Izzy can be a little too serious, self-righteous, superior, even devious."

The boys don't like each other at first — they argue but don't fight with guns or knives, the promotional materials point out — but they will ultimately learn "that as a team, they can outsmart almost anyone."

Referring to the series' multiple objectives, Queen Rania said she lent her name and support to the project because it held forth the promise that something created in Jordan by Americans, Arabs and others working together might be "equally enjoyed by a child in Jordan and a child in New York."

Similarly, she said she hoped that through the mutual enjoyment of a cartoon — something with the appeal of "Bugs Bunny," which mesmerized her as a child growing up in Kuwait, but also with a more serious underlying message — children might be able to bridge their differences in ways that have thus far eluded diplomats and other adults.

"There has to be dialogue between East and West," she said. "I don't think we've figured out how to do it. This is one tool."

None of the American television executives who have heard the initial pitch for "Ben and Izzy" were willing to lay odds on whether it might get picked up in the United States. (The producers have also approached a British television network, Channel 4, to gauge its interest in international distribution; separately, they are planning a DVD and series of books for children based on the show.)

As of now, the creators have told the networks little about the series beyond the basic plotlines, and shown them few images beyond some stills depicting the characters. Indeed, none of the initial 26 episodes projected for the show have been completed, though the producers have said they could have enough ready to begin broadcasting in early 2007.

Still, Mr. Higgins of the Cartoon Network, who met twice with Mr. Pritchard, said he was intrigued enough to want to see more.

"I like the ethnicity and point of view they're bringing," he said. "It's something I'm not seeing in other shows."

Considering that most producers need to be given some seed money to make a rudimentary television pilot, Mr. Higgins said it also worked in the creators' favor that they had already raised several million dollars — mostly from Jordanian investors — to work toward finishing several episodes.

The creators are being careful to avoid hot-button issues; Ben and Izzy won't be discussing the Bush presidency, for example, or comparing Islam, Christianity and Judaism. "If it's a way to represent a different ethnicity on our air, and leave it at that, that's one thing," Mr. Higgins said. "If it is a 'can't we all get along' type of heavy-handed messaging, even if it is hidden there, that's not a show for Cartoon Network."

The producers plan to show four minutes from the first episode at the New York gala. A 30-second clip shared with a reporter showed Ben and Izzy going back in time to meet Mark Twain, who, as a young writer, traveled to Petra.

"I reckon you and Ben don't get along too awfully well," the animated Twain tells the Arab boy.

"He is annoying," Izzy tells Twain. "Americans are so brash and full of themselves."

A moment later, Twain takes Izzy's chin in his hands, and instructs him: "Don't judge the country, son. Judge the man."

As for Ms. Ayoubi — who has degrees from Texas Tech and Harvard, and who has guided her company from a tiny start-up to a pioneer in a nation that aspires to be as high-tech as India and Israel — she knows how she wants her project to be judged. "I want to be a company that is mentioned in books," she said, "when they talk about the Arab renaissance."

So far she appears to have made a good start: from an initial investment of $140,000, Rubicon has grown into an enterprise with $7 million in revenues last year, Ms. Ayoubi said, first by selling training programs via CD-ROM to Jordanian banks, and later online course work to Jordanian schools.

As for Mr. Pritchard, who is accustomed to dealing with executives at American studios, getting the occasional verbal "note," or creative recommendation, from a king — albeit one who was educated at Deerfield Academy and Georgetown University — has had a pinch-me-am-I-dreaming quality to it. Mr. Pritchard said that King Abdullah had thrown out "this challenge to me to help change the way the Arab world is viewed and perceived in the West."

Though hardly a palace order, Mr. Pritchard said, the king's charge has carried a bit more weight than the typical Hollywood edict.

"Matt Groening could be considered royalty by a lot of people in the world," Mr. Pritchard said, referring to the "Simpsons" creator. "But with all due respect, he earned it. It wasn't by birth."

*Hassan M. Fattah contributed reporting from Dubai for this article.*

**Correction: May 7, 2006**

*A picture caption last Sunday with an article about "Ben and Izzy," an animated television series produced in Jordan for children, misstated the name of the country's queen, a supporter of the project. She is Queen Rania, not Rani.*

More Articles in Arts »

Related Articles
TELEVISION REVIEW; Debated Or Not, A Genocide In Armenia (April 17, 2006)
Urging New Path, Sharon and Abbas Declare Truce (February 9, 2005)
To Judge by Media Coverage, Talks Seemed Less Than Weighty (February 9, 2005)
Spreading the Word: Who's Who in the Arab Media (February 6, 2005)

Related Searches
Television
International Relations

# Cool Marketing Thoughts

- Disclaimer
- Link Love

RSS

## Ben & Izzy For Tolerance

08 May 2006

Rubicon, a Jordanian media company which produces state-of-the-art CGI animation series, came up with a cartoon to promote tolerance between 'the east' and 'the west'. In this 3D work of art, which could mirror itself against films as 'Finding Nemo' and other splendid 3D rendered movies, Benjamin (Ben) Martin is an eleven-year-old all-American boy who meets Izzy, an 11-year-old Arab boy from Jordan. In looks and attitude "Izzy" Issam Aziz is diametrically opposed to Ben. When the boys first meet at their grandfathers' archeological site, the summer vacation looks like it's going to be tough – right away the kids just don't like each other. That leads to a few confronting situations like there are plenty 'in real life'.

But when wandering through Petra one day, Ben and Izzy stumble upon a tomb, releasing the spirited genie Yasmine (whos voice is done by Lucy Liu). Through Yasmine's powers and her determination to save the world's precious heritage; the three are instantly wisked away from the present day dig site on a miraculous journey back in time to Petra in the year of the very first visit made by Mark Twain in 1867.



Ben & Izzy For Tolerance « Cool Marketing Thoughts

There's a gala today, May 8th, where the cartoon will basically be pitched to networks in the U.S. and abroad. 500 guests will get to see a 4 minute clip from the pilot episode where Ben and Izzy travel back in time to meet Mark Twain who travelled to Petra in Jordan when he was a young writer. Queen Rania of Jordan will be the hostess of the black-tie dinner at the Metropolitan Museum of Art.

From ABC News:

> A Jordanian media firm hopes its new TV cartoon series can achieve what politicians have failed to do so far: bridge the cultural divide between East and West. [...]

> Even more important is that the cartoon, called "Ben and Izzy" and aimed at 8 to 11 year olds, has royal backing from Jordan's media savvy rulers, King Abdullah II and Queen Rania, who have made it their goal to promote tolerance. [...]

> "Ben and Izzy has all the right ingredients," Rania told The Associated Press. "It uses the fun medium of a children's cartoon, promotes important intercultural understanding and educates our children as well."

> "It's all about partnership. This isn't about East telling West, or West telling East, but rather East and West putting their heads together and figuring out what's best for us both," she added.

See a snippet of the cartoon
Visit the Ben & Izzy website to meet the characters

Read:
'The New York Times'
'ABC News'

1 Comment

Posted by Miel Van Opstal in Campaigns, Design

## Leave a Reply

You must be logged in to post a comment.

1. RealhOn5's Donews Blog»Blog Archive » links for 2006-05-09

   May 9, 2006 at 1:23 pm

   [...] Coolz0r – Marketing Thoughts » Ben & Izzy For Tolerance (tags: cool) [...]

# GLOBALIST
*The Yale*

(http://tyglobalist.org)

# IS CARTOON NETWORK READY FOR MIDEAST PEACE?

DECEMBER 22, 2011

MARGARET (HTTP://TYGLOBALIST.ORG/AUTHOR/MARGARET/)

mailto:tyglobalist@gmail.com) LOBALIST.ORG/IN-THE-MAGAZINE/THEME/IS-CARTOON-
NETWORK-READY-FOR-MIDEAST-PEACE/#COMMENTS)

...tps://twitter.com/yaleglobalist)

POP (HTTP://TYGLOBALIST.ORG/CATEGORY/IN-THE-MAGAZINE/THEME/POP/),
https://www.facebook.com/pages/The- LIST.ORG/CATEGORY/IN-THE-MAGAZINE/THEME/)

Yale-
CARTOON NETWORK (HTTP://TYGLOBALIST.ORG/TAG/CARTOON-NETWORK/),
Globalist/288423684184) JORDAN (HTTP://TYGLOBALIST.ORG/TAG/JORDAN/), MIDDLE EAST
(HTTP://TYGLOBALIST.ORG/TAG/MIDDLE-EAST/)

*by Jeffrey Dastin:*

Few events merit renting the Metropolitan Museum of Art. Yet on May 8, 2006, the museum hosted a black-tie dinner in honor of a new television show, "Ben and Izzy." The show follows the unlikely friendship of two boys, one American and one Jordanian, as they travel through time in high-tech computer graphics. Hundreds of executives and celebrities attended the event, walking a red carpet to the Egyptian gallery where the dinner was held.

Bathed in warm red light, the grand Temple of Dendur shined brighter than it had in two thousand years. The location seemed fitting: an Egyptian temple built by Romans, a confluence of East and West. While the guests ate chicken tahini salad, Barbara Walters introduced Queen Rania of Jordan, the keynote speaker. The Queen spoke of the show's promise: "This cartoon uses a language that modern children understand — a language that unites them, whatever their background or beliefs, and makes them realize that you do not have to be alike to get along."

The show ended after one season.



(http://tyglobalist.org/front-page/theme/is-cartoon-network-ready-for-mideast-peace/attachment/dastin-2-2/)

(Courtesy Rubicon Group Holding)

After the initial 13 episodes aired in 2008, "Ben and Izzy" fell into obscurity. No American distributor picked up the show, and the first reruns aired on Cartoon Network Arabic in 2010. Only recently did writers pen new episodes. Why did this promising show fall short? The answer lies both in creative shortcomings and deeper cultural traits of the United States and the Middle East.

"Ben and Izzy" was first conceived by David Pritchard and Samer Ayoubi in Manhattan Beach, CA. Pritchard was a veteran of the entertainment industry, having produced "The Simpsons," "Family Guy," and "King of the Hill;" Ayoubi was the head of technology at the new Jordanian media firm Rubicon Group Holding. The two met some months after the September 11 attacks.

"I wanted to find ways to build communication bridges where there aren't any," Pritchard said. "And the place where that really starts is with young people."

According to Pritchard, the idea came from his relationship with Ayoubi. The two came from different cultural backgrounds and had different life experiences. Yet they connected over their interest in entertainment — and in telling stories.

"His stories were about great scientists that came out of the Arab world. My stories were about heroes that were part of American culture. So, the concept was using heroes in our two cultures to get a peek into their culture, which I was not familiar with" said Pritchard. "['Ben and Izzy'] was a lens into that history... to get exposed to this in a way that was kind of cool."

Jordan seemed the natural place to test their cross-cultural experiment. King Abdullah II long supported progressive reform. The country's education system was strong. And more so than its neighbors, Jordan's economy was increasingly based on technology.

Rubicon adopted and created the show. The media company had ambitions to make Jordan a global entertainment center, and "Ben and Izzy" would be its headlining project. Despite little funding, Rubicon managed to pay for 13 episodes without the help of distributors. Pritchard helped with production, and Jymn Magon, an Emmy Award-winning writer for "Winnie the Pooh," wrote the scripts.

The show's announcement generated a lot of excitement. Paul Buntz Rusby, whose consulting firm Atoka International represented Rubicon, said, "It was received with a lot of pride in Jordan and in other markets in the Middle East... There were emails we were getting from a teacher in Australia or teachers in the United States who had read about 'Ben and Izzy' and really wanted to get their hands on the episodes. And that was all because of the [Met] launch. But the product wasn't yet available."

"Ben and Izzy" did not air until two years after the Met event; Rubicon still had not completed the show. The early event aimed to capitalize on Rubicon's fame as a rising star in animation. "This raised expectations but also took away a little bit of momentum," said Rusby.

The show finally aired in Jordan in 2008. In each episode, the genie Yasmine (played by Lucy Liu) takes Ben and Izzy across time to stop the greedy, neo-imperialist Clutchford Wells from stealing treasures. Along the way, the boys meet famous Arab thinkers—from the Baghdad philosopher Al Kindi to the Moorish inventor Abbas Ibn Firnas.

Rubicon also released commercials for "Ben and Izzy," video games, and some merchandise. Rubicon even produced the show in Russian and other languages. But Middle East Broadcast (MBC) quickly put "Ben and Izzy" aside: ratings were low despite the show's prime-time slot during Ramadan, the highest-viewed television season of the year.

Was the show poorly made? Randa Ayoubi, the CEO of Rubicon and Issam Ayoubi's sister, said, "I was satisfied with the ultimate product within the constraints that we worked with. Like I said, it was [Rubicon's] first product... There was action and there was humor, but not enough action and humor to make it a complete entertainment show." Rusby praised the show's animation but echoed Ms. Ayoubi's concern about comedy.

Humor was the missing key. "Ben and Izzy" had the difficult task of striking a balance in edutainment. "What is it that we want to achieve?" asked Rusby. "You either had the commercial world or you had the PBS world... Distributors were not looking to air something that was educational, though now you can find more edutainment programs." Ultimately, the show erred on the educational.

While edutainment was tough itself, Rubicon lacked experience at the time. "'Ben and Izzy' was the most difficult thing I've done in my life, because it was the first production we did on that large scale," said Ayoubi. "We didn't want to be preaching either on the Arab side or the American side. We wanted it to be fun yet true, representative of the characters."

Still, Rubicon went to great lengths to ensure success. The company created focus groups of children in North America, the Middle East, Asia, and Europe and changed episodes—line by line—based on feedback. This practice is uncommon in the television industry, but Ayoubi explained it was necessary given the stakes. Yet the show did not pick up steam.

To Pritchard, a deeper cultural issue was at play. "It ended primarily because of a lack of inquisitiveness on behalf of the Western audience, and that's a real tragic statement for me to make. The stereotyping and narrow-mindedness that exist in so much of America is the thing that's actually hurting us the most in our capacity to innovate, our capacity to grow... We are more interested in being entertained than we are being provoked or informed."

The cultural problem extended beyond American frivolity to viewing interests in the Middle East. At the core was the novelty of shows like "Ben and Izzy." Pritchard, Rusby, and Ayoubi agreed that the Arab world lacked positive heroes. There was no Michael Jordan or Barack Obama in the Middle East. Indeed, its high-profile politicians were far from role models. "People appreciate those who stand up to the West, like Saddam

Hussein... but no kid" in relate to him or other politicians on a regular basis," said Rusby. The focus "Ben and Izzy" placed on heroes made it essential for the future of Arab culture yet inaccessible at the same time.

Labeling "Ben and Izzy" as a failure, however, would be unfair. First, it jumpstarted Rubicon and the animation industry in Jordan. After "Ben and Izzy," Rubicon produced the new Pink Panther movies; today Rubicon remains a top company. Likewise, Pritchard went on to produce "Captain Abu Raed" with goals similar to those of "Ben and Izzy." The film won awards at the Sundance Film Festival and received acclaim as one of the first great international films in Arabic.

Even "Ben and Izzy" has a second chance at the spotlight. After airing reruns, Rubicon planned to release a second season in 2012. The new episodes will take Ben and Izzy outside the Middle East to engage heroes from Latin America, China, and the United States. The characters will have a twist; merchandizing will include smart phone apps, e-books, and video games; and Rubicon intends to increase the show's action and humor significantly.

"It's now beginning to show the success it should have shown maybe two years ago," said Ayoubi. "I'm hoping [the second season] will create a lot more interest and get to be known in the United States."

But "Ben and Izzy" still tells a sad tale about popular culture. Producers must walk a fine line between education and entertainment to appease capricious, thrill-seeking viewers. Few shows can afford to try.

*Jeffrey Dastin '14 is in Saybrook College. Contact him at jeffrey.dastin@yale.edu.*

LIKE < 0

ONE RESPONSE TO "IS CARTOON NETWORK READY FOR MIDEAST PEACE?"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 430

# GIGAPIX STUDIOS

January 15th, 2009

Danny Rosett
COO
Via: Email

Danny:

Thank you for your time last week. David and I truly enjoyed it. You guys have a lot of friends in common!

We are excited about the opportunity to work with you regarding the distribution/marketing/& financing of the Permanent Recess Slate. The team all believes that you could be a terrific partner and sees synergy and opportunity in working together. We've fashioned a proposal for discussion with suggested terms for moving forward. We are planning to begin production in late June so time is of the essence. We've highlighted the major points below.

## Slate Parameters/Benefits:
The slate has the following components:
- Gigapix will produce five pictures over three years. David Pritchard and Kip Konwiser will produce.
- Family picture genre like "Stand By Me" or "Home Alone" or "Goonies".
- Production budgets $6MM - $10MM
- P&A $10MM - $20MM per picture
  - Gigapix can demonstrate proof of funds
  - 700- 1000 screen targeted releases, suburban markets. Will expand as necessary.
- Gigapix will be responsible for 55% of each films' budget
  - 40% Net Iowa Tax Credit
  - 15% Gigapix Equity or Gap Borrowing against International
- Overture to put up 45% on each film for total of 5 pictures on a revolving line as an advance (recoupable).
- Gigapix will sell foreign rights. Essential and Myriad are interested. We have Media 8 standing by as well.

| Terms | Details |
|---|---|
| Overture Budget Contribution % | 45% with key elements and budget approvals |
| Overture Budget Contribution - $ | $6MM revolver for 5 films/3years |
| Marketing & Distribution Costs & Approvals | GPX has approvals on Costs and Overture agrees to no-mark-up on Marketing & Distribution services. |
| Crossing & Rights | Crossed on North American Rights |
| Distribution Fee | Theatrical 12-15% DVD/HV/VOD 15% TV/PayTV (Starz under standard Overture terms) 20% |
| Net Profit Participation | 25% |

# GIGAPIX STUDIOS

**Assumptions:**

This proposal has the following assumptions:

- Blackbeard, Big Red, and Elvis and Leon are initial projects we seek pre-approval on.
- P&A structure is a standard structure
  - E.g. –P&A recoups principle and interest first, Distribution fee recoups second, recoupment of negative cost plus interest third and then net profit splits
- We assume you are amenable to a mechanism whereby we can get 5 pictures out in 2-3 years….
  - E.g. – create some mechanism to trigger pictures (you have approval on cast, director, script and budget)
- Marketing /Spending will need to have joint approvals with no mark-up on your services such as on Prints/ AD placement/media/PR...we pay direct costs only.
- We assume you will be putting up the video/DVD marketing.

We look forward to your thoughts and moving this forward.

Best,

Dominic Ianno

## FIRST LOOK AGREEMENT

THIS AGREEMENT ("Agreement") is made as of November 5, 2009, by and between ANCHOR BAY ENTERTAINMENT, LLC c/o, 2950 North Hollywood Way, Third Floor, Burbank, CA 91505 ("Licensee") and GIGAPIX STUDIOS, INC., c/o 9333 Oso Ave., Chatsworth, CA 91311 ("Licensor").

CONDITION PRECEDENT TO EACH PRODUCTION: Licensee's agreement to distribute each Production (as defined below) shall be subject to (i) Licensee's receipt and written approval (to be given in its sole discretion) of the screenplay, Chain of Title, and other information for such Production sufficient for Licensee to exercise its First Look Rights, (ii) Licensor's complete delivery of such Production, and (iii) Licensor's delivery to Licensee of signed copies of a distribution agreement with respect to such Production (which shall be in the form of an agreement incorporating the terms hereof) and any other document Licensee may need signed by Licensor in order to fully and legally exploit all of the rights granted hereunder.

## BASIC PROVISIONS

### PART I - FIRST LOOK PROVISIONS

A.    FIRST LOOK TERM: The "First Look Term" shall commence as of the date of signature of this Agreement and continue until December 31, 2012. The First Look Term may be extended for an additional two (2) years (the "Extended First Look Term") upon mutual agreement of the parties.

B.    FIRST LOOK: During the First Look Term, Licensor shall submit to Licensee any and all projects that Licensor wishes to produce; provided that the foregoing obligation to submit projects shall apply only to projects that the Licensor reasonably believes will be capable of receiving a "G" or "PG" rating; and provided further that each such project shall generally conform to the categories set forth below in B(1), B(2) and B(3). Licensee must accept or reject projects within 20 business days of submission. Failure to give notice within such 20 business day period shall be deemed a rejection. If a project is accepted for distribution, such project shall be deemed a "Production" and shall be governed by the terms of this agreement. If a project is rejected, Licensor may submit such project to a third party, subject to resubmitting to Licensee in the event of any changed material element.

(1)    Recess Films: Live action comedy films produced as entertainment for children with a final going-in-budget ranging from Eight to Ten Million Dollars ($8,000,000 - $10,000,000) and a final negative cost of no less than Five Million Dollars ($5,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(2)    GPX Animation: Stereoscopic, computer generated, animated films produced as entertainment for children with a final going-in-budget of no less than Twenty Million Dollars ($20,000,000) and a final negative cost of no less than Fifteen Million Dollars ($15,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(3)    Low Budget Production: A film produced as entertainment for children with a final going-in-budget of under Eight Million Dollars ($8,000,000).

C.    SUBMISSION: At such time as Licensor wishes to proceed to production with a particular project, Licensor shall furnish Licensee with all relevant information regarding such project, including the following package of materials, documentation and information: script, budget, proposed director, proposed principal cast, chain of title documents, and schedule for principal photography. Following receipt of a submission package, Licensee shall make a determination, which determination may include request for corporate "greenlight" approval, whether to distribute such project, disapprove the project or request certain alterations be made in the components of the submission package, which shall be considered in good faith by Licensor, provided, however, that the Licensor's decision shall be final and controlling.

D.    LIMITS: Licensee shall not be required to accept more than six (6) Productions during the First Look Term nor more than four (4) Productions during the Extended First Look Term, and no more than two (2) Productions in any one (1) calendar year of the Term. Each Production shall be no less than ninety (90) minutes in length and must be rated no more restrictive than "PG."

E.    ACCEPTED PROJECTS: If Licensee accepts a project as a Production hereunder, then the following provisions shall govern

       (1)    Distribution Rights: All of Licensee's and Licensor's respective rights and obligations in connection with the delivery and distribution of each such picture shall be governed in accordance with the terms and conditions of Part II - Distribution Provisions below which form a part of this agreement.

       (2)    Production Responsibilities: Licensor shall serve as the corporate entity responsible for the production of each picture. Licensor shall be solely responsible for any and all matters in connection with the production, completion and delivery of each Production. The foregoing shall not prohibit Licensor from creating and appointing as its designee for the purpose of producing an individual Production a single purpose production company, provided that such production company is created and exists solely and exclusively for the purpose of producing the relevant Production.  For each Production, Licensor shall secure a completion bond from Film Finance or another completion bond guarantee company ("Guarantor") that is reasonably acceptable to Licensee.

       (3)    Presentation to Overture: Licensee shall present each Production to its affiliate, Overture Films, LLC ("Overture"), not later than 15 days after such Production is accepted by Licensee hereunder.  If Overture elects, in its sole discretion, to negotiate for any distribution rights, then Licensee shall permit Licensor to negotiate with Overture for a period of up to thirty (30) days ("Negotiation Period"). Any agreement reached between Licensor and Overture shall be solely between them and shall relieve both parties hereto from any obligations and responsibilities set forth herein. If Overture elects not to negotiate to distribute a Production or, if Overture and Licensor fail to conclude an agreement during the Negotiation Period, then such Production shall again be governed in accordance with the terms and conditions of Part II - Distribution Provisions. Licensor warrants that it shall not disclose any involvement with Overture in connection with this Agreement for press purposes without the prior written approval of Licensee. No inadvertent disclosure by Licensor shall be deemed a breach of this Agreement.

F.    REJECTED PROJECTS: If Licensee does not accept a project for which Licensor has presented a submission package, then such project shall constitute a "Rejected Project". Any such Rejected Project may be offered to a third party for distribution, subject to the resubmission in the event of any changed material element. For the avoidance of doubt, Licensor shall not submit any project to any third party unless and until such time as Licensor shall have submitted such project

to Licensee and Licensee shall have rejected such project. Licensee shall have the right to reject any Production submitted by Licensor for any reason.

## PART II – DISTRIBUTION PROVISIONS

1. **PRODUCTION:** Each project accepted by Licensee pursuant to the First Look Provisions shall be deemed a "Production" hereunder. The Distribution Provisions hereunder shall apply to each Production.

2. **RIGHTS:**

(a) **Licensed Rights:** With respect to each Production, Licensor shall have the sole, exclusive and irrevocable right and license to advertise, market and otherwise exploit in any and all formats and in any and all media whether now known or hereafter devised, and all allied, ancillary and subsidiary rights with respect to such Production (the "Licensed Rights") including without limitation those rights enumerated herein and as may be defined in more detail in the attached "General Terms and Conditions" attached hereto as Exhibit "A," the "General Terms and Conditions" during the Term and the Sell-off Period (as defined below), in the Territory (defined below) and in accordance with the Distribution Provisions of these "Basic Provisions," the "General Terms and Conditions" attached hereto as Exhibit "A," the "Delivery Schedule" attached hereto as Schedule "DM." A "Short Form License" in the form attached hereto as Exhibit "B" shall be completed and delivered for each Production submitted by Licensor and accepted by Licensee hereunder. For any Low Budget Production accepted hereunder, the Licensed Rights shall include all rights other than Theatrical Rights.

(b) **Reserved Rights:** Unless otherwise agreed to by the parties, Licensor hereby reserves the following rights in and to the Productions: Stage rights, traditional publishing rights, all forms of video games whether now known or hereafter devised and all licensing rights, Merchandising, Subsequent Production (subject to paragraph 10 below), Airline, Ship, Music Publishing, Soundtrack, and Commercial Tie-In Rights (the "Reserved Rights"). Prior to exercising any of the Reserved Rights or any portion thereof, Licensor shall consult Licensee with respect to Licensee's involvement in the exploitation of the Reserved Rights, if any, and to ensure that exploitation of the Reserved Rights does not conflict or interfere with Licensee's exploitation of any of the Licensed Rights.

(c) **Pay Television:** Any Production that is a 'live-action' Production (as opposed to an animated film or documentary, etc.) and is theatrically released by Licensee shall be licensed to Starz Entertainment, LLC ("STE") under an output agreement between STE and Licensee for as long as Licensee's agreement with STE is in effect. Licensee represents and warrants that, with respect to such output agreement, each Production shall be treated substantially similar to any motion picture licensed from a party other than Licensor.

(d) **Certain Exploitation by Licensor:** Notwithstanding any of the foregoing, Licensor shall have the non-exclusive right to exploit the Digital/Electronic Rights in and to the Production(s) on either its own website or on websites branded solely for each such Production being exploited; it being understood that Licensor shall not begin exploiting such rights until 90 days following the Street Date for said Production.

(e) **International Holdback:** Licensor shall not itself nor authorize others to exhibit and/or distribute the Production in any territory not licensed hereunder until the date on which Licensee releases the Production in the United States, on a medium by medium basis (e.g.,

theatrical held back by Licensor until Licensee's theatrical release in the US, home video held back by Licensor until Licensee's home video release in the US).

3.     DISTRIBUTION TERM/EXCLUSIVITY:

    (a)     The distribution term ("Term") of Licensee's exclusive Licensed Rights in and to each Production shall commence on the date such Production is accepted by Licensee hereunder in accordance with the First Look provisions and shall continue for a period of ten (10) years after the later of (i) the initial commercial release of the Production by Licensee of such Production or (ii) the date at which all of the materials set out to be delivered to Licensee hereunder in Schedule "DM" (attached hereto and hereby incorporated by this reference) for such Production are actually received and accepted by Licensee and Licensee has issued its Notice of Acceptance of Delivery, plus an additional non-exclusive six month sell off period for Video/DVD Rights.  If Licensee desires to extend the Term hereof and/or renew the license of the Licensed Rights licensed herein, or any portion thereof, then at or prior to the expiration of the Term, Licensee shall notify Licensor of the same and upon such notice, Licensor and Licensee will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for any such extension and/or renewal.  If the parties fail to reach an agreement within such thirty (30) day period, then Licensor shall be free to offer the Production to a third party.  During the Term, Licensor will not itself, nor will it authorize anyone else to, exploit the Licensed Rights except as may be expressly permitted hereunder; provided that during any sell off period, Video Rights shall not be exclusive.

    (b)     The date upon which Licensor shall deliver the Delivery Materials specified in paragraph 8(a) below shall be mutually determined on a Production by Production basis.

4.     TERRITORY:  The territory ("Territory") shall mean the United States of America and its territories and possessions, and Bermuda and the Bahamas, provided that the Licensed Rights in Bermuda and Bahamas shall be limited to Television only.

5.     ROYALTIES FOR THE LICENSED RIGHTS:

    (a)     In connection with the exploitation of the Licensed Rights, and provided that Licensor is not in default of any of its obligations hereunder, Licensee shall pay to Licensor an amount equal to one hundred percent (100%) of Adjusted Gross Receipts actually received by it from exercise of the Licensed Rights.

    (b)     "Gross Receipts" shall mean all non-refundable monies actually received, used, or credited to, available to, and earned by Licensee or on its behalf from (i) the lease, sale, rental, distribution or other exploitation of any such rights granted hereunder including all monies received from subdistributors that Licensee, in its discretion, may elect to use, it being understood: (i) that in the case of the Video/DVD Rights, Gross Receipts shall be calculated without deductions for products that are returned and (ii) that (A) sales taxes, turnover taxes and the like, and any monies received by Licensee in the nature of refundable advances or security deposits, or deposits or periodic payments until such monies are earned or forfeited shall not be considered as included in Gross Receipts, and (B) in the case of sales directly to customers by means of direct response radio, internet, telephonic, mail, email or television solicitations Gross Receipts shall be fifty percent (50%) the gross monies received by Licensee from such sales, net of fulfillment costs, credit card fees and the like.

(c) Gross Receipts does not mean any revenue received by third parties unless and until it is actually received, used, or credited to, available to, and earned by Licensee or on its behalf as set forth in Section 5(b).

(d) Adjusted Gross Receipts "Adjusted Gross Receipts" shall mean Gross Receipts (as defined above) after deduction in the following priority of: (i) distribution and sales agency fees equal to the percentages listed in paragraph 5(e) below, (ii) credits, discounts, rebates, incentives, co-op, settlements, allowances and deductions for products returned, unless any such item has been otherwise deducted in computing Gross Receipts; (iii) costs of collection; (iv) foreign currency exchange costs; (v) actual out-of-pocket costs for digital linear tape ("DLT"), authoring, mastering, artwork design, and of "bonus" or added material, and of the like; (vi) all manufacturing and production costs, including but not limited to out-of-pocket costs of physical materials (including, for example, prints, tapes, disks, pre-production materials and the like) including any costs of preparation or distribution of product distributed digitally; (vii) payments and costs incurred by Licensee to third parties for distribution and related charges; (viii) subject to prior written approval of Licensor out-of-pocket direct advertising and marketing costs override, time and material charges for any in-house graphic design costs, with the understanding that if these costs are incurred in connection with various products including the Production hereunder, such costs shall be allocated on a reasonable basis by Licensee among such product and shall in any event include an appropriate charge for costs of conventions, trade shows, festivals and trade association dues; (ix) any costs incurred in connection with Licensee's institution of and/or maintenance or defense of any claim by or naming Licensee affecting rights granted by Licensor hereunder; (x) any third party participations and/or music payments and/or payments under any collective bargaining agreement (whether paid or accrued) and any costs incurred in the administering the same that Licensee agrees to or becomes obligated to assume hereunder; (xi) in the case of non-traditional channels (non-traditional channels include, but are not limited to, scan based trading, CBA markets, and third party marketing and/or sales services for one time and/or limited time promotions and programs) all costs of such sales including but not limited to costs of goods, co-op, discounts, and of marketing, selling and distributing the same, and (xii) any other direct out-of-pocket costs paid to third parties of a similar or dissimilar nature actually incurred in connection with exploitation of rights hereunder.

(e) Licensee shall be entitled to deduct the following distribution and sales agency fees from Gross Receipts:

(i) Twelve and a half Percent (12.5%) of Gross Receipts for the exploitation of the Theatrical Rights;

(ii) Fifteen Percent (15%) of Gross Receipts for exploitation of the Video/DVD Rights; and

(iii) Seventeen and a half Percent (17.5%) of Gross Receipts for exploitation of the Television Rights and all other Licensed Rights other than those enumerated in (i) and (ii) above.

6.  RESERVES; FREE GOODS; RESIDUALS:

(a) In the case of Video Rights, Licensee may retain a reasonable reserve for returns of any products sold pursuant to exploitation of the Licensed Rights in each quarterly period, to be liquidated within a reasonable time period taking into account current business and market conditions and based upon Licensee's business judgment.

(b) Licensee shall be permitted to distribute up to five percent (5%) of any products sold pursuant to exploitation of the Licensed Rights hereunder for promotional and review purposes without the payment of royalties.

(c)     Licensor shall be and remain liable for payment of all contingent payments including, but not limited to "residuals" which may be or become due under any applicable collective bargaining agreement as shown on the Union Residual List (see Schedule DM) to be delivered hereunder with respect to each Production; provided, however, that Licensee shall calculate and pay such residuals (inclusive of payroll taxes and fringes) directly to the guilds. Licensee shall deduct such costs, plus third party processing costs of same, from Licensor's share of Adjusted Gross Receipts with respect to each Production. Licensor warrants that it shall deliver a complete residual list pursuant to Schedule DM and shall indemnify, save and hold Licensee harmless from all damages, losses, penalties, and fees resulting from Licensor's failure to deliver a complete residual list.

7.     ACCOUNTINGS:

(a)     Licensee agrees to account and pay Licensor its royalties hereunder on a calendar quarterly basis within sixty (60) days after the end of the Licensee's fiscal quarter following the initial release of the Production and sixty (60) days following each calendar quarter thereafter for three (3 years following the rendition of the first statement that is rendered; thereafter such accountings and payments, if any, shall be on a semi-annual basis if any monies are payable to Licensor or, if none are due, then Licensee shall have no obligation to render a statement unless Licensor specifically requests in writing that a statement be rendered, which requests shall be made not more often than once per calendar year. Each such accounting shall set forth in reasonable detail the amounts and sources of revenue and, where applicable, the permitted deductions therefrom. Licensor or its designee shall have the right, upon reasonable written notice, not more than once in each calendar year, to engage a firm of licensed, independent, certified public accountants to examine and take excerpts from Licensee's books and records as they pertain to this Agreement, which examination shall be conducted for no more than thirty (30) days at Licensee's principal offices (as designated by Licensee) during normal business hours and shall not unreasonably interfere with Licensee's normal business operations. If a discrepancy of 10% or more is found then Licensee shall pay for the reasonable cost of such audit. Any such independent certified public accountants shall, upon Licensee's request, sign an appropriate confidentiality agreement. If any such examination results in a conclusion that monies earned for the period were under-reported and/or costs deducted (if applicable) during the period were overstated and if as a result thereof any payment is due, Licensee shall forthwith pay the balance due. Any statement that is rendered hereunder that is not contested within twenty four (24) months shall be final and incontestable as to matters shown thereon.

(b)     If any foreign receipts are frozen or unremittable, Licensee will notify Licensor to such effect and upon Licensor's written request and upon condition that the same shall be permitted by authorities of such foreign country, transfer to Licensor, at Licensor's cost and expense, in such foreign country and in the currency thereof such part thereof to which Licensor would be entitled hereunder if the funds were transmitted and paid in the United States in accordance with the terms hereof. Licensee shall not be liable in any way for any losses caused by fluctuation in the rate of exchange or because of any failure to convert or remit any particular funds to the United States at any particular time or at a more favorable cost or rate of exchange than the cost or rate of exchange at which such conversion and remittance was accomplished, it being agreed that Licensor shall be bound by whatever arrangements Licensee may make for the conversion and remittance of foregoing funds and by whatever cost or rate of exchange is incurred for such conversion and remittance.

8.     <u>MATERIALS TO BE DELIVERED</u>:

(a)     "Delivery" shall mean delivery to and acceptance by Licensee, in its sole discretion, of all delivery items (each a "Delivery Item" and collectively the "Delivery Materials") referenced in the attached Schedule "DM" (the "Delivery Schedule").  At or prior to the date as referred to in Paragraph 3(b) above, Licensor, at its sole cost and expense, shall deliver to Licensee at its address as set forth in the Basic Provisions, or such other place as Licensee may reasonably designate, the materials described in the Schedule DM (the "Delivery Materials"), in technically acceptable condition meeting Licensee's quality control (QC) requirements so that the Licensed Rights may be appropriately and professionally exploited.  Licensor shall notify Licensee in writing including the completed Delivery Binder Cover Sheet (Exhibit B) when it has completed delivery of all Delivery Materials and Licensee will review the Delivery Materials and will notify Licensor of any defects within thirty (30) days after delivery of all of the Delivery Materials. Delivery of the Delivery Materials shall be deemed complete when Licensee has approved the Materials by sending to Licensor a written notice of acceptance.  If at the end of thirty (30) days no notice is given, Licensee is deemed to have accepted the Materials.

(b)     If Licensee shall notify Licensor of any undelivered Delivery Materials or defects in the delivered Materials, Licensor shall within twenty (20) days after receipt of notice cause **all** such deficiencies or defects to be corrected and new Materials to be made and delivered to Licensee.  Each time Licensor delivers any new Materials, the thirty (30) day review period recommences for the new Materials.  Licensor shall pay the cost of manufacturing all such new materials.  In the event that Licensor fails to correct any defect or to cause such new Materials to be delivered to Licensee within said twenty (20) day period, Licensee may proceed to exploit the Licensed Rights for the relevant Picture by use of the uncorrected delivered materials or may, after determination by Licensee in its reasonable discretion that any defect is incurable, upon written notice to Licensor, terminate this Agreement with respect to such Picture only, with no further liability or obligation to Licensor with respect to such Picture.  Notwithstanding the foregoing, Licensee may without any obligation, create any undelivered Delivery Materials or cure any uncorrected Delivery Materials per Paragraphs 1 and 2 of Schedule DM whereupon Licensee will offset the cost thereof against any payments otherwise payable to Licensor hereunder.

(c)     Licensor shall make available to Licensee for copying and use, at Licensor's expense, such reasonable and customary promotional materials not required pursuant to Schedule DM but nevertheless deemed appropriate by Licensee and as Licensor may have in its possession or to which it has access and which Licensee desires to use in exploiting the Licensed Rights hereunder.  Licensor shall have access to any material created by Licensee upon payment to Licensee of Licensee's cost to create such materials, plus all access all shipping and duplication costs, any laboratory access fees, if applicable.

(d)     Licensor acknowledges that Licensee plans its release schedules based upon the delivery date(s) specified in this agreement or if none is/are specified then upon delivery dates which are mutually agreed upon between Licensor and Licensee; Licensor's failure to deliver a Production and to complete delivery as provided above, as agreed, shall cause Licensee to not only postpone its release date but to incur additional expenses because of such delay.  Licensee shall be entitled to recoup any direct, out-of-pocket costs incurred by Licensee as a result of such delay from any amounts payable hereunder to Licensor.

9.     <u>SUBSEQUENT PRODUCTIONS</u>:   If Licensor or any company controlled by, controlling, or under common control with Licensor seeks to produce, distribute or authorize others to produce or distribute productions related to the characters and/or content of Production,

including but not limited to sequels, prequels or spin-offs ("Subsequent Productions"), then Licensor shall give Licensee written notice of same prior to offering distribution rights or any portion thereof to a third-party or exercising such rights itself, and upon Licensee's request Licensor will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for Licensee's acquisition of the distribution right(s) to same. If the parties fail to conclude an agreement for such right(s) within thirty (30) days after such negotiations commence, then Licensor shall be free to offer such right(s) to others on such terms as it may determine.

      10.   THEATRICAL RELEASE:   Each Production shall be tested by a film research/testing service, with OTX and NRG being preapproved, in one or more focus groups, with the costs of such testing being paid by Licensor. Based on the results of such testing, the parties shall mutually determine the theatrical release date, the scope of such theatrical release (e.g., number of markets and number of screens), and the level of the initial print and advertising commitment (the "P&A Commitment") per subparagraph (i) below.

      (i)   For any Production that receives a sixty percent (60%) approval rating (i.e., sixty percent (60%) of the focus group liked the Production) or which is a Recess Film (regardless of test score), the P&A Commitment shall be no less than Six Million Dollars ($6,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Six Hundred (600) screens.

      (ii)   For any Production that receives a seventy five to eighty five percent (75%-85%) approval rating (i.e., seventy five to eighty five percent (75%-85%) of the focus group liked the Production) or which is a GPX Animation film, the P&A Commitment shall be no less than Ten Million Dollars ($10,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least One Thousand (1000) screens.

      (iii)   For any Production that receives an eighty five to ninety percent (85%-90%) approval rating (i.e., eighty five to ninety percent (85%-90%) of the focus group liked the Production), the P&A Commitment shall be no less than Fifteen Million Dollars ($15,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Fifteen Hundred (1500) screens.

      (iv)   For any Production that receives a ninety percent (90%) approval rating or higher (i.e., ninety percent (90%) or greater of the focus group liked the Production), the P&A Commitment shall be no less than Twenty Million Dollars ($20,000,000) and Licensee shall use reasonable efforts to cause Overture to secure a minimum release of more than Fifteen Hundred (1500) screens.

      (v)   Failure by Licensee to secure the minimum screen releases mentioned in this paragraph 10 shall not be deemed a breach hereof. If Licensee cannot secure the minimum screen releases for any Production or does not approve the increase in the minimum screens (i.e., an increase in the minimum screens due to the focus group approval rating(s) (the "additional screens")), then Licensor shall have the right to give notice to Licensee that Licensor desires to engage a third party to release the Production on the additional screens and Licensee shall have thirty (30) days to either secure or release in the additional screens or give Licensor notice that it will not elect to do so, at which time Licensor shall be free, at its election, to engage such third party (provided that Licensee shall retain all other Licensed Rights hereunder).

      (vi)   Strategy:   Licensee and Licensor agree to elect Eclipse Advertising (www.eclipseadvertising.com) ("Eclipse") as a non-exclusive consultant to work on the theatrical and video/DVD release of each such Production. Eclipse services shall include but not be limited

to creating and designing strategy for marketing and advertising campaigns and developing art and promotional materials for the release of each such Production as well as for building the Recess Films brand. The parties agree to consult with Eclipse regarding release strategy for each such Production, including but not limited to the media plan all possible media and sponsorship partners, if any. Licensor shall directly pay for all such costs associated with Eclipse. Licensor shall specifically pay for all the media buying strategic consultation provided by Eclipse and any other consultants elected by the parties and for all of the media purchases (inclusive of any mark-ups that shall be negotiated and mutually approved by both Licensee and Licensor), if any. If Licensor and Licensee jointly decide and approve to engage the services of additional consultants regarding the theatrical and/or the video/DVD release of any such Production then Licensor shall also directly pay for all such third party costs, if any. In the event of a dispute regarding this paragraph, Licensor's decision shall be final.

(vii)   Strategy Advisory and Consulting Fee: Licensor shall pay Licensee the non-recoupable sum of Two Hundred Thousand Dollars ($200,000) (not to be combined and/or associated with any other costs incurred by and/or monies otherwise payable to either party hereunder) per each Production for Licensee's consulting and advisory services in connection with the theatrical release of such Production per subparagraph (vi) above. Licensor shall pay such fee to Licensee as follows: (1) Fifty percent (50%) payable when Licensor delivers the Director's Cut of such Production to Licensee, and (2) Fifty percent (50%) payable when Licensor delivers the Final Cut of said Production to Licensee.

(viii)   Costs: Licensor shall approve and be responsible for any and all costs associated with the theatrical release of any accepted Production hereunder including but not limited to the P&A Commitment as specified above and any other costs associated with this paragraph 10.

11.   CREDIT: Licensee shall be credited as the distributor in all prints and advertising material, including but not limited to DVD packaging and the like, billing blocks and the paid ads. In addition, Licensee shall be entitled to (i) an on screen presentation credit (e.g., "Presented by Licensee") at the beginning of the Production, (ii) the right to run an animated logo at the beginning of the Production, and (iii) a static logo at the end of the Production. All of the foregoing shall be subject to the Territory for such Production and no casual failure by Licensor to comply with these obligations shall be deemed a breach hereof, provided however that Licensor shall use reasonable efforts to cure any such failure.

12.   OTHER BASIC TERMS: A courtesy copy of any notice given hereunder shall also be given to Licensee; Attention: Business and Legal Affairs Department, 2950 N. Hollywood Way, Burbank, CA 91505 and to Licensor; Attention: Nadia Davari, 9333 Oso Ave., Chatsworth, CA 91311, Tel: 818-592-0755; Email: ndavari@gigapixstudios.com.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Licensee:                                             Licensor:
ANCHOR BAY ENTERTAINMENT, LLC         GIGAPIX STUDIOS, INC.


By: _____              By: _____

Its: _Presidorf_____         Its: _Pres-det_____

Home    Mail    News    Sports    Finance    Weather    Games    Groups    Answers    Screen    Flickr    Mobile    More

Search Mail    Search Web                    Home    Cherie

✉  📅  ⋮

✏ Compose

Inbox
Drafts (20)
Sent
Spam (497)
Trash
˅ Folders (38)

Francisco ˅
Amway 20:
Amway 20:
Amway 20:
Bills
Bills 2011
Bills 2012
BMW
credit
Dodgers
e-bay
e-bay paid
Family 201
Forms 201
friends
GPX 2011
home
Home 201.
Inbox
Investors 2
Investors 2
Learning A
legal
Legal Infor
Medical 11
Medical 20
n21 11
network 21
Network 2
Notes
Pand A Fur
Pictures (1
quixtar (1:
Real Estate
restaurant
Synced Me
Tickets (1)
Trade
Trading (3
travel



FOR IMMEDIATE RELEASE:
NOVEMBER 9th, 2009

# GIGAPIX PICKS PARTNERS!

## Anchor Bay Entertainment Will Have First Look
## For Distribution in the U.S.

SANTA MONICA, CA -- Essential Entertainment's President of Worldwide Distribution, John Fremes, announced a multi-picture agreement today at AFM with Gigapix Studios ("Gigapix") for five "G" and "PG" rated live action kids films through its subsidiary Recess Films. The five live action films and one CG animated film will be produced by Gigapix Studios over the next three years. Anchor Bay Entertainment will have rights for first look in the U.S. with Essential Entertainment handling all International rights. "This is an exciting slate of films that are in the framework of classic kids action comedy films like *Home Alone* and *Goonies*. These are films that have strong international appeal, universal themes, and broad comedic elements that we believe will work across all international platforms," says Fremes.

Anchor Bay Entertainment and Gigapix have entered into a multi-year first look arrangement on the Recess Film slate where Anchor Bay will be releasing the films in theatrical, home entertainment and television with a commitment from Gigapix to fund a minimum P&A outlay of $6mm and 600 screens per film depending on how well each of the films tests in advance screenings. Each film release may go up to $20mm and 2,000 screens.

Kevin Kasha, Senior Vice President of Anchor Bay Entertainment added, "We are excited to be in business with the production team assembled at Gigapix and to have a worldwide distribution partner in Essential Entertainment. Quality kids' films are going to continue to be a staple of family entertainment spending as they always have been."

The first film, *The Return of Captain Kidd*, written by Jymn Magon (*DuckTales, A Goofy Movie* and Kern Konwiser, two-time Emmy winning writer/director/producer (*On Hallowed Ground* and *Miss Evers' Boys*), is to be directed by Kern Konwiser.

According to Kip Konwiser, head of production at Gigapix, "All of the live action films will have production budgets of $8-10mm each and the CG animated film will be budgeted at $20mm." This first film in the slate, *The Return of Captain Kidd*, was on the verge of production when it was caught in the temporary suspension of the Iowa State film tax credit program. Gigapix has been assured by the Iowa State representatives that their film has an agreement in place, consequently Gigapix has chosen to go forward on the production with an early 2010 start date. Currently, cast is being reassembled for a revised start date. We will be announcing the start of the next two live action films and production on our CG animated film within a few weeks."

Text me a link

‹    ›

Home   Mail   News   Sports   Finance   Weather   Games   Groups   Answers   Screen   Flickr   Mobile   More
Press Release AB Ess GPX.doc                                    2  of 3

Search Mail      Search Web                           Home      Cherie

✉  ⬛

✎ Compose

Inbox
Drafts (20)
Sent
Spam (497)
Trash
▼ Folders (38)

Francisco
Amway 20
Amway 20
Amway 20
Bills
Bills 2011
Bills 2012
BMW
credit
Dodgers
e-bay
e-bay paid
Family 201
Forms 201
friends
GPX 2011
home
Home 201
Inbox
Investors 2
Investors 2
Learning A
legal
Legal Infor
Medical 11
Medical 2C
n21 11
network 21
Network 2
Notes
Pand A Fu
Pictures (
quixtar (1:
Real Estate
restaurant
Synced Me
Tickets (1)
Trade
Trading (3
travel

A

Text me a link

🖼

Gigapix recently closed a P&A funding agreement with Main Stream Pictures (MSP) of Los Angeles and secured a lending facility with Capitoline Global Finance (CGF) of Newport Beach California. MSP is a new funding/ advisory and production company with principals Geno Taylor, David Williams and Tony Chopelas and will be a presenting producer on the films. Geno Taylor of MSP said, "I am pleased that we are in business on these films, and the quality distribution partners that Gigapix has put together is ideally suited to maximize the market opportunity in the one stable part of the theatrical film business, which is G and PG rated films. The three partners in MSP will also be Executive Producers.

Capitoline, a private fund manager and investment bank is headed by President, Brian Gilmore, and is facilitated by an advisory group led by entertainment industry veteran, Patrick Murray. David Pritchard, President of Gigapix said, "Brian Gilmore, Pat Murray, and Financial Consultant, Dominic Ianno were all instrumental in developing the overall strategy and financin plan for Recess Films, and Dominic was critical in establishing the distribution relationships wi Anchor Bay and Essential." Ianno will serve as an Executive Producer on the films.

Essential Entertainment provides global sales, distribution and marketing for its sister company Essential Pictures, as well as third-party productions. Founded by Jim Kohlberg in January 200 and headed by John Fremes, President of Worldwide Distribution, the company has quickly grown to become one of the world's premier global sales and distribution companies. For more detailed information, please visit http://www.essential-ent.com.

Anchor Bay Entertainment is the home entertainment division of Starz Media, LLC. It includ the Anchor Bay Films and Manga Entertainment brands. It distributes feature films, children entertainment, fitness, TV series, documentaries, anime and other filmed entertainment on DV and Blu-ray formats. It is the exclusive home media distributor in the U.S. of the theatrical titl from Overture Films. Headquartered in Beverly Hills, CA, Anchor Bay Entertainment h offices in Troy, MI, as well as Canada, the United Kingdom and Australia. Starz Med (www.starzmedia.com) is a controlled subsidiary of Liberty Media Corporation.

Gigapix Studios first film production, *Captain Abu Raed* won the 2008 Sundance Audience Award and is currently in worldwide release thru Fortissimo and NeoClassics in the US. Gigapix features an experienced management team with a history of success in Film, TV and digital media. www.gigapixstudios.com

Capitoline Global Finance is a global investment bank that specializes in media finance and proprietary content acquisition. The Company specializes in transactions that are new and innovative in the capital markets, bringing a level of "financial translation" to the institutional market that is unique and compelling. **www.capitolineglobal.com**

‹   ›



Compose

Inbox
Drafts (20)
Sent
Spam (498)
Trash
Folders (38)

Francisco v
Amway 20:
Amway 20:
Amway 20:
Bills
Bills 2011
Bills 2012
BMW
credit
Dodgers
e-bay
e-bay paid
Family 201
Forms 201
friends
GPX 2011 I
home
Home 201:
Inbox
Investors 2
Investors 2
Learning A
legal
Legal Infor
Medical 11
Medical 2C
n21 11
network 21
Network 2
Notes
Pand A Fur
Pictures (1
quixtar (1:
Real Estate
restaurant
Synced Me
Tickets (1)
Trade
Trading (3
travel

**Patrick Murray** is an independent consultant specializing in finance, operations, strategic planning and other advisory services for production companies, distributors and financiers.
  pmurray13@gmail.com.

**Dominic Ianno** is the CEO and founder of Indomitable Entertainment, a film financing, production and media strategy firm. The Company provides consulting services, strategic planning, financing advice and management to companies such as ScrollMotion (a leading smart phone application developer), where Ianno is a member of the Board of Directors.  In addition, Dominic recently launched Greentrestle Bridge Fund with film finance attorney Michael Barnes to provide bridge financing.

# # #

CONTACT:

FOR ESSENTIAL ENTERTAINMENT
**Wendy Smith**
917. 331.3123

FOR ANCHOR BAY ENTERTAINMENT
Sue Procko
323.653.5153
sue@sueprockopr.com

FOR GIGAPIX STUDIOS
**Mary Woodbury**
818-592-0755
mwoodbury@gigapixstudios.com

FOR DOMINIC IANNO
Dennis Dembia
310-854-8114

Text me a link

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 432

Essential Entertainment Media, L.L.C.
9000 Sunset Boulevard, Suite 600
Los Angeles, California 90069

Dated as of November 3, 2009

David Pritchard
Kip Konwiser
Gigapix Studios
9333 Oso Avenue
Chatsworth, CA 91311

Gentlemen:

Set forth below are the principal terms and conditions (the "**Agreement**") agreed to by and between Essential Entertainment Media, L.L.C. ("**Essential**") and Gigapix Studios ("**Producer**"), effective as of November 3, 2009 (the "**Effective Date**") pursuant to which Essential shall exclusively represent Producer with respect to the sale, distribution, license or transfer of certain rights in and to the motion picture described and defined herein. The principal terms and conditions are as follows:

## I. SALES AGENCY

1.      The Picture: The motion picture subject to this Agreement is currently entitled "Blackbeard" aka "The Return of Captain Kidd" (the "**Picture**"). The Picture shall: (a) be substantially based on the existing screenplay written by Jymn Magon & Kern Konwiser; (b) be produced by Producer; (c) be shot in 35mm, in color, with a projection aspect ratio of 1:85:1; (d) star Christopher Lloyd and Ron Perlman (with Essential's right to approve any replacement thereof); (e) be directed by Kern Konwiser; (f) have a running time of not less than 90 minutes nor more than 120 minutes; (g) have an MPAA rating no more restrictive than "PG-13"; (h) have a P&A commitment of US$6,000,000 secured by letter of credit approved by Essential; and (i) an initial theatrical release in the United States by Overture/Anchor Bay (with Essential's right to approve any replacement domestic distributor) on a minimum of 600 screens concurrently.

2.      Term: The term of Essential's engagement as exclusive sales agent of the Picture shall commence on the Effective Date and shall continue for a period ending five (5) years from the date of the first sale or license for the Picture (the "**Term**"). Each party shall notify the other in writing within the final ninety (90) days of the Term, should it elect to renew this Agreement, good faith renegotiation of which shall commence at that time. Essential is authorized to permit the license of the Rights hereunder, as defined below, to certain third parties for a period not to exceed fifteen (15) years, unless otherwise approved in writing by Producer (the "**Exploitation Period**").

3.      Exclusive Sales Agent: For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Producer hereby engages Essential for the Term, as Producer's sole, exclusive and irrevocable sales agent in connection with the licensing and servicing of the Picture throughout the Territory, defined in paragraph 4 below.

4.      Territory: The "**Territory**" means the universe with the exception of the United States, Bermuda, the Bahamas and their respective territories and possessions. For the avoidance of doubt, the Territory includes Canada and its respective territories and possessions. Essential shall have the sole and exclusive

---

right and authority to negotiate license agreements with respect to the Picture for the Territory as a whole or for any smaller part thereof.

5.    <u>Rights</u>: The exclusive exploitation rights shall include all rights and media under copyright now known or hereafter devised, including, without limitation: theatrical, non-theatrical, public and commercial video, home video rental, home video sell-through, television (including, without limitation free TV and pay TV), pay-per-view, video-on-demand, soundtrack, electronic sell-through, internet (all digital forms of distribution must contain geofiltering technology or such rights may be granted but shall remain frozen during the Exploitation Period), wireless, ancillary rights (including airline, ships and hotel) in the Territory (the "**Rights**").

6.    <u>Sales Fee</u>:

    (a) <u>International Sales Fee</u>: With respect to the Picture and the exploitation of the Rights in the Territory the sales fee shall be an amount equal to ten (10%) percent of one hundred (100%) percent of the Gross Proceeds, defined below, to be paid to Essential as and when any portion of the Gross Proceeds, including, but not limited to the minimum guarantees or overages, is received by Producer or credited to its account, in perpetuity, directly or indirectly through a collection account agent (the "**International Sales Fee**").

    (b) "**Gross Proceeds**" shall mean all amounts actually received by Producer (including but not limited to minimum guarantees or overages) credited to Producer's account or received by the designated collection account agent ("**Collection Account**" or "**TCAM**") on Producer's or Secured Party Financier's behalf that are derived from the exploitation of the Rights to the Picture throughout the Territory ("**International Gross Proceeds**"). "**Secured Financing**" shall mean any senior, mezzanine or gap financing amounts for the Picture provided by any applicable party ("**Secured Party Financier**").

7.    <u>Market Charge</u>: Essential is entitled to a one-time market charge of One Hundred Thousand US Dollars (US$100,000) as a fixed, pre-approved, non-accountable and non-auditable contribution toward Essential's customary expenses incurred in connection with Essential's cost of attending and representing the Picture at film markets (the "**Market Charge**"). The Market Charge excludes all other expenses associated with the representation, promotion, license and distribution of the Picture. Accordingly, the Market Charge shall be in addition to any other cost and Expense (defined below) to be charged to Producer hereunder. ) of the Picture and the Market Charge shall be payable directly to Essential as follows: (a) one-half (1/2) upon the earlier of (i) completion of principal photography of the Picture; and (ii) the collection of Gross Proceeds payable to or for the benefit of Producer per the CAMA (as defined in paragraph 21 below), provided that if the Expenses are payable out of the Collection Account, Expenses shall be payable only after the payment of reasonable and customary fees and costs payable to the collection agent for the administration of the Collection Account; and (b) one-half (1/2) no later than ten (10) days before the first day of the first major film market in which the Picture is exploited (i.e., Cannes Film Festival).

8.    <u>Expenses</u>: Essential shall not exceed One Hundred Thousand US Dollars (US$100,000) in Expenses for the Picture in the Territory during the Term without Producer's prior approval ("**Expense Cap**"). "**Expenses**" shall mean all of Essential's customary out-of-pocket distribution expenses, including without limitation, the following: advertising and publicity costs (excluding special publicity events, press junkets, press conferences, and the costs associated with the attendance of key talent; such costs will be approved and paid by Producer directly), the appropriate pro rata share of the institutional advertising announcing Essential's slate of films for the relevant film market promotional materials, test screenings (i.e., NR-G, OTX), any costs associated with delivery to licensees (inclusive of the costs of manufacture,

storage, vaulting, freight, delivery and courier costs), fees related to the entry of the Picture in film festivals, messenger and courier costs, reasonable travel and entertaining costs (to the extent that such costs directly relate to the Picture), auditing and collection costs, customary insurance, fees and commissions and any other amounts payable to third parties, and a discretionary amount for necessary but non-budgeted items. Any single Expense in excess of Five Thousand US Dollars (US$5,000) shall be pre-approved by Producer. Expenses shall be payable upon the earlier of (i) the completion of principal photography of the Picture; and (ii) the collection of Gross Proceeds payable to or for the benefit of Producer per the CAMA, provided that if the Expenses are payable out of the Collection Account, Expenses shall be payable only after the payment of reasonable and customary fees and costs payable to the collection agent for the administration of the Collection Account. Notwithstanding the Expense Cap, any out-of-pocket expenses incurred by Essential due to circumstances beyond Essential's control, including, but not limited to, insufficient funds in the Production Budget for Delivery Materials, shall be recoupable as additional distribution expenses and outside the Expense Cap. All Expenses shall be payable to Essential plus interest at a rate of one hundred twenty five (125%) percent of the then current Prime rate, as announced from time-to-time by JPMorganChase Bank, calculated monthly and due when Expenses are due and payable to Essential.

9.     Delivery Materials: Essential or its designee and Producer will collaborate on the delivery of the Picture to any and all licensees in the Territory, it being agreed that Essential is the sales agent in function hereof for Producer and that the financial responsibility of delivery remains with the Producer. Producer will be responsible for the cost and creation of all of the delivery materials set forth in the delivery schedule (the "Delivery Materials"), attached hereto as "Exhibit 1" (the "Delivery Schedule") and incorporated herein by this reference. Producer is responsible for the creation and delivery of all of the materials in the Delivery Schedule, (a) even if materials or documents in the Delivery Schedule are not bonded by the completion bond company (the "Completion Guarantor") and (b) regardless of the existence or non-existence of a domestic distribution deal. As soon as practicable, Producer shall deliver to Essential or its designee or provide Essential or its designee reasonable and customary laboratory access with Producer's prior written approval (at Producer's sole cost and expense) to all Delivery Materials to the specifications and as required in the Delivery Schedule. Producer will order and pay directly for all quality control reports at Essential's laboratory within five (5) business days of delivery of the applicable Delivery Materials to Essential's laboratory. If (a) the Delivery Materials do not conform to customary technical industry standards requirements set forth on Exhibit 1, (b) Producer fails to deliver any materials or documents or (c) the quality control report proves that any of the Delivery Materials are not of acceptable quality, then Essential or its designee shall notify Producer of such nonconformity in writing ("Notice of Nonconformity"). Producer shall use commercially reasonable efforts to repair any faults, obtain conforming materials and order and pay directly for subsequent quality control reports within ten (10) business days after receipt of the Notice of Nonconformity. Producer shall indemnify and hold harmless Essential and its designees against all claims and damages arising from Essential's inability to deliver the Picture pursuant to any license agreement as a result of the failure by Producer to deliver any conforming materials which Producer does not correct within ten (10) business days after Essential's Notice of Nonconformity. Actual, third-party costs incurred by Essential in correcting deficient Delivery Materials or in creating Delivery Materials not delivered by Producer, which Producer does not correct within ten (10) business days after Essential's Notice of Nonconformity, will be recoupable from Producer as Expenses hereunder and are not subject to the Expense Cap.

10.     Servicing Agent: Essential will render all services customarily performed by sales agents in connection with the licensing of the Rights of the Picture, including, without limitation: (a) representing Producer at film markets in connection with the sale of the Picture; (b) overseeing the marketing of the Picture in the Territory; (c) drafting all licensing agreements relating to the license of the Picture in the Territory; (d) collection services; and (e) coordinating delivery to the licensees.

---

11.    Approvals:  Producer will have the right to approve the following with respect to the Picture: (a) the ask and accept schedule ("Sales Estimates"), as further defined in paragraph 15; and (b) any single Expense exceeding Five Thousand US Dollars (US$5,000). Producer hereby pre-approves any license agreement entered into by Essential at a major film market (i.e., Berlin, Cannes, AFM) for territories where the accept price is reflected on its sales estimates, provided that the minimum guarantee pursuant to any such license agreement is at or greater than the respective accept price.  In the event an offered minimum guarantee is less than its estimated accept price, Producer shall have twenty four (24) hours to deny said minimum guarantee upon written notification and request from Essential or said request shall be automatically deemed rejected. The parties acknowledge and understand that time is of the essence for any written notice sent by Essential requesting Producer's approval, especially at the film markets; accordingly, Producer shall designate one authorized representative to any of whom all requests for approval by Essential shall be directed. For the avoidance of doubt, Producer's execution of any short or long-form license agreement is conclusively deemed approval by Producer of the form and substance of the license agreement. Essential and Producer shall have mutual approval of all marketing materials with respect to the Picture, including, but not limited to publicity, press releases, key art, promos and trailers. In the event of a dispute, after meaningful consultation with Producer, Essential's decision shall control in the Territory.  Essential shall have the right to approve the international version of the theatrical trailer of the Picture.  Essential's inadvertent failure to obtain an approval hereunder, does not constitute breach of this Agreement.

12.    Essential Authority: All contracts with licensees shall be entered into by Essential as agent only, and Producer, or Producer's designee (including any licensing intermediary) as the licensing party. Essential is not authorized to execute any contract on Producer's behalf or to in any way bind, or hold itself out as having the authority to bind, Producer to any agreement with a third party unless such contract provides for a minimum guarantee and/or licensing fee which equals or exceeds the "accept" price for the Picture for that portion of the world, or: (i) such lesser amount as Producer shall approve in writing; or (ii) such lesser amount that Producer approves orally to Essential when time is of the essence.

13.    Third-Party Obligations: Producer shall be responsible for paying all third-party payments, per the CAMA, including, but not limited to any acquisition, production and financing costs with respect to the Picture,  any third-party participations arising from the sale or commercial exploitation of the Picture, and any residuals due and owing to any of the guilds or unions.  Producer will provide for residuals as a separate line item in the Production Budget which shall be payable into the Collection Account for the Picture as described in Paragraph 19 below.  Producer shall also be responsible for all music clearance fees with respect to the use of any musical elements embodied in the Picture for its exploitation, advertising and promotion (whether "in-context" or "out of context").

14.    Future Projects: (a) "Recess Films" shall be live action comedy films produced as entertainment for children with a final going-in budget ranging from Eight Million US Dollars (US$8,000,000) to Ten Million US Dollars (US$10,000,000) and a final negative cost of no less than Five Million US Dollars (US$5,000,000), excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor; and (b) "GPX Animation" shall be stereoscopic, computer generated, animated films produced as entertainment for children with a final going-in budget of no less than Twenty Million US Dollars (US$20,000,000) and a final negative cost of no less than Fifteen Million US Dollars (US$15,000,000), excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor. With respect to Recess Film Projects and GPX Animation Projects (as such terms are defined above), Producer shall, during the Submission Period (as defined below), submit to Essential, on an exclusive "First Look" basis, Producer's Recess Film Projects and GPX Animation Projects and Essential shall have the exclusive right and option to accept any and all of such Recess Film Projects and GPX Animation Projects. For purposes hereof, the term "Submission Period" shall mean

---

the period commencing upon the date hereof and continuing for a period of four (4) years thereafter. The submission process shall be as follows ("**Submission Process**"):

(a) <u>Submitted Project</u>: Producer shall provide Essential with respect to each Recess Film Project and GPX Animation Project with sufficient information, including, but not limited to each such project's screenplay, casting, production budget and film financing as well as all ideas, materials and/or properties contained therein and related thereto (each a "**Submitted Project**"). Essential shall thereafter have a period of five (5) business days to read the Submitted Project ("Reading Period"). Upon conclusion of the Reading Period, Essential shall either (a) reject the Submitted Project or (b) elect to perform additional diligence, for a period not to exceed twenty (20) business days ("**Diligence Period**"), in order to gather sufficient information to reject or accept the Submitted Project. In the event that Essential accepts a particular Submitted Project (each an "**Accepted Project**"), such Accepted Project shall be deemed to be a Picture hereunder and all terms and conditions set forth in this agreement shall be applicable to such Accepted Project.

(b) In the event that Essential rejects any such Submitted Project for any reason and thereafter Producer makes any substantive or material changes or additions to the screenplay of such rejected Submitted Project, then Producer shall be obligated to resubmit such previously rejected Submitted Project and Essential shall be entitled to the Reading Period and Diligence Period in accordance with paragraph 14(a).

(c) In the event that Essential rejects any such Submitted Project and thereafter Producer makes any substantive or material changes or additions to the elements of such rejected Submitted Project, other than the screenplay (e.g., a material change in financial terms or change to an actor, director or producer), then Producer shall be obligated to resubmit such previously rejected Submitted Project and Essential shall be entitled to a fifteen (15) business day Diligence Period, but will not be entitled to an additional Reading Period.

15.    <u>Sequels and Derivative Works</u>:  Essential shall have the right to sell theatrical sequels, prequels, remakes and television spinoffs (including television series and direct-to-video), subsequent productions, stage plays, video games, computer and electronic and other games, interactive uses, and all other productions of the Picture, whether for initial release theatrically, on home video, on television or as stage plays or any other media on the same terms as applicable to the Picture.

16.    <u>Sales Estimates</u>:  As between Essential and Producer, the "**Sales Estimates**" shall mean the table summarizing Essential's collective opinion of the minimum guarantees which potential licensees are likely to pay for the Picture, assuming: (a) that the Picture is: (i) filmed in substantial conformity with the draft screenplay written by Jymn Magon & Kern Konwiser dated August 13, 2009, that Producer authorized Essential to send to potential Licensees; and (ii) filmed substantially in color on 35mm film stock; (b) that there is no material deterioration in the economic conditions within the respective territories or the Theatrical, Video and/or Television markets within such territories; (c) the Picture is directed by Kern Konwiser; (d) the Picture is produced by Producer; (e) the Picture stars Christopher Lloyd and Ron Perlman and/or other talent mutually approved by Producer and Essential; (f) the Picture is produced with direct above and below-the-line costs not less than Nine Million US Dollars US Dollars (US$9,000,000.00); (g) the Picture has a P&A commitment of US$6,000,000 secured by letter of credit; (h) and an initial theatrical release in the United States by Overture/Anchor Bay on a minimum of 600 screens concurrently. Producer hereby acknowledges that said domestic release commitment may be expressly listed as an essential element to any and all international distribution agreements and notices of assignment for the Picture, with Essential's right to approve any replacement distributor. Essential shall prepare Sales Estimates for Producer approval no later than five (5) days prior to the first major film market in which the Picture is exploited. Within thirty (30) days of Essential screening the director's cut

of the Picture (per Paragraph 20 below), Essential will submit any necessary revisions to the Sales Estimates for Producer approval. The parties hereto acknowledge that the Sales Estimates are inherently speculative; accordingly, Essential does not represent, warrant, covenant or guarantee that such offers will be forthcoming or that such minimum guarantees will be obtained by Producer. Producer hereby waives any rights or remedies against Essential if any such offers are not forthcoming, license agreements for such territories and amounts are not entered into by Producer and/or such amounts are not collected under any or all license agreements and/or received by Producer.

17.     Reports/Accountings/Audit Rights:  Essential shall render a quarterly basis statement to Producer, sixty (60) days in arrears, beginning upon the delivery of the Picture and continuing for a period of three (3) years thereafter, provided that no statement need be provided if the Collection Account agent is rendering regular statements or sales made or amounts collected are less than One Thousand US Dollars (US$1,000) during any statement period, and thereafter Essential shall render such statements on a quarterly basis, sixty (60) days in arrears.  Producer will have the right to request an updated written statement no more frequently than sixty (60) days after the close of the calendar quarter. During the Term, Producer shall have the right to audit the books and records of Essential with respect to the Picture, once per year, and upon reasonable written notice to Essential.  All statements rendered by Essential in connection with the Picture shall be conclusively binding upon Producer and not subject to any objection unless specific objection in writing is given to Essential within two (2) years from the date such statement is rendered and an audit for that statement is completed within six (6) months after such objection notice is given. If Producer's audit of such statement rendered by Essential concludes that there is a discrepancy of ten (10%) percent or more, then Essential shall pay Producer's cost of the audit for that statement.

18.     Failure to Commence Principal Photography:  The parties expressly acknowledge and agree that Essential's reasonable expectation under this Agreement is that Producer will complete and deliver the Picture to Essential or its designee (for delivery to licensees) and that Essential has incurred some indeterminate opportunity cost by accepting the engagement as agent hereunder.  Accordingly, Producer shall use best efforts to ensure that Essential is a named beneficiary in the completion guaranty, at Essential's cost, and such that if after the completion guaranty is in effect, Producer abandons the Picture or otherwise fails to make delivery of the Picture, Producer and/or the Completion Guarantor immediately pays Essential any and all entitlement to the Expenses, Market Charge and International Sales Fee (calculated against advances for all license agreements), upon receipt of which this Agreement shall be deemed terminated (the parties hereby acknowledge that Essential will not be named as a beneficiary in the completion guaranty for "Blackbeard" aka "The Return of Captain Kidd"; however, the parties acknowledge that this provision remains in effect for all Accepted Projects, Sequels, Prequels and Derivative Works). Notwithstanding the foregoing, Producer must pay Essential one-third (1/3) of the Market Charge and all accrued Expenses within ten (10) days of the earliest of: (a) Producer's failure to commence principal photography within six (6) months from the date of the first offer for the license of the Picture; and (b) otherwise failing to make delivery of the Picture prior to the bonded delivery date. Thereupon this Agreement shall be deemed terminated and, within ten (10) days thereof, Producer shall return (or authorize the Collection Account manager to return) any and all deposits collected to date from licensees. Unless and until Producer receives written and express authorization from Essential, Producer hereby acknowledges that Producer may not utilize any licensee's deposit or minimum guarantee payment for any purpose prior to the close of the production financing for the Picture, which means that no minimum guarantee (or any portion thereof) may be used for any financial purpose as to the Picture or any other picture prior to confirmation that: (a) a verifiable production financing plan is in place, (b) there is a completion bond company commitment letter for the Picture, (c) there is a confirmed date for the commencement of principal photography, and (d) the Secured Financing for the Picture is closed.

19.     Credits:  Essential will be entitled to a company presentation credit on the screen in all positive prints of all releases of the Picture in the Territory, including, without limitation, theatrical releases, film

---

festival and market screenings of the Picture. Such credit may be a moving or animated logo on a separate card ahead of the "Title" of the Picture. Such credit will also be tied to Producer's company credit and will be included in all trailers, paid advertising and the billing block, subject to customary exclusions, in a size equal to that used to display Producer's credit. In addition, Essential shall receive an "International Sales by Essential Entertainment" credit (a) on the screen, in the end crawl of all positive prints of the Picture in the Territory, and (b) in all press releases, press kits and announcements. Producer also agrees to include Essential's logo on all artwork and promotional materials in the Territory and on all prints of the Picture screened at any film market, in proximity with and in equal size to Producer's logo. No casual or inadvertent failure by Producer to accord such credit, nor the failure for any reason by third parties to comply with the provisions of this paragraph, shall be deemed a breach hereof by Producer; provided, however, that Producer agrees to use reasonable efforts to cure prospectively any failure to accord such credit promptly following Producer's receipt of written notice of any such failure.

20.     Previews: Essential shall be entitled to the following preview rights: (a) upon commencement of principal photography, Essential will be provided with "dailies" on a weekly basis, which will be provided to Essential on DVD, tape or electronically; and (b) Essential will be shown all "cuts" and "previews" of the Picture.

21.     Priority of Disbursements from Collection Account:  Together with certain other third-parties, Essential and Producer shall be parties to a collection agreement that provides for the payment of Gross Proceeds and residuals into, and disbursement of those certain sums due to Essential, including but not limited to the Expenses, the Market Charge and the International Sales Fee, from a Collection Account ("CAMA").  In the event that payment of the sums due to Essential are not timely made as set forth herein, then Producer shall pay Essential within fifteen (15) days of receipt of an invoice for the same. It is a material term of this Agreement and a condition precedent of Essential's obligations hereunder that Essential be a party to the CAMA, that the CAMA provide that it cannot be modified without Essential's express written consent, and that unless and until Essential, in its sole discretion, grants such written consent, all funds received in the Collection Account with respect to the license agreements must be disbursed as and when received in the order of priority as set forth on Schedule "1" attached hereto.

22.     Vault and Return of Materials:  Until the expiration of the Term of this Agreement or any prior termination of this Agreement and following delivery to the licensees, Producer shall be responsible for the costs associated with the vaulting or storage of the Delivery Materials. Following the expiration or any prior termination of this Agreement, Essential shall within sixty (60) calendar days deliver to Producer all of the materials delivered or supplied to it pursuant to this Agreement and all other materials manufactured or created by Essential in respect of the Picture plus copies of all other materials then in Essential's possession relating to the Picture or the performance of its obligations hereunder or shall, if Producer so elects by notice in writing to Essential, erase or destroy all such materials and supply a certificate of destruction signed by an officer of Essential.

23.     Assignment: Producer may assign any and all rights hereunder to any production entity, financier, lender, bond company and/or guild, provided that Producer shall remain secondarily liable hereunder and provide written notice to Essential of such.

24.     Representation of Other Films/Producers: Producer acknowledges that it has been advised by Essential that Essential will act as the sales representative for third parties and/or for films owned or controlled by third parties and/or films that Essential owns or controls and that such acts are not in violation of the terms of this Agreement.

25.     Conditions Subsequent: Essential's obligations hereunder shall be subject to the following "Conditions Subsequent":

(a) <u>Chain of Title</u>: Producer acknowledges and agrees that it is a material term of each license agreement Essential concludes, and that Essential will represent to any prospective licensee that Producer has the right to grant the Rights it purports to grant pursuant to such license agreement. Accordingly, as a condition subsequent to any obligation of Essential hereunder, promptly upon execution of this Agreement, and to the extent it may change thereafter, Producer shall provide Essential with the complete chain of title, at Producer's sole cost and expense, which Essential may have reviewed by independent outside counsel (the cost of which is a reimbursable Expense). In the event that Essential provides Producer with notice of any deficiencies in the chain of title which would materially impair the ability of any licensee to exploit any of the licensed Rights or is likely, in Essential's sole and reasonable judgment, to expose Essential to liability or otherwise adversely impact Essential's performance hereunder, Producer shall use all reasonable efforts to correct such deficiencies promptly. Essential may suspend its performance hereunder until such deficiencies are corrected and may, if such deficiencies cannot be corrected within fifteen (15) business days of notice from Essential, terminate this Agreement. For purposes of clarity, approval of chain of title by Essential does not waive any of Essential's rights to indemnity hereunder.

(b) <u>Errors and Omissions Insurance</u>: Producer shall maintain or cause to be maintained in full force in effect, during the first three (3) years of delivery of the Picture, standard form Producer's liability insurance (error and omissions insurance) with liability limits of not less than One Million US Dollars (US$1,000,000) per occurrence and Three Million US Dollars (US$3,000,000) in the aggregate and with a maximum deductible of not greater than Twenty Five Thousand US Dollars (US$25,000) naming Essential Entertainment Media, L.L.C. and its officers, employees, representatives, attorneys, successors, and assigns as additional insureds. Such insurance coverage shall extend to all customary uses of the Picture by Essential hereunder as are covered by customary E&O policies. Producer shall ensure that the errors and omissions insurance may not be terminated without thirty (30) days prior written notice to the above-mentioned additional insured parties and the certificates issued naming such parties as additional insured entities shall include statements to this effect. As a condition subsequent to Essential's obligations hereunder, Producer shall furnish Essential with a certificate of such insurance within fourteen (14) days of signature of the issuance of such policy

26.     <u>Termination</u>: Producer shall have the right to terminate its obligations hereunder with respect to the Picture if: (a) Essential materially breaches this Agreement and fails to cure within twenty-one (21) days; (b) at any time during the Term Essential becomes insolvent or is unable to pay its debts generally as they arise; (c) Essential files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law; (d) a petition is presented or resolution passed for the winding up of Essential, or proceedings are started for the reorganization of Essential or the appointment of a receiver or trustee for all of Essential's assets; (e) Essential suspends or threatens to suspend its general operations, or (f) Essential's assets are seized or appropriated by or on behalf of any governmental authority.

27. intentionally deleted.

28.     <u>Indemnity</u>: Producer shall defend, indemnify and hold harmless Essential (including its affiliates, officers, directors, partners, employees, agents, exhibitors, licensees, and assignees) from and against any and all third-party claims, liabilities, liens, losses, injuries, damages, costs and expenses (including actual, out-of-pocket, reasonable expenses and reasonable outside attorney's fees) of any kind or nature incurred or suffered in connection with any and all demands, claims, proceedings, suits or actions (whether or not such is meritorious) arising out of or relating to: (i) the development and production of the Picture, (ii) any breach by Producer of any representation, warranty, obligation or covenant herein; (iii) any gross negligence or conduct by Producer; (iv) any claim or action relating to or arising out of any item enumerated in Exhibit 1 attached hereto, but which item is either incompletely delivered or not delivered

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 447

## "OZ3D" PRODUCTION FINANCING AGREEMENT

This financing agreement ("**Agreement**") is entered into as of August 25, 2011, by and between Multiple Media Entertainment Inc. ("**MME**"), an Ontario corporation with offices at 1920 Yonge Street, Suite 200, Toronto, Ontario M4S 3E2, ARC Productions Ltd. ("**Arc**"), an Ontario corporation with offices at 230 Richmond Street East, Toronto, Ontario M5A 1P4, and OZ3D, LLC ("**LLC**"), a Nevada limited liability company, with offices at 11835 W. Olympic Blvd., Suite 350E, Los Angeles, CA 90064 in connection with the production financing and disbursement of available proceeds, if any, relating to the to-be-produced stereoscopic, CGI animated motion picture currently titled "OZ3D" ("**OZ3D**") based on the screenplay ("**Screenplay**") attached hereto as Exhibit A and subject to the budget ("**Budget**") attached hereto as Exhibit B. The term "**Parties**" shall refer collectively to MME, Arc and LLC and the term "**Party**" shall refer to MME or Arc or LLC individually.

OZ3D shall be produced in accordance with the production services agreement ("**Production Services Agreement**") dated as of August 25, 2011, between LLC and Arc attached hereto as Exhibit D. Any increase in the Budget (or any line item thereof) in excess of five percent (5%) or any change to the Screenplay shall require the unanimous, prior written approval of the Parties. In consideration of the promises and covenants set forth herein, the Parties hereby agree as follows:

1) The Parties agree that LLC and its affiliate Gigapix Studios, Inc., ("**Gigapix**") a California corporation, up-to-date have contributed and spent $5.13 million on development and pre-production work, including, but not limited to the Screenplay, writer fees, acquisition of literary rights, character creation/development and script/story development. Additionally, LLC and its affiliate Gigapix will continue to provide production services and creative services (including any rewrites).

2) LLC shall be responsible for negotiating all talent agreements: including but not limited to voice talent, composer(s), music supervisor(s), writer(s), director(s) and producer(s). The costs of the foregoing shall be subject to the approval of the Parties and be included in the Budget and paid therefrom.

3) LLC shall negotiate with WowWee Canada Inc. with respect to any licensing and merchandising in connection with OZ3D. Any such proceeds shall be paid into the Collection Account, as such term is defined below in paragraph 8.

4) Gigapix or an affiliate shall own and control all rights to distribute OZ3D in the U.S. market, and may provide a theatrical release on up to of 1,000 screens, supported by a minimum prints and advertising ("**P&A**") spend of up to U.S. $10 million. In respect of the foregoing, Gigapix or an affiliate shall enter into a customary "all rights" distribution agreement upon terms and conditions which are subject to the unanimous, prior written approval of the Parties.

5) Arc shall appoint Stephanie Denton as the "in house" international sales agent to sell the global ( other than US, Canada and excluding territories that E-One Entertainment, if any, shall be distributing) distribution rights to OZ3D as soon as sufficient creative elements are in place to maximize such sales. The international sales agency agreement and any related compensation (which shall be 100% deferred until the Budget is fully financed) paid to such sales agent, shall be subject to the review and unanimous, prior written

approval of the Parties. The Parties, in conjunction with the sales agent, will determine the minimum acceptable price ("**Minimum Sales Price**") for each territory. All sales agreements entered into by the sales agent will conform to the requirements of production lenders and be subject to a minimum guarantee which will not be less than the Minimum Sales Price (by territory) unless a lower price is unanimously authorized in writing by the Parties. The terms and conditions of all sales agreements will be subject to the unanimous, prior written approval of the Parties.

6) The sales agreements referred to in paragraph 5 above will include directions to the international buyers to pay minimum guarantees and any overages to the U.S. or Canadian bank(s) (or financial institution(s)) making the applicable production loan(s). Any receipts in excess of the loan(s) (plus interest and other costs) will be paid into the Collection Account, as such term is defined below in paragraph 8.

7) In accordance with the Production Services Agreement, Arc, will provide production services with a value of $1.088 million which will be matched equally (in cash) by each of MME and Arc. Arc will be compensated from the Collection Account for such services as described in paragraph 19.

8) MME together with Arc shall establish a collection account ("**Collection Account**") and will prepare instructions ("**Instructions**") to determine the priority and authorization requirements for payments from the Collection Account. Such Instructions will be subject to the unanimous, prior written approval of the Parties.

9) MME and Arc agree to secure a completion bond ("**Bond**") on OZ3D through Films Finances Inc. Canada ("**FFIC**"). The Parties shall provide any and all documentation and/or other information required by FFIC to secure such Bond. The cost of the Bond shall be included in the Budget and paid therefrom.

10) MME, in conjunction with Arc, will immediately prepare the necessary documentation (which conforms with production lender's requirements and will be subject to review and prior written approval of LLC) to secure and maximize the federal, provincial and other tax credits (and incentives) which shall include but not be limited to:

   i) Ontario Production Services Tax Credit ("**OPSTC**")
   ii) Ontario Computer Animation and Special Effects Tax Credit ("**OCASE**")
   iii) Film or Video Production Services Tax Credit ("**PSTC**")

   Any tax credits (including investment incentives and capital cost allowances) or other incentive programs earned and/or received by any of the Parties in respect of OZ3D will be paid to the Collection Account and used solely for the purpose of financing the Budget or as otherwise permitted in paragraph 19 hereof.

   The third party costs of preparing and certifying such tax credit documentation will be included in the Budget and paid therefrom.

11) MME, in conjunction with Arc, will pledge all approved tax credits as collateral for a production loan(s) from a Canadian bank(s) (or other financial institution(s)). MME will be responsible for negotiating such production loan(s), but the terms and conditions of such loans will be subject to the review and unanimous, prior written approval of the

Parties. The proceeds of the loan will be paid into the Collection Account and used solely for financing the Budget or as otherwise permitted in paragraph 19 hereof.

12) MME, in conjunction with Arc, will issue "directions to pay" instructing the federal, provincial and other applicable institutions issuing the tax credits and/or other incentives to pay the proceeds from all such tax credits and/or other incentives directly to the bank(s) (or financial institution(s)) which made the applicable production loan(s). Any tax credits and/or other incentives in excess of the applicable loan(s) (plus interest and other costs) will be directed to the Collection Account.

13) MME, in conjunction with Arc, will pledge the receipts earned from the international presales contracts (and estimates for unsold territories if applicable) as collateral for a production loan(s) from a Canadian (or U.S.) bank(s) (or a financial institution(s)). MME will be responsible for negotiating such production loan(s) but the terms and conditions of such loan(s) will be subject to the review and unanimous, prior written approval of the Parties. The proceeds of the loan(s) will be paid to the Collection Account and used solely for financing the Budget or as otherwise permitted in paragraph 19 hereof.

14) MME will pre-sell the Canadian distribution rights to OZ3D. MME's sales agency agreement for Canada and related compensation (which shall be 100% deferred until the Budget is fully financed) shall be subject to the review and unanimous, prior written approval of the Parties. The Parties will determine the minimum acceptable price ("**Minimum Sales Price**") for Canada. MME shall not sell Canadian distribution rights for less than the Minimum Sales Price unless a lower price is unanimously authorized in writing by the Parties. The Canadian distribution sales agreement(s) shall conform with production lender's requirements and be subject to the unanimous, prior written approval of the Parties.

15) MME will pledge the receipts earned from the Canadian sales agreement(s) as collateral for a production loan(s) from a Canadian (or US) bank(s) or financial institution(s). The terms and conditions of such production loan(s) will be subject to the unanimous, prior written approval of the Parties. The proceeds of such loan(s) shall be paid into the Collection Account and used solely for financing the Budget or as otherwise permitted in paragraph 19 hereof.

16) MME shall direct the Canadian distributor(s) of OZ3D to pay the minimum guarantees and/or overages to the lending bank(s) (or financial institution(s)) referred to in paragraph 15 above. Any minimum guarantees or overages in excess of the production loan(s) (plus interest and other costs) shall be paid into the Collection Account.

17) To the extent that the combination of the production loans and the contributions from the Parties is insufficient to fund the Budget, the Parties will meet and discuss in good faith how such shortfall should be funded (*e.g.* gap, super-gap or additional equity). Notwithstanding the foregoing, any Party may contribute additional equity to the Budget and receive an additional percentage share of the Remaining Balance, as defined in paragraph 19 hereof, equal to the additional amount invested as a percentage of the total production cost less the sum of the production loans received in paragraphs 11, 13 and 15 hereof.

18) All receipts (other than those pledged to banks or financial institutions) received in respect of OZ3D by any of the Parties hereto which have not been paid directly to the

Collection Account will immediately, on the day of receipt, be wired to the Collection Account and shall be used solely for financing the Budget or as otherwise permitted in paragraph 19 hereof. In no event will any Party retain any amounts received as an advance against its entitlement under paragraph 19 hereof even if the Budget is fully financed.

19) Subject to the repayment of any production lenders (including gap and/or super-gap lenders) and collection fees payable to the administrator of the Collection Account and subject to the retention of cash reserves for reasonably anticipated future liabilities, all receipts received into the Collection Account shall be payable on a continuing and rolling basis in the following priority:

    a.  Firstly:
        i)       $1,088,000 to Arc

    b.  Secondly:
        ii)     Arc's sales agency fees
        iii)    MME's sales agency fees

The amounts paid in (ii) and (iii) above shall be made on a pari-passu basis and reflect the pro-rata percentage payable to each sales agent as a percentage of the total amount available in the Collection Account (after the payment to Arc per paragraph 19 (i) hereof) but shall not exceed the total amount payable to each sales agent.

    c.  After payment of sales agency fees, the remaining balance ("**Remaining Balance**") shall be disbursed to the following recipients on a pari-passu basis:

        iv)    75% of the Remaining Balance to LLC
        v)     5% of the Remaining Balance to MME
        vi)    10% of the Remaining Balance to Arc
        vii)   10% of the Remaining Balance to talent, if any.

If the Remaining Balance payments to talent are less than ten percent (10%) then any remaining available proceeds will be paid to LLC.

20) This Agreement contains the entire agreement between the Parties relating to the Screenplay and the subject matter hereof and shall supersede any and all prior, contemporaneous or other promises, representations, and agreements, whether written or oral. This Agreement shall not be modified or amended except in writing signed by all Parties.

21) All notices, requests, demands or other communications required or permitted to be given by one party to another under this Agreement (each a "**Notice**") shall be given in writing and delivered by personal delivery or delivery by recognized national courier, sent by facsimile transmission or delivered by registered mail, postage prepaid, or by electronic communication (including e-mail but excluding Internet or intranet websites) addressed as follows:

If to Arc:                          230 Richmond Street East
                                    Toronto, Ontario
                                    M5A 1P4
                                    Attention: Jeff Young
                                    Facsimile Number: (416) 682-5207
                                    E-Mail: Jeff.Young@arcproductions.com

If to Gigapix or LLC:               11835 W. Olympic Blvd., Suite 350E
                                    Los Angeles, CA 90064
                                    Attention: Nadia Davari, Jim Cardwell
                                    Facsimile Number: (323) 389-0842
                                    Email: ndavari@gigapixstudios.com
                                            jcardwell@gigapixstudios.com

If to MME:                          1920 Yonge Street, Suite 200
                                    Toronto, Ontario
                                    M4S 3E2
                                    Attention: Michael Taylor
                                    Facsimile Number: (416) 484-8001
                                    Email: michael.taylor@multiplemedia.ca

22) If any of the provisions of this Agreement shall be unlawful, void, or for any reason unenforceable, they shall be deemed separable from and shall in no way affect the validity or enforcement of the remaining provisions of this Agreement. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer rights or obligations upon any person other than the Parties hereto.

23) This Agreement may be executed in any number of counterparts (including by facsimile and/or electronic transmission, PDF, JPEG, or TIFF), each of which shall be deemed a duplicate original, but all of which together shall constitute one and the same agreement and shall become effective when a copy signed by each Party has been delivered to the other Parties. Such separate execution shall be of full force and effect so long as each Party has executed the same agreement. Facsimile, PDF, JPEG, or TIFF copies of this Agreement and signatures thereon shall be valid and binding on the Parties.

24) MME's and Arc's sole remedy for breach of any of the provisions of this Agreement shall be an action at law for damages, if any, and neither MME nor Arc shall have the right to in any way enjoin or restrain the distribution, advertising, marketing, exhibition, exploitation of OZ3D and/or any work or activities of LLC or its affiliates or terminating or rescinding any rights granted to LLC hereunder.

25) This Agreement shall not be construed against the Party preparing it, but shall be construed as if all Parties jointly prepared this Agreement; and any uncertainty or ambiguity shall not be interpreted against any one Party.

26) This Agreement shall be governed by the internal laws of California (*i.e.,* without regard to its conflict of law principles). The sole location for jurisdiction and venue for any litigation relating to this Agreement shall be in the federal or state courts in Los Angeles County, California. The Parties consent to jurisdiction and venue in such courts and waive any objection based on inconvenient forum. Each of the Parties consents to the

service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. AS TO ANY ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AMENDMENT, THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHTS TO A TRIAL BY JURY. In the event of a dispute under this Agreement, the Parties agree to binding arbitration pursuant to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing Party shall be entitled to attorneys' fees and costs.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

ARC Productions Ltd.                          Multiple Media Entertainment Inc.

By:_____                      By:_____
Name:  Jeff Young                             Name:  Michael Taylor
Title:    President & COO                     Title:

Gigapix Studios, Inc.                         OZ3D, LLC

By:_____                      By:_____
Name:                                         Name:  David Pritchard
Title:                                        Title: