# EXHIBIT 454 (Part 1 of 2)

..er of Intent

# GIGAPIX STUDIOS-MSH ENTERTAINMENT
# LETTER OF INTENT

May 10, 2011
MSH Entertainment Corp.
Attention: Mr. Chuck Walker, President

RE: Letter of Intent between Gigapix Studios, Inc. and MSH Entertainment Corp.

Dear Mr. Walker:

This letter of intent, ("LOI") is entered into as of May 10, 2011, by Gigapix Studios, Inc. ("Gigapix"), a California corporation, with offices located at 9333 Oso Avenue, Chatsworth, California 91311 and MSH Entertainment Corp. ("MSH"), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304. This LOI sets forth the key terms and conditions which will be included in a binding merger agreement ("Merger Agreement") between Gigapix and MSH. Such acquisition shall be completed through issuance of new MSH stock to Gigapix stockholders and surrender of Gigapix stock to MSH.

## TERMS

## WARRANTIES

1. MSH represents and warrants that it currently has 145,800,150 shares of common stock issued and no shares of preferred stock. Additionally, there are no investments, convertible debts/loans, stock options, warrants or any other instruments or "poison pill" provisions that may result in dilution of MHS common stock. Other than specified herein, there will be no events that result in the issuance of additional stock, common or otherwise that could cause dilution of MSH stock. MSH agrees that from the date hereof until the earlier of the termination of this LOI or completion of the Merger that no new shares of MSH or any other convertible or any other dilutive instrument, except as provided for herein, have been or will be issued. Any shares or dilutive instruments issued after the Merger unless provided for in this LOI shall be subject to the prior written approval of the new board of MSH.

2. Gigapix represents and warrants that immediately prior to the Merger it will have issued 22,934,758 shares of common stock and 4,214,370 shares of preferred stock. Gigapix agrees that from the date hereof and except as provided for herein, no new shares of Gigapix will be issued, without the prior written approval of the board of directors of MSH.

3. MSH has notified Gigapix that additional share grants are outstanding for pre-Merger services rendered to MSH, loans to MSH, and settlements on behalf of MSH. These shares will be issued post-reverse split and post-Merger and cumulatively will not exceed 500,000 common shares in MSH. Simultaneous with the closing of the Merger, MSH shall issue 12,000,000 options to purchase post reverse split shares of MSH at the option price of $0.10 each for 9,675,525 of such shares (for management and board of MSH) and no charge for 2,324,475 of such shares (for Gigapix's founder). Those options will be granted to the new board and the management of MSH. A copy of the pre-Merger and post-Merger capital structure of each of Gigapix and MSH is attached hereto as Exhibit A. It is anticipated by the parties that at the closing of the Merger but prior to the issuance of the shares contemplated to be issued in this paragraph 3 that the current shareholders of MSH shall cumulatively have 4,860,005 shares of MSH and former Gigapix shareholders (including former preferred shareholders) shall cumulatively have 10,854, 011 shares of MSH.

Initial: _____ / _____ / _____ / _____

**Letter of Intent**

## AGREEMENT

### I. Pre Merger conditions

4. MSH acknowledges and agrees, as a condition to the Merger, and before the issuance of any new shares contemplated by this LOI, that it will reverse split its common shares at one (1) for thirty (30). It is anticipated that at the time of the Merger after the surrender of Gigapix stock and the issuance of MSH stock but before the issuance of the stock and the stock options described in paragraph 3 above that the shareholders of MSH will have 4,860,005 MSH shares in MSH and former Gigapix common (including former preferred shareholders) shall have the total of 10,869,761 shares in MSH.

5. Gigapix agrees to minimize dilution of Gigapix stock to enhance the value of MSH shares. It is planned for MSH to be listed on NASDAQ approximately 15 months from completion of the Merger. In consideration for the surrender of all outstanding shares of Gigapix to MSH, MSH will issue 10,869,761 common shares (at no cost) from treasury to Gigapix shareholders, on the basis one for one to preferred shareholders and 9 for 20 to common shareholders, and 12,000,000 options to former Gigapix management purchase shares of MSH (at the exercise prices in paragraph 3 above to former Gigapix management). Former Gigapix shareholders and management will then control approximately 82% of MSH (*i.e.* the total of 22,869,761 which shall include 10,869,761 common shares and 12,000,000 options to purchase additional shares). Former MSH shareholders will then own approximately eighteen percent (18%), (*i.e.* 4,860,005 shares), of the issued shares of MSH. The valuation of MSH will be set by the public market. Gigapix will provide the necessary capital as specified in paragraph 9 below to fund the Merger and operations of MSH.

6. Completion of the Merger shall be subject to MSH's and/or its designee's satisfactory due diligence review of the business and financial statements of Gigapix prior to closing.

7. Completion of the Merger shall be subject to Gigapix's and/or its designee's satisfactory due diligence review of the business and financial statements of MSH prior to closing.

8. MSH shall fully disclose to Gigapix all debts, judgments, settlements, and liabilities, if any, and MSH will use its "best efforts" to mitigate such potential liabilities, prior to completion of the Merger.

9. No deposit shall be required from MSH or Gigapix as a condition of entering into this LOI. Gigapix and MSH agree that the consideration for entering into this LOI and fulfilling the conditions herein, is Gigapix obligation to pay for the legal, accounting, regulatory, filing, printing, listing fees and investor relations services costs related to this Merger. These costs may exceed $300,000. Gigapix at its sole discretion shall select and pay all providers of such services. In addition, Gigapix will provide services and expertise to develop, produce, license and otherwise exploit the "Vanpires" property. In no event shall either party hereto, be obligated to the other for any fees, penalties, loss of opportunity or any other "break-up" fees if the Merger is not completed.

### II. Post Merger conditions and terms

10. Post-Merger, MSH shall issue (i) up to 4,000,000 shares (at no charge but valued at $0.50 per share) to convert Gigapix promissory notes of up to $2,000,000; (ii) up to 500,000 shares priced at $0.50 each to satisfy and retire pre-Merger obligations of Gigapix; and,(iii) up to 500,000 shares priced at $0.50 each to satisfy and retire pre-Merger obligations of MSH. The proceeds from the issuance of the notes referred to in 10 (i) above shall be applied as provided in paragraph 29.

11. It is the intention of the parties hereto that immediately after completion of the Merger but prior to issuance of shares contemplated in paragraph 10 above, the former shareholders and managers of Gigapix will hold a controlling interest in MSH representing at least 82% of the issued and outstanding shares (including options) and former MSH stockholders will control approximately 18% of the outstanding shares.

Initial: _____ / _____ / _____ / _____

# Letter of Intent

12. MSH will maintain MSH's status on the pink OTC Markets and will apply for a NASDAQ listing at the appropriate

13. MSH will prepare and file the necessary Securities and Exchange Commission filings, including Forms 8-K, and Forms 3 and 4. MSH and Gigapix will each make any appropriate notifications to their respective shareholders and regulatory agencies in connection with the Merger.

## III. Miscellaneous

14. Gigapix agrees to provide audited financial statements for its two most recent fiscal years within forty five (45) days from the date of this LOI. These will be prepared and audited at Gigapix's expense. MSH will also provide audited financial statements for its two most recent fiscal years within forty five (45) days from the date of this LOI. These will be prepared and audited at MSH's expense.

15. If either MSH or Gigapix shareholders are entitled to dissenter's rights, in connection with any action of MSH or Gigapix which are required to be resolved prior to the completion of the Merger, MSH and/or Gigapix shall resolve such obligations to the dissenting shareholders immediately prior to, completing the Merger as may be required by the laws of the State of Utah and/or the State of California.

16. The pre-Merger shareholders and directors of MSH agree to indemnify Gigapix former shareholders and management from any known or unknown liabilities of MSH, which may arise during the twelve month period following the Merger. The parties hereto agree that MSH shall use its "best efforts" to secure- "directors and officers" insurance and "errors and omissions" insurance as soon as practical after execution of this LOI.

17. After execution of this LOI, the parties hereto agree to negotiate a formal agreement to complete the Merger and to direct their respective officers to do all acts necessary to complete the Merger in a timely manner.

18. The parties hereto agree to use good faith efforts to finalize the Merger by August 1, 2011, unless this LOI is extended in writing by both parties hereto. The parties hereto estimate that it will take approximately 3 months to complete this Merger from the date that there is sufficient capital to engage appropriate legal and financial counsel to commence activities. Time is of the essence. In the event that the Merger is not completed by August 1, 2011, or by the date specified in any mutually agreed extension thereof, this LOI may be terminated by either party hereto. If this LOI is terminated the parties hereto shall have no further obligation to the other and each party shall return the confidential information to the other party. The prior sentence shall survive the termination of this LOI. Each of the parties hereto represents and warrants that it has the full right, power and authority to enter into this LOI.

19. This LOI is binding and enforceable, subject to the conditions precedent stated below in paragraph 25.

20. Prior to closing and to expedite completion of the Merger, Gigapix and its divisions shall continue operating in the ordinary course of business and provide MSH and its agents with reasonable information as needed. MSH will not dispose, mortgage, lease, or otherwise hypothecate or sell any of its assets or compromise any of its liabilities, pay dividends, or repay any capital to any shareholder and/or investor or proceed with any new business, or transactions other than those necessary for completing this Merger. Continued development and exploitation of the "Van-pires" property is a permitted activity of Gigapix and MSH.

21. The parties hereto agree that any information relating to this LOI and the Merger are confidential. Further, this LOI shall be governed under the laws of the State of Utah and may not be assigned, in whole or in part, without the consent of all parties hereto. It is agreed that this LOI may be executed in counterparts and by facsimile.

22. No press releases or other publicity will be issued by any party to this LOI without the prior written approval of both MSH and Gigapix. Such approvals will not be unreasonably withheld. The parties hereto acknowledge and agree to issue such press releases as necessary to ensure that Gigapix and MSH comply with applicable laws and regulations.

Initial: _____ / _____ / _____ / _____

## Letter of Intent

The costs of preparing necessary financial and legal documents, proxy statements, etc, if any, valuation reports and other legal requirements related to the Merger shall be borne equally by Gigapix and MSH. Gigapix and MSH shall each be responsible for its own costs of preparing and auditing financial statements, notices to shareholders and other documentation that may be reasonably required. (See paragraph 9 herein).

24. The completion of the Merger is subject to the following conditions precedent:

a) Issuance of or completion of approvals, if any, for the issuance and distribution of stock and options as described in paragraph 3 and paragraph 10 herein.

b) Completion of due diligence by Gigapix and MSH no later than sixty (60) business days following the date of this LOI and receipt of sufficient funds to pay legal and financial costs associated with the Merger (see 18 above). For the purpose of this sub-paragraph "due diligence" shall include the parties agreeing on the tax structure of the Merger and the terms and conditions of the agreements required to complete the Merger. Such agreements will be on terms and conditions typical of similar types of transactions. This condition is solely for the benefit of the shareholders of MSH and Gigapix.

c) Approval by all applicable regulatory authorities and by the directors and shareholders of both Gigapix and MSH. Such regulatory approval is to be obtained no later than August 1, 2011, and such Board approvals to proceed with the due diligence process after execution of this LOI to be obtained not later than ten (10) days following satisfaction of conditions in sub-paragraph 25(b).

25. At the time of completion of the Merger, MSH's Board of Directors will be comprised of at least five (5) nominees of former Gigapix board members and two (2) nominees of former MSH board members. All former directors of Gigapix and MSH shall resign. Future management of MSH shall be as directed by current Gigapix management.

26. Gigapix and MSH each agree to provide the other party with financial statements and any other applicable information to complete due diligence on a timely basis. All information supplied by either party shall be kept confidential.

27. MSH and Gigapix agree to provide Personal Information Forms with respect to prospective directors, officers and insiders as required by regulatory authorities.

28. The shareholders of Gigapix will surrender all of the issued and outstanding shares of Gigapix to MSH. Additionally and in keeping with the parties' intention to complete this Merger in the most tax effective manner all references herein to "the shareholders of MSH and the shareholders of Gigapix" shall be deemed to be a reference to the shareholders of any other company that may be incorporated to own the assets of MSH and Gigapix, or any corporation itself in the event of the sale of MSH and/or Gigapix assets to such corporation. To comply with the foregoing, the provisions of this LOI shall be amended accordingly.

29. As a condition to the Merger, Gigapix will offer private placement(s) in the form of convertible promissory notes of no more than $2,000,000. The proceeds from such placement will be used collectively by Gigapix and MSH for continuing operations and for administration, accounting, legal, filing fees and other costs associated with the Merger. This will provide additional cash on hand of no more than $2,000,000 (the "Gigapix Cash"). Any remaining Gigapix Cash after the completion of the Merger will form part of MHS's assets. As described in paragraph 10, the lenders of Gigapix Cash shall have the option to convert their promissory notes to MSH stock valued at $0.50 a share (see a copy of the Convertible Note Purchase Agreement attached hereto as Exhibit B). Such stock shall be issued post-Merger.

30. The terms and conditions governing the transactions described in the above paragraphs will be set forth in the Merger Agreement, which shall be subject to the approval of the parties hereto and their respective counsels. Such terms and conditions shall include (i.) warranties, representations and indemnities including those usually given in

Initial: _____ / _____ / _____ / _____

**Letter of Intent**

transactions of the nature herein contemplated, satisfactory to the majority of both parties' shareholders relating to S's structure, organization, business, operations and financial condition; (ii.) usual conditions which must be satisfied before parties to transactions of this type are obligated to close, including, but not limited to, obtaining any required consents relating to material contracts, (iii.) the absence of any litigation or other legal proceeding relating to this transaction or MSH; and (iv.) provisions relating to compliance with applicable securities laws.

31. This LOI may be signed in any number of counterparts and by facsimile, PDF, JPEG, or TIFF. Each such counterpart shall be deemed to be a duplicate original, all of which shall constitute one agreement and shall become effective when a copy signed by each party has been delivered to the other party. Such separate execution shall be of full force and effect so long as each Party has executed the same agreement. Facsimile, PDF, JPEG, or TIFF copies of this LOI and signatures thereon shall be valid and binding on the parties. All of such counterparts shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this LOI on the date first above written.

MSH Entertainment Corp. ("MSH")

_____
Chuck Walker, President

Gigapix Studios, Inc. ("GIGAPIX")

_____
David Pritchard, President

Initial: _____ / _____ / _____ / _____

EX T A

## GIGAPIX AND THE SHARE BREAKDOWN OF THE EFFECT OF MERGER

| | | | |
|---|---:|---:|---:|
| Preferred | 4,214,370 | | 15.2% |
| Common | 4,372,766 | 8,587,136 | 15.8% 31.0% |
| Employees | | 450,000 | 1.6% |
| Blauvelt | 1,832,625 | | 6.6% |
| Add: Blauvelt "Top Up" | 2,324,475 | 4,157,100 | 8.4% 15.0% |
| | | 13,194,236 | 47.6% |
| Vendor Share Issue | | – | 0.0% |
| Convertible Note | | – | 0.0% |
| Common Shareholders in Newco | | 13,194,236 | 47.6% |
| Management & Executives Options | 12,000,000 | | 43.3% |
| Less: Blauvelt "Top Up" | (2,324,475) | 9,675,525 | -8.4% 34.9% |
| | | 22,869,761 | |
| MSH Shareholders | 145,800,150 | | |
| Ratio of Reverse split to 1 to | 30 equals ---> | 4,860,005 | 17.5% |
| Final Share Capital after Merger/Options | | 27,729,766 | 100.0% |

### CURRENT MANAGEMENT OF GPX

| | | | | |
|---|---:|---:|---:|---:|
| Mgmt & Exec - Options | | 12,000,000 | | |
| Chris Blauvelt after conversion | | 1,832,625 | | |
| Total Mgmt & Exec | | 13,832,625 | | 49.9% |
| Chris Blauvelt - Founder | 1,832,625 | | | |
| Chris Blauvelt - Options "Top Up" | 2,324,475 | @ 10 cents (to be paid by Co.) | | |
| Chris Blauvelt Total Shares & Options | 4,157,100 | | 15.0% | |
| | | | No. of People | |
| David Pritchard Total Options | 4,157,100 | | 15.0% | (23) |
| Management - Options | 4,268,425 | | 15.4% | (6) |
| Board Member's Options | 1,250,000 | | 4.5% | |
| | 5,518,425 | | 19.9% | |
| | | 13,832,625 | | 49.9% |

## GIGAPIX AND THE SHARE BREAKDOWN OF THE EFFECT OF MERGER

| | | | |
|---|---:|---:|---:|
| Preferred | 4,214,370 | | 12.9% |
| Common | 4,372,766 | 8,587,136 | 13.4% 26.2% |
| Employees | | 450,000 | 1.4% |
| Blauvelt | 1,832,625 | | 5.6% |
| Add: Blauvelt "Top Up" | 2,324,475 | 4,157,100 | 7.1% 12.7% |
| | | 13,194,236 | 40.3% |
| Gigapix Obligations | | 500,000 | 1.5% |
| Convertible Note | | 4,000,000 | 12.2% |
| Common Shareholders in Newco | | 17,694,236 | 54.1% |
| Management & Executives Options | 12,000,000 | | 36.7% |
| Less: Blauvelt "Top Up" | (2,324,475) | 9,675,525 | -7.1% 29.6% |
| | | 27,369,761 | |
| MSH Shareholders | 145,800,150 | | |
| Ratio of Reverse split to 1 to | 30 equals ---> | 4,860,005 | 14.8% |
| MSHE Obligations | 5,360,005 | 500,000 | 1.5% |
| Final Share Capital after Merger/Options | | 32,729,766 | 100.0% |

### CURRENT MANAGEMENT OF GPX

| | | | | |
|---|---:|---:|---:|---:|
| Mgmt & Exec - Options | | 12,000,000 | | |
| Chris Blauvelt after conversion | | 1,832,625 | | |
| Total Mgmt & Exec | | 13,832,625 | | 42.3% |
| Chris Blauvelt - Founder | 1,832,625 | | | |
| Chris Blauvelt - Options "Top Up" | 2,324,475 | @ 10 cents (to be paid by Co.) | | |
| Chris Blauvelt Total Shares & Options | 4,157,100 | | 12.7% | |
| | | | No. of People | |
| David Pritchard Total Options | 4,157,100 | | 12.7% | (23) |
| Management - Options | 4,268,425 | | 13.0% | (6) |
| Board Member's Options | 1,250,000 | | 3.8% | |
| | 5,518,425 | | 16.9% | |
| | | 13,832,625 | | 42.3% |

6 q/7

## EXHIBIT B

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT ("Agreement"), is made as of the ___ day of May, 2011, by and between Gigapix Studios, Inc., 9333 Oso Avenue, Chatsworth, California, 91311 a California corporation (the "Company") and Make Something Happen Entertainment, Inc. ("MSH"), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304, on the one hand, and _____ (the "Note Holder"), on the other.

Subject to the terms and conditions set forth herein, the Company desires to sell and the Note Holder desires to purchase from the Company, pursuant to and in accordance with the terms of this Agreement, and the convertible note set forth as Exhibit A attached hereto (the "Convertible Note") and by reference made part of this Agreement. The Convertible Note shall be freely assignable, negotiable and marketable with no restrictions on such transferability other than applicable state and federal securities laws, if any, and subject to the execution and/or delivery by transferee of such documents that the Company may require.

1. **Convertible Note.**

    1.1 Sale and Purchase. Subject to the terms and conditions of this Agreement and the subscription agreement ("Subscription Agreement") dated as of May __, 2011, between Company and MSH, on the one hand, and the Note Holder (in the Subscription Agreement referred to as the Subscriber), on the other, at the Admission Date (defined below), the Company will execute, deliver and issue the Convertible Note to the Note Holder in the principal amount of _____ (the "Principal Amount").

    1.2 Purchase Price. As consideration for the sale of the Convertible Note, the Note Holder will advance and deliver to the Company the Principal Amount. The Principal Amount shall be paid in such form as the Company may require.

    1.3 Admission Date. The closing of the purchase and sale of the Convertible Note (the "Admission Date") will take place at such time and place as the Company and the Note Holder agree in writing as described in the Subscription Agreement.

2. **Representations and Warranties of the Company.**

The Company and MSH hereby represent and warrant to the Note Holder that:

    2.1 Organization, Good Standing and Qualification. Each of Company and MSH are a corporation duly organized, validly existing and in good standing under the laws of the States of California and Utah respectively, and each has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

    2.2 Authorization. All corporate action on the part of each of the Company and MSH, each of its respective officers, directors and shareholders, necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of the Company hereunder has been taken. MSH or its successors or assignees in interest has reserved a sufficient number



7 of 17

1

of shares of its capital stock to fulfill its obligations upon conversion of the Convertible Note. This Agreement and the transactions contemplated hereunder constitute valid and legally binding obligations of the Company and MSH, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' and lenders' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief and/or other equitable remedies.

3. **Representations and Warranties of the Note Holder.** The Note Holder hereby represents and warrants to each of Company and MSH that:

    3.1 <u>Authorization</u>. The Note Holder has full power and authority to enter into this Agreement, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' and lenders' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief and/or other equitable remedies.

    3.2 <u>Disclosure of Information</u>. The Note Holder believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Convertible Note. The Note Holder has a preexisting personal or business relationship with the Company. The Note Holder further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the business, assets, prospects, financial condition, results of operations and properties of Company and MSH. The foregoing, however, does not limit or modify the representations and warranties of the Company and/or MSH contained herein or the right of the Note Holder to rely thereon.

    3.3 <u>Investment Experience</u>. The Note Holder is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the purchase of the Convertible Note and any consideration issuable upon conversion of the Convertible Note (collectively, the **"Securities"**).

    3.4 <u>Accredited Investor</u>. The Note Holder is an "accredited investor" within the meaning of Securities and Exchange Commission (**"SEC"**) Rule 501 of Regulation D, as presently in effect. The Note Holder is acquiring the Convertible Note for investment for its own account only, not as nominee or agent, and not for resale.

4. **Covenants.**

    4.1 <u>Conversion to Common Stock</u>. If the Convertible Note is converted into Common Stock of MSH, the Note Holder covenants and agrees to execute and deliver such documents as reasonably requested by the Company containing the representations and warranties required to comply with applicable federal and state securities laws.

    4.2 <u>Information Rights</u>. For so long as any obligations remain outstanding under the Convertible Note, the Company shall provide the following:

        4.2.1 <u>Annual Reports</u>. Furnish to the Note Holder, as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Company, unaudited consolidated financial statements.



8 of 17

    4.2.2  <u>Quarterly Updates/Reports</u>. Furnish to the Note Holder, as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of the Company (except the last quarter of the Company's fiscal year), unaudited consolidated financial statements, if available, and any Company "updates", press releases and or any material information about the Company that has transpired in the previous quarter.

    4.2.3  <u>Business Plan and Operating Budget</u>. Furnish to the Note Holder, as soon as practicable, but in any event within a reasonable time after approval by the board of directors of the Company, an annual business plan, any amendments thereto, operating budget and any amendments thereto.

  5.  **Miscellaneous**.

    5.1  <u>Survival of Warranties</u>. The representations, warranties and covenants of Company, MSH and of the Note Holder contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Note Holder or Company or MSH.

    5.2  <u>Successors and Assigns</u>. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of each of the parties hereto (including transferees of any Securities). Nothing in this Agreement, express or implied, is intended to confer upon any person or entity other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

    5.3  <u>Finder's Fee</u>. Each party represents that the other parties will not be obligated for any finders' fee or commission in connection with the transactions contemplated by this Agreement.

    5.4  <u>Amendments and Waivers</u>. This Note is being issued in connection with the issuance of a series of notes by the Company on or about the date hereof. Any term of this Agreement may be amended, waived or modified (a) in writing, signed by the Company and the Note Holder if and to the extent such amendment, waiver or modification does not have an adverse effect on any other holder of notes issued by the Company on or about the date hereof; or (b) to the extent that such amendment, modification or waiver would have such an adverse effect, then any of the terms of this Agreement may be waived or modified only in writing, signed by the Company and holders of a majority in principal amount of all notes issued by the Company in such series. Any amendment or waiver effected in accordance with this <u>Section 5.6</u> shall be binding upon Note Holder, and each holder of Common Stock of MSH and the Company, and their respective successors and assigns.

    5.5  <u>Severability</u>. If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

    5.6  <u>Governing Law</u>. This Convertible Note, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of California, without regard to the conflicts of law principles. In any dispute, action or proceeding arising out of, related to, or in connection with this Agreement, the parties hereto consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the parties hereto consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. In the event of a



dispute under this Agreement, the parties hereto agree to binding arbitration pursuant to the rules and regulations of the American Arbitration Association in the State of California. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Company or MSH breach this Agreement, Note Holder shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Company, MSH or their affiliates. It is the intention of the parties that the laws of the State of California relating to contracts made in, and to be performed wholly within, such State, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

5.9   Waiver of Jury Trial/Submit to Arbitration. THE PARTIES HERETO HEREBY AGREE TO WAIVE EACH OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY PERMITTED CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT, ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY DEALINGS BETWEEN ANY OF THE SIGNATORIES HERETO RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. The scope of this waiver is intended to encompass any and all disputes that relate to the subject mater of this Agreement or any of the transactions contemplated hereby, including, without limitation, contract claims, tort claims, and all other common law and statutory claims. This waiver is irrevocable, meaning that it may not be modified either orally or in writing, and this waiver shall apply to any subsequent amendments, supplements or other modifications to this Agreement, any of the transactions contemplated hereby or to any other document or agreement relating to the transactions contemplated hereby.

5.10   Representation by Counsel. Each party hereto represents and agrees with the other that it has been represented by, or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired. It availed itself of this right and opportunity, and it, or its authorized officer (as the case may be) have carefully read and fully understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence. The parties to this Agreement participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof will arise favoring or disfavoring either party to this Agreement by virtue of the authorship of any of the provisions of this Agreement.

5.11   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.12   Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement among the parties with respect to the subject matter and no party shall be liable or bound to any other party in any manner by any representations, warranties or covenants except as specifically set forth herein or therein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.



4

10 f 17

**GIGAPIX STUDIOS, INC. ("COMPANY")**

Dated: _____   By: _____

Its: _____

Address:    9333 Oso Avenue,
            Chatsworth, California 91311

**MAKE SOMETHING HAPPEN, INC. ("MSH")**

Dated: _____   By: _____

Its: _____

Address:
_____
_____

_____ "NOTE HOLDER"

Dated: _____   By: _____

Its: _____

Address:



5

"EXHIBIT A"

CONVERTIBLE NOTE

THIS CONVERTIBLE NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS CONVERTIBLE NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES. THESE SECURITIES MAY BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

**CONVERTIBLE NOTE**
**OF**
**GIGAPIX STUDIOS, INC.**

$_____                                                                                       May \_\_\_\_, 2011

This convertible promissory note ("**Convertible Note**") is entered into as of May \_\_\_, 2011 (the "**Admission Date**"). For value received, Gigapix Studios, Inc., a California Corporation (the "**Company**"), with principal offices at 9333 Oso Avenue, Chatsworth, California 91311 and Make Something Happen Entertainment, Inc. ("**MSH or Public Company**"), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304, hereby promise to pay to _____ (the "**Note Holder**") the sum of _____Thousand Dollars ($_____) (the "**Principal Amount**"), plus interest, (**see below**) accrued on the unpaid Principal Amount (the "**Accrued Interest**") at a rate equal to fifteen percent (15%) per annum, accrued annually based on a 365-day year, and compounded quarterly from the Admission Date until the Principal Amount and all Accrued Interest are paid (or converted, as provided in Section 3 hereof) by wire transfer or by mail to the address of the registered holder of this Convertible Note in lawful money of the United States, unless this Convertible Note shall have been converted pursuant to Section 3. Company shall accept minimum investment increments of $50,000 (Lesser amounts may be accepted with written approval of Company.) Maturity Date shall be as described in paragraph 1 below. This Convertible Note shall be freely assignable, negotiable and marketable with no restrictions on such transferability other than applicable state and federal securities laws, if any. The valuation of the Company prior to the issuance of the Convertible Notes and prior to receipt of the Principal Amount is estimated to be $20,000,000.

1. Maturity Date: No earlier than four (4) months and no later than twelve (12) month after Admission Date at Company's sole discretion. Subject to the written approval of the Note Holder and the Company, the Maturity Date may be extended.

2. Preemptive Rights: In the event of a post-Merger public offering, each Note Holder will have pre-emptive rights to purchase such Note Holder's pro rata share of the publicly offered shares issued by the post-Merger Public Company, based on the ratio of the each Note Holder's aggregate post-Merger shares to the total post-Merger shares of the Public Company.



6

12/8/17

3. <u>Redemption/Conversion:</u> Convertible Note and Accrued Interest thereon are redeemable, at Company's sole option, in cash or shares at the earlier of Maturity Date or completion of the Merger. If Company converts the Convertible Note to shares in the Public Company, such shares shall be valued at $0.50 each. Note Holders shall be entitled to receive shares with a value equal to the um of the Principal Amount and Accrued unpaid Interest.

Additionally, a portion of the Principal Amount and Accrued unpaid Interest are convertible at the option of each Note Holder at maturity or when Merger is complete into investments in the following off-balance sheet projects:

(i) Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's CGI animated feature film entitled "OZ3D".

(ii) Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's slate of five (5) kids' comedy live action feature films known as Recess Films.

(iii) Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's interest in Gigapix Releasing, LLC.

The balance of such Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon will be converted into shares of the Public Company or redeemed in cash at Company's option.

4. <u>Loan/Use of Loan</u>: $1,000,000 loan secured by Convertible Notes with a provision allowing Company to accept an additional $1,000,000. Company is entering the final stages of its plan to become a publicly traded, fully integrated state of the art film and television production/distribution company. Company is offering Convertible Notes to expedite its final stage of financing which includes among other things: (i) financing the cost of the Merger (as such term is defined below), (ii) funding the operating costs of Company, (iii) providing funds for development, production and distribution of a slate of kids' live action comedy feature films, and (iv) providing development, production and distribution funding for 3D animated films for which some funding is committed (see attached "Schedule A" and "Schedule B"). Company plans to raise up to $8,000,000 in additional funds through a public offering, facilitated by acquiring and merging (the "Merger") with a publicly traded company (the "Public Company") with a history in the media industry. A letter of intent to merge with the Public Company has been executed by Company and the Public Company. Company may raise additional funds through sponsorships, advertising revenues, licensing fees, monetization of tax credits and other sources.

5. <u>No Rights or Liabilities as Stockholder.</u> This Convertible Note does not in itself entitle the Note Holder to any voting rights or other rights as a stockholder of the Company or the Public Company. In the absence of conversion of this Convertible Note into common stock of MSH, no provisions of this Convertible Note, and no enumeration herein of the rights or privileges of the Note Holder, shall cause the Note Holder to be a stockholder of the Company or the Public Company for any purpose.

6. <u>No Impairment.</u> The Company and the Public Company will not, by amendment of its certificate of incorporation or bylaws, or through reorganization, consolidation, merger, dissolution, issue or sale of securities, sale of assets or any other voluntary action, willfully avoid or seek to avoid the observance or performance of any of the terms of this Convertible Note, but will at all times in good faith assist in the



13 of 17

carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of the Note Holder under this Convertible Note against wrongful impairment. Without limiting the generality of the foregoing, the Company and the Public Company will take all such actions as may be necessary or appropriate in order that the MSH may duly and validly issue fully paid and non-assessable shares of common stock upon the conversion of this Convertible Note into MSH common stock.

9.  Prepayment. Notwithstanding anything to the contrary in this Agreement, Company may "call" and prepay any Convertible Note in whole or in part at any time upon thirty (30) days prior written notice to the Note Holder; provided that such Note Holder will have the right within such notice period to exercise such Note Holder's conversion options as described above. However, if the Merger, is not complete, Company may, in its sole discretion, elect to redeem the Convertible Note plus Accrued Interest thereon in cash (or Note Holder may elect to convert its Principal Amount and unpaid Accrued Interest into Company's off-balance sheet projects as described above in Paragraph 3. i- iii). Company may redeem the Convertible Notes in whole or in part from the proceeds of a public offering and/or revenues generated by Company from broadcasting fees/revenues, feature film sales, P&A Fund fees, the sale of sponsorships, advertising, licensing revenues, consulting services, operating income or other sources.

10. Expenses: Company will draft documents. Each party hereto shall pay its own fees and expenses of in connection with the Convertible Note.

11. Waivers. The Company and all endorsers of this Convertible Note hereby waive further demand, presentment, dishonor, notice of dishonor, protest, notice of protest and any other notice or formality, to the fullest extent permitted by applicable laws.

12. Governing Law. This Convertible Note, and all matters arising out of or relating to this Convertible Note, shall be governed by the laws of the State of California, without regard to the conflicts of law principles. In any dispute, action or proceeding arising out of, related to, or in connection with this Convertible Note, the parties hereto consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the parties hereto consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. AS TO ANY ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE PARTIES HERETO HEREBY AGREE TO WAIVE THEIR RIGHTS TO A TRIAL BY JURY. In the event of a dispute under this Agreement, the parties hereto agree to binding arbitration pursuant to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Company or MSH breach this Convertible Note, Note Holder shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Company, MSH or their affiliates. It is the intention of the parties that the laws of the State of California relating to contracts made in, and to be performed within, such State, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

13. Headings. The headings and captions used in this Convertible Note are used for convenience only and are not to be considered in construing or interpreting this Convertible Note. All references in this Convertible Note to sections and exhibits shall, unless otherwise provided, refer to sections hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.



14 of 17

14. <u>Notices</u>. Unless otherwise provided, any notice required or permitted under this Convertible Note shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified or upon deposit with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the Note Holder at the last address furnished to the Company by the Note Holder in writing in the Exhibit A to the Subscription Agreement or, in the case of the Company or the Public Company, at the principal offices of the Company, or at such other address as the Note Holder or the Company or the Public Company may designate by giving written notice to any other party.

15. <u>Severability</u>. If one or more provisions of this Convertible Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Convertible Note, and the balance of this Convertible Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with it terms

    **IN WITNESS WHEREOF**, the undersigned, who is duly authorized to execute and deliver this Convertible Note on behalf of the Company, has duly executed and delivered this Note this __day of _____, 2011.

**GIGAPIX STUDIOS INC:**

By: _____

Name: _____

Title: _____

Address:    9333 Oso Avenue
              Chatsworth, California 91311

**MAKE SOMETHING HAPPEN, INC.:**

By: _____

Name:_____

Title:_____

Address:_____

:

AGREED AND ACKNOWLEDGED:

**THE NOTE HOLDER:**

By: _____

Name: _____

Title: _____

Address: _____



9

15 of 17