STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ELLYN MARCUS LINDSAY (Cal. Bar No. 116847)
BYRON J. MCLAIN (Cal. Bar No. 257191)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2041/0637
     Facsimile: (213) 894-6269
     E-mail:    Ellyn.lindsay@usdoj.gov
                Byron.mclain@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-282-R |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT PRITCHARD'S POSITION RE: SENTENCING |
| v. | |
| DAVID PRITCHARD, | Date: February 9, 2015 |
| Defendant. | Time: 10:00 a.m. |
| | Place: Courtroom of the Honorable Manuel Real |

   Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California, hereby submits its Response to defendant David Pritchard's Position Re: Sentencing.  This Response is based on the attached Memorandum of Points and Authorities, the files and records in this case, and any further evidence and argument as may

//

be presented at the sentencing hearing.

Dated: February 5, 2015   Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


       /s/
ELLYN MARCUS LINDSAY
BYRON J. MCLAIN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.     INTRODUCTION**

The government filed its sentencing position concurring with the findings of the probation officer set forth in the pre-sentence report, but recommending a below-guidelines sentence of 240 months.

Defendant has now filed his sentencing position. In it, he argues the following: 1) Because Gigapix was a legitimate company, the entire amount invested by victims should not count towards loss; 2) For the reasons set forth in the loss argument, not all victims should count for the purpose of determining the number of victims; 3) the vulnerable victim enhancement should not apply; 4) defendant should not receive an upward adjustment for his role in the offense; and 5) the factors set forth in 18 U.S.C. § 3553(a) indicate that a sentence below the guidelines is warranted.

The government believes it has already addressed the § 3553(a) analysis. Thus, the government below addresses only arguments 1-4.

**II.     ARGUMENT**

**A.     LOSS**

Loss in a fraud case is determined pursuant to Sentencing Guidelines Section 2B1.1. The loss figure that is to be used is the greater of actual or intended loss. App. Note 3(A). "The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." App. Note 3(C).

In this case, the probation officer used the actual loss figure of $20,882,654.65, which includes a reduction for any money returned to victims. (PSR ¶ 58.)

Defendant's first argument is that the government has not

1  sufficiently substantiated the loss figure provided to the probation
2  officer.
3      The probation officer's numbers come from Tonya Pinkerton, the
4  FBI financial analyst who testified at trail regarding her evaluation
5  of the bank accounts from July 31, 2006, through December 31, 2012.
6  (Exhibit A, transcript of testimony of Tonya Pinkerton, October 16,
7  2014, pp. 8-9.)  In order to evaluate these accounts, she "took every
8  transaction from the bank statements, put it into a Microsoft Excel
9  file, and . . . categorized every transaction and . . . used
10 Microsolft Excel to summarize the categories . . . ." (Exhibit A, p.
11 9.)  Ms. Pinkerton identified five categories of deposits into the
12 Gigapix and OZ3D bank accounts.  (Exhibit A, p. 10.) One category was
13 investors.  (Exhibit A, p. 10.)  In order to determine who the
14 investors were, Ms. Pinkerton determined investor deposits by
15 consistency -- that they were always a lump sum.  Often they had a
16 comment in the memo line of the checks that indicated how many shares
17 they were purchasing.  Ms. Pinkerton took this list and compared it
18 to a list of investors that she obtained from Shawn Walker, and
19 researched any differences.  (Exhibit A, p. 11.)  She also used
20 documents she received from IRA Resources and Sterling Trust to
21 determine the specific investors that went through those trust
22 companies.  (Declaration of Tonya Pinkerton, ¶ 2.)
23     Defendant challenges certain entries on the victim list.
24 Regarding "victim" number 76, the law firm Buchanan, Ingersoll &
25 Rooney, this firm acted as an escrow for a number of investor
26 deposits.  One investor provided documents evidencing this, and Colin
27 Mutton confirmed that some investor deposits went through this firm.
28 The amount listed for "victim No. 76" actually represents 16

1  different deposits from September 2009 through March of 2010 -- thus,
2  possibly 16 separate victims.  (Declaration of Tonya Pinkerton, ¶ 3.)
3  Entry numbers 574 and 596 are for trust companies investors used to
4  transfer retirement funds to Gigapix and OZ3D, but in the instances
5  mentioned by defendant, the government was unable to tell exactly who
6  the investor was.  (Declaration of Tonya Pinkerton, ¶ 4.)  Moreover,
7  "The court need only make a reasonable estimate of the loss."  USSG
8  2B1.1, app. Note 3(C).

9  　　Defendant asserts that the government has not proved that all
10 investors were induced to invest based on misrepresentations.
11 Defendant claims that Gigapix was not a "sham company" because
12 defendant tried to produce movies while he was at Gigapix.
13 (Defendant's Position, p. 13.)  The government disagrees that Gigapix
14 was legitimate.  The government will not repeat the facts set forth
15 in its original sentencing position, but in short, investors were
16 promised a safe investment into Gigapix, which was supposedly a
17 company that made animated programming, and OZ3D, an animated version
18 of the Wizard of Oz.  Defendant, Blauvelt, and their telemarketers
19 made numerous misrepresentations to investors, and omitted to tell
20 investors material facts in order to get their money.  Examples of
21 the misrepresentations were: that Gigapix was a financially
22 successful company; that investors in Gigapix and OZ3D would receive
23 high returns on their investments; that the investments in Gigapix
24 and OZ3D carried little or no risk; that the majority of investor
25 money would be spent on the making of the movies; that Gigapix would
26 go public within a short time after an investor invested; that OZ3D
27 was in production or would be released soon; and that investors would
28 see returns within a year or 18 months of investing.  Many of the

3

victims who testified at trial heard the misrepresentations directly from defendant. As this Court knows, after Gigapix encountered great difficulty with its movie "Blackbeard," all the money that came in went simply to keeping the company afloat and paying off its old debts, and was not spent on anything that could make any money for any investors. The evidence demonstrated that only about 23% of the money coming into Gigapix was actually spent on movie-related expenses, and less than 5% of the money coming into OZ3D was so spent. Meanwhile defendant received $1,011,723 in salary and spent $359,373.95 from the company bank accounts on personal expenses, for a total financial benefit of $1,371,097.53. In addition, there were personal expenditures from company accounts to which both defendant and Blauvelt had access of $622,573.37. Moreover, as set forth in detail in the government's initial sentencing memorandum, defendant and Blauvelt sent out numerous "update" letters to all investors which contained lies and omitted material facts.

Defendant claims he was not really involved in the telemarketing aspect of the fraud. In so arguing, defendant fails to acknowledge that the fraud in this case was two-tiered. On the one hand were the lies and misrepresentations used to get the victims to invest. On the other hand was the complete and utter misuse of investor money, driven by defendant himself, in such a way that no investor could possibly have made money. From June 2006, the defendants and their colleagues raised approximately $22 million for Gigapix and OZ3D from approximately 731 victim investors. Specifically, Gigapix received around $14 million, and OZ3D received approximately $8 million directly from investors. The defendants represented to the victim investors that the majority of the money raised for Gigapix would be

4

used by the Company to produce and distribute films.  Defendant was in charge of how the money was spent, and the evidence at trial demonstrated that he misused the money sent in by investors.  He spent only about 20 percent of the $14 million raised for Gigapix on production and distribution costs for the Company.  He allotted even less to the production of OZ3D, as only 5 percent of the $8 million raised for the movie from victim investors was allotted to OZ3D.  As a result, the OZ3D movie was never produced, and the victims lost all their invested money.

Defendant himself perpetrated the most significant part of the fraud.  That is, after the state of Iowa took back its tax credit on the film "Blackbeard" around the middle of 2009, Gigapix fell apart financially.  Rather than disclose this, defendant and Blauvelt instead began raising money for the movie OZ3D, and using all the money to pay off the debts and expenses of Gigapix.  Since the investors' money was being thrown away on past debt and not put into a project that had any chance of making money, there was no way that the investors could do anything but lose their entire investments.  Defendant, as the person who controlled the bank accounts, was primarily responsible for using investor funds in a way that was not only completely different from how the investors were told their money would be spent, but would result in nothing but the loss of all that money to the investors.

Thus, Gigapix and OZ3D were in fact sham companies, and defendant was squarely in the center of making them shams.  The loss was not only foreseeable to him (how could investors in OZ3D make any money if all the investment was thrown away on Gigapix's debts?), but all relevant conduct was criminal, as the way defendant spent

investor money made a lie out of everything the investors were told.

Defendant himself admitted that he participated in the fraud. FBI Special Agent Eric Potecek interviewed defendant on June 5, 2014. During this interview, defendant admitted that Gigapix was not financially sound from around 2010 to 2012. Defendant admitted that during this time period, employees were laid off as Gigapix could not afford to pay employee salaries. Defendant also acknowledged that he provided significant direction on how investor funds should be spent. He also admitted that the salespeople received their information about OZ3D from him. Defendant acknowledged that Gigapix investors received update letters that he and others wrote and mailed, which described what was supposedly occurring at Gigapix. He acknowledged that in 2010 and 2011, he probably did not provide full and complete information to the investors. In particular, he acknowledged that OZ3D was never in production and that by 2011, he had serious doubts about OZ3D ever getting made. Defendant advised that if an investor letter said "in production" it would be "obviously misleading." He later acknowledged that he spoke to approximately twelve to fifteen investors, and he agreed that he said things which were misleading and omitted information about the true state of Gigapix when he spoke to investors. Specifically, he admitted that he never told investors the "bleak, blunt truth" about how badly Gigapix was doing financially after the end of 2009.

For the foregoing reasons, the loss figure in the presentence report is correct.

**B.   NUMBER OF VICTIMS**

Defendant makes the same argument regarding number of victims that he did regarding loss: namely, that it cannot be said that

everyone who lost money from his or her investment into Gigapix was a victim. Defendant claims that a "victim" cannot be counted unless his or her loss was part of the total loss calculation. As argued above, because Gigapix was permeated by fraud, and because the defendants failed to spend the victims' money on anything that could ever earn them a return, everyone who invested and lost their money is a victim. The probation officer's calculation is correct.

### C. VULNERABLE VICTIM ENHANCEMENT

Defendant argues that the enhancement for vulnerable victims, pursuant to USSG § 3A1.1(b)(1), should not apply, as the government has not proven that defendant knew or should have known that any victims were reloaded. (Defendant's Position, pp. 17-18).

Defendant concedes that he was on telephone calls soliciting money from investors who had invested previously. He maintains, however, that he had no way of knowing that those investors had been lied to previously. However, as discussed above, since defendant misspent the investors' money, all investors were defrauded as defendant well knew.

Moreover, defendant forgets the testimony of his own witness, Bill Uchimoto. Mr. Uchimoto, a securities attorney, testified that he advised the defendants that they should only solicit repeat investors, and the defendants testified that this is exactly what they did. Thus, there was a policy of directed reloading at Gigapix.

The enhancement was properly applied.

### D. ROLE ENHANCEMENT

The presentence report applies a four-level upward enhancement in defendant's offense level because he was the organizer and leader

7

of a criminal activity that involved five or more participants and was otherwise extensive, pursuant to USSG § 3B1.1(a).

The probation officer reasoned that defendant was the President of Gigapix and a managing member of OZ3D. Defendant and Blauvelt received the greatest share of the profits and decided how the money would be spent. "Pritchard appears to have directed Mutton and Walker and regularly held meetings with the sales staff to brief them on Gigapix's developments. Both Pritchard and Blauvelt shared information with the closers that was not to be passed on to investors, such as timelines for projects. When necessary, Blauvelt and Pritchard also spoke to and met with investors." (PSR ¶ 66.) The probation officer concluded:

> Based on the foregoing, Blauvelt and Pritchard are consider[ed] leaders in the fraudulent scheme because they held positions of authority and supervised the conduct of more than five criminally culpable participants. Neither party supervised the conduct of the other and they both worked jointly in running the fraudulent scheme. Accordingly, [the] four-level increase for role is applied.

(PSR ¶67.)

Defendant asserts that the government has not established that the scheme involved five or more participants. There is no dispute but that the scheme involved at least four participants: Defendant, Pritchard, Brown, and Pusateri. The government would argue that all of the salespeople were also culpable. For example, during the testimony of Tiffany Ryan, she described how sales manager Ken Gross wanted the salespeople in the open so that he could make sure they were not making misrepresentations to investors. (Exhibit A to the government's response to defendant Blauvelt's sentencing position -- the transcript of Ryan's testimony, p. 16-17.) A closer with the last name of Hines was suspected of misrepresenting to investors.

8

(Exhibit A, p. 18.)  Gross got him out in the open, and Hines refused to work.  Instead, he took his client list to Cherie Brown, and Ms. Ryan assumes they then had a deal that he would get a cut of her commissions.  (Exhibit A, pp. 18-19.)[1]

But even if there were only four participants, this scam was "otherwise extensive."  Application Note 3 to section 3B1.1 states:

> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

In this case, the fraud lasted over at least six years.  There were over 550 victims, and a loss exceeding $21 million.  The telephone room employed openers and closers other than Brown, Pusateri, and Hines.  Thus, it is appropriate to apply the enhancement.  See United States v. Farris, 585 Fed.Appx. 934 (9th Cir. 2014), an unpublished decision in which the Ninth Circuit held that the enhancement was proper where "Evidence at trial showed that Farris perpetrated an elaborate fraud involving millions of dollars, many employees, and victims across several states." Farris cites United States v. Booth, 309 F.3d 566, 577 (9th Cir. 2002), in which the Ninth Circuit held that the enhancement was proper even though there were not five participants "because of the involvement, albeit unknowing, of more than ten employees and the geographical reach of the scheme." Booth in turn cites United States v. Govan, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a

---

[1] Defendant is correct that the government does not believe that Shawn Walker was a participant.  The government does believe that Colin Mutton was a participant, however.

9

large number of victims ... as well as nearly $100,000 in robbery proceeds").

Thus, the enhancement was properly applied.

### III. CONCLUSION

For the foregoing reasons, the government asks this court to sentence defendant to a term of incarceration of 240 months, based on an offense level of 41, a criminal history score of I, and a guidelines range of 324-405 months.