# EXHIBIT A

 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,          )
                                        )
 6                      Plaintiff,      )
                                        )
 7        vs.                           )   Case No. CR 14-282 R
                                        )
 8   DAVID PRITCHARD and                )
     CHRISTOPHER JAMES BLAUVELT,        )
 9                                      )
                        Defendants.     )
10   _____)

11

12                REPORTER'S PARTIAL TRANSCRIPT OF
                        TRIAL PROCEEDINGS
13                 TESTIMONY OF TONYA PINKERTON
                    THURSDAY, OCTOBER 16, 2014
14                          1:14 P.M.
                    LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 430
             LOS ANGELES, CALIFORNIA 90012
25                   (213) 894-2305

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        STEPHANIE YONEKURA
         Acting United States Attorney
5        BY:  ELLYN M. LINDSAY
         BY:  BYRON J. MCLAIN
6            Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012

8

9    **FOR THE DEFENDANT DAVID PRITCHARD:**

10       LAW OFFICES OF MICHAEL W. EMMICK
         BY:  MICHAEL W. EMMICK
11           Attorney at Law
         3701 Highland Avenue, Suite 305
12       Manhattan Beach, California  90266

13

     **FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:**
14

         LAW OFFICES OF STEPHANIE AMES
15       BY:  STEPHANIE AMES
             Attorney at Law
16       12100 Wilshire Boulevard, Suite 800
         Los Angeles, California  90025

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                           **INDEX OF WITNESSES**

2

3      PLAINTIFF'S WITNESSES                                        PAGE

4      PINKERTON, Tonya

5          Direct Examination by Ms. Lindsay                          5
           Cross-Examination by Mr. Emmick                           30
6          Cross-Examination by Ms. Ames                             31
           Redirect Examination by Ms. Lindsay                       44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS

 2                                        FOR          FOR
                                    IDENTIFICATION  EVIDENCE
 3    NUMBER   DESCRIPTION                PG.          PG.

 4    150  -  List of bank accounts        7            8
      151  -  Source of Funds Table -     10           10
 5            GigaPix and OZ3D combined
      152  -  Source of Funds Pie Chart - 12           12
 6            GigaPix and OZ3D combined
      153  -  Source of Funds Table -     13           13
 7            GigaPix and OZ3D separated
      154  -  Source of Funds Pie Charts -16           17
 8            GigaPix and OZ3D separated
      155  -  Number of investors         18           19
 9    156  -  Use of Funds Table -        20           20
              GigaPix and OZ3D separated
10    157  -  Use of Funds Table -        22           23
              GigaPix and OZ3D combined
11    158  -  Use of Funds Pie Charts -   24           24
              GigaPix and OZ3D separated
12    159  -  Use of Funds Pie Charts -   25           26
              GigaPix and OZ3D combined
13    160  -  Payments to defendants      27           27

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 16, 2014

 2                              1:14 P.M.

 3                               -oOo-

 4              (The following is a partial transcript

 5               of the day's proceedings.)

 6              (In the presence of the jury.)

 7              THE COURT:  Call your next witness.

 8              MS. LINDSAY:  Tonya Pinkerton.

 9              THE COURTROOM DEPUTY:  Please raise your right hand.

10         Do you solemnly swear that the testimony you shall give in

11     the cause now pending before this Court shall be the truth, the

12     whole truth, and nothing but the truth, so help you God?

13              THE WITNESS:  Yes, I do.

14         TONYA PINKERTON, PLAINTIFF'S WITNESS, WAS SWORN

15              THE COURTROOM DEPUTY:  Okay.  Thank you.  Please

16     take a seat.

17         And state your full and true name for the record and spell

18     your last name.

19              THE WITNESS:  Tonya Pinkerton, T- -- my name is

20     spelled T-o-n-y-a.  Pinkerton is P-i-n-k-e-r-t-o-n.

21              MS. LINDSAY:  May I proceed, Your Honor?

22              THE COURT:  Yes.

23                        DIRECT EXAMINATION

24     BY MS. LINDSAY:

25     Q    And, Ms. Pinkerton, you may want to pull the mike close
```

1   because you have a --

2   A     Okay.

3   Q     -- quiet voice.

4         How are you currently employed?

5   A     I'm a forensic accountant with the Federal Bureau of

6   Investigation.

7   Q     How long have you been so employed?

8   A     About four and a half years.

9   Q     How were you employed prior to that?

10  A     Prior to that, I was an auditor at a public accounting

11  firm.

12  Q     For how long did you do that?

13  A     About two and a half years.

14  Q     What did you do prior to that?

15  A     Prior to that, I worked in a small company doing general

16  accounting and bookkeeping work.

17  Q     And prior to that?

18  A     Prior to that, I was in the United States Air Force.

19  Q     What training did you receive prior to your employment

20  with the FBI in the area of accounting?

21  A     I obtained my bachelor's degree in business administration

22  with emphasis in accounting.  And I worked at the CPA firm

23  under an accountant in order to obtain my CPA license.

24  Q     Did you obtain your CPA?

25  A     Yes.

1    Q      What does that stand for?

2    A      Certified public accountant.

3    Q      Now, when you went to the FBI, did you receive specialized

4    training there?

5    A      I did.  I attended a six-week training course for forensic

6    accounting at Quantico, Virginia.

7    Q      And can you tell us what forensic accounting is?

8    A      Yes.  In forensic accounting, we use accounting skills and

9    investigative skills to review financial information and

10   prepare an analysis that's suitable for court.

11   Q      In the course of your employment, did you perform a

12   forensic accounting for GigaPix, *OZ3D*, and related entities?

13   A      Yes.

14   Q      In connection with your investigation, did you obtain bank

15   records for GigaPix, *OZ3D*, and related companies?

16   A      Yes.

17   Q      And how many bank accounts did you analyze?

18   A      We received approximately 42 bank accounts and I used 24

19   of those in my analysis.

20           MS. LINDSAY:  And, Ms. Clerk, I would ask that

21   Exhibit 150 for identification be placed before the witness.

22           THE COURTROOM DEPUTY:  Exhibit 150 is identified and

23   placed before the witness.

24           (Exhibit 150 for identification.)

25   *///*

```
 1  BY MS. LINDSAY:

 2  Q     Ms. Pinkerton, do you recognize this?

 3  A     Yes.

 4  Q     What is that?

 5  A     That's a listing of the bank accounts that were received.

 6              MS. LINDSAY:  Your Honor, I move in 150.

 7              MS. AMES:  No objection.

 8              MR. EMMICK:  No objection.

 9              THE COURT:  In evidence.

10              (Exhibit 150 received into evidence.)

11              MS. LINDSAY:  And if we could display that.

12  BY MS. LINDSAY:

13  Q     So what are the shaded accounts there?

14  A     The shaded accounts represent the accounts that were used

15  in my financial analysis.  You'll see that there are some

16  accounts for GigaPix and Oz that are not shaded, and I didn't

17  use them because there were minimal or insignificant amount of

18  transactions.

19  Q     What is Principle Media Group?

20  A     Principle Media Group, according to the bank records, was

21  a company belonging to Colin Mutton.

22  Q     And how about Survey Says?

23  A     Survey Says, according to the bank records, was a company

24  belonging to Christopher Blauvelt.

25  Q     And what is Taylor & Ross?
```

```
 1   A     Taylor & Ross was a company for Eugene Taylor.

 2   Q     Over what time period did you evaluate these records?

 3   A     For analysis purposes, I evaluated from July 31st, 2006,

 4   through December 31st, 2012.

 5   Q     Were the records you evaluated voluminous?

 6   A     Yes.

 7   Q     Did you summarize the records?

 8   A     Yes.

 9   Q     What did you do to summarize the records?

10   A     I took every transaction from the bank statements, put it

11   into a Microsoft Excel file, and I -- I categorized every

12   transaction and I used Microsoft Excel to summarize the

13   categories and -- and the charts into charts.

14   Q     So transactions meaning deposits and withdrawals?

15   A     Yes.

16   Q     And would you look at, in particular, like, checks that

17   were coming in and checks that were going out, et cetera?

18   A     Yes.  The bank statement has -- when you use your debit

19   card, you'll see the debit card transaction or you can write a

20   check or deposit check or wires, all of that, every transaction

21   on the bank statement.

22   Q     Did you do a summary of the deposits into the bank

23   accounts that you evaluated?

24   A     Yes.

25             MS. LINDSAY:  And I would ask that this witness be
```

1   shown what's been marked for identification as Government's

2   Exhibit 151.

3       And if you want, I think we're done with that binder,

4   so --

5           THE COURTROOM DEPUTY:  Exhibit 151 is identified and

6   placed before the witness.

7           (Exhibit 151 for identification.)

8   BY MS. LINDSAY:

9   Q    Do you recognize that?

10  A    Yes.

11  Q    What is that?

12  A    That's a table showing a summary of my categories of money

13  that was deposited into the bank accounts.

14          MS. LINDSAY:  I move in 151.

15          MR. EMMICK:  No objection.

16          MS. AMES:  No objection.

17          MS. LINDSAY:  May we display, Your Honor?

18          THE COURT:  Yes.

19          (Exhibit 151 received into evidence.)

20          MS. LINDSAY:  Okay.

21  BY MS. LINDSAY:

22  Q    Now, it looks like you have five categories of deposits.

23  Can you explain that?

24  A    Yes.  The investor category is money from *Oz* and GigaPix

25  investors.  Movie income is income from movies.  I did see memo

1  references to *Workaholics* and *Battlefield America*, some of the

2  examples.  Financing is a category that I separated it.  It's

3  more loans from individuals and companies.  They're not

4  investors.  They're not identified as investors.

5      So Taylor & Ross is the Eugene Taylor company.  I

6  identified that separately.  And the Unknown category is -- but

7  1.6 of that.  The majority of that amount consists of the

8  account balance.  So the rest of it are items that the bank was

9  unable to provide.

10 Q    And the unknown with $1.6 million in it, is that -- you

11 call it "Unknown."  Is that because your analysis started in

12 2006 and this was the money that had come in prior to that?

13 A    Yes.

14 Q    Okay.  How did you know that the investor money was from

15 investors?  What did you do to track that?

16 A    A couple of things.  At one time eventually I did receive

17 an investor list from an employee Walker, Shawn Walker I

18 believe his name was.  He provided us with an investor list.

19 But before that, I determined it based on consistency.

20 Investor deposits were always a lump sum.  Oftentimes they had

21 a comment in the memo line that indicated how many shares of

22 GigaPix or *Oz* they were purchasing.  And then afterwards, I did

23 compare my list to Shawn Walker's list and then researched any

24 differences.

25 Q    Now, I'd ask you to take a look at what's been marked for

```
 1   identification as Government's Exhibit 152 and ask if you
 2   recognize that.
 3            THE COURTROOM DEPUTY:  Exhibit 152 is identified and
 4   placed before the witness.
 5            (Exhibit 152 for identification.)
 6            THE WITNESS:  Yes.
 7   BY MS. LINDSAY:
 8   Q    What is that?
 9   A    This is a graphic depiction of the table of money
10   deposited into the bank accounts, pie chart.
11            MS. LINDSAY:  Your Honor, I would move in 152.
12            MR. EMMICK:  No objection.
13            MS. AMES:  Your Honor, I have no objection to this
14   as a demonstrative.  But given that it is a chart, I would
15   object to it being submitted to the jury as an exhibit.
16            THE COURT:  152 in evidence.
17            (Exhibit 152 received into evidence.)
18            MS. LINDSAY:  And let's display that.
19   BY MS. LINDSAY:
20   Q    So can you explain this graphic chart of the money coming
21   into GigaPix and OZ3D accounts?
22   A    Yes.  This is a pie chart that shows the majority of the
23   pie consists of investor deposits, 83 percent or 21 million.
24   Movie income was about 9 percent, 2.4 million.  Unknown
25   category, about 7 percent, 1.8 million.  And the Taylor & Ross
```

```
 1   and Financing are small slivers, less than 1 percent.

 2   Q     And did you summarize the amounts of money coming into

 3   GigaPix and OZ3D separately?

 4   A     Yes.

 5   Q     And then I'd ask you to take a look at what's been marked

 6   for identification as Government's Exhibit 153 and ask if you

 7   recognize that.

 8               (Exhibit 153 for identification.)

 9               THE WITNESS:  Yes.

10   BY MS. LINDSAY:

11   Q     What is that?

12   A     This is a table that separates OZ3D income from GigaPix

13   income.

14               MS. LINDSAY:  I move 153 into evidence.

15               THE COURT:  Any objection?

16               MS. AMES:  Same objection.

17               THE COURT:  153 in evidence.

18               (Exhibit 153 received into evidence.)

19               MR. EMMICK:  No objection.

20               MS. LINDSAY:  And if we could display that and make

21   it bigger.

22   BY MS. LINDSAY:

23   Q     Now, across the top, you have three categories there, and

24   the first one is OZ3D and Survey Says.  Why did you include

25   Survey Says with OZ3D?
```

A    Looking at the bank accounts, Survey Says is a Blauvelt account.  And in the bank account, there's no source of income other than money that came from *Oz* and GigaPix.  The amount of money that was deposited in Survey Says was approximately 500,000.  And of that, 400,000 came from *Oz*.  And the transactions are similar to the transactions going out from the *Oz* account, so I lumped it together with *Oz*.

Q    And so let's look at *OZ3D* and Survey Says.  It looks like almost -- almost 100 percent of the money into *OZ3D* and Survey Says was investor money; is that correct?

A    Yes.  That's correct.

Q    And what is the -- when you put numbers in parentheses as you have for Financing, what does that mean?

A    Yes.  The Financing figure is a net figure.  So it's loans.  So think of loans as money that they received in and loan payments that they made out.  I just netted the two, so it's one -- it ends up being a positive figure.

For *OZ3D* in particular, it looks like they made a payment or two -- I'm not sure how many payments that they made out of the *Oz* account, but it's more than likely a GigaPix loan that they paid out of the *Oz* account.

Q    And so when you put it in parentheses, that means it's a negative number?

A    Yes.

Q    So rather than a minus sign, you put it in parentheses?

1    A    Yes.

2    Q    Okay.  And what about the Unknown category there?

3    A    For *OZ3D* and Survey Says, the Unknown consists of items

4    the bank was unable to provide.

5    Q    So you didn't have a specific check or whatever?

6    A    Exactly.

7    Q    And in your experience as a forensic accountant with the

8    FBI, is it typical that the bank will misplace or not have full

9    and complete records and there will be some of these unknown

10   items?

11   A    Yes.  It's typical.

12   Q    And now, let's look at the GigaPix category.  And the --

13   let's highlight the top number there for the GigaPix category.

14   So of incoming money to GigaPix, what is that top category

15   there?

16   A    The top category consists of transfers from the *OZ3D*

17   account.  So of the 8.2 million of investor money that was

18   deposited into *OZ3D*, 4 million was transferred to GigaPix.

19   Q    So that was -- because *OZ3D* is almost 100 percent investor

20   funds, that would be *OZ3D* investment funds transferred to

21   GigaPix?

22   A    Yes.

23   Q    And how much from investors do you have there?

24   A    4 million.

25   Q    I'm sorry.  How much from investors into GigaPix?

1    A    Oh, I'm sorry.  13 million.

2    Q    And the -- the next category is that movie income.

3    A    Yes.

4    Q    Is that the same the combined figure that we talked about

5    before?

6    A    Yes, it is.

7    Q    And the next figures, can you explain?

8    A    The next figure is the financing, which is the loans that

9    were determined not to be investor money.  The Taylor & Ross

10   money, which is also a net figure, I took the money that came

11   in from Taylor & Ross and went back to Taylor & Ross.  And it's

12   netted to 20,000.  And the Unknown, which is the majority,

13   beginning account balance.

14   Q    So that was what you didn't know because you started your

15   analysis after that?

16   A    Yes.

17   Q    And then -- sorry.  And then the combined column there, is

18   that what we discussed previously when we talked about all the

19   money coming in?

20   A    Yes.

21   Q    And now I'd like you to take a look at what's been marked

22   for identification as Government's Exhibit 154 and ask if you

23   recognize that.

24            (Exhibit 154 for identification.)

25            THE WITNESS:  Yes.

BY MS. LINDSAY:

Q    And what is that?

A    This is a graphic depiction of the *OZ3D* and GigaPix money that was deposited into those accounts separated.

MS. LINDSAY:  I move in 154.

MS. AMES:  Same objection.

MR. EMMICK:  No objection.

THE COURT:  154 in evidence.

(Exhibit 154 received into evidence.)

BY MS. LINDSAY:

Q    And now if we could display that and let's focus on the -- the *OZ3D* and Survey Says pie.

So is this basically showing that almost all the money into *OZ3D* and Survey Says was investor funds?

A    Yes.  98.5 percent.

Q    And there was no movie or TV income coming into that account?

A    No.

Q    And now let's look at the GigaPix pie.

Now, transfers from *OZ3D*, we have transfers from *OZ3D* -- we have -- let me start over.

The biggest category there is the investor money; correct?

A    Yes.

Q    And, um, if we combine the transfers from *OZ3D*, which we established was investor money into *OZ3D*, and then also --

```
 1   well, if you combine those two, can you tell us how much you
 2   have?
 3   A    It's about 17 million.
 4   Q    And then if you take the -- as a given testimony we've
 5   previously heard that the money that was already in the bank
 6   account that you didn't evaluate was investor funds, how much
 7   would the total into GigaPix be from investors?
 8   A    About 18 and a half, a little over 18 and a half million.
 9   Q    And what percentage about would that be?
10   A    Putting my math skills on the spot.
11   Q    I got 88 percent.
12   A    About 88 percent, yeah.
13   Q    Let's just say.
14        And how much -- so how much of the source of funds -- what
15   percentage of the source of funds coming into GigaPix was from
16   any kind of movie or TV profit?
17   A    About 11 percent.
18   Q    Now, from bank and other records, were you able to
19   identify the number of investors into GigaPix and related
20   companies?
21   A    Yes.
22   Q    And I'd ask you to take a look at what's been marked for
23   identification as Government's Exhibit 155 and ask if you
24   recognize that.
25             (Exhibit 155 for identification.)
```

1          THE WITNESS:  Yes.

2    BY MS. LINDSAY:

3    Q    And what is that?

4    A    That's a listing showing the number of GigaPix investors,

5    the number of *OZ3D* investors, and reducing out both -- some

6    investors invested in both GigaPix and *Oz*.

7          MS. LINDSAY:  Let me stop you and ask if I can admit

8    the exhibit.

9          MS. AMES:  No objection.

10          MR. EMMICK:  No objection.

11          THE COURT:  155 in evidence.

12          (Exhibit 155 received into evidence.)

13          MS. LINDSAY:  And if we could just display it.

14    BY MS. LINDSAY:

15    Q    So you were saying this shows the number of GigaPix

16    investors?

17    A    The number of GigaPix investors, the number of *OZ3D*

18    investors, and some investors invested in both GigaPix and *Oz*.

19    And I reduced them out to avoid double counting.  So the true

20    number of investors is 731.

21    Q    Okay.  Did you summarize the expenditures from the

22    accounts that you evaluated?

23    A    Yes.

24    Q    And looking at what's been marked for identification as

25    Government's Exhibit 156, can you tell us what that is?

```
 1                    (Exhibit 156 for identification.)
 2                    THE WITNESS:  Yes.  This is a table that shows the
 3       expense categories split between the Oz account and the GigaPix
 4       separated.
 5                    MS. LINDSAY:  And I would move 156 into evidence.
 6                    MS. AMES:  I'll note my prior objection, Your Honor.
 7                    MR. EMMICK:  No objection.
 8                    THE COURT:  156 in evidence.
 9                    (Exhibit 156 received into evidence.)
10                    MS. LINDSAY:  And if we could display it.  Um, let's
11       see how we can -- maybe we can for the moment just make the
12       whole thing bigger.
13            Well, I'll tell you what.  Let's -- let's cut out the
14       combined column just so that it's a little easier, if we can
15       see a little better what's on there.  That helps a little bit.
16       BY MR. LINDSAY:
17       Q    Anyway, so can you tell us what the -- the majority
18       percentage is of money in -- money out?  Sorry.
19       A    From OZ3D and Survey Says account, the majority was
20       transferred to GigaPix.
21       Q    And what is the next expense that you have?
22       A    The next expense is the sales expenses, the 31 percent.
23       Q    How about administrative?
24       A    Administrative is 12 percent.
25       Q    And can you explain to us what you put into the
```

1   administrative category?

2   A     Sure.  Administration category consists of expenses that

3   are normal -- normally considered business expenses and the --

4   and the normal course of running a business.

5   Q     Such as what?

6   A     Such as utilities, rent for your office space, employee

7   salaries, insurance, that type of thing.

8   Q     And now, can you tell us about the sales category?  What

9   did you put into the sales category?

10  A     The sales category consists of expenses consistent with

11  raising money for movies, which is the commissions and payroll

12  for salespeople who are selling the movie, filings, state

13  filings, mailings, because I believe they mailed brochures to

14  investors, telephone expense, and Internet, rent for the sales

15  office, and leads.

16  Q     You have a category there called "Production."  And how

17  much was spent -- what percentage was spent on production from

18  *OZ3D* and Survey Says?

19  A     4.8 percent.

20  Q     And how about for GigaPix?

21  A     23.3 percent.

22  Q     And what was in your Production category?

23  A     The Production category consists of things that are used

24  for the direct production of the movie, like the scripts, the

25  production studios, the writers, the actors, the music, that

1    type of thing.

2    Q    And your next category is Personal.  Can you explain that?

3    A    Personal expenses are expenses that are not generally

4    considered business administration expenses, like mortgage,

5    cars, entertainment.

6    Q    Well, we'll get into that in a minute.

7         And why do you have travel as a separate category?

8    A    I separated travel because often travel could either be a

9    business or a personal expense and I had no way of identifying

10   which travel was business or personal.

11   Q    And then you have an Unknown category.  Is that also where

12   the bank was unable to provide the item?

13   A    Yes.

14   Q    And finally, you have Investors and it looks like some

15   investors received some money.

16   A    Yes.  Not all investors received money back.  Some

17   investors received what appeared to be a refund or small

18   interest payments.

19   Q    Do you have a separate chart for the total combined of

20   GigaPix and *OZ3D* expenditures?

21   A    Yes.

22   Q    And now I'd like you to take a look at what's been marked

23   for identification as Government's Exhibit 157 and ask if you

24   recognize that.

25            (Exhibit 157 for identification.)

1          THE WITNESS:  Yes.

2  BY MS. LINDSAY:

3  Q    And is that the total chart?

4  A    Yes.

5          MS. LINDSAY:  I move that in, Your Honor.

6          MS. AMES:  Same objection, Your Honor.

7          THE COURT:  157 in evidence.

8          (Exhibit 157 received into evidence.)

9          MS. LINDSAY:  If we can display that, and this one

10  might be a little easier to read.

11  BY MS. LINDSAY:

12  Q    And so for the money coming into GigaPix and *OZ3D*, can you

13  just tell us for each of your categories what percentage of the

14  money was spent on what?

15  A    Sure.  40 and a half percent was spent on general

16  administrative expenses; 23 percent on sales expenses;

17  21 percent on production; 7.6 percent on personal; 4 percent

18  unknown; travel, 1.9 percent; and money back to investors,

19  1.6 percent.

20  Q    So is it your conclusion that approximately 77 percent of

21  the money coming into the bank accounts was eaten up by the

22  companies themselves and the people working there?

23  A    Yes.

24  Q    Now, let's look at the Production category.  And for this,

25  if you could focus on the bottom part of the page -- actually,

```
 1   if you could -- here, I'll show you.
 2        Did -- um, in your analysis, did you -- in the Production
 3   category, did you allow some of the expense -- for the office
 4   at the Oso Avenue address, did you allow that to -- or did you
 5   consider some of the expenditures on the rent for that space in
 6   the Production category?
 7   A     Yes.  That facility included a studio.  So based on an
 8   interview with an employee, they helped us determine what
 9   percentage of the facility was used for production and what was
10   used for administrative.  So part of my expense is in the
11   Administrative category and part in the Production category.
12   Q     And, um, now I'd like you to take a look at what's been
13   marked for identification as Government's Exhibit 158 and ask
14   if you recognize that.
15             (Exhibit 158 for identification.)
16             THE WITNESS:  Yes.
17   BY MS. LINDSAY:
18   Q     And what is that?
19   A     That's a graphic depiction of the previous table that had
20   the GigaPix and the *OZ3D* use of funds separated.
21             MS. LINDSAY:  I would move in 158.
22             MS. AMES:  Same objection.
23             MR. EMMICK:  No objection.
24             THE COURT:  158 in evidence.
25             (Exhibit 158 received into evidence.)
```

1    MS. LINDSAY:  And if we could focus on the -- the

2   *OZ3D* and Survey Says pie.

3   BY MS. LINDSAY:

4   Q    Now, this demonstrates graphically that almost half of all

5   the money in *OZ3D* was sent to GigaPix; is that correct?

6   A    Yes.

7   Q    Does this also show that over 95 percent of the money into

8   *OZ3D* was spent on expenses having nothing to do with

9   production?

10   A    Yes.

11   Q    How much was actually spent on the making of the movie

12   *OZ3D*?

13   A    According to the bank records, 391,000 or 4.8 percent was

14   spent on production expense.

15   Q    And now if we could look at the GigaPix expenditures.

16        Does this graphically demonstrate that for GigaPix, over

17   three-fourths of the money going into GigaPix was spent on

18   expenses having nothing to do with production?

19   A    Yes.

20   Q    And now I'd like you to take a look at what's been marked

21   for identification as Government's Exhibit 159 and ask if you

22   recognize that.

23        (Exhibit 159 for identification.)

24        THE WITNESS:  Yes.

25   ///

```
 1   BY MS. LINDSAY:

 2   Q     And what is that?

 3   A     That's the graphic depiction of the combined money out of

 4   the accounts for both GigaPix and Oz.

 5              MS. LINDSAY:  I move in 159.

 6              MS. AMES:  Same objection.

 7              THE COURT:  159 in evidence.

 8              (Exhibit 159 received into evidence.)

 9              MS. LINDSAY:  And maybe we can just make that even

10   bigger if we can.

11   BY MS. LINDSAY:

12   Q     So what was the majority of the money spent on?

13   A     The majority of the money was spent on administrative

14   expenses.

15   Q     And second to that?

16   A     Sales expenses.

17   Q     How about personal expenses?

18   A     Personal expenses, 1.9 million or 7.6 percent.

19   Q     And for the 25 million invested into both companies, only

20   how much was spent on production?

21   A     5.3 million.

22   Q     Or about 21 percent?

23   A     Yes.

24   Q     Now, did you attempt to determine how much money each

25   defendant now in court received from GigaPix and OZ3D?
```

```
 1   A     Yes.
 2   Q     And I'd like you to take a look at what's been marked for
 3   identification as Government's Exhibit 160.
 4              (Exhibit 160 for identification.)
 5   BY MS. LINDSAY:
 6   Q     Do you recognize that?
 7   A     Yes.
 8   Q     And what's that?
 9   A     That shows the amount of money that the defendants made,
10   both their payroll commissions and their personal expenses.
11              MS. LINDSAY:  I move in 160.
12              MS. AMES:  Same objection.
13              MR. EMMICK:  No objection.
14              THE COURT:  Objection is overruled.  160 in
15   evidence.
16              (Exhibit 160 received into evidence.)
17              MS. LINDSAY:  Okay.  If we could focus on the top
18   part.
19   BY MR. LINDSAY:
20   Q     And for David Pritchard, can you explain the difference
21   between payroll and/or commissions and personal charges?
22   A     Yes.  The payroll and/or commissions is money that was
23   paid to them.  It was believed for administrative payroll or
24   commissions on sales and the personal charges are the personal
25   expenses split into the ones that were attributable to
```

1    Pritchard.

2    Q     How were you able to attribute those to Mr. Pritchard?

3    A     In some cases, it was evident on the memo line of the

4    check or the wire.  And in other cases, we based it on the

5    signatory on the bank accounts, if Pritchard was the only

6    signatory on a particular bank account and he had control of

7    that.  We also based it on interviews of employees.  Colin

8    Mutton was helpful in identifying -- helping us to identify

9    personal charges for the defendants.

10   Q     So Mr. Pritchard received a total of 1.37 million?

11   A     Yes.

12   Q     And then for Mr. Blauvelt, would it be the same analysis?

13   A     Yes.

14   Q     So that he received over $1 million?

15   A     Yes.

16   Q     Now, you have a category for Pritchard and Blauvelt

17   together.  What is that category?

18   A     Those are personal charges from bank accounts where they

19   were both signatories on the account, and I could not identify

20   who in particular those charges belonged to.

21   Q     Okay.  Now, if we could focus on the -- the second part of

22   the chart.  And if you could explain that.

23   A     Yes.  This is the -- this breaks down the 1.9 million

24   total that was spent on personal expenses into the different

25   categories.

1           MS. LINDSAY:  You know, I apologize, Your Honor.  I

2    think we might have the wrong version in the computer.  So I

3    would ask if we could just --

4           (Pause in the proceedings.)

5    BY MS. LINDSAY:

6    Q    And if you could explain some of these categories, please.

7    A    Sure.  The Shopping category is general shopping.  It can

8    be department stores, online shopping, health and beauty,

9    doctor's offices, dental offices, the gym memberships, hair and

10   nail type places.

11          Mortgage is money to -- in some cases, there's monthly

12   payment with, in particular, Blauvelt's name and account

13   number.  And some of it is, like, to an escrow company or other

14   companies that were determined to be potentially mortgage

15   payment.

16          Family and friends, self-explanatory.  Miscellaneous, most

17   of that consists of a loan transaction that appeared to be

18   personal in nature.  Cash withdrawals, restaurant charges,

19   automobile, car payments.  Utilities, home utilities, home

20   maintenance, dry-cleaning services, grocery, entertainment.

21   Some of those were Mammoth Mountain or casino bill.  Gas and

22   convenient store, self-explanatory.  And boat expenses, most of

23   that was for a boat slip.

24          And property taxes, the memo line they included a parcel

25   number on the property.  I looked it up online, and it was

1    Blauvelt's property and personal rent.

2    Q    What made you put the boat slip into Mr. Blauvelt's

3    category?

4    A    I believe it either came out of the account that he was --

5    that he controlled or it had his name on the -- in the memo

6    line.  There was something that was attributable to him.

7              MS. LINDSAY:  Thank you very much.  I have nothing

8    further.

9              THE COURT:  Cross-examination on Pritchard.

10                        **CROSS-EXAMINATION**

11   BY MR. EMMICK:

12   Q    Hi.

13   A    Hi.

14   Q    I just wanted to ask you some questions about

15   Mr. Pritchard who's my client and payments to him.  So that's

16   the context.

17        Were you aware that he was being paid a salary?

18   A    I looked at payments to him.  They appeared to be salary

19   payments.  I can't recall the amount.

20   Q    But he was being paid a salary.

21   A    Okay.

22   Q    And he had been promised a salary on an annual basis?

23              MS. LINDSAY:  Objection.

24              THE COURT:  The objection is sustained.

25   ///

1    BY MR. EMMICK:

2    Q      And are these the only payments that were salary-type

3    payments that you were keeping track of?

4    A      Any payments that were payable to Pritchard I attributed

5    for salary or payroll commission.

6    Q      And is it broken down at all by year, for example?

7    A      Not in these exhibits, no.

8    Q      But perhaps by you?

9    A      Yes.

10   Q      And so then you would know that during 2010, 2011, 2012,

11   he was not paid the salary that he was promised at all; right?

12   A      I did see payments going to Pritchard up through October

13   2011 -- or 2010.

14   Q      But there was a long stretch of time when he was not

15   getting paid a salary at all?

16   A      Correct.

17              MR. EMMICK:  Nothing further.

18                          **CROSS-EXAMINATION**

19   BY MS. AMES:

20   Q      Good afternoon.

21   A      Good afternoon.

22   Q      It's Ms. Pinkerton; correct?

23   A      Yes.

24   Q      Sorry.  I blanked out for a moment on your last name.

25          You mentioned on direct examination on one of the charts

```
1    that we looked at that you separated travel as a category in

2    and of itself; correct?

3    A    Yes.

4    Q    And you said that you did that because you had no way of

5    knowing whether it was personal or business?

6    A    Yes.

7    Q    And why is it that you had no way of knowing?

8    A    Because the memo line of the check or wire transaction did

9    not indicate which individual it was for or the purpose wasn't

10   clear.

11   Q    And that's also because you only inspected the bank

12   documents; is that correct?

13   A    Yes.

14   Q    You did not look at any sorts of source documents?

15   A    Correct.

16   Q    So you didn't look at invoices?

17   A    Correct.

18   Q    Receipts?

19   A    Correct.

20   Q    Bills, any actual document that supports what the bill or

21   the expense is for?

22   A    That's correct.

23   Q    So on occasions, you were making a bit of an educated

24   guess; is that correct?

25   A    Yes.  Based on knowledge, experience, interviews, and memo
```

1    lines.

2    Q    Okay.  And you talked about interviews.  The primary

3    person that you interviewed to provide you this information was

4    Mr. Mutton?

5    A    Mutton helped with the personal expenses.  I did review

6    all of the interviews that were conducted during the

7    investigation.  Other employees helped with the category of

8    employees who were fronters, who were salespeople, who were

9    administrative employees.  So I obtained a lot of my analysis

10   from any of the interviews.  But Mutton helped with most of the

11   personal expenses, yes.

12   Q    Okay.  But those employees that you're talking about who

13   provided you information would only know about employees;

14   correct?

15   A    Correct.

16   Q    They weren't in a position to know about other business

17   expenses beyond being employees?

18   A    I wouldn't know that.  No.

19   Q    To your knowledge, Mr. Mutton, though, was the one who was

20   the accountant for the company?

21   A    Correct.  You believe he's the CFO.

22   Q    And so in the information -- I'm sorry.  What information

23   did he provide you again?

24   A    He provided information on an AMEX card.  He had an AMEX

25   card in his name that Pritchard was using for his own expenses.

1    And he provided those AMEX records to us, so I identified those

2    charges.

3         In addition, he had the QuickBooks files for the company

4    and he had separated charges that were made by Pritchard and

5    Blauvelt that were -- they needed to be categorized by Mutton

6    for business purposes, and he had asked them to give him

7    details on what those expenses were for and they never did.

8         And he also said that they often used the cards for every

9    meal.  Every meal that they ate, they charged on the card,

10   every personal expenses they charged.  They lived off the

11   business cards.

12   Q    And that was according to Mr. Mutton?

13   A    Yes.

14   Q    And, in fact, part of your analysis, you appeared to find

15   that Mr. Mutton received a tremendous amount of money from this

16   business; is that correct?

17   A    Um, I don't recall how much he received.  Um --

18   Q    But in your discussions --

19   A    I don't think it was tremendous.

20   Q    In your analysis, there was a disparity between what he

21   had represented as to what he had received from the company and

22   what your independent analysis shows; is that correct?

23   A    Initially he told us he received a certain amount.  And in

24   my analysis, I found that he received more.

25        So we met with him a couple of times.  We had an interview

1   with him, and he explained why and that he was using his own

2   personal accounts or using his business accounts.  Some of them

3   were on the list earlier.  He was using those accounts to kind

4   of hide money and pay business expenses with his accounts.

5        So they transferred money to him, which initially appeared

6   to me to be payments to Mutton and salaries.  And he cleared

7   that up and provided the evidence to support it.  And what I

8   was able to verify, I re-categorized as the appropriate

9   expense.

10  Q    And what evidence did he provide to support that?

11  A    The AMEX cards.  A lot of the money that was transferred

12  to him was used to pay the AMEX cards.  A lot of it was also

13  transferred back into GigaPix.

14  Q    And he was also the one to provide you the information as

15  to what those AMEX cards were used for; correct?

16  A    Yes.

17  Q    He told you what they were used for?

18  A    Yes.

19  Q    You didn't have any independent information?

20  A    Right.  Other than the -- the statements themselves.

21  Q    Now, I would -- I would presume that being an accountant,

22  you work under the generally accepted accounting principles;

23  correct?

24  A    Yes.  Well, yes.

25  Q    And I -- I would presume that the -- the preferred method

1    of making any sort of accounting analysis is to have the actual

2    supporting documents in addition to any bank accounts; correct?

3    A    Certainly.  That's all preferred.

4    Q    And that's because you're not having to make kind of

5    guesstimates?

6    A    Yes.

7    Q    And oftentimes you don't have any sort of indication on

8    those memo lines of the checks?

9    A    Yes.

10   Q    And so -- and that was the situation with this case;

11   correct?

12   A    Yes.  There were not always memo lines.

13   Q    Did you attempt to obtain those supporting documents?

14   A    No.

15   Q    And why is that?

16   A    I just -- I worked with the case agent and, you know,

17   mainly do the bank accounts.  If they conduct a search on the

18   company and obtain the company records, then I would review

19   those as well.  But we had not conducted a search of the

20   company records.

21   Q    So the agents just didn't provide you any of those

22   documents?

23   A    Correct.

24   Q    But it would be your preferred analysis, you would feel

25   more confident in your analysis if you were able to have those

1    documents, wouldn't it?

2    A    Sure.

3    Q    Thank you.

4         Um, in -- in your breakdown as to -- so let me go back to

5    travel for a moment, then.  I would presume that in

6    movie-making, travel is required and would be part of business

7    expenses; isn't that correct?

8    A    Sure.  That's reasonable.

9    Q    But in this case, you weren't able to decide for -- if any

10   of the travel that you noted was for business?

11   A    Correct.  I did not interview further to identify which --

12   which trips were travel -- for business and which were

13   personal.

14   Q    And you also noted cash withdrawals.  I would presume

15   oftentimes a business has to pay cash maybe for small expenses

16   along the way; is that correct?

17   A    Yes.

18   Q    And in this case, you would not be able to identify what

19   cash withdrawals could have been business related?

20   A    Correct.  The reason I put that in the personal expense is

21   based on an interview with Colin Mutton.

22   Q    Okay.  And so again on that, your information would be

23   only as good as the information that Mr. Mutton gave you?

24   A    Yes.

25   Q    And any problems in his memory as to certain things would

1    also affect your analysis here?

2    A    Yes.

3    Q    You have as a separate note Telephone.  And you've put

4    that under "Sales."  And I'm looking -- maybe I can help here.

5    This is Government's Exhibit 156.  Yes.

6         Is that large enough that you can see that, ma'am?

7    A    Yes.

8    Q    Now, I would presume that a production company in

9    production would require the use of telephones, would it not?

10   A    Yes.  These charges were significantly higher than average

11   in business because they did a lot of cold calling and they had

12   sales offices to call investors.

13   Q    But I see that you didn't include any telephone under

14   Production; is that correct?

15   A    Correct.

16   Q    So you put all of it under Sales?

17   A    Yes.

18   Q    And mailings, I would presume that production business

19   requires mailings out to maybe contracts, to artists,

20   et cetera; correct?

21   A    Yes.

22              MS. LINDSAY:  Objection.  Argumentative.

23              THE COURT:  The objection is sustained.

24   BY MS. AMES:

25   Q    Ms. Pinkerton, would mailing be a legitimate production

1  expense?

2              MS. LINDSAY:  Objection.

3              THE COURT:  The objection is sustained.

4  BY MS. AMES:

5  Q    Ms. Pinkerton, under the -- why don't you explain to us

6  what the generally accepted accounting principles are about?

7  A    The generally accepted accounting principles more come

8  into effect whenever you're preparing financial statements.

9  There are certain rules that you follow when you categorize

10 certain expenses for your financial statements.

11 Q    But under those accepted accounting principles, isn't --

12 isn't a film production company considered a manufacturing --

13 as equal to a manufacturing company?

14 A    I don't know that for sure.  I'd have to look it up.

15 Q    Um, are you familiar with how business assignments are

16 made from manufacturing companies?

17 A    Can you say that again?

18 Q    And I admit it was a poorly worded question.

19      Um, are you familiar under GAAP what costs for a company

20 can be attributed to that business versus not attributed to the

21 business?

22 A    I'm somewhat familiar.  I do know that there are

23 manufacturing expenses, direct manufacturing expenses and they

24 can allocate a certain number of administrative overhead to the

25 manufacturing expense as well.

```
 1   Q    And so if a film company were treated the same as a
 2   manufacturing company, some of its overhead expenses would be
 3   able -- would be appropriately attributed as part of that;
 4   correct?
 5   A    Yes.
 6   Q    And that would include things such as rent?
 7   A    Yes.
 8   Q    For the office space?
 9   A    Yes.
10   Q    That would include payroll?
11   A    Yes.
12   Q    Employee benefits?
13   A    Yep.
14   Q    Legal?
15   A    Yes.
16   Q    Taxes?
17   A    Yes.
18   Q    Now, I want to ask you as well, when we look back at use
19   of funds, you put Legal under Administrative.
20   A    Yes.
21   Q    Wouldn't a production company need to have the assistance
22   of legal experts for contracts with artists, for obtaining
23   space to do filming, et cetera?
24        THE COURT:  That appears to be administration,
25   Counsel, also.
```

```
 1   BY MS. AMES:
 2   Q    Ma'am, would it be considered as well as a production
 3   cost?
 4   A    I think that legal expenses are general administrative
 5   expenses that every company incurs.
 6   Q    So you would not categorize them under Production?
 7   A    No.
 8   Q    Even if they are directly related to the production of a
 9   film?
10   A    There were either some legal fees that I attributed to the
11   sales expense in filings because one of the legal firms was to
12   help bring them public.  So I included that in the sales
13   filings.  But every other legal fee is under the Administrative
14   category.
15              MS. AMES:  Just one moment, Your Honor.
16              (Pause in the proceedings.)
17   BY MS. AMES:
18   Q    Ms. Pinkerton, I'd like to direct your attention to what's
19   previously been marked as Exhibit No. 150.  And you don't seem
20   to be able to get the whole thing, but this, in essence, is
21   the -- the list of all the bank accounts that you looked at in
22   your analysis; is that correct?
23   A    This is a listing of all the bank accounts that we
24   received.  And the highlighted accounts were used in the
25   analysis figures and all the other exhibits.
```

**UNITED STATES DISTRICT COURT**

1    Q    Thank you for that correction.

2         And in looking at that, the highlighted portions, you

3    noted who was an authorized signator on each of those accounts;

4    correct?

5    A    It's not noted on this exhibit but I did note it, yes.

6    Q    Right.  Okay.

7         And there were different people who were authorized

8    signators on varying of these accounts that are listed here in

9    the highlight; correct?

10   A    Yes.

11   Q    And all of the -- excuse me.

12        There were nine accounts total that you looked at for

13   GigaPix Releasing, LLC; correct?

14   A    Yes.

15   Q    And three of those were with Citibank?

16   A    Yes.

17   Q    And six of those were with Wells Fargo?

18   A    Yes.

19   Q    And Mr. Blauvelt was not a signator on any of those nine

20   accounts; is that correct?

21   A    I don't recall -- I don't believe he was on the Releasing

22   accounts.

23   Q    And then you looked at ten accounts for GigaPix Studios?

24   A    Yes.

25   Q    And five of those accounts were with Wells Fargo Bank?

```
 1   A     Yes.

 2   Q     And five of those were with Citibank?

 3   A     Yes.

 4   Q     And Mr. Blauvelt was also not a signator on any of the

 5   five accounts with Wells Fargo; correct?

 6   A     I can't say that for sure.  I'd have to see the signature

 7   cards.

 8   Q     Do you have any recollection?

 9   A     I recall that he was on some accounts.  I don't remember

10   if they were Wells Fargo or Citibank.

11   Q     But of the GigaPix accounts, he was on all of -- one of

12   those accounts and then not on any of the others; is that your

13   recollection?  If it isn't, that's fine, but just what your

14   recollection is.

15   A     Can you say that again?  It was on one --

16   Q     Well, we've got five and five.

17   A     Okay.  No, I don't recall that.

18              MS. AMES:  Okay.  Just one moment, Your Honor.

19              (Pause in the proceedings.)

20   BY MS. AMES:

21   Q     I have a few more questions regarding payroll and personal

22   expenses that you note.  Um, in -- in your accounting work,

23   isn't it correct that oftentimes a person will not be

24   necessarily paid strictly the salary but they may receive it in

25   kind?  They may get perks, if you will, in other areas; is that
```

1    correct?

2    A    Sure.

3    Q    And so oftentimes that can be part of their employee

4    package?

5    A    Yes.

6    Q    And your break-up -- excuse me.  Let me find this again.

7         On Exhibit 160, we are actually looking at a period of

8    time from '06 through '012.

9    A    Yes.  July '06 through December of 2012.

10             MS. AMES:  Okay.  No further questions, Your Honor.

11             THE COURT:  Redirect.

12                       **REDIRECT EXAMINATION**

13   BY MS. LINDSAY:

14   Q    Ms. Pinkerton, when you put together your summary, was the

15   purpose of your summary to prepare a CAPA -- CAPA -- GAAP

16   financial statement for a publicly traded company or was it to

17   make demonstrative evidence so the jury could see how GigaPix

18   and *OZ3D* practically spent their money?

19   A    To show exhibits.  There's no way I could come up with a

20   GAAP -- which is generally accepted accounting principles.

21   There's no way I could come up with GAAP financial statements

22   based just on the bank records.

23   Q    So you were just trying to demonstrate where the money was

24   spent?

25   A    The source and use of funds into the -- into and out of

```
 1   the bank account.
 2   Q    And you were asked when you didn't have information about
 3   a check or something like that and if you had the underlying
 4   documents, it would have been helpful.  But when you didn't
 5   have information about a check, is that when you'd put it into
 6   the Unknown category?
 7   A    No.  Um, I think what she's talking -- I think it's
 8   different.  I didn't have information -- the Unknown category
 9   is solely items I did not receive from the bank or the
10   beginning account balance that I didn't identify what category
11   it could go into.  Everything else was put into a category
12   based on my knowledge and experience, Web searches, interviews,
13   or memo line.  There was not always a memo line.  There are
14   other ways of determining which category it goes into.
15   Q    And reviewing the files and records of the agent on the
16   case?
17   A    Yes.  Reviewing the case file.
18             MS. LINDSAY:  Thank you.  I have nothing further.
19             THE COURT:  All right.  You may step down.
20             (Testimony of Tonya Pinkerton
21              concluded at 2:07 p.m.)
22
23
24
25
```

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17            DATED THIS 6TH DAY OF NOVEMBER, 2014.

18

19

20            /S/ MYRA L. PONCE
     _____
21   MYRA L. PONCE, CSR NO. 11544, RMR, CRR
            FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**