1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   ELLYN MARCUS LINDSAY (Cal. Bar No. 116847)
4  BYRON J. MCLAIN (Cal. Bar. No. 257191)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-2041
        Facsimile: (213) 894-6269
8       E-mail:    ellynlindsay@usdoj.gov
                   Byron.mclain@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,        No. CR 14-282-R

14            Plaintiff,            GOVERNMENT'S POSITION RE:
                                    SENTENCING FACTORS AND RESPONSE TO
15            v.                    DEFENDANT CHERIE BROWN'S POSITION
                                    RE: SENTENCING FACTORS; SENTENCING
16 CHERIE BROWN,                    MEMORANDUM

17            Defendant.            Sentencing Date: 2/23/15
                                    HEARING TIME: 10:00am
18                                  HEARING LOCATION: Courtroom of the
                                    Honorable Manuel Real
19

20

21        Plaintiff United States of America, by and through its counsel

22 of record, the United States Attorney for the Central District of

23 California and Assistant United States Attorneys Ellyn Marcus Lindsay

24 and Byron J. McLain, hereby files its Position Re: Sentencing Factors

25 and Response to Defendant Cherie Brown's Position Re: Sentencing

26 Factors; Sentencing Memorandum.  This Opposition is based on the

27 attached memorandum of points and authorities, the files and records

28 in this case, and such other evidence and argument as may be provided

1  to the Court at the sentencing hearing.

2  Dated: February 11, 2015          Respectfully submitted,

3                                    STEPHANIE YONEKURA
                                     Acting United States Attorney
4
                                     ROBERT E. DUGDALE
5                                    Assistant United States Attorney
                                     Chief, Criminal Division
6

7                                    _____/s/_____
                                     ELLYN MARCUS LINDSAY
8                                    BYRON J. MCLAIN
                                     Assistant United States Attorneys
9                                    Major Frauds Section

10                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES...........................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION..............................................1

II.   FACTS.....................................................1

III.  DEFENDANT'S FACTUAL OBJECTIONS TO THE PSR................10

      A.    PARAGRAPH 17(a).....................................10

      B.    PARAGRAPH 111.......................................10

      C.    PARAGRAPH 82........................................10

      D.    PARAGRAPH 24........................................11

      E.    PARAGRAPHS 30(a) AND 58.............................11

      F.    PARAGRAPHS 30(f) AND 30(h)..........................11

      G.    PARAGRAPHS 43(c) AND 43(d)..........................11

IV.   GUIDELINES ARGUMENTS.....................................12

      A.    LOSS................................................12

      B.    NUMBER OF VICTIMS...................................15

      C.    VULNERABLE VICTIMS..................................16

V.    § 3553(a) FACTORS........................................17

      A.    "(1) the nature and circumstances of the offense and
            the history and characteristics of the defendant."......17

      B.    "(2) the need for the sentence imposed..................35

            1.    "(A) to reflect the seriousness of the offense,
                  to promote respect for the law, and to provide
                  just punishment for the offense."..................35

            2.    "(B) to afford adequate deterrence to criminal
                  conduct."......................................35

            3.    "(C) to protect the public from further crimes of
                  the defendant."...............................36

**TABLE OF CONTENTS (CONTINUED)**

**PAGE**

    4.   "(6) the need to avoid unwarranted sentence
         disparities among defendants with similar records
         who have been found guilty of similar conduct."....36

    5.   "(7) the need to provide restitution to any
         victims of the offense."...........................36

VI.  CONCLUSION.................................................37

**TABLE OF AUTHORITIES**

PAGE(S)

**CASES**

United States v. Becerril-Lopez,
     541 F.3d 881 (9th Cir. 2008)..................................36

United States v. Ciccone,
     219 F.3d 1078 (9th Cir. 2000)..............................16

United States v. Cruz-Gramajo,
     570 F.3d 1162 (9th Cir. 2009)..............................16

United States v. Green,
     592 F.3d 1057 (9th Cir. 2010)..............................36

United States v. Randall,
     162 F.3d 557 (9th Cir. 1998)...............................16

United States v. Treadwell,
     593 F.3d 990 (9th Cir. 2010)............................15, 16

**STATUTE**

18 U.S.C. § 3553(a)...............................................17

**RULE**

Federal Rule of Criminal Procedure 32(i)(3)(B)....................11

**SENTENCING GUIDELINES**

USSG § 1B1.3......................................................16

USSG § 1B1.3(a)(1)(A), (B)........................................15

USSG § 2B1.1......................................................34

USSG § 3A1.1(b)(1)..............................................16, 34

MEMORANDUM OF POINTS AND AUTHORITIES

I.        INTRODUCTION

The government concurs with the findings and calculations of the probation officer.  Defendant presents several factual objections to the presentence report, which are discussed below.  Regarding the calculation of the sentencing guidelines, defendant argues: 1) the evidence does not support the loss amount of approximately $14 million because the figure is not trustworthy, because defendant did not mislead investors, because loss cannot be assumed for all investors, and because the amount of loss was not foreseeable to defendant; 2) that the government has not proved that over 250 investors were "victims"; and 3) that the victims in the case were not vulnerable.  Defendant also propounds several reasons why this Court should sentence her below the guidelines range.

The government responds below.

II.       FACTS

In 2002, co-defendant Christopher Blauvelt founded Gigapix, which was supposed to be an animation studio that would produce and distribute television shows and movies.  Defendant Blauvelt served as Chief Executive Officer, Chairman of the Board of Directors, and Chief Financial Officer of the Company.  In June 2006, co-defendant David Pritchard joined Gigapix as its President and Director.  While in charge as the two main operators of Gigapix, defendants Blauvelt and Pritchard hired salespeople to solicit investors in Gigapix and in the movie OZ3D through cold-call telemarketing.  Defendant and co-defendant Gregory Pusateri were the two top-selling telemarketers.

The evidence against defendant at trial consisted of testimony from victim investors she had solicited, insiders who testified about

what happened at the company and what everyone knew was going on there, and a financial analysis.  Defendant testified and made many admissions.

Victim Eric Tate testified that he was a teamster with minimal investment experience.  He received a cold-call from defendant in March 2008.  She said the investment would make him very rich, and that the stocks would go public within the next year or two for a huge profit.  Regarding risk, defendant told him there was no possibility he would lose his money, that the investment was a sure thing, and that he should not worry about the risk language in the paperwork because it just had to be disclosed.  He told her about a previous investment he had made into an independent movie at Big Sky in which he had lost a significant amount of money.  Defendant omitted to tell Mr. Tate that she had been a solicitor for that company, and instead claimed that Big Sky erred by having an investment into just one movie, whereas the Gigapix investment was in a whole studio.  Mr. Tate filled out paperwork stating that he was accredited, which he was not, but defendant told him he should not worry about it and fill it in that way.  Mr. Tate invested $30,000 and lost it all.

Victim Danny Zucker testified that he invested in Big Sky with defendant.  She had told him that Big Sky was a low risk investment, and he would get returns within six months, and that his returns would be ten times what he put in.  Of $210,000 he invested, he received a return of $200.  Defendant then called him with the investment in Gigapix, telling him that she would make up his losses in that investment.  Again she told him it was a low risk investment.

She told him the stock would soon be traded on the NASDAQ.  She told him she expected him to make 10-15 times his investment when the company went public.  She also told him that an audit by Ernst and Young was going to happen.  She told him that most of her commission was in the form of stock she would get once the company went public.

He read the PPM and was very concerned about risk.  Defendant told him the risk was actually low because of the good people working there.  Mr. Zucker also invested in a company called Gigapix Releasing, which was supposed to be a distributor.  For this investment, defendant offered close to a guarantee, and told Mr. Zucker it was a low risk investment.  She told him the profits would be astronomical -- more than for Gigapix itself.  In 2011, defendant solicited Mr. Zucker for OZ3D.  She told him this movie would save Gigapix.  She told him the OZ3D returns would be 15 times the investment, and that it was a fairly low risk investment.  Defendant called Mr. Zucker constantly and put a lot of pressure on him.  She also wined and dined Mr. Zucker and his family, taking them out to fancy dinners and giving the family gifts, including religious books.  In all Mr. Zucker invested $1.4 million into Gigapix, Gigapix Releasing, and OZ3D.  He lost all but $43,000 returned to him in the Gigapix Releasing investment.

Defendant directed Mr. Zucker to an attorney, and Mr. Zucker sued Gigapix and David Pritchard.  Nothing came from that lawsuit.

Victim Jerome Goodman testified that he dealt with Blauvelt and Pusateri before he dealt with defendant.  In 2004, Blauvelt told Mr. Goodman that the investment was very safe, with big dividends to come.  Blauvelt wanted Mr. Goodman to invest $20,000, but Mr. Goodman

3

did not have that kind of money.  Blauvlet told him to invest a little at a time, and told him it was a sure thing with no risk. Sometime in between 2004 and 2008, Mr. Goodman dealt with Pusateri. Mr. Pusateri told him that the investment was a sure thing, and that there was no risk because things were going so well.  He asked Mr. Goodman, "what are you going to do with all that money?" He told Mr. Goodman that Gigapix's prior movies had made big profits.

Mr. Goodman then spoke to defendant.  They spoke about OZ3d. She said it would be a hit, and there was a possibility that Disney might buy it.  She said that OZ3D would be the savior for Gigapix. She also told him there was big money in ancillary products, like T-shirts.  There was not discussion of risk.  She told him that it would give him a very good retirement.  She said OZ3D would get a couple billion dollars like a Pixar film, that it would be in all the theaters and that kids loved animated movies.  She also told him, in conversations in 2009, that the movie would be released in a few months, and that it was in production.  She asked him for $20,000, but he told her he could not afford that.  Instead he had a friend who could put in $10,000 and he would put in $10,000.  She called him about twice per week.

After he invested, he spoke to defendant once per week.  He became concerned about the progress of the investment in 2010. Defendant expressed no concerns to him.  In summer 2011, Mr. Goodman visited Gigapix.  He met with defendant, who gave no indication that there were any problems at Gigapix.  Instead she wanted more money.

Regarding the risk language in the PPM, defendant told Mr. Goodman not to pay attention to it, but just to mail her the check.

4

He asked defendant personally, is this a good deal? She said yes, so he did not bother much with the PPM.

Shawn Walker testified that he worked at Gigapix as Pritchard's right-hand man from the fall of 2006 through the end of 2011.  He testified that the projects Pritchard undertook were highly risky and there was no guarantee they would be successful.  Walker testified that from 2006 through 2009, the projects he and Pritchard were working on were in development mode and were not on the verge of being made.  OZ3D was never in production during the time Walker was present.  In 2009, they began to work on a live-action children's movie called "Blackbeard."  The financial structure for Blackbeard was not fully in place, in that Pritchard had not obtained bank financing and thus no production bond.  Part of the financing had been a tax credit from the state of Iowa that was withdrawn at the last minute.  This sent the production into disaster.  After that, Gigapix was a financial disaster, and bills could not be paid.  Money was being raised through OZ3d but was being used to cover Gigapix's debts.  Everyone at Gigapix was aware that the only money coming in was from the OZ3D raise and that the money was being used to pay off the debts from Iowa.  The salespeople were all aware of this.  Bills were not being paid, such as payroll and health insurance.

As to defendant, she knew specifically about the desperate money situation at Gigapix.  Not only did Walker speak with her directly about it, but he overheard her speaking to Pritchard about it.

Walker was asked about some of the statements in letters that Pritchard and Blauvelt sent to investors.  For example, Government's Exhibit 40 stated that Ernst and Young was doing an audit of Gigapix.

1   Walker stated everyone knew this was not true because if it had been
2   true, it would have been a big deal and a selling point.  In
3   Government's Exhibit 68, Pritchard stated that Gigapix was about to
4   become a public company, which never happened.  Even if it did, it
5   was only to be traded on the pink sheets and not on a major exchange.
6        Tiffany Ryan testified that she worked as an opener and then
7   assistant sales manager at Gigapix.  The closers made 20%
8   commissions, and if an opener helped them, they would give 5% to the
9   opener and keep 15%.  She and everyone else at Gigapix understood
10  that the investments were highly risky, and it would have been a lie
11  had a salesperson told the investors that the investment was not
12  risky.  It would also have been a lie for a salesperson to tell
13  investors that they would receive returns within a year of their
14  investment, or to say that OZ3D was in production or would soon come
15  out.  When Ryan started, the offices were on Oso Avenue, and the
16  closers sold behind closed doors.  When the office moved to
17  Lankershim Boulevard, there was an open area for salespeople.  The
18  manager, Ken Gross, wanted the salespeople out in the open where they
19  could be heard, to make sure they were not making misrepresentations.
20  The only two who he was unable to get out in the open were defendant
21  and Gregory Pusateri.  A salesperson named Hines refused to sell out
22  in the open, so instead went to defendant and gave her his clients.
23  When she sold them behind her closed door, they split the
24  commissions.  Ryan tried to be a closer, but she told potential
25  investors about the risks and she never guaranteed returns, and she
26  only made one sale in two months.
27       Gigapix's regulatory issues were well known, and Ryan prepared
28
                                    6

1   do not call lists which were circulated to the salespeople.

2       After the issues in Iowa, everyone was aware of the financial

3   problems of the company.  People's salaries were not getting paid and

4   the activity level of the studio had dropped to almost nothing.  Ryan

5   left in June 2011 because Gigapix could no longer afford her salary

6   of $900 per month.

7       Tonya Pinkerton, a financial analyst with the FBI, testified

8   that she analyzed the bank accounts for Gigapix and OZ3D from July

9   31, 2006, through December 31, 2012.  Over $8 million came into OZ3D

10  from investors, and about $13 million came into Gigapix from

11  investors.  In all, there were 731 investors.  Forty percent of the

12  money that came in went to administration, 23.4% went to selling the

13  investment, a total of about 21% was spent on anything having to do

14  with producing movies, and $1.9 million went to Pritchard and

15  Blauvelt.  Defendant made $650,964.81 from April 14, 2008, through

16  August 19, 2011, and Pusateri made $578,284.15 from September 11,

17  2006, through January 10, 2011.

18      Professor William Hicks testified that the OZ3D and Gigapix

19  offerings should have been registered with the SEC as none of the

20  exemptions from registration applied.

21      Special Agent Adam Storer testified regarding his interviews of

22  defendant.  She told him that she had heard that 30-35% of investors'

23  money at Big Sky had gone to the cost of raising money.  She said she

24  left Gigapix because the investors were not getting information they

25  needed and money was not going to where it should.  She told Agent

26  Storer that she heard other salespeople making misrepresentations.

27  For example, that investors would make ten to twenty times returns,

28

1    that the investment was sure-fire, that the film would be finished in

2    one year.  She stated that she knew that money was spent on overhead

3    and sales expenses.  She also stated that she knew in September 2009

4    that the company was falling apart.  She stated that she knew about

5    the cease and desist orders.  She stated that she  knew the

6    investments were risky.  She said she was apprehensive about selling

7    Gigapix because she's not a stockbroker.  Agent Storer testified that

8    he originally viewed defendant as just a witness, but when he learned

9    that she had made misrepresentations and earned such a large amount

10   of money, her status changed.

11        At the end of the government's case in chief, this Court granted

12   defendant's motion for a judgment of acquittal as to all counts of

13   the offer and sale of unregistered securities against her.

14        Pusateri called Ken Gross as a witness.  He testified that he

15   was the sales manager at Gigapix on and off from 2002 through 2010.

16   He stated that he was the telemarketers' boss, and that he ran a

17   tight ship, by the book.  He testified that he wanted the salespeople

18   to be in one room, out in the open for three reasons: so that

19   everyone could learn from each other, so that there would be no hard

20   feelings about certain people having private offices, and as a

21   prophylactic measure against misrepresentations.  He testified that

22   he wanted defendant and Pusateri out in the open with everyone else,

23   but that Blauvelt refused, and defendant and Pusateri sold behind

24   closed doors.  On cross-examination, Gross admitted that salespeople

25   earning high commissions, such as the 20% at Gigapix, generally could

26   not be trusted to sell honestly.  He also admitted that in the trial

27   of Pritchard and Blauvelt, he testified under oath that the reason he

28

                                        8

1    wanted the salespeople in the open was so that he could do his job --
2    that is, preventing misrepresentations.   He testified that if
3    defendant and Pusateri were being fully open and honest, there would
4    be no reason not to let him hear what they were saying, but they
5    refused.   Gross had no idea what defendant said to the investors.   In
6    fact, he was unable to do his job as to defendant and Pusateri.

7         Defendant called two of her investors, Philip Ruyle and Jack
8    Feldsher.   Mr. Ruyle testified that he was a savvy investor who
9    invested in Gigapix in the third quarter of 2006.   He spoke to Robert
10   Jordan and Blauvelt.   He then spoke with defendant and invested in
11   OZ3D.   He believed she was fully open and honest with him.   Dr.
12   Feldsher testified that his cousin worked at Gigapix, and he got in
13   touch with defendant.   She set him up with Pritchard, and she merely
14   observed Pritchard's presentation.   He invested in both Gigapix and
15   OZ3D.   He received no revenue, but what motivated him was the
16   continued progress regarding the movies.   This included encouraging
17   details about the company and the progress of OZ3D.   It was reported
18   to him that the movie was being made.

19        Colin Mutton, Gigapix's accountant, testified.   He confirmed
20   that after 2009, everyone at Gigapix knew that the company was
21   falling apart financially.   It was clear that the money raised was
22   going to the debts created by Blackbeard and just to keep the lights
23   on.

24        Defendant testified at great length.   She testified that she
25   truly believed in Gigapix because of Pritchard, and that she relied
26   on him and Blauvelt, as well as the PPMs, letters to investors, and
27   press releases to know what was going on.   In speaking to investors,

28
                                      9

she stuck with what was in the PPM.  She was not privy to financial details.  Regarding the Iowa disaster, she did not know anything about it other than that the film would not be made in Iowa, but would rather be made in Canada.  She went through numerous exhibits regarding the information she claimed she believed about what was happening at Gigapix.  She claimed that each of her investors was fully aware of the risks involved in the investment, and that she did discuss these risks.  She stated that she never promised anyone a return.  Regarding Mr. Goodman, defendant claimed she only met him once.  She testified that eventually, she learned that Pritchard and Blauvelt were not doing what they said they were doing, and she left the company.  She then contacted her investors and suggested that they hire an attorney and sue the company.

## III.  DEFENDANT'S FACTUAL OBJECTIONS TO THE PSR

### A.   PARAGRAPH 17(a)

Defendant argues that Paragraph 17(a) implies that she supervised fronters, which she did not do.  To the extent that this paragraph suggests that defendant supervised fronters, the government agrees that the evidence does not demonstrate that she did so.

### B.   PARAGRAPH 111

Defendant maintains that she worked in a professional capacity in the psychiatric and mental health wards of the V.A. Hospital.  The government has no evidence to the contrary.

### C.   PARAGRAPH 82

Defendant disputes that she saw no physical abuse at home.  The government has no evidence to the contrary.

### D.   PARAGRAPH 24

Defendant denies that she lied to investors.  The government believes the evidence was overwhelming that defendant knowingly lied to investors, and that the jury's verdict contradicts defendant's claims.

### E.   PARAGRAPHS 30(a) AND 58

Defendant disputes that victim "J.G." was 85 at the time of his investments.  J.G. was born in 1929.

### F.   PARAGRAPHS 30(f) AND 30(h)

Here defendant appears to mean to discuss paragraphs 33(f) and 33(h), which relate information provided to the FBI by Colin Mutton. Regarding these paragraphs, defendant appears to agree with what they say, and thus there is nothing for the court to resolve.  Defendant's use of the paragraphs to argue her trial theory is beside the point of correcting factual errors to the PSR.

### G.   PARAGRAPHS 43(c) AND 43(d)

In paragraph 43(c), defendant disputes exactly who she heard make misrepresentations at Gigapix.  In paragraph 43(d), defendant claims she did not know how much money had been raised when she worked at Gigapix.  The government does not believe resolution of these points is necessary both because the matters will not affect sentencing and because the court would not consider then in sentencing, pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.   GUIDELINES ARGUMENTS**

    **A.   LOSS**

    Defendant first asserts that Gigapix was not a sham company, and thus no loss was "intended."  Related to this argument is her claim that simply because investors lost money does not mean they were defrauded.

    The government disagrees that Gigapix was legitimate.  Investors were promised a safe investment into Gigapix, which was supposedly a company that made animated programming, and OZ3D, an animated version of the Wizard of Oz.  Pritchard, Blauvelt, and their telemarketers -- the most successful of whom was defendant -- made numerous misrepresentations to investors, and omitted to tell investors material facts in order to get their money.  Examples of the misrepresentations were: that Gigapix was a financially successful company; that investors in Gigapix and OZ3D would receive high returns on their investments; that the investments in Gigapix and OZ3D carried little or no risk; that the majority of investor money would be spent on the making of the movies; that Gigapix would go public within a short time after an investor invested; that OZ3D was in production or would be released soon; and that investors would see returns within a year or 18 months of investing.  Many of the victims who testified at trial heard the misrepresentations directly from defendant.  As this Court knows, after Gigapix encountered great difficulty with its movie "Blackbeard," all the money that came in went simply to keeping the company afloat and paying off its old debts, and was not spent on anything that could make any money for any investors.  The evidence demonstrated that only about 23% of the

money coming into Gigapix was actually spent on movie-related expenses, and less than 5% of the money coming into OZ3D was so spent.

The evidence also demonstrates that defendant was fully aware of the disastrous financial condition of Gigapix, and of the fact that all of the OZ3D money went to pay off Gigapix debts. Tiffany Ryan and Shawn Walker testified that after the issues in Iowa, everyone was aware of the financial problems of the company. Ryan noted that salaries were not getting paid and the activity level of the studio had dropped to almost nothing. Walker testified that he spoke directly to defendant about the financial crisis and heard her discussing it with Pritchard as well.

Thus, Gigapix and OZ3D were in fact sham companies, defendant knew it, and the investors were victims.

Defendant next asserts that the loss figure is not based on "any reliable or trustworthy evidence." (Defendant's Motion, p. 8.) The probation officer's numbers come from Tonya Pinkerton, the FBI financial analyst who testified at trail regarding her evaluation of the bank accounts from July 31, 2006, through December 31, 2012. (Exhibit A to the Government's Response to Defendant Pritchard's Position Re: Sentencing, transcript of testimony of Tonya Pinkerton, October 16, 2014, pp. 8-9.) In order to evaluate these accounts, she "took every transaction from the bank statements, put it into a Microsoft Excel file, and . . . categorized every transaction and . . . used Microsolft Excel to summarize the categories . . . ." (Exhibit A, p. 9.) Ms. Pinkerton identified five categories of deposits into the Gigapix and OZ3D bank accounts. (Exhibit A, p.

13

10.) One category was investors.  (Exhibit A, p. 10.)  In order to determine who the investors were, Ms. Pinkerton determined investor deposits by consistency -- that they were always a lump sum.  Often they had a comment in the memo line of the checks that indicated how many shares they were purchasing.  Ms. Pinkerton took this list and compared it to a list of investors that she obtained from Shawn Walker, and researched any differences.  (Exhibit A, p. 11.)   For defendant's sentencing, Ms. Pinkerton selected only those transactions that occurred during the time period that defendant received paychecks.  (PSR ¶¶ 29, 30.)

Defendant argues that several of her investors believed in her and did not think she lied to them.  But it was established at trial with those investors she called to testify on her behalf that defendant never told these individuals that Gigapix was in financial crisis and all their money would go to pay off past debts.  The fact was that no one could ever make any money from this investment because no money was being spent on anything that could possibly earn the victims money.  Defendant was fully knowledgeable about this.  That she managed to continue to lie to her investors and convince them that she was the victim just proves that she is a great salesperson.  As defendant concedes, if a company is a sham company, then the court may assume that all investor are victims.  (Defendant's position, p. 9.)  Since Gigapix was a sham and defendant knew it, all investors were victims.

Defendant next argues that not all loss was foreseeable to her.  She claims that because she worked privately in her own office, she would not know what the other investors were being told.  However,

14

1    she knew what the PPMs and brochures said, and she knew what the

2    letters sent by Pritchard and Blauvelt said, and she knew the company

3    was a financial disaster.  She thus knew that the investors were lied

4    to and the company was a sham.  The loss was therefore foreseeable to

5    her.

6         **B.   NUMBER OF VICTIMS**

7         Defendant next argues that the number of victims enhancement is

8    not supported by actual proof.  She argues that there is no proof

9    that the victims sustained a loss and the loss was attributed to

10   defendant's conduct.

11        As demonstrated above, because Gigapix was permeated by fraud,

12   each of the investors is a victim.  Regarding the losses being

13   attributed to defendant, where the loss is the result of "jointly

14   undertaken criminal activity," such as a conspiracy or scheme to

15   defraud, loss "shall" be determined based on the conduct of defendant

16   and "all reasonably foreseeable acts and omissions of others in

17   furtherance of the jointly undertaken criminal activity."  United

18   States v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010); U.S.S.G. §

19   1B1.3(a)(1)(A), (B).  The conduct of others that was both in

20   furtherance of, and reasonably foreseeable in connection with, the

21   criminal activity jointly undertaken by the defendant is relevant

22   conduct under this provision."  Section 1B1.3 cmt. n.2.

23        Thus, the court must "identify the loss that fell within the

24   scope of the defendant's agreement with his co-conspirators and was

25   reasonably foreseeable to the defendant."  Treadwell, 990 F.3d at

26   1002.  To comply, the court need not "proceed item-by-item through a

27   complete list of all losses attributed to a criminal conspiracy."

28

1    _Id._  Rather, § 1B1.3 is written broadly, to allow sentencing judges

2    maximum discretion and flexibility, and its interpretation depends on

3    the specific guideline section to which it is applied.  _Id._ at 1003,

4    quoting United States v. Cruz-Gramajo, 570 F.3d 1162, 1171 (9th Cir.

5    2009).

6         Because all investors were victims at Gigapix, and because

7    defendant is responsible for these losses through her jointly

8    undertaken criminal activity, the probation officer properly

9    calculated the number of victims.

10        **C.   VULNERABLE VICTIMS**

11        Defendant argues that the enhancement for vulnerable victims,

12   pursuant to USSG § 3A1.1(b)(1), should not apply, as the government

13   has not proven that defendant knew or should have known that any

14   victims were vulnerable.  (Defendant's Position, p. 11).

15        The probation officer applied the enhancement as follows:

16       The Ninth Circuit has held that when a defendant "reloads"
         victims, or returns again to those who have been proven
17       susceptible to fraud, a vulnerable victim enhancement is
         appropriate.  See United States v. Ciccone, 219 F.3d 1078
18       (9th Cir. 2000) and United States v. Randall, 162 F.3d 557
         (9th Cir. 1998).
19
         In the instant matter, the co-defendants reloaded at least
20       four victims while **Brown** was employed at Gigapix.  One of
         the victims was also 85 years old.  Based on the foregoing,
21       a two-level increase is applied pursuant to USSG
         §3A1.1(b)(1).
22

23   (PSR ¶¶ 57-58.)

24        Defendant notes that a district court applying this enhancement

25   should identify victims who fall within the scope of those protected.

26   Here, the probation officer has done so.  Defendant personally

27   reloaded D.A. and J.G.  Blauvelt reloaded D.A. into the OZ3D

28
                                     16

1    investment.  L.H. testified that Pusateri pressured her to reinvest,

2    and that although she resisted, her husband was unable to resist.

3    Pusateri reloaded S.W. as well.

4        Defendant argues that J.G., while older, was not feeble, and

5    thus was not vulnerable.  But Mr. G.'s age is irrelevant to the

6    reason for the enhancement.  He was vulnerable because he was

7    unsophisticated enough to fall for the scam once, and defendant went

8    back and got him to invest again.  The fact that he was reloaded, not

9    the fact of his age, made him vulnerable.

10   **V.   § 3553(a) FACTORS**

11       Defendant argues that a myriad of factors mitigate against a

12   guidelines sentence.  The government agrees that the guidelines are

13   unnecessarily high in this case.  However, the factors pursuant to 18

14   U.S.C. § 3553(a) indicate that a significant sentence is warranted.

15       A.   **"(1) the nature and circumstances of the offense and the**
           **history and characteristics of the defendant."**
16

17       This case involves an egregious fraud of massive proportions

18   that targeted non-wealthy victims who the defendants heartlessly

19   misled.  The effects of this crime on the victims are truly

20   devastating in every way, as set forth in detail below.  These quotes

21   are taken from the numerous victim impact statements obtained by the

22   government in this matter.  While the quotes are many and lengthy,

23   the government urges this Court to read them carefully, for they

24   agonizingly demonstrate the terrible devastation wrought by the

25   defendants through their greed and absence of conscience.

26       Below the victims discuss losing their homes, having to declare

27   bankruptcy, losing their retirement savings, losing money they worked

28

                                    17

1  at low paying jobs for years and years to save, having to go on food

2  stamps, experiencing depression, anger, and anxiety, physical health

3  deterioration, and endless suffering.   These were, in some instances,

4  elderly victims, low income victims, victims who suffered from

5  illnesses such as cancer and the effects of polio, and victims who

6  were supporting children with down syndrome and spina bifida.[1]

7       From victim J.G.:

8       I'am a eighty-five year old soon to be 86 who's worked
        since I was 18.  I have been working five days a week,
9       looking to retirement when I was sixty-five.  I had a
        family of 3 other people, it wasn't easy to save much money
10      because of basic exspenses and educate my two sons with
        additional college costs.  When I participated in Gigapex
11      it was with after tax money, I was told would be well worth
        it, to make my life financially easier for vacations and
12      luxuries.  I invested $30,000 total in installments of
        10,000, 10,000, 5,000, 5,000 for which huge sacrifices for
13      which I did without vacations, newer cars, larger home, but
        of rewards promised only to have my dreams shattered.

14      . . .

15
        Our family's livelihood is the following, social security,
16      small IRA, no income from property, a few stocks with small
        divadens.  Have have our son living with us 61 years old,
17      with Parkinsons diseas no money, getting divorced after 22
        years married 2 daughters in community colleges.  Resided
18      in North Carolina.

19      From victim J.T.J.:

20      This statement is to confirm that I [J.T.J.] and my wife
        [S.H.J.] were duped out of a lot of money by the
21      defendants.  We are not wealthy.  We were school teachers

22      _____

23      [1] It is true that not all of these victims were contacted
        directly by defendant.  In fact, many of the individuals who
        submitted victim impact statements do not remember who contacted
24      them, and thus it is not possible to pinpoint exactly who defendant
        victimized personally.  The first two statements are from victims who
25      remember that they were contacted by defendant (J.G. being a trial
        witness.)  These statements belie defendant's claim that Gigapix was
26      legitimate, and defendant's demands for leniency must be weighed
        against the consequences of her crime.

27      The actual victim impact statements have previously been filed
        with the court.

28
                                        18

and worked long and hard to save up a few dollars to help us in retirement.  Now all this is gone.  We were made to feel that this was a no lose investment.  Many phone calls were made to ensure that we understood how lucrative this investment was, even to invest in the company itself which we did.

These people should be made to repay what was taken from us.  We will never be able to live the life and do the things we had planned to do because of this mistake on our part.

From victims C.A. and D.A.:

In Sept 2013, I began 45 Radiation treatments for prostate cancer.  In Sept 2014 my wife ([C.]) began 35 Radiation treatments for breast cancer.  Together we had over 100, two hour round trips to our doctors.  The monies that was taken from us by the Gigapix Thiefs was a large portion we had saved for retirement.  When the sickness came to us we would have used it to help pay our medical bills.  Our medical bills were over 400 thousand dollars.  Our Insurance paid 80% leaving an unpaid balance of approximately 20%.

Not only did it hurt financially, we believed these people were honest.  We are still paying now and years to come.  We will get this paid in full someday.  We are honest, considerate, and respectful law abiding citizens that still believe basically everyone has some good in them.


From victim C.R.:

Till this day, my life has been impacted GREATLY because of what these people did to me and my family.  They took my life savings that was set aside for emergencies and for my daughter which has Downs Syndrome and is mentally challenged for her medical bills.  I personally gave Gigapix $25,000 which was my entire savings.  My family . . . gave them over $177,000 and lost everything.  One year after I closed my saving account, I was forced out of my home because I didn't have the money to pay the bills and for my daughter's health care needs.

. . .


Honorable Real, I ask you to please put these people away in federal prison for the rest of their natural lives.  Since, they are were found guilty of at least 13+ counts each, please, I beg you to not be lenient on them.  They were not lenient on the victims when they stole people's money.  They have ruined my life along with hundreds, if

not thousands of other life's that were affected by their
FRAUD while they used our money to live the good life!!

There is not one day that goes by that I do not think about
my life savings which was stolen from me.  I was promised
the world from Gigapix.  I am deeply saddened by their
actions.  If I had my $25,000 returned to me, I could pay
for my daughters medical bills and debt which Gigapix
impacted me.

In closing, I asked two things from you honorable Real,
Please put them away for life, so they cannot do this again
and <u>PLEASE</u> award restitution for them to return my $25,000.
My Down's Daughter and family really need's this money.

<u>From victims O.P.M. and J.Y.M.</u>:

I am 75 years old and [my wife] is 73 years old.  We raised
four (4) children and impacted the lives of many other
children as Foster Parents for many years.  My wife is a
Domestic Engineer (Homemaker) and still is.  I retired from
the City of San Diego as an Administrative Analyst in 1995
after 30 years employment.

. . .

As a result of these failed investments and a major
economic downturn in 2008 through 2010 my family and I were
forced to file for bankruptcy in 2010.  We are now
struggling to stay above board in our finances.

<u>From victims L.R. and K.R.</u>:

We were looking forward to retirement and wanted to
increase our retirement funds as well as save money for a
new handicapped van.  My wife ([K.]) had polio as a child
and her health is slowly declining to the point she needs
to be in a wheelchair almost fulltime.  At the time we
invested the money we were told that and we were reassured
that our money would be repaid 3 to 4 times what we
invested, and we would have the money in 3 years.  We
invested our savings of $16,250.00 and when it got to the
point we had to have the van we had to borrow a lot more
money since we had trusted them, it also greatly reduced
our future retire funds, and we don't trust anyone now
after what we have lost with Gigapix.

<u>From victim P.R.B</u>:

I invested approximately $85,000 in Gigapix and Oz 3D, LLC.
All 5 [sic] defendants sold me the American Dream, but the
lights went out on this dream when they did not perform and
stopped returning phone calls.  This investment was a large
part that I was planning for my retirement (I am now 68

years old).  This loss has caused me and my family great
anxiety and depression.  It has also taken a toll on me
physically.  Because of their misrepresentation and fraud I
hope the court will impose the most severe penalties and
jail time.  They should have to pay big time for their
crimes.

From victim C.B.B.:

When I first learned the FBI was investigati[ng] this case
I felt devastation and my worst fears came true.  My wife
and I had invested a total of $165,000 and it was all gone.
Our nest egg was gone due to fraud.  A glimmer of hope and
faith in the legal system is what followed.  It is what
helped us try to move past the anger and depression that we
had been duped in a huge way, impacting our future
permanently.  Knowing the defendants have been found guilty
makes the future seem a little brighter with the
possibility of actual financial restitution being made, and
jail time served for the financial and emotional pain
caused by these two and others.

To this day it makes me sick to think how foolish I was to
get involved with this investment.  . . . My wife and I met
the defendants.  They had won our trust.

The emotional impact: Anger, depression, guilt, self doubt
and broken. Not a day goes by without this event entering
my mind.  My wife suggests that this case has contributed
to serious health issues I have suffered in recent years.

The financial impact has been devastating as the source of
the investment were home equity and hard earned savings.
The home was sold as a result and our retirement plans are
no longer viable.  Add unemployment and my age to the
picture our retirement plans are non-existent, sadly
replaced with worrying about making ends meet rather than
having enough to live modest lifestyle.

Your Honor, please order restitution in order that justice
may be served and that glimmer of hope will brighten the
day, evil and corrupt greed will lose, and that financial
damage may begin to be repaired.

From victim R.G.:

I invested all my savings in Gigapix Studios with the
understanding that OZ would be coming out in 12 to 18
months, when that time was up I was told it was going to be
another 12 to 24 months.  With the economy turn down and
loss of work and not having any savings to fall back on I
tried for Home loan modification over many stressful months

21

with BAC.  My Home finally went in foreclosure and was sold, it was absolutely depressing being homeless.  About a month later Mark Shurtleff Utah Attorney General at the time came out and said BAC was foreclosing illegal and fortunately was able to get my modification.  It is still very stressing as it month to month survival and I had to file bankruptcy so I have no credit. . . .

I don't know if I will ever be able to save and be able to retire, will probably have to work until I die . . . totally lost and vulnerable, worry constantly. . . .

From victim R.J.:

Circumstances at this time:

A) My wife passed away in 2000

B) Very bad depression set in

C) Lost my job

D) [Illegible] took the money I had and began investing into almost everything I was approached about (I must have been on a sucker list).  This was one of the companies I invested in . . . . All I have is my social security check.  Live month to month.  Almost everyone thinks of leaving something to their children, I have nothing.  My 3 sons do not talk to me, afraid I'll ask them for a handout. . . . I don't need my house cleaned I need money for food and medicine.

From victim J.K.:

These people stole 40000 from my family.  When I started working at my present employer I was paid $160 per week.  That is 250 weeks to get that 40,000 back.  My wife's salary was about the same.  40,000 is a lot of money you just can't replace without a lot of years of extra work and just getting on with life.  Have three children whom I would like to help get started.

From victim B.S.:

I am pleased that some of the people that I have dealt with from Gigapix have been prosecuted and have been found guilty.  I kept pulling money out of my IRA and savings on what I was promised.  I have lost 40% of my retirement and 75% of my savings listening to the defendant's.  I also talked my children into investing what they had into the company.  I have also lost my home and my retirement home as I did not have the money to keep up payments with the economy.

22

I am starting over at age 56 with my wife and my one daughter (age 24 with spinabifida) that is still at home with no savings and my wife that has to stay at home to take care of my daughter.  I just barrowed the money for a down payment on a home as we have been renting for the past 2 years.

The **$48,000.00** I have invested and the **$3,000.00** I talked my children into may not mean much to some but that was most of what I had, I was planning on using Gigapix for my retirement but that has gone.  I know that I should have spread things out but they are very convincing and I kept listening when they call.  That is on me.

From victim H.T.:

Thank you for your help and informations and your dedication to fight the unethical businessmen who undermine the American way of life; honest, trust, and compassion to each other.

I have worked very hard and tried my best throughout my life.  After serving the USA Army during the "Korean War" from 1952 to 1954, I graduated from the USC Electronic Engineering with a BA degree in 1958 with the help of the GI Bill.

. . .

I worked twelve hours per day Monday thru Saturday.  One evening in a week, I attended UCLA evening class from 7:00PM to 10:00PM.  On Sunday, I did my homework assignment and prepared for the midterm exam and the final exam. . . .

Now . . . my total income is $2,212 per Month including my Social Security benefits, and my total expense is about $2,200 per month . . . .

I wish that I had that $20,000 now, and I wish that I was more prudent and careful before putting my hard earned money to the GigaPix Studio.  The sales person of the studio called me many times "I should invest my money to make money when the studio goes "public."" The Gigapix Studio sent me their personal changes and bright future prospect except going "public" officially.  Finally, I realized that I have made a poor judgment and bad investment, and I could not do anything about it. . . .

23

1    <u>From victim S.W.</u>:

2    I feel bad that all of this has come about and pray that
     restitution can be obtained.  My son also lost $10,000.00
3    dollars.  Because of this I am living of a greatly reduced
     income.  P.S. I am 75 years old.

4

5    <u>From victim J.B.</u>:

6    I'm just an[] ordinary guy working at the time for wages it
     took me about a year to save for the investment as I recall
7    was about $5,000 for me at the time was and still is a big
     chunk of change.  I was told all sorts of wonderful things
8    about the management by the sales man.  I was not expecting
     crazy returns just a few percent better than a savings
9    account.  My job situation shortly after making the
     investment turned for the worse, and I have never quite
10   recovered.  In fact I'm currently on food stamps/SNAP and
     could really use the funds just to pay the bills.

11

12   <u>From victims L.A.C. and J.R.C.</u>:

13   We are disgusted with the actions of Chris Blauvelt and
     David Pritchard as they knowingly lied and gave us
14   continual assurances that their projects would provide us
     imminent financial security.  I was "right around the
15   corner".  We had many telephone conversations over the past
     11 years and even visited the Gigapix studio in Los
16   Angeles.  Each conversation reassured us of their upcoming
     success!!

17
     I worked as a high school science teacher and [J.] worked
18   as a part-time RN while raising our family of 6 children.
     We invested our hard-earned savings in the hope of helping
19   our 18 grandchildren with college expenses.  Obviously
     this is not possible now.  The investment also was planned
20   as a resource for us in our older years and again we don't
     have this security.

21
     .  .  .
22

23   I am now 80 years old and legally blind with Macular
     Degeneration so this loss to our family security is
24   significant! Words can't express the emotional turmoil
     caused by the actions of these two individuals who
25   seemingly had no regard for honesty.  I have experienced
     many lost hours of sleep as the true nature of
26   Giga[p]ix/OZ3D slowly became apparent!

27

28
                                  24

<u>From victims C.G., M.G. and Family</u>:

I'm a *Public School Teacher* in St. Louis and the **$20,000** I invested was obviously a huge amount for my family.  That amount is **40%** of my YEARLY salary.  The **$20,000** for my immediate family vs. the "huge returns" we were promised by David Pritchard (Gigapix) would be a small investment to what was estimated on returns.  This was inheritance money from my Mother who knew David Pritchard personally.  As a family, we certainly feel cheated.  Punch to the gut for sure!

Actually, four other siblings invested more than I did because of David Pritchard and his "St. Louis" connection and ties to the town we grew up.  He was a St. Louis neighbor.  Dare we say a family friend? Guy makes me feel sick now.

. . .

Again, as I type this, my frustration level is escalating thinking about what my immediate family could've done with **$20,000** for my three kids that are now ages 10, 9, and 6. To David Pritchard/Chris Blauvelt, that amount might be just another vacation.  To where we're at, with three kids and a stay at home wife, that amount would make things MUCH easier around here.  Certainly, we didn't come from $$! To think, I had that $$$ in my account, passed down by my deceased mother, trusted David (*Gigapix or Gigacrooks* as we called them later) and his word, and writing that INITIAL check for $20,000 about tore me up but based on his word and promises, I didn't doubt that "promise" could provide for my family in the future.  If I had that money back . . . college $$, a real stock?

<u>From victim V.G.</u>:

Thank you so much for taking the time to read my letter. My family – [G's] grew up in the same neighborhood as Mr. David Pritchard.  He was a family friend of sorts. . . . That is what so intrigued all of us siblings to invest in Gigapix.

When we learned that David P was behind the venture all of us were willing to invest very hard earned money.  My father passed away in 1982 after working for the St Louis Cardinals. . . . David knew my father growing up and told me personally my dad was a hero to him.  My wife and I flew to LA to visit his studio.  He showed us around and had us in his office to tell of the investment.  When I returned I sent him another check for $12,500 along with Cardinal baseball memorabilia my dad left me, besides the $30,000 I had already put in the company.  This money was left to our family from my dad's life work.  He died of cancer at age

25

53 and my mother passed in 2003 at the age of 71. The money left to us is what allowed our family to invest in Gigapix. We completely trusted him. Our family is not wealthy. We had no inkling this would be a scam. We would never of risked our parents money had that been a question.

Needless to say this has been a crushing loss - not just financially but also emotionally as part of your fabric is ripped out when you realize you have been swindled. I was the one who actually introduced my siblings and a good buddy . . . to invest in Gigapix. It is something I now have to carry with me as I can't recover the funds that were stolen.

I certainly appreciate the opportunity you have given to voice our story and kindly ask for any restitution that you can authorize to be done to repair the damage done. Even a return of the Cardinal "schwag" as David puts it would be a repairing of the damage done. . . .

From victims G.J. and C.J.:

This represents a very sad day for me. Because of your actions 21 of the people that I love and cherish the most were hurt because of their trust in my recommendation to invest in Gigapix. My goal was to make their lives better not worse. I am especially grieved for my own children.

Of course we grieve over the loss of the money but far greater than that was the loss of the hope for wholesome film that harbored rich content and allowed families to sit in the same space without apologies for adult themes or innuendos. We represent a large population whose objective is to let children's minds expand and imagine without forcing them into a premature stage of life. We were promised and reassured that this was the highest goal of Gigapix filming.

From the brother of victim R.B.J.:

My brother, [R.B.J.], was the "real victim" in this case. [R.] invested in the Gigapix company from the years 2003 until his death in 2006. Upon his passing, my sister and I inherited his estate. . . . Totally, my brother invested $80,000 plus in Gigapix. I am saddened that his hard earned monies were misused and his trusting nature abused.

From the sister of victim R.B.J.:

I am writing this letter to inform the court of the negative impact made by the actions of defendants David Pritchard and Christopher Blauvelt.

26

My brother, [victim R.B.J.], now deceased, was a man of
great moral convictions that gave generously to the
community he lived in.  One of his great passions was
education and the systems that supported what he felt was
the best leg up on life.  He held degrees from two colleges
and became advisor to the fraternity he had belonged to in
order to mentor and guide young men toward the better life
a good education could afford them.

The monies he invested in Gigapix were monies he planned to
give to the university and fraternity that he supported so
passionately.

Anyone who invests and gets frauded out of their hard
earned money feels "taken for a fool" but especially so
when swindled out of an investment that was intended for
philanthropic purposes with the hopes of being able to give
back to an educational system he loved and found so worthy
of his time and money.  Those dreams were not able to be
realized because of the actions of the defendants.  Their
fraudulent activities stole from people trying to better
themselves and contribute to our society.  When they stole
from [victim R.B.J.] they stole from a greater community
with untold numbers of people who would have benefitted
from his generous support.

From victim M.R.L.:

I have felt cheated, betrayed, swindled, robbed, even worse
as time went on because also now this is a severe financial
burden, to lose a significant amount of money.  I had
talked to both Mr. Blauvelt and Pritchard by phone numerous
times at the beginning of my investment and for 2 years
after that, received numerous letters and mailings from
them, and they always indicated Gigapix was moving forward
and was a solid investment. . . . This swindle has
curtailed my disposable income and this is now a
significant percentage of my savings . . . .

From victim J.H.M.:

As one of the people scammed in the case of Gigapix
Studios, Inc; OZ3D, LLC, I wish to comment on how
Christopher Blauvelt and David Pritchard affected me with
their dishonesty.  I was at that time an associate
professor at a university that did not pay very well.  I
had three children for whom we always looked for good
entertainment.  I had saved for a long time to invest in
something that would not only make some money for my family
but would also in some way benefit the people that look for
good entertainment for themselves and their families. That
is hard to find these days.

. . .

Needless to say, I did without to help back this venture.
I saved giving up much over time to back something like
this.  The loss of this money in a scam limited what I
could give my kids and set me back substantially.  There
should be retribution!


From victim J.P.:

I invested our family's hard earned money.  I took a
$10,000 position of common stock and a $10,000 position in
the film "OZ3D" ($20,000 total).  I fielded phone calls
from Gigapix and spoke to their salesman for hours, it
seemed I learned about all the "great" things that were
going on.  I even flew to Iowa to observe the filming of
"Blackbeard" inside the mall in Des Moines, but when I
arrived there were no actors, no pirates, and no pirate
ship.  When I questioned Gigapix, they said the production
had been stopped due to "mis-appropriation of funds".  I
was floored, but it didn't take long before I was
propositioned for more money from Gigapix Studios. . . .  I
have lost my faith in investing, my wife's trust without
our family finances, and my poor father has passed away
after giving $20,000 to Gigapix Studios per my
recommendation.


From victim J.P.:

The impact this stupid investment has had on me is more
than I care to admit.  Emotionally, I feel like a fool.  I
felt like a fool when I invested under continuous pressure
from Mr. Blauvelt and his staff to not miss out on this
incredible opportunity.  I felt like a bigger fool later
when it turned out to be a complete loss. . . .  I should
not have been investing in Gigapix in the first place but
Mr. Blauvelt convinced me I was an accredited investor and
even though I couldn't afford to invest $20,000 in one-
shot, $5,000 would be enough to get me started.  . . .

I recently took a new job in Lincoln, Nebraska.  That may
turn out to be a blessing but I'll openly admit that had I
not made this investment in Gigapix Studios or had I at
least gotten my money back, I may not have been looking for
a job as my dream has always been to be financially
independent with my own consulting company which I was on
pace to become had I not gotten careless with this and had
a couple of other things happen that affected my cash flow.

28

From victims K.S.:

Approximately in May of 2009 I was contacted by Chris
Blauvelt with Gigapix Studios and along with Tony Wright
stating that they had a fantastic investment in an up
coming animated film called OZ3D in which a investor could
make a lot of money with a small investment.  Their small
amount or minimum investment was $20,000 a lot of money to
me but I did have it in a IRA acct.  After days of calling
me and telling me that they only needed a few more
investors to get this Movie going and into production, I
was told that it would be released just before Christmas of
that year and that it would make a box office smash, being
one of the first 3D animated films out and then being the
Wizard of OZ. . . .  Under high pressure from them I
decided to invest.

    . . .

The sad thing about this is that they sounded so
professional and sincere but now seeing what was done
leaves me with no doubt that they new their was trouble and
yet they keep trying to get more money from innocent
people.

From victims J.S. and M.S.:

The financial loss is the greatest impact.  Secondly, when
you spend your life be honorable you expect others to be
forthright, honest and not deceptive.  This one threw me a
real curve.  This investment was recommended to me by a
friend.  Now we've both been burned.

From victim A.H.S.:

Much good could have been done by that $5,000 [invested].
I could have helped my children with educational costs, or
possibly I could have given the money to various charities.
. . .

From victims A.W. and R.W.:

We still haven't recovered from this terrific loss of
income and loss of growth as we near retirement.  We have
always lived below our means and this has set us back
farther.  We are waiting to see if there is any Restitution
from the Millions they have.

From victim S.W.:

My Husband and I invested $5,000.00 dollars to Giga Pix in
April 2007.  We were told that our money contribution was
surely going to make us rich. . . .  After we invested we

29

waited patiently and nothing became of the company.  I was
called and pressured on several occasions again to invest
more money with the promise that Giga Pix was definitely
going to go big.  My Husband and I are on a tight budget
and thankfully I never invested anymore than the $5,000.00
with Giga Pix.  Although $5,000.00 might not be a lot of
money to some of the rich people, it is to us.  I hope the
Judge will make the guilty pay restitution and send back
our $5,000.00 that was stolen by false promises.  I am
thankful that we have a law that will finally stand up for
what is right.  So many times people get away with crime.
This time I pray that this Judge will stand up for the many
victims involved in this fraud.

From victim L.K.:

The loss of $85,000 has substantially affected my
retirement security.  My initial investment of $20,000 was
made while still employed; the additional investments of
$65,000 were made after losing my job in Apr. 2008.  The
person from Gigapix who called to sell me on making the
investments knew that I had lost my job; he assured me that
this was an amazing investment that would bring a great
return.  I now am scrambling to earn any income I can
wherever I can.

During one of my trips to S. Cal to visit my mom, I brought
her with me to tour the Gigapix studio, where we met
personally with David Pritchard and Chris Blauvelt.  I am
now very embarrassed to have trusted these supposedly
'highly respected' people in the industry.  This experience
has not only taken a large financial toll, but an emotional
one as well.

From victim P.M.:

I don't even know how to begin this letter but let me share
with you the **DEVASTATING** IMPACT THAT Gigapix studios had on
my life.

When my brother separated from his wife after 34 years of
marriage he came to me and requested financial help.  I was
able to help him but at the same time I had heard about
Gigapix and was told how much we would profit from
investing with them. . . .

Because I could no longer help my brother financially, he
took his life, by committing suicide, this last year.  I am
DEVASTATED at the lost of losing my brother.  Until you
have gone through this, no one knows or even cares the
impact that this has on your life.  I am so MAD at Gigapix
and their continually lying to me about what was going on
and how soon I would be seeing profits.  Yes, I would love
to have my money back, but more importantly, I want my

30

brother back.  Because of their lies, I no longer have a
brother.

I hope upon sentencing them, they realize the impact that a
scam has on people's lives and what it has cost the
investors.  I will **never get my brother** back because of
what they did with their lies and the phony baloney they
kept telling people. . . .

PLEASE, let these people (Gigapix), know what they have
done to my life.

From victim S.B.:

When my husband Sal and I were married in 1992, he promised
to love and take care of me, which he did financially until
his health made him take an early retirement.  As he was no
longer able to work outside of the home, he felt that he
could best provide for our family with two teenage
daughters, (one with severe disabilities) through taking
some of our savings and making good investments.  He
researched GigaPix and made the investments in the company
with due diligence, talking with Chris Blauvelt and Dave
Pritchard by phone, by e-mail, and by visiting with them in
person in Chatsworth.  I made the investments with him,
supporting him to have all of his dreams come true. . . .

I had to work 7 years longer than we had planned, partly
due to the lack of funds which were no longer available to
us because of our investments with Chris and David.  During
our marriage, Sal suffered many heart attacks.  His health
deteriorated, and we were unable to participate in many of
the activities which had previously given us much pleasure.

These were years filled with worry and stress.  I was
constantly torn between the need to take care of my
husband, our daughters, and the need to work to support us.
Many days, I left home fearing the worst.  I was unable to
spend the time I wanted, the time Sal needed, because we
chose to trust Chris and David.  . . . Sal and I will never
get that time back.

One year ago, on January 6, 2014, my husband . . . passed
away after his seventh heart attack.  He died before his
'ship came in' when GigaPix and OZ3D finally paid off.
. . . [W]e would have been able to spend much more time
together and our lives would have been much easier and more
comfortable if we had not been swindled out of money
through this group.

From victim C.P.L.:

I invested, LOST, was ROBBED of $10,000! By these thieving,
conniving, scum.  They conned me out of what is for me, a
LARGE sum of my heard earned money, cash I could

31

desperately use now as my job with GE went away at the
First of this year (2014) unemployment Benefits ran out in
20 weeks, the stress caused a cranial subdural heatoma
requiring emergency surgery, leaving me disabled and unable
to work.  My home is going to foreclosure.  I'm unable to
pay my bills and barely keep my wife and daughter fed, I'm
daily reminded of my poor judgment and what these Hollywood
scumbuckets took from me and spent on high living while I
sink deep into debt and my family goes without.

From the son of victim H.B.F.:

My father was a fairly successful oil and gas operator in
Texas for over 60 years.  His health began to fail because
of an undiagnosed case of acute myogenic leukemia several
years before his subsequent death in 2008.  He continued to
go to his office to conduct his regular business but his
secretary informed me he had withdrawn funds inherited from
his mother to "invest" in some unusual enterprises.  I
purposefully moved into his office to help her monitor the
situation.  He exhausted those funds and started using
funds marked for future needs with the family business and
continued to deplete his savings.

The defendants, by their actions, almost brought my
parent's 60+ year marriage to a divorce because my mother
realized he was being swindled and had already lost several
hundred thousand dollars.  Dad was at that time trying to
regain what he had lost but unfortunately there was no
quick fix to a lifetime of slow but steady accumulation of
funds. . . .

It is more than a helpless feeling to daily see your father
continue to be preyed upon by the relentless onslaught of a
set of individuals like the defendants.  He had worked hard
to get where he was in life and to have a group of greedy
individuals who predominantly prey on the elderly is a
complete travesty.   . . .

Judge understand that the sentence passed on the defendants
will never come close to mitigating the financial and
emotional damage they have done to my family.  They
perpetrated their enterprise with willful malice of
forethought and preyed on those in your society that were
not able to defend them.  This white-collar crime is no
different that Madoff or Ken Lay with Enron except in it's
size.

Please understand that there is no prison course study or
medication available to treat a defendant where they lack
compassion for those around them that are the most
helpless.  I only ask that you sentence them to the maximum
time available for this crime and thereafter keep them away
from any situation with the elderly or functionally
disabled so no one has to go through what we had to endure

32

in the future.

From victim D.N.:

[Unintelligible] and depression on my part, plus anger,
sadness made me go into self isolation, and not thinking of
the family situation, but seeing what happens to me affects
all of them.  I was so disappointed in myself for being
taken by Gigapix, that I wasn't thinking properly.  Meaning
I was a strong outgoing person going the opposite
direction, not wanting to go anywhere or talk to anyone has
its repercussions on all of them.  This investment was
supposed to make a better life for all of us, but instead
it put us in the poor house.  I almost lost everything,
including love of family over this.  It's like my hole
world collapsed around me, loans started to default, money
got tighter, credit score from 760 to 500 fast couldn't get
credit anymore, loans became high interest.  Could not
refie home, can't buy a car, and ate Top Ramen for over 2
years, yes I'm very angry.


From victim C.K.:

I am deeply upset that so many people as well as myself
have lost hard earned income due to this type of illegal
activity. . . .  I should have become suspect when the
salesman directed me to declare to a personal financial
position that was beyond my means, but necessary to invest
with the defendants' business ventures.  My personal
finances have been detrimentally affected by the tens of
thousands I lost in my investments with the defendants and
their businesses.  I trust your Honor will proffer the
strongest penalties to the defendants to hopefully deter
any future actions against unwitting persons by same minded
individuals.


From victims S.W. and G.W.:

I get sick to my stomach every time I think about Greg
Pusateri's lies and false statements and how he not only
took from me but many other individuals/victims.  Since I
had worked many years to save this money for retirement, it
will definitely postpone any possible way for retirement.

Since I make barely 30,000 per year, the money was a big
part of my savings for retirement.  It took me years to
save that amount.

33

From victim L.S.H.:

We lost $25,000, which is a year's wages for me. . . .  We had bills we couldn't pay. . . .  We are nearly retirement age and instead must work several more years to make is up.

From victims J.W.H. and K.W.H:

The money we invested with Gigapix were funds for our retirement.  Setting aside that amount ($5,000) annually, basically set us back 3 years.  It was not easy to regroup, or simply say "oh well."  We had a difficult time, as it was the same time my company lost money with the economic downturn and less money was available to put towards retirement.  Just very frustrating and economically damaging.

The loss figure under represents the seriousness of the offense because there is no guideline enhancement in this case that reflects the severe pain and suffering defendant inflicted on his victims. USSG § 3A1.1(b)(1) provides for an upward adjustment of two levels if the offense involves vulnerable victims.  However, this guideline does not take into account the emotional, physical, and financial harm defendant visited on his victims.  In fact, USSG § 2B1.1, Commentary Note 19(A)(ii) includes as a reason for upward departure: "The offense caused reasonably foreseeable, psychological or psychological harm or severe emotional trauma."

Defendant argues that her role in the offense warrants a downward adjustment.  However, defendant earned more than any other salesperson -- $650,000 -- and thus she is directly responsible for more of the pain and misery described above than any other salesperson.  Given that commissions were 20%, it appears that defendant personally brought in $3,250,000.  Thus for defendant to claim a lesser role in the offense is absurd.

On the other hand, there are several mitigating factors.

34

Defendant has lived 65 years without a prior criminal conviction, she had a difficult upbringing, and she has performed a great deal of charitable work.  The government believes that this all indicates that a sentence below the guidelines is appropriate.  However, the government cannot agree with defendant's request for a probationary sentence.  Defendant was a highly culpable member of the egregious scheme to defraud in this case, and personally brought in over $3 million.  While she earned hundreds of thousands of dollars, her victims were left with nothing.  Thus, a significant sentence is warranted.

This court should also recall that while defendant was not charged in connection with her conduct while at Big Sky Entertainment, that company was also a scam, and all of its investor victims lost their money.  Thus, for three years prior to her employment at Gigapix, defendant solicited investments from individuals into a movie company that is the subject of federal and state fraud investigations.  (PSR ¶ 106 and n.4.)

**B.    "(2) the need for the sentence imposed**

      **1.    "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."**

The government has discussed the extreme seriousness of this offense above.  Given the egregious nature of the offense, the government believes a significant sentence is necessary for just punishment.

      **2.    "(B) to afford adequate deterrence to criminal conduct."**

A significant sentence provides general deterrence to defendants

35

who would commit investment-type scams.  The government hopes that a significant sentence would provide specific deterrence to this defendant as well.

> 3.  "(C) to protect the public from further crimes of the defendant."

The government does not believe that defendant poses a threat to society.

> 4.  "(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Following a guidelines sentence avoids disparity between similarly situated defendants.  United States v. Green, 592 F.3d 1057, 1072 (9th Cir. 2010) (sentencing guidelines exist to create national uniformity of sentencing); quoting United States v. Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008) ("[W]e have trouble imagining why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants are likely to receive").

In this case, the guidelines are so high that a downward adjustment would not cause undue disparity with other similarly situated defendants.

> 5.  "(7) the need to provide restitution to any victims of the offense."

There is no indication that defendant will ever be able to pay back the victims of this crime.  Thus, it is unnecessary to believe that an early release from custody would allow him to work to pay the victims back.

1

## VI.   CONCLUSION

2     For the foregoing reasons, this Court should sentence defendant

3 to a significant term of custody.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Belinda B. Tunque, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **GOVERNMENT'S POSITION RE: SENTENCING FACTORS AND RESPONSE TO DEFENDANT CHERIE BROWN'S POSITION RE: SENTENCING FACTORS; SENTENCING MEMORANDUM** service was:

[X]  Placed in a closed envelope, for collection and interoffice delivery addressed as follows:     [ ]  Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ]  By hand delivery addressed as follows:     [ ]  By facsimile as follows:

[ ]  By messenger as follows:     [ ]  By federal express as follows:

**Alexis Berg, United States Probation Officer**
**United States Probation Office**
**312 North Spring Street, 11th Floor**
**Los Angeles, CA  90012**

This Certificate is executed on February 11, 2015, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

*Belinda B. Tunque*