RICHARD M. CALLAHAN, JR.
225 South Lake Avenue, Suite 300
Pasadena, CA  91101
Telephone:  (626) 202-4060
Telecopier:  (626) 794-4676
State Bar No. 100446
Email: *rmcallahanjr@gmail.com*

Attorney for Defendant
GREGORY PUSATERI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  CR 14-282-R-4 |
| Plaintiff, | **DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM** |
| vs. | |
| DAVID PRITCHARD, *et al.,* | Date:   February 23, 2015 |
| Defendants. | Time:   10:00 a.m. |
| | Place:  Courtroom of the Honorable Manuel L. Real |

Defendant Gregory Pusateri, by and through his counsel of record, hereby submits his sentencing memorandum in the above-captioned matter.

Dated:  February 15, 2015.

Respectfully submitted,

THE LAW OFFICES OF
RICHARD M. CALLAHAN, JR.

By: _____
RICHARD M. CALLAHAN, JR.
Attorney for Defendant
GREGORY PUSATERI

## TABLE OF CONTENTS

Page

I. INTRODUCTION ……………………………………………………….. 1

II. MR. PUSATERI'S FACTUAL CORRECTIONS TO THE
PRESENTENCE REPORT …………………………………………. 2

III. MR. PUSATERI'S LEGAL OBJECTIONS TO THE PRESENTENCE
REPORT ………………………………………………………………….. 2

  A. THE LOSS CALCULATION IN THE PSR IS DRASTICALLY
OVERSTATED ………………………………………………….. 3

    1. Mr. Pusateri Joins the Government in the Revised Loss Calculation
Since Mr. Pusateri Left Gigapix in the Summer of 2010, So Funds
Invested in OZ3D After That Date Are Not Attributable to Him …..…. 3

    2. There Is No Reliable Evidence That the "Loss" in This Case
Was Remotely Close to the $20 Million-Plus Figure in the
Presentence Report …………………………………………… 4

    3. Greg Pusateri Can Only Be Held Accountable for
His Participation in "Jointly Undertaken Criminal Activity" ……….. 5

  B. THERE IS NO REASONABLE BASIS FOR IMPOSING
A SIX-LEVEL GUIDELINE ENHANCEMENT BASED
ON HAVING MORE THAN 250 VICTIMS …………………………. 8

  C. THE PROPOSED TWO-LEVEL ENHANCEMENT FOR
"VULNERABLE VICTIMS" IS NOT APPLICABLE TO
MR. PUSATERI ……………………………………………….. 9

IV. § 3553(a) FACTORS WARRANT A SIGNIFICANT
SENTENCING VARIANCE FOR GREG PUSATERI ………………….. 10

  A. GREG PUSATERI'S PERSONAL HISTORY WARRANTS
A VARIANCE ……………………………………………………... 11

    1. Greg Has Lived a Law-abiding Life…………………………………... 11

    2. Greg Pusateri Has Demonstrated His Good Character ……………….. 11

    3. Greg Pusateri's Family Circumstances Warrant a Variance …………. 12

  B. A VARIANCE IS NECESSARY TO AVOID "SENTENCING
DISPARITY" ………………………………………………….. 14

CONCLUSION ……………………………………………………………... 15

1

## **TABLE OF AUTHORITIES**

2
**Page(s)**

3
**Cases**

4

5
*United States v. Arutunoff,*
    1 F.3d 1112 (10th Cir. 1993)............................................................................. 8

6

7
*United States v. Autery,*
    555 F.3d. 864 (9th Cir. 2009)........................................................................... 12

8

9
*United States v. Bernot,*
    2014 U.S. Dist. LEXIS 65234 (E.D. Cal. May 9, 2014) ...................................7, 8

10

11
*United States v. Blinkinsop,*
    606 F.3d 1110 (9th Cir. 2010)......................................................................... 11

12

13
*United States v. Blitz,*
    151 F.3d 1002 (9th Cir. 1998).......................................................................... 7

14
*United States v. Bueno,*
    549 F.3d 1176 (8th Cir. 2008)......................................................................... 12

15

16
*United States v. Carty,*
    520 F. 3d 984 (9th Cir. 2008).......................................................................... 11

17

18
*United States v. Gregorio,*
    956 F.2d 341 (1st Cir. 1992) ............................................................................ 8

19

20
*United States v. Hicks,*
    217 F.3d 1038 (9th Cir. 2000)........................................................................... 4

21

22
*United States v. Johnson,*
    964 F.2d 124 (2nd Cir. 1992)........................................................................... 12

23

24
*United States v. Leon,*
    341 F.3d 928 (9th Cir. 2003)........................................................................... 12

25
*United States v. Luca,*
    183 F.3d 1018 (9th Cir. 1999).......................................................................... 9

26

27
*United States v. Owens,*
    145 F.3d 923 (9th Cir. 1998)........................................................................... 12

28

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

*United States v. Pauley,*
   511 F.3d 468 (4th Cir. 2007)................................................................. 12

*United States v. Ressam,*
   679 F.3d 1069 (9th Cir. 2012).........................................................10, 14

*United States v. Showalter,*
   569 F.3d 1150 (9th Cir. 2009)................................................................. 9

*United States v. Studley,*
   47 F.3d 569 (2nd Cir. 1995)...................................................5, 6, 7, 8

*United States v. Tadio,*
   663 F.3d 1042 (9th Cir. 2011)............................................................... 11

*United States v. Tomko,*
   562 F.3d 558 (3rd Cir. 2009)................................................................ 11

*United States v. Treadwell,*
   593 F.3d 990 (9th Cir. 2010)................................................................4, 5

*United States v. Tzoc-Sierra,*
   387 F.3d 978 (9th Cir. 2004)................................................................. 14

*United States v. Veerapol,*
   312 F.3d 1128 (9th Cir. 2003)................................................................. 9

**Statutes**

18 U.S.C. § 3553(a) ..........................................................*passim*

U.S.S.G. § 1B1.3 .........................................................3,5,6, 8

U.S.S.G. § 2B1.1 .........................................................3,4,8 9

U.S.S.G. § 3A1.1(b)(1) ..................................................... 9

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

## GREG PUSATERI'S SENTENCING MEMORANDUM

### I

### INTRODUCTION

Greg Pusateri comes before this Court for sentencing after being found guilty in a jury trial on charges of mail fraud, wire fraud, and selling unregistered securities, arising out of his job as a phone salesperson for investments in Gigapix Studios and OZ3D LLC. Four people were indicted for their actions at Gigapix:  David Pritchard, Chris Blauvelt, Cherie Brown, and Mr. Pusateri.  Ms. Brown and Mr. Pusateri were severed from the case and tried separately.  Messrs. Pritchard and Brown were convicted, and sentenced on February 9, 2015.  Despite each being found to have advisory Guideline ranges of 324-405 months, and with the government seeking 20-year sentences for both, Mr. Pritchard was sentenced to five (5) years in custody; Mr. Blauvelt received a sentence of eight (8) years.  Notwithstanding the sentences for Messrs. Blauvelt and Pritchard were dramatically below not only the advisory Guideline range but also the Government's sentencing recommendations, the government has submitted its sentencing papers for Mr. Pusateri, recommending "a significant term of custody."[1]

Regarding the Guidelines, Mr. Pusateri argues that 1) the loss calculation advocated by the prosecution is dramatically inflated, 2) there were not greater than 250 victims, and 3) there should be no "vulnerable victim" enhancement.  As to § 3553(a) factors, in light of Greg's age, his sterling background, and his family obligations, a substantial variance is warranted.  In addition, a variance is required to avoid disparity in sentencing.

/

/

/

---

[1] To avoid any confusion, the Government Sentencing Position for Mr. Pusateri mistakenly states at page 9, lines 2-4, that the government is recommending a 240-month sentence for Mr. Pusateri. Government counsel concurs this recommendation for Mr. Pusateri was in error.

-1-

## II

## MR. PUSATERI'S FACTUAL CORRECTIONS
## TO THE PRESENTENCE REPORT

Mr. Pusateri has a blanket objection to the "Offense Conduct" portion of the Presentence Report (¶ 10-¶ 39), but notes the following paragraphs in particular since it is not believed they are in dispute:

**¶ 16:** The Presentence Report claims that Mr. Pusateri and the other defendants executed a scheme to defraud between 2006 and 2012. Mr. Pusateri left Gigapix in the late summer of 2010, and he had no association with Gigapix or the co-defendants for the final two years of Gigapix's existence.

**¶ 29(e):** Mr. Pusateri was no longer working at Gigapix on June 1, 2011, and never sold a $100,000 membership to D.Z.

**¶ 30:** Mr. Pusateri left the employ of Gigapix in the late summer of 2010, so the loss calculation is inflated. This issue will be dealt with in Section III, below.

**¶ 35(f):** Tiffany Ryan never directly heard Mr. Pusateri make misrepresentations over the phone, and there was no testimony at trial to the contrary.

**¶ 41:** See response to ¶ 30, above.

**¶ 54:** *Id.*

**¶ 75:** This incident occurred 25 years ago when Greg was a young man, and he jumped in a neighbor's swimming pool in the middle of the night resulting in the homeowner contacting law enforcement. This is a non-issue.

## III

## MR. PUSATERI'S LEGAL OBJECTIONS
## TO THE PRESENTENCE REPORT

While the four defendants each have facts and arguments unique to their particular case, they share common ground in challenging several critical Guideline arguments, to wit: 1) the loss calculation, 2) the proposed enhancement for a scheme involving over 250 victims, and 3) the proposed "vulnerable victim" enhancement. For purposes of

brevity, it is the intention of this memorandum to adopt certain Guideline arguments raised by Mr. Pusateri's co-defendants, supplement those arguments when appropriate, and present several new arguments on Mr. Pusateri's behalf.

## A.  THE LOSS CALCULATION IN THE PSR IS DRASTICALLY OVERSTATED

### 1.  Mr. Pusateri Joins the Government in the Revised Loss Calculation Since Mr. Pusateri Left Gigapix in the Summer of 2010, So Funds Invested in OZ3D After That Date Are Not Attributable to Him

The Presentence Report initially recommended a 22-level increase in the offense level under U.S.S.G. § 2B1.1(b)(1)(L) for a loss of greater than $20 million but less than $50 million.  As a preliminary matter, however, Mr. Pusateri left the employ of Gigapix in the late summer of 2010, so investment dollars received after that time cannot be attributed to Greg as "relevant conduct" since he was no longer part of the alleged "jointly undertaken" activity.  U.S.S.G. § 1B1.3(a)(1)(B).  Analysis of several key bank accounts provided in discovery[2] shows that at least $2,083,100 of the $21 million raised through investors was obtained after Greg left the company.  While not a complete list of investor dollars Gigapix and its related entities received after Greg left, merely subtracting those monies received in 2011 brings the loss amount—even adopting for the moment the prosecution's disputed methodology—to $18,799,654.66, well under $20 million.  Although the government's revised calculation is approximately $500,000 higher than that determined by the defense, for purposes of Guideline offense level calculations, the difference is irrelevant.  The revision reduces the recommended 22-level adjustment under § 2B1.1 to 20 levels, a reduction of two levels.  Immediately taking this $2.1 million off the top provides the appropriate starting point in challenging the prosecution's loss calculation.

/

---

[2] The accounts reviewed for this analysis included OZ3D account xxxxxx797, Gigapix account xxxxxx319, and Gigapix Releasing account xxxxxx931.

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

## 2. <u>There Is No Reliable Evidence That the "Loss" in This Case Was Remotely Close to the $20 Million-Plus Figure in the PSR</u>

It is the government's burden to prove the loss enhancement under U.S.S.G. § 2B1.1 and in light of the disproportionate effect that the loss has on the sentence, it must do so with clear and convincing evidence. *United States v. Treadwell*, 593 F.3d 990, 1000-01 (9th Cir. 2010). The Probation Office calculated the loss amount under a false premise, resulting in a dramatically inflated loss figure. The fundamental flaw in their methodology is the assumption that *all* of the investors invested based on misrepresentations. The government has offered victim impact statements from fewer than 7% of investors. The government bears the burden of proving the defendant's relevant conduct proximately caused the victims' loss. *United States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000).

It cannot be disputed that Gigapix was a legitimate company that failed because of fiscal mismanagement and fraud committed by Pritchard and Blauvelt. Trial testimony from FBI accountant Tonya Pinkerton showed the vast majority of investor funds went for business-related expenditures, such as administrative (40.5%), sales (23.4%) and production costs (21.0%), which proves the legitimacy and sincerity of the efforts to make Gigapix succeed.

Mr. Pusateri proffered evidence from several investors who would have testified Mr. Pusateri warned them of the substantial risks involved in the offering. Letters from additional investors attached to this sentencing memorandum affirm this point. The loss calculation based on the submitted victim impact statements is less than $2.5 million, which results in a 16-level adjustment under U.S.S.G. § 2B1.1(b)(1)(I).[3]

/

---

[3] The details of Mr. Pusateri's loss argument were extentively briefed by his codefendants, and those arguments are incorporated herein by reference. *See* Defendant Blauvelt's Sentencing Position [Dkt. 263] at pgs. 2-7; Defendant Pritchard's Sentencing Position [Dkt. 283] at pgs. 10-15; Defendant Brown's Sentencing Position [Dkt. 301] at pgs. 8-10.

### 3. **Greg Pusateri Can Only Be Held Accountable for His Participation in "Jointly Undertaken Criminal Activity"**

The Presentence Report recommends that Mr. Pusateri be held accountable for the actions of other defendants procuring investor funds under the doctrine of "jointly undertaken criminal activity." U.S.S.G. § 1B1.3. Besides not being responsible for any investor proceeds received by Gigapix or OZ3D after Mr. Pusateri left the employ of Gigapix, Mr. Pusateri should only be accountable for those investor funds he himself brought to Gigapix, and not those solicited by other telemarketers.

U.S.S.G. § 1B1.3 states when a defendant has engaged in "jointly undertaken criminal activity," relevant conduct under the Sentencing Guidelines includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense …." U.S.S.G. § 1B1.3(a)(1)(B) (2014). The court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that 1) fell within the scope of the defendant's agreement with his co-conspirators and 2) was reasonably foreseeable to the defendant. *United States v. Treadwell, supra* at 1002 (citations omitted).

One of the key sentencing issues for Mr. Pusateri is determining under what circumstances a telemarketer should be held to be engaged in "jointly undertaken criminal activity" with other telemarketers and executives at that company. The leading case on this issue is *United States v. Studley*, 47 F.3d 569 (2nd Cir. 1995). Studley was a telemarketer who pleaded guilty for a scheme involving fraudulently inducing a customer to pay a $249 application fee for a loan the customer would never receive. The company where Studley worked employed between 10 and 20 salespeople, all of whom were making similar false representations to customers. As in this case, the Probation Office recommended Studley be held accountable for the entire loss caused by the

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

telemarketing operation during the term of his employment.  Studley objected, arguing that the actions of other employees were not "jointly undertaken criminal activity" as described in U.S.S.G. § 1B1.3.  The district court sided with the Probation Office and held Studley accountable for the entire loss, ruling that the salespeople "were all together in one plan or scheme," and "that plan was to act together to call people to send in money for loans."  *Id.* at 576.

The Second Circuit, however, held the actions of others at the telemarketing firm were not jointly undertaken criminal activity, and remanded the case for resentencing. After analyzing the illustrations provided in the notes to § 1B1.3, the Court set forth the facts showing Studley was not involved in jointly undertaken criminal activity, including:

1) Studley did not design or develop the telemarketing scheme;
2) There was no evidence Studley worked to further the scheme outside of his sales efforts;
3) Studley was paid on pure commission, and received none of the profits of the overall operation;
4) There was no evidence Studley assisted other representatives with their sales, and in fact was competing against other sales representatives for commissions;
5) Even though Studley shared office space and the phone bank with other telemarketers, neither Studley nor the other salespeople contributed to the telemarketing scheme or pooled their resources.

*Id.*  The Court concluded:

The evidence proffered to date supports the conclusion that Studley's agreement to participate in the fraudulent scheme was limited to his own fraudulent activity and did not encompass the fraudulent activity of the other representatives.  His objective was to make as much money in commissions as he could.  He had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales.

*Id.*  The *Studley* factors provide the perfect template for Mr. Pusateri's case.  As in *Studley*, Greg Pusateri did not design or develop a scheme; he went to work at Gigapix because of its expertise in sound and animation.  There has been no evidence that Greg

-6-

did anything to further the purported scheme outside of his sales efforts.  As in *Studley*, Greg was purely a commissioned salesman, and his income was not based upon the efforts of other salespeople.  Finally, there is no evidence the Greg assisted other salespeople with their sales, as he was in direct competition with them.

The *Studley* factors have been used in this circuit as the model for "jointly undertaken criminal activity" analysis in several telemarketing cases, including *United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998), and more recently by the district court opinion in *United States v. Bernot*, 2014 U.S. Dist. LEXIS 65234 (E.D. Cal. May 9, 2014).  In *Blitz*, the Court distinguished *Studley* by its facts and found jointly undertaken criminal activity with other telemarketers in two significant regards.  First, unlike *Studley*, the telemarketers all worked together to further the scheme, including assisting one another to make a sale, attending sales meetings together where the fraudulent sales pitches were discussed, and problem customers were referred to one of the co-owners to handle their complaints to keep them from demanding a refund.  Second, unlike *Studley*, the employees did not work on a pure commission basis.  Rather most received a salary making the sales representatives dependent upon each other and the success of the company overall for their compensation.  *Blitz* is distinguishable from the case at hand.

In contrast, the court in *Bernot* found that the defendant's relevant conduct should be limited to those telemarketing transactions in which he was directly involved. Relying on the factors, the court found joint involvement with codefendants for three transactions, but no other jointly undertaken criminal activity was found since Bernot was paid on commission, and outside of those three limited transactions, there was no evidence the codefendants worked together directly or pooled their profits.  Further, as in *Studley*, the Court refused to find jointly undertaken activity merely because the defendants attended at least one meeting together, coordinated mailings, worked out of the same location, and relied on the same support staff.  *Id.* at *18.  While the Court expressed concerned that Bernot 1) was a "team leader" where he could receive additional commissions based on his team's performance, 2) served as a contact for new

hires, and 3) was involved with the fraud since its inception, the Court held that "[o]n the totality of the record before the court, the government has not carried its burden of showing, by a preponderance of the evidence, that Mr. Bernot's relevant conduct extends beyond the [three specified] transactions." *Id.* at \*20.

Under *Studley*, and as reinforced by *Bernot*, Mr. Pusateri should be held responsible under U.S.S.G. § 1B1.3 for no greater than the total of investors he personally sold—in whole or with an associate—Gigapix or OZ3D. As the Presentence Report points out, the loss calculation for the alleged scheme prepared by the government covers the period July 31, 2006 through December 31, 2012. [PSR at ¶ 30]. Using the financial spreadsheets provided to the defense prior to trial, the investor funds obtained through Mr. Pusateri during the duration of the purported scheme was $2,340,321. Again, even accepting for the moment the government's flawed premise that every investor dollar should be added to the loss total—notwithstanding that a substantial amount of investor funds went for legitimate business expenses, and that many investors do not believe Greg Pusateri defrauded them—the gross amount attributable to Mr. Pusateri would add no more than 16 levels to the offense calculation, rather than the 20 levels encouraged by the Probation Office and the government.[4]

**B.**   **THERE IS NO REASONABLE BASIS FOR IMPOSING A SIX-LEVEL GUIDELINE ENHANCEMENT BASED ON HAVING MORE THAN 250 VICTIMS**

As with the other defendants, the Presentence Report and the government recommend a six-level enhancement for Mr. Pusateri under U.S.S.G. § 2B1.1(b)(2) claiming that the underlying scheme to defraud involved over 250 victims. Mr. Pusateri joins in the argument raised by codefendants pointing out the government has presented

---

[4] Even if the Court finds that Greg and the other salespeople were involved in "jointly undertaken criminal activity" from a purely Guideline standpoint, a variance from the Guidelines is warranted. *See United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993); *United States v. Gregorio*, 956 F.2d 341, 344-348 (1st Cir. 1992).

1  a list of 663 investors in Gigapix and OZ3D in order to obtain this enhancement, but *has*

2  *provided no information showing victim status for* 93% of those individuals it hopes to

3  include in this select group.  As noted by the Ninth Circuit in *United States v. Showalter*,

4  569 F.3d 1150, 1160 (9th Cir. 2009), "[t]he Guidelines do not . . . allow a district court

5  to "estimate" the number of victims to enhance a sentence under § 2B1.1(b)(2)," and

6  that the government must provide "at least *some* evidence of support" of its sentencing

7  calculations." *Id.* (emphasis in original).  The only evidence provided by the government

8  is 47 victim impact statements, so the appropriate enhancement under § 2B1.1(b)(2)(A)

9  is two levels, not the six-level adjustment sought by the government.

10  **C.   THE PROPOSED TWO-LEVEL ENHANCEMENT FOR**

11  **"VULNERABLE VICTIMS" IS NOT APPLICABLE TO**

12  **MR. PUSATERI**

13       Mr. Pusateri joins his codefendants in arguing he should not be burdened with an

14  additional two offense levels for targeting "vulnerable victims," under U.S.S.G. §

15  3A1.1(b)(1).  U.S.S.G. § 3A1.1(b)(1) provides that "[i]f the defendant knew or should

16  have known that a victim of the offense was a vulnerable victim, increase by 2 levels.

17  The application notes to that section define vulnerable victim as a person . . . who is

18  *unusually* vulnerable due to age, physical or mental condition, or who is otherwise

19  particularly susceptible to the criminal conduct.  §3A1.1, Application note 2 (emphasis

20  added).

21       In determining whether the "vulnerable victim" enhancement is warranted, two

22  essential elements must be satisfied:  1) one or more of the victims must belong to a class

23  particularly vulnerable to that criminal activity, and 2) there is one or more individual

24  victims whom the defendant knew or should have known were unusually vulnerable by

25  membership in the class identified.  *United States v. Veerapol*, 312 F.3d 1128, 1133 (9th

26  Cir. 2003); *United States v. Luca*, 183 F.3d 1018, 1025 (9th Cir. 1999).  Application Note

27  2 to this Guideline provides the perfect example of why this enhancement should not be

28  imposed upon Mr. Pusateri:

1
2
3
4
5
6

> The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. *But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.*

7
8
9
10
11
12

(Emphasis added.)   There is absolutely no evidence that Mr. Pusateri "targeted" any investor based on age or other vulnerability.   The government wrongly asserts in its sentencing position that Greg had solicited the four investors who testified against him . None of the four investors who testified against Mr. Pusateri was cold-called or otherwise solicited by Greg.  Each contacted Greg due to recommendations from friends or family.[5]  This enhancement is inapplicable.

13

**IV**

14
15

**§ 3553(a) FACTORS WARRANT A SIGNIFICANT SENTENCING VARIANCE FOR GREG PUSATERI**

16
17
18
19
20
21
22
23

Under Title 18 U.S.C. §3553(a), the Court should consider a variety of factors, including but not limited to 1) the nature and circumstances of the offense and the history and characteristics of the defendant, and 2) the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct.  18 U.S.C. §3553(a); *see also United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012); *United States v. Tadio*, 663 F.3d 1042, 1048 (9th Cir. 2011); *United States v. Blinkinsop*, 606 F.3d 1110, 1114 (9th Cir. 2010); *United States v. Carty,* 520 F. 3d 984 (9th Cir. 2008).   Section 3553(a) further requires the sentencing court to "impose a sentence

24
25
26
27
28

---

[5] Investor D.A. testified he had been discussing Gigapix with his friend, C.H. who recommended D.A. invest.   D.A. testified he believes C.H. provided D.A.'s contact information to Greg. Similarly, investor S.W. could not identify specifically with whom she spoke before her initial investment.   Investor L.H. testified that another investor, P.M., had told her great things about Gigapix, and L.H. had P.M. permission to pass her contact information on to Gigapix.   Finally, although investor J.G. testified he spoke to Mr. Pusateri, it is unclear whether he initially spoke with Greg or with Chris Blauvelt.

sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." *Id.; Carty* at 989.

## A.   GREG PUSATERI'S PERSONAL HISTORY AND CASE CIRCUMSTANCES WARRANTS A VARIANCE

### 1. <u>Greg</u> <u>Has</u> <u>Lived</u> <u>a</u> <u>Law-abiding</u> <u>Life</u>

Greg is 50 years old, and this is his first felony conviction.[6]  Having a minimal criminal record, and no criminal history points—especially at Greg's age—can warrant a below-guideline sentence. *See United States v. Tomko*, 562 F.3d 558 (3rd Cir. 2009).

### 2. <u>Greg</u> <u>Pusateri</u> <u>Has</u> <u>Demonstrated</u> <u>His</u> <u>Good</u> <u>Character</u>

Greg has spent his fifty years leading an exemplary life.  Greg and his wife Judy have three young daughters, Kaylee (age nine), Kaycee (age six), and Katherine (age two).  In light of Greg's conviction, the family is relocating to Las Vegas to rent a home there due to less expensive housing.  Greg has been a strong and devoted husband, and a positive role model for his three girls.  He has no history of substance abuse, is law abiding, and is fully supported by his family.  "Greg is almost too giving, and sometimes people will take advantage of him," Greg's wife Judy writes.  "This is why I love him so much.  He was always thinking of others rather than himself."  His girls Kaylee and Kaycee echo these warm sentiments about Greg: "He is the best Dad in the world."  His longtime friend Keith Dickens writes of their careers in the entertainment business, and his respect for Greg.  "Putting someone like Greg Pusateri in jail would be taking one of the good, honest and upstanding citizens out of society," Dickens writes.  "With the times we live in today, that is one of the last things that are needed."  His colleague at Gigapix, Richard Jamison, puts it very simply:  "I have known Greg Pusateri for 11 years," he writes.  "He is a friend and I know his heart.  He is a good man.  He is a good husband, a good father, and a good friend."

---

[6] As noted previously, Greg's only previous "brush" with the law was as a young man when he was arrested for trespassing after jumping into his neighbor's swimming pool and receiving a $150 fine.

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

Such a wonderful life warrants a variance. *See United States v. Autery*, 555 F.3d. 864, 874 (9th Cir. 2009) (variance warranted based on defendant's personal attributes, such as "having no history of substance abuse, no interpersonal instability, no sociopathic or criminalistic attitude, his motivation and intelligence, and the support of his wife and child"); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (downward variance since defendant was a "good parent" valid consideration under § 3553(a)).

### 3. <u>Greg **Pusateri's** <u>Family</u> <u>Circumstances</u> <u>Warrant</u> <u>a</u> <u>Variance</u></u>

As noted in several of the attached character letters, the Pusateri family is extremely concerned about Greg being incarcerated because of health issues suffered by his wife, Judy, and how that would affect the children.  When a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the critical inquiry is the effect of the defendant's absence on his family members. *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992).  "The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *Id. See also United States v. Bueno,* 549 F.3d 1176 (8th Cir. 2008) (drug defendant with Guideline range of 9-11 years given five years of house arrest due to wife's life-threatening illness and reliance on defendant); *United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) (six-level departure granted because defendant was sole caregiver for his wife who suffered from renal failure and was suicidal); *United States v. Owens*, 145 F.3d 923 (9th Cir. 1998) (crack cocaine dealer receives substantial departure where he maintained good relationship with his three children, and wife maintained that if defendant went to prison she might have to move to public assisted housing and receive welfare).

Judy Pusateri's medical condition makes it nearly impossible for her to have confidence in her sole ability to keep her children safe.  As she writes in her letter to the Court:

> I suffer from vertigo and often black out along with having a broken leg which makes it very hard to drive, and the stress of this whole

-12-

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

ordeal has made things worse.  I am a wreck, and I haven't worked since getting pregnant with our third child 3 years ago.  The fear of blacking out with three little girls is why I need my husband by my side.  I rely on Greg for just about everything from picking the girls up from school to all of the shopping for everything.  Greg takes care of the girls when I am not feeling well, and helps them with their home work.  Greg is there for the girls when I can't be there ….  I wouldn't know how to tell our three little girls that their Daddy wouldn't be there for them any more. Who would protect them?… Who would help them with their home work if I am sick?  Most importantly who will provide for them?

Greg and his girls share Judy's concerns about her health and the impact on the family. Greg writes:

I am very concerned about her health.  I am scared that if I am not there to help her something horrible could happen to not only her, but my beautiful little girls.  The girls are still too young to know what to do when my wife faints.  They get scared and begin to cry. If I am not around to help and protect them, I can't imagine what could happen to them.

In their letter, Greg's daughters Kaylee and Kaycee also seek help from the Court:

Some times my Mom faints and can't get up.  When this happens we get really scared and don't know what to do.  My Dad tells us to stay calm and he will make everything OK.  We all get into the Car and take my Mom to the Hospital.  The people at the Hospital call what my Mom has Vertigo.  My Dad tells my Mom not to drive because he is afraid it my happen when she is driving, and doesn't want any of us hurt. My Dad is really worried about my Mom, and her fainting spells.  I don't know what my sisters and I would do if he wasn't there to protect us arid take care of us.  When our mom is sick my Dad has to do everything.  He will take us to school and pick us up from school.  He will cook us dinner and show us how to clean up after and wash the dishes.  He always takes us to church and makes us say our prayers….  My sisters and I are too young to take care of my Mom when she gets sick.  My sisters just cry and I get to scared to do anything when my Mom faints.

This difficult medical and family situation merits a substantial variance from the Court.

/

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

**B.    A VARIANCE IS NECESSARY TO AVOID "SENTENCING DISPARITY"**

Title 18 U.S.C. §3553(a)(6) states that a critical consideration when imposing sentence is "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *See also Ressam, supra* at 1094-95; *United States v. Tzoc-Sierra,* 387 F.3d 978 (9th Cir. 2004).

David Pritchard was President of Gigapix from 2006 through 2012, and was recently sentenced to prison for a term of five years.  According to the government, Pritchard's wrongdoing included, but was not limited to:

    1)  briefing the sales staff on studio developments;

    2)  meeting personally with investors, and made misrepresentations to them;

    3)  authoring false and misleading letters sent to all investors to encourage additional investment;

    4)  using investor proceeds intended for OZ3D to pay off other debts and expenses at Gigapix;

    5)  further mismanaging the investor proceeds by spending only 5% of investor funds on movie-related expenses;

    6)  making over $1 million in salary and commissions;

    7)  misappropriating more than $359,000 of investor funds for his personal use;

    8)  with codefendant Blauvelt, misappropriating an additional $622,000 of investor funds.

What makes Pritchard's conduct all the more disparate in relation to Mr. Pusateri is that Pritchard was found to be a "leader-organizer" of the scheme for Guideline purposes, while neither the government nor the Probation Office seeks such an adjustment for Mr. Pusateri.  Greg was not in a management position, and did not control the investor funds or how they were spent.  Unlike Pritchard, Greg did not misappropriate millions of dollars and spend them on personal extravagances.  Further, the government's key "insider" witness, Gigapix executive Shawn Walker, testified that not only did Pritchard

1  deceive the investors and creditors, but he also deceived Gigapix employees.   The

2  potential for sentencing disparity warrants a substantial variance.

3                                    **CONCLUSION**

4        For the reasons stated, Greg Pusateri should receive a non-custodial sentence.

5  Dated:  February 15, 2015.                    Respectfully submitted,

6                                                THE LAW OFFICES OF
                                                 RICHARD M. CALLAHAN, JR.
7

8                                                By: _____
                                                      RICHARD M. CALLAHAN, JR.
9                                                     Attorney for Defendant
                                                      GREGORY PUSATERI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT GREG PUSATERI'S [#4] SENTENCING MEMORANDUM

# Letters
# in Support of
# Greg Pusateri

Dear Judge,

My name is Gregory Pusateri and I am 50 years old.  The first thing I want to say is that I am truly sorry that the shareholders in Gigapix and OZ3D lost their money.  I would never have worked for Gigapix Studios if I knew the OZ3D movie wasn't going to be made.  Having watched all of the other Gigapix projects come to fruition, I assumed the OZ3D movie would also.  Gigapix has a show called Workaholics still airing on Comedy Central to this day.  Being an Emmy winner, I decided to work for Gigapix because I thought they could be a very successful animation company, and possibly be the next Pixar Entertainment.

The biggest reason for working at Gigapix was its pledge of doing G-rated family entertainment.  I don't have to tell you, Your Honor, that there is very little TV that our children can watch anymore that isn't full of violence, foul language and sex.  I truly believed that Gigapix was going to be successful, because not many entertainment companies produce G-rated family entertainment anymore.  That is the biggest reason that so many shareholders believed in Gigapix Studios.  Your Honor, I was born in Buffalo N.Y. and raised in a Catholic household.  As a child, I participated in athletics and was a Boy Scout.  I was taught to be honest and to always tell the truth, and I have always tried to live up to those principals.  As a father of three beautiful little girls I have tried to teach them those same principals.  My father taught me to give an honest day's work for an honest day's pay.   Growing up I went to church every Sunday, and learned valuable lessons along the way.  Your Honor, I cannot stress enough that I would never take advantage of anybody, or purposely mislead them.

Having said that, it is impossible for me to prove to you that I never told anyone to say they were accredited if they weren't.  I cannot prove to you that I told every shareholder that all investments are risky, and to only invest what you can afford to lose.  I cannot prove that I didn't tell anyone when we would go public, or even how much money we could earn as shareholders, because the truth of the matter is I didn't know the answer to those questions.  If I didn't know the answer then I told them I don't have the answer, Your Honor.  That is why you don't have hundreds of shareholders telling you that I made those statements.  I won't call them liars, because they are good people.  I will say they are confused as to what I told them.  The shareholders didn't have to say that they were accredited, because Chris Blauvelt said he was able to take some non-accredited shareholders.   You heard my boss Ken Gross say that he never heard me make any misrepresentations as long as we worked together, and I sat right next to him. It is simply my word against the witnesses the government provided.  I said the same thing to all the investors, and all of us believed in G-rated entertainment.  What better movie to make than arguably the most beloved children's movie of all time, The Wizard of OZ, in 3D animation?

The only problem is that Gigapix didn't make the movie, and for that I am truly sorry and embarrassed.  I am embarrassed because I was part of a company that let down its shareholders.  I also embarrassed my family and friends by being arrested.  My parents, my wife, and my beautiful children did not deserve this, and for that I am truly sorry.  I also want to say I'm sorry to you, Your Honor, for wasting the court's time with this case.  The Wizard of Oz in 3D should have been made.  Your Honor I have worked for Sony Studios, Warner Bros. Studios &

Saban Entertainment.  All three studios are billion dollar companies.  I cannot stress enough that I would not leave those companies to work for a company that would intentionally scheme to defraud its shareholders.

The only proof you really need is my beautiful family, Your Honor.  I would never knowingly or willfully participate in any scheme to defraud.  I am blessed with a wonderful wife and 3 beautiful little girls, Kaylee age 9, Kaycee age 6,and Katherine age 2.  I would NEVER do anything to risk losing my family.  They are everything to me.  The thought of doing something dishonest would never enter my mind.  My wife suffers from vertigo, and is constantly fainting.  I am very concerned about her health.  I am scared that if I am not there to help her something horrible could happen to not only her, but my beautiful little girls.  The girls are still too young to know what to do when my wife faints.  They get scared and begin to cry.  If I am not around to help and protect them, I can't imagine what could happen to them.  This is why I do not want her to drive a car. Your Honor this whole situation has devastated not only myself but my family as well.  My wife's health has gotten worse.  My oldest daughter has nightmares about the FBI coming to our house with guns, and my middle daughter is always worried that her Daddy is not going to be there to protect her and her mother and sisters.

I beg you to show me mercy, Your Honor.  I hope you will give me the chance to do what Dads are supposed to do with their little girls.  Please let me educate them, protect them, and provide for them.  They deserve a college education. Thank you very much, Your Honor, and once again, I am sorry for wasting your time with this case.  This nightmare never should have happened.

Sincerely,

Gregory Pusateri

December 19th 2014

To Whom it may concern:

I met Greg Pusateri in 1998 just after I arrived to the United States from the Philippines. I was working full time as a care giver for a wonderful lady in the Victorville area. I didn't get out much because of my job and the fact that I had no car. Whenever I could I would go out with my relatives to Los Angeles and dance which is where I first meet the love of my life. When I first meet Greg I was amazed at the kind of a person he was. He was a very kind and caring person and, was always offering to drive to Victorville if I ever needed anything, because he knew that I didn't own a car. He would come and help with my patient if her family wasn't available to take her to the doctor or get her what she needed. It was quite a drive for him from Los Angeles, but he never asked for a penny for helping us. That is why I fell in love with him. He taught me how to drive , and helped me to buy my first car. I had never meet such a caring and giving person in my life. Greg is almost too giving, and some times people will take advantage of him. This is what I believed happened to Greg at Gigapix Studios. My relatives were impressed with how polite he is. Greg said it was because he was a boy scout as a young man, and that his parents had raised him to always be polite and to think of others rather than himself. This became very apparent when I was pregnant with our first daughter. Greg didn't have to marry me, but he did because he loved me and he said it was the right thing to do. When Greg and I first started dating he had 5 dogs that lived with him that he had rescued off of the streets of Los Angeles. It was always Greg's dream to start an animal rescue to help all of the homeless animals. Greg also wanted to help disabled and mentally challenged children. Greg knew several people that had disabled or mentally challenged children, and he would always find time to spend with them and put a smile on their face. He wanted to start Ranches that would help not only homeless animals, but help disabled and mentally challenged children as well. He felt that if you put the disabled and mentally challenged children with the abandoned animals that it would be a great form of therapy for both of them. Greg said that each child would adopt their own animal to take care of the entire time they were at the Ranch. He thought this would teach the kids responsibility and build a lasting and trusting relationship between the two of them. He would always tell me that as soon as he had the money he was going to buy the land and build the first Ranch. Greg had already won an Emmy before I met him and worked on very successful shows at some of the largest studios in the world. When Greg started to work for Gigapix Studios he told me that with the stock he was receiving that he thought he would make enough money to start his first Ranch. This is why I love him so much. He was always thinking of others rather than him self.  He didn't tell me he would buy a mansion for himself instead he thought of others. Greg would never work for a company that he thought would steal money from others. Especially hard working middle class people. That wasn't the the man I married. Greg was confident that Gigapix was going to be very successful because everything that Greg did was successful. Everything!  I beg you Judge not to send my husband to jail because of Gigapix Studios. He truly believed it was going to be successful, and he would work there for  the rest of

1

his life. I beg you not to send my husband to jail for many other reasons. Myself and our three little girls would not be able to survive without him. He is the sole provider for our family along with taking care of all of us. I suffer from vertigo and often black out along with having a broken leg which makes it very hard to drive, and the stress of this whole ordeal has made things worse. I am a wreck, and I haven't worked since getting pregnant with our third child 3 years ago. The fear of blacking out with three little girls is why I need my husband by my side. I rely on Greg for just about everything from picking the girls up from school to all of the shopping for everything. Greg takes care of the girls when I am not feeling well, and helps them with their home work. Greg is there for the girls when I can't be there. Greg is the one that makes sure we all go to church every Sunday. He teaches the girls about God and Jesus and, is the one who teaches the girls their prayers and answers their quetions about religion. He is the one that teaches the girls right from wrong just as his parents did for him. They love him more than anything anything in the world. They are truly Daddy's little girls. I wouldn't know how to tell our three little girls that their Daddy wouldn't be there for them any more. Who would protect them? Who would teach them all of the things that Daddy's teach their little girls? Who would help them with their home work if I am sick? Most importantly who will provide for them? We can not erase the horrible nightmare the whole family has been through, but you can end it by letting Greg do something other that going to jail. My husband does not deserve to be in jail, and his three little girls deserve to grow up with their Daddy. I beg you your Honer please don't send my husband Greg Pusateri to Jail because it would not only destroy his life, but my life and the life of his three little girls. It would kill him if he could not be there to watch his babies grow up to be ladies, and our daughters would not understand why he is gone. How do you tell a two year old that her daddy is gone? Please your honor I beg you don't send my husband away!

Sincerely,

Judith C. Pusateri

Judith Pusateri
(818) 317-4204

2

Dear Judge,

My name is Kaylee Pusateri and I am 9 years old, and in the 3rd grade.  My sister Kaycee is 6 years old, and in the first grade. My youngest sister Katherine is only 2.  I really enjoyed going to Gigapix studios when I was younger.  I used to play ping-pong and Foosball with my Dad.  Gigapix was a huge building filled with many offices and studios where the people worked.  My dad would show me all of the shows that they were working on, and I would watch them work.  I was really sad when he had to move to a different building close to Universal Studios.  I couldn't play ping-pong anymore, and I really liked to play that with my Dad.  My Dad says that he might have to go away from my sisters and I for awhile, because Gigapix didn't make the Wizard of Oz Movie.  I don't know why they didn't make the movie, because my dad was really excited about doing it.  We don't know why you need to send our Dad away because Gigapix didn't make the Wizard of 02 Movie.  It isn't his fault that Gigapix didn't make the movie.  I have bad dreams because the FBI came to our house with guns and took my Dad away.  I wasn't sure if I was going to see him ever again.  I cried for along time and still have bad dreams about it.  Please don't send my Dad away Judge, because my sisters and I really need him.  My Dad is the one who always helps us when we need help.  My Dad is the one that teaches us everything.  My Dad is the one who taught us how to ride our bike, how to swim, how to tie our shoes, how to say my prayers, and helps us with our homework, He is always protecting my sisters and I, and teaching us things like looking both ways for cars before we cross the street.  Dad wont let us play outside unless he can watch us.  Some times my Mom faints and can't get up.  When this happens we get really scared and don't know what to do.  My Dad tells us to stay calm and he will make everything OK.  We all get into the Car and take my Mom to the Hospital.  The people at the Hospital call what my Mom has Vertigo.  My Dad tells my Mom not to drive because he is afraid it my happen when she is driving, and doesn't want any of us hurt.  My Dad is really worried about my Mom, and her fainting spells.  I don't know what my sisters and I would do if he wasn't there to protect us arid take care of us.  When our mom is sick my Dad has to do everything.  He will take us to school and pick us up from school.  He will cook us dinner and show us how to clean up after and wash the dishes.  He always takes us to church and makes us say our prayers.  He tells me to pray every night so that he doesn't have to go away.  I asked him why would God do this to him, and he said that God will never give us anything that we can't handle.  We have been praying every day to God and asking him not to our Dad go away.  Please don't take my Dad away again Judge.  My sisters and I are too young to take care of my Mom when she gets sick.  My sisters just cry and I get to scared to do anything when my Mom faints.  We are going to keep on praying and hope that you and God answer our prayers and let my Dad stay home with us, so he can protect us, and take care of us.  Kaycee says the only thing she wants from Santa this year is to have her Dad home for Christmas.  He is the best Dad in the world.  Please Judge we beg you to answer my prayers.

Kaylee Pusateri      Kaycee Pusateri

December 12, 2014

To: Presiding Judge

**Re: Character reference for Greg Pusateri**

Your Honor,

As Greg Pusateri's sister, I have known him for 44 years. We grew up in a small, middle-class town in Western New York, when times were simpler and where family values still matter. We knew our neighbors, didn't have to worry about locking the front door to the house and felt genuinely connected to our community. Our parents raised us to be kind, respectful and giving, and encouraged us to go out in the world, be successful and make a positive difference.

As we moved on in our lives, and to different states, Greg accomplished much that has mattered to him. He graduated from Ohio University. Then he headed to Los Angeles to fulfill his dream of movie-making as an award-winning sound effects editor (because, ultimately, that's what he loved most—to entertain people). He rescued many abandoned dogs and helped them live long, happy lives with him. And he became a devoted family man to three beautiful little girls, ages 3, 6 and 9. It was never on his agenda to be part of an organization that would be charged with investment fraud.

Greg would always call me and our parents to proudly explain the projects he was working on— exciting animation features with real Hollywood talent—that he couldn't wait to have released. He's a passionate creative. Not a scheming shyster trying to dupe people out of money to live lavishly. (His modest lifestyle and lack of personal financial investment should be considered.) So it's been a total shock to our whole family—including Greg, himself—that he's in this conundrum. He, like the involved investor/plaintiffs, trusted that Gigapix would carry out the intensions to complete the projects in question and many promising future ones, as well.

The impact that this case has had on him and those who love him has been irreversible. He was not allowed to take a prospective job to support his family. His professional reputation is now tarnished. His health and that of his wife has declined. His daughters have nightmares from seeing their daddy forcefully taken in handcuffs from their home by armed strangers to jail. And he stresses about who will care for his family if he goes to prison. There is no opportunity for him to make "a positive difference" in this situation.

On behalf of his children, wife, our parents, relatives and friends, I ask that you please process all I've shared and consider this very relevant perspective in the upcoming proceedings. I am available to answer any questions related to this letter. Happy holidays to you and yours.

Sincerely,

Dana Pusateri Denberg

585- 360- 4246

February 10, 2015


Honorable Manuel Real:

My name is Edward Jaffee, D.D.S. and I reside in the Cherry Hill, NJ area.  I invested $55,000 in Gigapix.  I submit this letter in support and on behalf of Greg Pusateri because based upon my experience and contacts with Greg, I don't think that Greg is guilty of anything. I spoke with Greg on many occasions for several years as Greg was my primary contact with Gigapix during my investment experience, and he was always very personable with me.

I met Greg Pusateri in an unrelated matter and prior to investing in Gigapix and I have known Greg to be an honest and sincere person.  I traveled to California on 2 occasions and toured the Gigapix premises. Greg always felt good about Gigapix and expressed great enthusiasm and believed it was going to be a successful business adventure. I believe that if a salesman believes in the company they work for, then he or she should push the company, but I don't think that Greg's enthusiasm or belief in the company was done to persuade me to invest.  Greg never made any promises or guarantees to me about the success of Gigapix and never promised or guaranteed any rate of return on my investment.  Greg always told me not to invest more than I could afford to lose.

I have no complaints with Greg Pusateri and I don't believe he has a bad bone in his body. I was an accredited investor at the time I made my investment and I recall reviewing the investment materials I received from Gigapix with Greg. I knew the stock was speculative and Greg also told me that it was.  I don't recall if Greg told me he earned a commission on my investment, but I had no doubt that he was getting a commission from my investment.

I hope you will consider my personal experiences with Greg and that you will consider my information useful in making your life changing sentencing ruling.

Regards,

Edward Jaffee, D.D.S.

December 10, 2014

Honorable Manuel Real:

Our names are Larry and Marge Suggett.  We are Gigapix investors.  We submit this letter to share our knowledge and experiences we had with Greg Pusateri.  Greg was our primary contact with Gigapix for many years, and he was always very available and personable with us.

On November 18, 2014, we were in your courtroom and prepared to testify on behalf of Greg Pusateri to tell the jury facts about what Greg told us.  However, we were prevented from providing testimony since we were late.  Larry and I went through great effort to be in your courtroom, since Larry just left chemotherapy and radiation treatment for cancer, which made it that much more disappointing.

Greg Pusateri has always showed a warm personality toward us and has a beautiful smile.  He always expressed great enthusiasm and total belief in Gigapix and believed it was going to be a successful business venture, which he wanted us to share and be a part of its success.  Greg never made any promises or guarantees to us about the success of Gigapix, and never promised or guaranteed any rate of return on our investment.  We invested because we wanted to invest and we knew there were risks and we could lose all our money.  Greg always told us not to invest more than we could afford to lose, because we believe he cared about us.

Every Christmas we took seven to nine batches of fudge to Gigapix to share with the staff.  While at Gigapix, Greg always kept his promises and gave us a tour of the studio and gave us a yearly update of all the progress of Gigapix.

We see and know Greg to be a sincere person, fair and truthful, who told us upfront that the stock was speculative.  Greg was very loyal and dependable, and never turned us away or made us feel like he was ever in a hurry with us.

Thank you for taking this short time to consider our knowledge and experiences we had with Greg.

Regards,

Larry and Marge Suggett

To whom it may concern:

I met Greg Pusateri in June of 2003 when he came to work at Gigapix Studios. Our friendship began to develop when we discovered that we shared professional backgrounds in the film industry. Greg was an Emmy Award winning sound engineer and I was a moderately successful actor turned writer/producer. We also shared the same hopes and ambitions for Gigapix. We were happy to describe Gigapix to potential investors and help fund the company, but we didn't want it to end there. As the company became successful, we believed that we would be in a position to once again be involved in film production. We wanted Gigapix to become what it was intended to be-a successful movie studio-so that we could become successful movie makers! Sadly, that didn't happen-but not because we didn't try.

Another piece of background we shared was our religion. We were both born and raised Catholic. In the last 40 years or so the Catholic church has seen some big changes. I, being of a conservative nature, didn't like a lot of them. Greg was a little more easy going than I was, so we had some interesting discussions regarding the church.

Eventually we had fatherhood in common. As the years went by and Greg married and had 3 little girls, he became a little less easy going where faith, spirituality, morality etc. were concerned. The responsibility of raising children in a world that sometimes seems to be going faster and faster to hell in a handbasket caused him a certain amount of anxiety. He worried about their future and his ability to help them cope with it. In short, he became a father.

Knowing that I had 4 children and 9 grandchildren, 3 of whom are about the same age as his girls, he would occasionally ask me for child rearing advice. In the process of advising and re-assuring him that he was doing OK as a father, one thing became very clear to me. He adored his children. Nothing was too good for them. I told him once that where fatherhood is concerned, love makes up for a multitude of parental mistakes. As long as they knew he loved them-and they did-he'd be alright. Just as any good father does, he loves his children more than his own life..

I have known Greg Pusateri for 11 years. He is my friend and I know his heart. He is a good man. He is a good husband, a good father and a good friend. He was a good investor relations representative for Gigapix Studios, treating all of the investors with painstaking honesty and respect. He has been unjustly accused and unfairly convicted. He certainly does not deserve to be incarcerated. Taking him away from his wife and children would truly be "cruel and unusual punishment" - especially since it would be for a crime he did not commit!

Sincerely

Richard Jamison
Agoura Hills, Ca
805-558-1551

December 22, 2014
Los Angeles California

To whom it may concern.

I have known Greg Pusateri for about 26 years and I consider him a trusted, caring and generous person. We met through a mutual friend, and it was our love for music, animals, and the outdoors that kept us close friends for all these years. Greg and I are avid mountain bikers and skiers.  We have gone in many trips all over the Los Angeles area, Utah, and Nevada.  It is by doing this that I have gotten to know him very well, and what kind of person he is.  We did all these outdoor activities quite often until he had a severe accident that broke his ankle preventing him from doing so, until his recent improvement.

Being an avid fan of extreme sports teaches you to appreciate life, health and all the things God has given us.  Greg is very appreciative of life and is very religious.  He and his family attend church on a regular basis to thank God for what he has given to all of us.  I believe Greg has lots to be thankful for. He has a wonderful wife and three beautiful little girls that depend on him.

Greg is a kind man.  As an example of his character, Greg, the animal lover, has rescued over 25 Dogs off the streets of L.A.  Some, he's kept to care for himself, and for the others, he found good homes for them.  It was his dream to start an animal rescue to help find homes for the lost and abandon animals of Los Angeles.  I remember Greg having five recued dogs living with him at one time, which I believe it's how he met his wife through their shared love for animals.

Knowing the kind of a person that Greg is, it was hard for me to understand what he's going through and the issues with the authorities and legal system.  I know that he was extremely proud when working at Gigapix Studios, and he would enthusiastically discuss the projects the studio was working on.  One of his wishes was to receive an Oscar to go along with the Emmy he received for the X-files TV show many years ago.

I believe Greg would never have worked for a company that he didn't trust and thought it was being dishonest in any way.  This is not the type of person Greg Pusateri is known for.  Greg has worked for some of the largest entertainment studios in the world.  Sony, Warner Brothers and Saban Entertainment to name a few, and I never was aware of any problems.  Greg often told me that he thought Gigapix Studios would become the next giant in the entertainment industry; however, that success may not allow him to fulfill his wish to start his animal rescue, due to the time demand on him because he was a large stock shareholder of Gigapix and consequently, this brought lots of responsibility and accountability.

Doesn't this makes you wonder why would he leave some the largest studios in the world, where he had already established a good reputation, to work for a bunch of scam artists?  Greg, the man I know, is all about caring and giving to others, his generosity and goodwill are prevalent, and that is why the unfortunate situation he and his family find themselves in is so tragic.  It is tragic not only to Greg, but to his wife and three young little girls.  When Greg told me he may face jail time, I was shocked.  If Greg has to go to jail who will take care and protect his wife and little girls?  Surely there has to be another way of dealing with this situation.  Jails were not made to house good people like Greg Pusateri.

If Greg goes to jail, it would be terribly unfair not only to him, but his wife and three little girls.  Greg and his family do not deserve this fate.  I am very fortunate and proud to have him as a friend.  It is too late to erase the last seven months of his and his family's nightmare, but you can end it by spare him being incarcerated.  I appeal to you to give the good man I know, an opportunity to continue his life and provide for his family.  I can assure you, he will be the outstanding citizen we all wish to have as a neighbor and friend.

Sincerely,

Ernie Castellanos

To Whom It May Concern;                                                                 February l, 2015

I met Greg Pusateri in 1983, through a mutual friend while attending Ohio University.  While there, we developed a friendship, a bond of trust and respect for one another through Art, Entertainment, and Music, This relationship has continued on through the past three decades and I have never lived more than five miles away from Greg. He is one of very few people in a culture we live in today (that I know of), if you give him a call, he will be there on the next train out!

After graduation, the two of us and a couple of friends with dreams of becoming famous all moved to Los Angeles.  Since those days Greg, myself, and our other O.U. friends have spent countless days working in Television Entertainment, more specifically, children's television programming. From Power Rangers, to Sponge Bob to countless Disney / Warner Bros./ Marvel series, Greg has never displayed anything but incredible enthusiasm, dedication, and honesty, all done with the up most integrity. I have been fortunate enough to receive four Emmy awards and a Golden Reel award, as well as eleven nominations, and would be the first to jump on board to work on any production Greg Pusateri had anything to do with coming to fruition.

To state as I did earlier that the friendship has continued over the past three decades is actually a bit of an understatement.  He introduced me to my wife and we just celebrated our 20th anniversary this past September. My wife and I are the God Parents to his first daughter, and now that we are becoming long in the tooth, discuss where we hope to retire some day and what we our going to do in our old age.  I realize that this letter may be starting to sound a bit "self absorbed," and it in no way is intended to impress you. But to actually impress upon you that Greg has many, many relationships with friends and co-workers in the entertainment industry of this depth.  Not to mention his wife and three daughters who love and depend on him without comparison.

As far as the charges that Greg has been accused of and unjustly convicted, I do not understand this at all, and I defiantly do not understand it from an investment in an entertainment property perspective.  I personally went to two production meetings in 2009, spoke directly to a director of one movie, and on one of these trips witnessed an audition line that day for a movie they were ramping up to do called Black Beard the Pirate. The line of kids with a stage mom or dad went out the door, though the parking lot and practically to the side walk.  During this time they were making plans in Iowa to start shooting a remake of The Wizard of Oz. That seems like an, awful lot of smoke and mirrors for a scam.  Now unfortunately those movies never saw completion, unfortunate for me, and a lot of other creative people who were counting on that work, to survive that year and maybe the next. However this is not a crime.  I and other people who work in this industry must go through at least ten other of those meetings each year, and witness the exact same thing.  All in hope that one will get enough of a green light and therefore money to see it through. Or it just never gets released for any one of a dozen reasons.  The point being; would Walt Disney, or executive producers there then or now; face criminal charges, or incarceration if the same thing would have happened with one of their ideas for a production? Does that happen to any major Hollywood studio for that matter?

Therefore I implore you not to incarcerate Greg while he is waiting for his appeal. Better yet, and way more fair I may add, is to not incarcerate him at all; ever!  Putting someone like Greg Pusateri in jail, would be taking one of the good., honest, and up standing citizens out of society. With the times we live in today, that is one of the last things that are needed.

Sincerely,                                                                                      Keith Dickens