```
STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ELLYN MARCUS LINDSAY (Cal. Bar No. 116847)
BYRON J. MCLAIN (Cal. Bar No. 257191)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2041/0637
     Facsimile: (213) 894-6269
     E-mail:    Ellyn.lindsay@usdoj.gov
                Byron.mclain@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-282-R |
|---|---|
| Plaintiff, | <u>GOVERNMENT'S RESPONSE TO DEFENDANT PUSATERI'S SENTENCING MEMORANDUM</u> |
| v. | Date: February 23, 2015 |
| GREGORY PUSATERI, | Time: 10:00 a.m. |
| Defendant. | Place: Courtroom of the Honorable Manuel Real |

   Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California, hereby submits its Response to defendant Gregory Pusateri's Sentencing Memorandum.  This Response is based on the attached Memorandum of Points and Authorities, the files and records in this case, and any further evidence and argument as may

//

//

be presented at the sentencing hearing.

Dated: February 17, 2015                Respectfully submitted,

                                        STEPHANIE YONEKURA
                                        Acting United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                               /s/
                                        ─────────────────────────────────
                                        ELLYN MARCUS LINDSAY
                                        BYRON J. MCLAIN
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.  INTRODUCTION**

The government filed its sentencing position concurring with the findings of the probation officer set forth in the pre-sentence report, and recommending a substantial sentence.[1]

Defendant has now filed his sentencing position. In it, he argues the following: 1) Because Gigapix was a legitimate company, the entire amount invested by victims should not count towards loss; 2) Defendant is only responsible for the loss he personally caused; 3) for the reasons set forth in the loss argument, not all victims should count for the purpose of determining the number of victims; 4) the vulnerable victim enhancement should not apply; and 5) the factors set forth in 18 U.S.C. § 3553(a) indicate that a sentence below the guidelines is warranted.

The government believes it has already addressed the § 3553(a) analysis. Thus, the government below addresses only arguments 1-4.

**II.  ARGUMENT**

    **A.  CORRECTIONS TO THE PSR**

        1.  Paragraph 16

Defendant claims he did not participate in the scheme to defraud after 2010. The government believes defendant's last paycheck was received on January 10, 2011, and thus agrees that defendant left the scheme at that point.

        2.  Paragraph 29(e)

Defendant claims he did not sell the $100,000 membership interest in OZ3D to victim D.Z. on June 1, 2011. The government

---

[1] Defendant is correct that the recommendation of 240 months was an error.

agrees. However, defendant is responsible for that sale pursuant to United States v. Lothian, 976 F.2d 1257 (9th Cir. 1992).

### 3. Paragraphs 30, 41, 50

Defendant argues that the loss calculation is incorrect because it does not reflect the date he left Gigapix. Although the government believes that pursuant to Lothian, defendant can be held responsible for the foreseeable loss after he left, the government has submitted a new loss amount, discussed in the government's Position re: Sentencing Factors, of $19,338,194.65 during the time period of defendant's employment.

### 4. Paragraph 35(f)

Defendant objects to this paragraph, which relates that Tiffany Ryan told the FBI that he and other salespeople made misrepresentations to victims. While Ryan may not have directly heard defendant on the phone with victims, she knows he was lying to victims because she discussed it with Ken Gross and knew that this is why defendant was fired.

### 5. Paragraph 75

Defendant objects to this paragraph, which describes a prior criminal incident. He does not deny that it happened, and thus is not contesting the facts in the paragraph. He simply argues that this is of little importance. However, the incident has no criminal history points and thus defendant is merely stating the obvious.

## B. LOSS

### 1. Gigapix Was a Scam

Loss in a fraud case is determined pursuant to Sentencing Guidelines Section 2B1.1. The loss figure that is to be used is the greater of actual or intended loss. App. Note 3(A). "The court need

only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence."  App. Note 3(C).

Defendant's first argument is that the government has not sufficiently substantiated the loss figure provided to the probation officer.  Defendant claims: "It cannot be disputed that Gigapix was a legitimate company that failed because of fiscal mismanagement and fraud committed by Pritchard and Blauvelt."  (Defendant's Position, p. 4.)  In fact, the jury found beyond a reasonable doubt that Gigapix was not legitimate, and that defendant knew this.  Even without the disaster of the Iowa tax issue and the "Blackbeard" movie, defendant worked at Gigapix for years and years during which the company produced absolutely nothing.  The company existed for no other reason than to collect money from the victim investors that lined the pockets of the salespeople, none more so than defendant and Cherie Brown, and to have Pritchard run around trying to make deals that went nowhere.  Less than 5% of the money raised for OZ3D was actually spent on making the movie.  Defendant was especially put on notice of the fraud he was committing when he was named in the cease and desist order filed by California.  This did not deter him from continuing his scheme to defraud.

Defendant has provided instances of four investors (two of whom are a couple), who do not blame defendant for the loss of their investment into Gigapix.  No doubt defendant has sold them on the theme he raised at trial and continues to raise in his sentencing memorandum -- that it is all the fault of Pritchard and Blauvelt.  However, the lack of blame from those investors is vastly overwhelmed by the horrifying losses and sorrow suffered by defendant's own

victims, set forth in the statements summarized in the government's position.[2]

### 2. Defendant's Relevant Conduct

Defendant's next claim is that he should only be held responsible for the loss he personally caused, and not the loss of the company during the time he was employed.

Where the loss is the result of "jointly undertaken criminal activity," such as a conspiracy or scheme to defraud, loss "shall" be determined based on the conduct of defendant and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." United States v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010); U.S.S.G. § 1B1.3(a)(1)(A), (B). Under § 1B1.3, jointly undertaken criminal activity by a defendant is not necessarily the same as the entire scheme. To determine the scope of a particular defendant's involvement, the court must "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." Section 1B1.3 cmt. n.2.

Thus, the court must "identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." Treadwell, 990 F.3d at 1002. To comply, the court need not "proceed item-by-item through a

---

[2] Defendant incorporates the loss arguments made by his co-defendants. The government likewise incorporates its responses.

4

complete list of all losses attributed to a criminal conspiracy." Id. Rather, § 1B1.3 is written broadly, to allow sentencing judges maximum discretion and flexibility, and its interpretation depends on the specific guideline section to which it is applied. Id. at 1003, quoting United States v. Cruz-Gramajo, 570 F.3d 1162, 1171 (9th Cir. 2009).

Defendant claims he acted independently and should not be responsible for any other telemarketer's losses. He likens his participation to that of the defendant in United States v. Studley, 47 F.3d 569 (2d Cir. 1996). In that case, the Second Circuit held that a telemarketer who worked in a boiler room with other telemarketers was not responsible for the losses of the whole room, but rather only for the losses he personally caused. Id. at 576. This holding was based on the seeming complete independence of the defendant, who "was not responsible for the activities of other telemarketers because he did not design or develop the fraudulent scheme; did not work in any way to further the scheme outside of his own sales efforts; was paid on a pure commission basis, and received no profits from the overall operation; did not assist other representatives with their sales, but rather competed with them for commissions; did not pool resources with other telemarketers; and had no interest in the success of the operation as a whole." United States v. Blitz, 151 F.3d 1002, 1013 (9th Cir. 1998).

Other circuits have declined to follow the legal reasoning of Studley. The Ninth Circuit, in Blitz, held that the telemarketers involved were responsible for the loss to the whole boiler room. The Court noted that it "agree[d] with other Courts of Appeals, which have held telemarketers responsible for the losses caused by other

5

telemarketers in their fraudulent company." Id.; citing United States v. Whatley, 133 F.3d 601, 606-07 (8th Cir. 1998) ("the amount of loss may include those losses caused by reasonably foreseeable acts that co-workers committed to further the scheme to defraud"); United States v. Senn, 129 F.3d 886, 898 (7th Cir. 1997) ("we have held that a sentencing court could find a joint undertaking without proof of all the factors set out in Studley"), abrogated on other grounds United States v. Vizcarra, 668 F.3d 516 (7th Cir. 2012); United States v. Gray, 105 F.3d 956, 970 (5th Cir. 1997) ("a defendant is accountable for all relevant conduct [citation omitted], which is a concept that includes his own conduct and the foreseeable acts of co-conspirators"); United States v. Boatner, 99 F.3d 831, 835-36 (7th Cir. 1996).

In Boatner, the Seventh Circuit held that not all factors considered by the Studley court need be distinguished in order for a participant to be held fully responsible for the loss of a scheme to defraud. 99 F.3d at 836. In Boatner, a group of people staged a fake auto accident, claimed injuries, and separately pursued fraudulent insurance claims against an insurance company. The Seventh Circuit noted that there was no pooling of profits or resources and conflicting evidence regarding whether the defendant participated in planning the scheme. However, since there was "a great deal of concerted activity" prior to the point where the participants in the scheme could independently seek fraudulent insurance payoffs, each participant was jointly liable for the total loss. Id. Studley was further distinguished in that in that case, "each telemarketer pursued different victims independently." Id. at 837.

The Blitz Court also distinguished Studley on its facts, which

6

demonstrated that although the telemarketer in Studley was part of a boiler room, he truly acted alone.  In contrast, in Blitz, the telemarketers worked together to further the fraudulent scheme; the openers and closers relied on each other; the owners of the enterprise would speak to "problem" victims; one of the telemarketers wrote a "pitch" that was used throughout the boiler room; the employees attended sales meeting where the pitch was discussed; the owner provided sales advice; and one of the owners handled customer complaints and kept the victims from demanding refunds.  Id.

Defendant claims that he was much more like the defendant in Studley than the defendants in Blitz.  He claims that he did nothing to further the scheme outside his own efforts, that he was a purely commissioned salesman, and that there was no evidence that he assisted other salespeople.

Defendant's arguments ignore many of the pertinent facts in this case.  First, all of the defendants were acting in concert for the same purported goal: to raise money for independent films produced by Gigapix.  They all used the same materials to sell the deal. Defendant testified at trial that he relied on the sales brochures and the letters sent by co-defendants Pritchard and Blauvelt. Openers working at Gigapix assisted defendant with his sales.  He shared victims, such as J.G. and D.A., with other telemarketers, all helping each other to take as much money from each victim as possible.  He relied on Gigapix to supply him with the leads he used to find victims.  Moreover, the uncontested testimony at trial was that Gigapix was in such terrible financial condition that every employee, including defendant relied on all the telemarketers to bring in investor money, which was the only thing that kept the

lights on and paid the bills.

Thus, even if Studley were considered good law in this Circuit, defendant's actions were highly reliant on those of his co-defendants and therefore, he is responsible for all losses during his course of employment.

### C. NUMBER OF VICTIMS

Defendant makes the same argument regarding number of victims that he did regarding loss: namely, that it cannot be said that everyone who lost money from his or her investment into Gigapix was a victim. As argued above and in the government's responses to the co-defendants' similar claims, because Gigapix was permeated by fraud, and because the defendants failed to spend the victims' money on anything that could ever earn them a return, everyone who invested and lost their money is a victim. The probation officer's calculation is correct.

### D. VULNERABLE VICTIM ENHANCEMENT

Defendant argues that the enhancement for vulnerable victims, pursuant to USSG § 3A1.1(b)(1), should not apply, as the government has not proven that defendant "'targeted' any investor based on age or other vulnerability." (Defendant's Position, pp. 9-10).

The probation officer noted that the victims were vulnerable because they were re-loaded. (PSR ¶¶ 56-58.) When a defendant re-solicits someone who has proven vulnerable to the scam by falling for it before, the Ninth Circuit recognizes that that victim is vulnerable. United States v. Ciccone, 219 F.3d 1078 (9th Cir. 2000); United States v. Randall, 162 F.3d 557 (9th Cir. 1998). As the probation officer noted, defendant reloaded at least five

8

victims. J.G. testified at trial that defendant re-loaded him, as did victim L.H.

Defendant's claim that he did not target such people is unavailing. The test is not whether a defendant targeted vulnerable victims, but rather whether that defendant "knew or should have known" that a victim was vulnerable. United States v. O'Brien, 50 F.3d 751, 754-55 (9th Cir. 1995). Since defendant knew that he had victimized people and then victimized them once again, he knew they were vulnerable, and the enhancement applies.

**III. CONCLUSION**

For the foregoing reasons, the government asks this court to sentence defendant to a substantial term of incarceration, based on an offense level of 35, a criminal history score of I, and a guidelines range of 168-210 months.